**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

**BASSEM AL-TAMIMI, et al.**

Plaintiffs,

v.

**SHELDON ADELSON, et al.;**

Defendants.

———————————————————————

Case No. 1:16-cv-00445-TSC

**PLAINTIFFS' MOTION FOR RECONSIDERATION**
**OF THIS COURT'S JULY 6, 2016 ORDER**
**RE DEFENDANTS AHAVA AND NORDSTROM'S MOTION FOR RELIEF**
**UNDER LOCAL RULE 5.1(c)(1)**

COME NOW the Plaintiffs herein and hereby move the Court for reconsideration of its

order entered on July 6, 2016. Due to lack of effective communication between Plaintiffs'

counsel, no opposition was filed against the June 15, 2016 motion. As explained herein, there are

valid grounds to support the argument that it is dangerous to list addresses for some of the

Plaintiffs based on retaliation that has already occurred. As also explained herein, the addresses

as listed are already as specific as is possible given the current realities of infrastructure in the

OPT. As such, Plaintiffs request this Court's permission to not disclose their residential

addresses unless there is some compelling showing that Plaintiffs have falsified the addresses

provided. If necessary, Plaintiffs have no problem disclosing their residential address under seal.

I. **PLAINTIFFS HAVE ALREADY SUFFERED RETALIATION BECAUSE OF THEIR PARTICIPATION IN THIS LAWSUIT, AND THEY FEAR FOR THEIR PHYSICAL SAFETY AND THAT OF THEIR FAMILY MEMBERS AND PROPERTY SHOULD THEY BE REQUIRED TO PUBLISH THEIR HOME ADDRESSES**

The lead Plaintiff herein, Bassem Al-Tamimi, has already been punished for participating in this lawsuit. The day after this suit was filed, his approved visa to travel out of the country was revoked. He was coming to Washington, D.C. to meet with undersigned counsel on a prepaid round-trip ticket. The goal was to discuss various aspects of this case, including the very serious sensitive issue that other potential Plaintiffs are reluctant to join in this suit because they feel that violent settlers and Israeli soldiers will retaliate against them. The same night that his visa was peremptorily revoked, his sister was arrested by the Israeli army and detained for nine days *without any charges being filed against her*—clear harassment and retaliation. Immediately thereafter, Plaintiff Tamimi's name appeared in defamatory articles on extremist settler websites, accusing him of such things as terrorist ties, "illegal protest" (whatever that is supposed to mean, in an ostensibly democratic society) and blood libel. He lives in fear that the Israeli army or the local extremist violent settler militia in the settlement of Halamish will target him and his family again, and in greater severity, if his name and address were made public. One of the reasons is that he clearly recalls what it was like to be tortured by Israeli army interrogators simply because he was demonstrating against the expansion of the local settlement.

This is no idle threat. Violent settlers have engaged in "price tag" attacks against Palestinians before, with devastating consequences. The Dawabshe family, in a village just a few miles east of Plaintiff Tamimi's village, was burned to death by extremist settlers while they slept. 18 month-old Ali Dawabshe was among the victims. The Dawabshe family's only crime was to have been in a convenient location when the violent settler extremists decided to lash out

at them, presumably because they were angry about violence committed by other Palestinians.
*Query*: How much more reason would such extremists have to target someone like Plaintiff
Tamimi, who is attempting to use the legal remedies available to him, i.e., the pending lawsuit,
specifically in order to counteract settler violence, further ethnic cleansing, arms trafficking, and
the financing of such activity by donors to the 501(c)(3)s named herein?

Plaintiff Tamimi's fear is justified for another reason: after extremist settlers murdered
the Dawabshe family, the Israeli army *raided the homes of the victims' relatives* in the
Palestinian town of Duma.[1] Thus he cannot rely on the Israeli authorities (who, in fact, have
arrested him twelve times, kept him detained for years, and tortured him while in custody) for
protection from extremist settlers who would greatly benefit from knowing his home address. As
Israeli army veterans have testified under oath, they have absolutely no control over the violent
settlers. In their own words, the settlers can do whatever they want, and the Israeli army is
actually supposed to protect them when they go out on excursions looking for unarmed
Palestinians to maim and murder. Complaint ¶ 198.

Similarly, Plaintiff Susan Abulhawa is a well-known figure in the Palestinian literary
world, and her books have already been denounced by ideologically-driven pro-settler
organizations in the United States and in Israel because they portray the human side of
Palestinians, and the suffering they endure on a daily basis. She is at the forefront of the genre of
Palestinian literature, which in and of itself is an affront to the settlers' disingenuous narrative

---

[1] Nasser Dawabshe, an uncle of the deceased, said that at 2:00 am on the morning of August 6,
2015 (just five days after the murder), 30 Israeli army Jeeps with approximately 150 soldiers
arrived in Duma. He said they woke sleeping members of the Dawabshe family, removed them
from their houses, and searched the buildings until around 4:30 am. He said the soldiers "treated
us like shit." http://mondoweiss.net/2015/08/following-israeli-
dawabshe/#sthash.8RXkrmX7.dpuf

that the Palestinian people do not exist as an ethnicity with its own language, culture, and arts. She is fearful that were her U.S. address made public, she and her family could be in danger. One has only to scan the news to see that even here in the United States, individuals perceived (correctly or incorrectly) to be Muslim or Arab spokespersons, advocates, or litigants are disproportionately likely to be the victims of hate crimes.[2]

Plaintiff Linda Kateeb, like many of the Plaintiffs herein, owns valuable property in the OPT, which has been illegally confiscated by nearby violent settlers. She has already lost two of her six parcels of land as a result of forged deeds and the conduct of violent armed settlers. She is fearful that angry violent settlers might decide to steal her remaining property were she required to disclose its location at this time. This is not conjecture—it was only when Plaintiff Kateeb received the deeds from her father and sought to register the transfer in Palestine that the settlers from the settlement of Giv'at Ze'ev took over her two parcels. (*See* Ex. 1, Linda Kateeb Aff.). That settlement receives funds from a 501(c)(3) by the name of Christian Friends of Israeli Communities. Thanks to the diligent but unsuccessful efforts of her attorney in Palestine to regain possession of her parcels, she has reason to believe that the settlers became aware of her recordation and only then decided to take physical control of the property in retaliation for asserting her legitimate property ownership rights.

None of these fears are theoretical or speculative. Undersigned counsel has received at his law firm address, in hard copy and electronic form, hate mail in retaliation for bringing this action. This hate mail has been sent from parties to this action as well as members of the general

---

[2] See, e.g., http://www.nytimes.com/interactive/2015/12/22/us/Crimes-Against-Muslim-Americans.html?_r=0 ("reports of attacks and threats against Muslims in the United States have surged," listing several of the more recent crimes against Muslim Americans and perceived Muslim Americans, i.e., "The shooter thought he was a Muslim, but he is Sikh.")

public. Many of this latter group, judging from the choice of vocabulary and the lack of depth with which they address the subject matter, do not approach the issue academically, but rather from an emotional perspective with varying levels of mental stability. Undersigned counsel would much prefer that such threats be directed to his law firm address rather than against the Plaintiffs themselves.

As for the issue raised by Defendants Ahava and Nordstrom, the fact that Local Rule 5.1(c)(1) deals in the same paragraph with the addresses of the parties themselves and their attorneys seems to suggest that the purpose of providing the name and full residence address of the party is to hold the parties responsible for remaining up to date on court filings with current addresses such that they cannot later claim to have not received notice. To the extent that this Court concludes that is the true purpose of Local Rule 5.1(c)(1), then undersigned counsel represents to this Court that he will be responsible for receiving and responding to filings on behalf of all Plaintiffs such that notice is not an issue.

## II.     SHOULD THIS COURT UPHOLD ITS ORDER FOR PLAINTIFFS TO DISCLOSE THEIR ADDRESSES, PLAINTIFFS RESPECTFULLY REQUEST THAT SUCH DISCLOSURE BE MADE UNDER SEAL

Should this Court fail to grant Plaintiffs' request not to disclose their residential addresses, in the alternative Plaintiffs respectfully request that they be allowed to disclose their residential addresses under seal. The elements laid out in *Nat. Assoc. of Waterfront Employers v. Chao*, 587 F. Supp. 2d 90 (D.D.C. 2008) for bringing suit pseudonymously have application here. First, as stated *supra*, Plaintiffs are not requesting relief from LCvR 5.1(c)(1) simply to "avoid the annoyance or criticism that may attend any litigation." Instead, and as per the second *Chao* element, disclosure of their residential addresses "poses a risk of retaliatory physical or mental harm to [them] or, even more critically, to innocent non-parties."

The Plaintiffs have openly and publicly staked their reputations on this lawsuit, and they understand that a certain amount of risk, at least in terms of financial and emotional drain, are concerned. But they do not want to expose themselves to the very real specter of retaliatory hate crimes. More importantly, it is unfair to ask family members to expose themselves to such a risk simply to satisfy two Defendants' curiosity. Family members can easily be detained and arrested based on the whim of an Israeli soldier. They can be thrown in jail just for demonstrating. And now, the Israeli army has adopted a "shoot first" policy.[3]

The third and fourth *Chao* elements (the age of the parties and the private or public status of the Defendants) have no application on our facts. However, the fifth *Chao* element, i.e., the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously, is addressed in some detail *infra*.

## III.   NO UNFAIRNESS OR PREJUDICE INURES TO DEFENDANTS IF THEY DO NOT HAVE PLAINTIFFS' RESIDENTIAL ADDRESSES

Defendants Ahava and Nordstrom's argument that they need the Plaintiffs' residential addresses in order to fully investigate the allegations and present a defense is baseless. First, Plaintiffs primarily invoke federal question jurisdiction, thus unless and until the Plaintiffs fail to succeed under their Alien Tort Statute claims, there is no need to determine whether any of the Plaintiffs are domiciled in the same state as any of the Defendants, or whether they have made up fictitious addresses re federal forum shopping.

Second, discovery will render obvious the causal chain in each Plaintiff's case, i.e., exactly which donor donated to which tax-exempt entity, and which settlement was the recipient of the tax-exempt entity's monetary transfer. This causal chain will also identify which

---

[3] *See* Israeli officers permitted to open fire on boys with slingshots, http://mondoweiss.net/2016/07/officers-permitted-slingshots/.

corporations were complicit in the resulting crimes committed against the Plaintiffs by the recipient settler militia group. See Complaint p. 9, illustrative causal chains. As alleged in this suit, these funds are also used to purchase sophisticated military equipment and even sniper scopes for violent settlers intent on stealing Palestinian property. These funds are also used to set up sniper schools in order to train settlers how to maliciously wound Palestinian farmers seeking to harvest their olive groves.

As stated in the Complaint, Plaintiffs are still in the process of compiling a complete database of the criminal activities committed upon the Plaintiffs. In order to address Defendants' unfounded fear that they are simply being sued by "a person who identifies as 'Palestinian'…just because she perceives that Israel has wronged Palestinians," Plaintiffs produce as an attachment to this motion for reconsideration a draft database of the causal chains as understood currently. (*See* Exhibit 5). The final version of these causal chains will be incorporated as allegations in the anticipated Amended Complaint, in which a substantial number of new Plaintiffs will be added. Certainly, the details provided in these specific causal chains should serve to sufficiently educate counsel for these Defendants about the nature of the injuries complained of herein. After all, ethnic cleansing, violent subjugation of a civilian population, and the illegal extraction of minerals owned by Palestinians are war crimes, plain and simple. *See* Counts II and V.

While discovery will obviously help flesh out these causal chains, Plaintiffs, of course, hope that this Court will agree that the Plaintiffs herein have a more-than-colorable claim to tracing the direct cause of their injuries back through the settler militia and Israeli soldiers to specific corporations, tax-exempt entities, and donors, many of whom are named defendants in this action. In any case, examining the issue of proximate cause is the purpose of a motion to dismiss which, obviously, the Defendants contemplate filing. Plaintiffs have to challenge

Defendants' unspoken assumption that they can hide behind the defense of proximate causation simply because there is an ocean between the two countries and a multiplicity of actors involved.

Third, to the extent a specific Plaintiff's claim is based upon damage to land abutting a nearby "Jewish-only" settlement whereon he is a resident, the Defendants will receive more than simply a residential address in discovery—they will receive the specific land demarcation and other available documents like deeds evidencing the Plaintiff's claim. Prior to the dispositive motions stage, however, it is unclear why Defendants would need an actual street address instead of an allegation that a Plaintiff's property abuts a given settlement in order to challenge the sufficiency of the Plaintiff's claims. Apart from the violence engaged in by the settler population and the poisoning of livestock and water wells, landowners near settlements have to contend with toxic runoffs. This is one reason why Palestinian children have one of the highest rates of dysentery in the world. Recently, 20 congressional representatives have written President Obama about the plight of Palestinian children, and have specifically asked for the appointment of a special envoy. (*See* Ex. 4 attached).

## IV.   EVEN IF THIS COURT REQUIRES THE PLAINTIFFS TO PUBLISH THEIR RESIDENTIAL ADDRESSES, MANY ADDRESSES WILL NOT COMPORT WITH DEFENDANTS' MISGUIDED CONCEPTION OF ADDRESSES IN THE OCCUPIED PALESTINIAN TERRITORIES

Defendants Ahava and Nordstrom seem to be of the view that addresses are uniform throughout the world, or at least that all address systems contain street names, house numbers, and zip codes. This is simply not the case, especially in the West Bank and the Gaza Strip.

With respect to Plaintiff Doa'a Abu Amer and the additional Plaintiffs from Gaza who will be named in the anticipated Amended Complaint, much of the Gaza Strip simply does not have a uniform address system. During the Israeli military assaults on the Gaza Strip in 2008-09

(Operation Cast Lead), 2012 (Operation Pillar of Defense), and 2014 (Operation Protective

Edge), according to the Office of the United Nations High Commissioner for Human Rights

(OHCHR) and Israeli human rights organization B'Tselem, over 2,300 Palestinian civilians were

killed and *hundreds of thousands of homes and key parts of Gaza's civilian infrastructure were

destroyed*, a human rights crisis that constitutes collective punishment, in violation of

international law.[4] As a result, many of the Plaintiffs have had to move into refugee camps or

UN compounds, where there simply are no street addresses. (*See* Ex. 2, Ahmed Hmeedat Aff.).

Mail is often delivered to and or gathered from the local post offices, if such offices are still

standing after constant bombardment by the Israeli air force. Members of the Israeli air force

have characterized their own conduct as war crimes.[5] The problem with living in the UN

compound is that Israeli forces have repeatedly targeted these compounds, not only killing

innocent Palestinian civilians, but also UN employees.

Even in the West Bank and East Jerusalem, the specificity possible for a given residential

address varies widely between urban centers and rural peripheries. Urban centers often have

addresses very close to the "American" standardized address. However, in more rural settings, it

is not uncommon for an individual living in one of the hundreds of Palestinian villages Israel

refuses to recognize to have an address that consists simply of the name of the governorate, the

village, and the resident's name. Again, because of the Israeli military stranglehold over the

West Bank's infrastructure, it is often impossible for residents of these villages to receive mail at

their residences, even assuming their local post office is still intact. (*See* Ex. 3, Avraham Peled

Aff.).

---

[4] https://uofcdivest.com/resolution/
[5] *See* http://www.seruv.org.il/english/article.asp?msgid=55&type=news (the "Pilots' Letter" in which Israeli air force pilot Yonatan Shapira confessed that "I was a member of a terrorist organization" in carrying out strikes against civilians).

Thus, Plaintiffs respectfully submit that even if this Court denies Plaintiffs' instant motion for reconsideration, not all of the Plaintiffs will be able to provide an address that comports with the Defendants' perceived understanding of what a residential address entails in the OPT. They have offered this Court no proof as to what a typical residential address is in Palestine other than a reference to a village. Plaintiffs request that in such a situation, the Court adopt a broader interpretation of a residential address under LCvR 5.1(c)(1) in order "to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. The bottom line is that whether Plaintiff X lives in village A or village B will hardly be dispositive in terms of a motion to dismiss, i.e., this Court will determine whether the allegations contained herein state plausible causes of action under the *Iqbal* analysis. In any case, a simple interrogatory can answer that question expeditiously during discovery.

## CONCLUSION

For the following reasons, Plaintiffs respectfully request that this Court reconsider its June 6, 2016 order and permit Plaintiffs to refrain from publishing their residential addresses or, in the alternative, provide them under seal.

Respectfully Submitted,

*/s/ Martin F. McMahon*
Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

This is to certify that I have on July 15, 2016, served all the parties in this case with this

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF THIS COURT'S JULY 6, 2016**

**ORDER RE DEFENDANTS AHAVA AND NORDSTROM'S MOTION FOR RELIEF**

**UNDER LOCAL RULE 5.1(c)(1)** in accordance with the notice of electronic filing ("ECF"),

which was generated as a result of electronic filing in this court.


/s/ Martin F. McMahon
_____
Martin F. McMahon, Esq.