## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **BASSEM AL-TAMIMI;** ) | |
| **Palestine** ) | |
| **SUSAN ABULHAWA;** ) | |
| **Pennsylvania, U.S.A** ) | |
| **DOA'A ABU AMER, as next of kin of** ) | |
| **ALI S. A.** ) | |
| **HUDA H. A.** ) | |
| **JAD A. A.** ) | |
| **LEEN A. A.** ) | |
| **MAJD A. A.** ) | |
| **LUBNA A. A.** ) | |
| **SUFIAN A. A.** ) | |
| **SARAH S. A.** ) | |
| **SA'ED H. A.** ) | Case No. 1:16-cv-00445 |
| **ZEID W. A.** ) | |
| **RAMI W. A.** ) | |
| **HASSAN W. A** ) | |
| **ALA'A W. A. and** ) | |
| **YOUSSEF W. A.;** ) | |
| **Palestine** ) | |
| **JIHAN ANDONI;** ) | |
| **Palestine** ) | |
| **HIBA  BARGHOUTHI, as next of kin of** ) | |
| **ABDELRAHMAN BARGHOUTHI;** ) | |
| **Next to the big mosque of Abood,** ) | |
| **The Main Rd.,** ) | |
| **Abood Village, Ramallah** ) | |
| **DR. ISMAIL DEIK, as personal representative** ) | |
| **of the FAMILY HUSSEINI;** ) | |
| **Al-Wadi Dates Company,** ) | |
| **Al-Maghtass, Jericho, Palestine** ) | |
| **ABDUR-RAHIM DUDAR;** ) | |
| **U.S.A** ) | |
| <span style="color:red">**ADAM HAMDAN**</span>**;** ) | |
| **Palestine** ) | |
| **ABBAS HAMIDEH;** ) | |
| **Palestine** ) | |
| **KHULUDE ISAAC;** ) | |

**Palestine** )
**MINA ISHAQ;** )
    **Palestine** )
**QAIS ISHAQ;** )
    **Palestine** )
**RA'FAT ISHAQ;** )
    **Palestine** )
<span style="color:red">**LINDA KATEEB**</span>; )
    **Ohio, U.S.A** )
<span style="color:red">**WAFA NIJMEDDIN;**</span> )
    **Palestine** )
**ALAA NOFAL;** )
    **Palestine** )
**IBRAHIM SABIH;** )
    **Next to Al-Khader Gate,** )
    **Al-khader Village,** )
    **Bethlehem, Palestine** )
**EMAD SHUJAIA;** )
    **Nest to the Elementary School,** )
    **Dir Jareer Village,** )
    **Ramallah, Palestine** )
**EMAAN TOPPAZZINI;** )
    **Canada** )
**VILLAGE COUNCIL OF THE VILLAGES OF:** )
    **ABU AL-'ASJA** )
    **ABU AL-GHAZLAN** )
    **ABU AL-'ARQAN** )
    **KARZA** )
    **RABOUD;** )
    **Eastern Entrance,** )
    **Next to Abo Al-asjja Mosque** )
**HASHIM YOUSEF, in his official capacity as** )
    **President of THE SOCIETY FOR** )
    **FARMERS' RIGHTS AND THE** )
    **PRESERVATION OF PALESTINE'S** )
    **ENVIRONMENT;** )
**AHMED AL-ZEER** )
    **Al-Naseem building, 1st Floor** )
    **Next to Selwad boys' elementary school,** )
    **Main Road, Ramallah** )
<span style="color:red">**JAMAL DARDUNA**</span> )
    **Sala Dardonah St, Al-Slam Neighborhood** )

2

Jabalia Town, Gaza                                        )
**IBRAHIM AL-NADIR**                                      )
   Near Kebaa' Mosque                      )
   Old Gaza St. Jabalia Town, Gaza          )
**RASHAD TAWEELA**                                        )
   Abi Tawilah St., near Al-Shajaiah Mosque)
   Al-Mansorah St., Al-Shajaiah, Gaza       )
**KHALIL AL-'ASH**                                        )
   Near Al-Tawfiq Mosque                    )
   Baghdad St. Al-Shajaiah, Gaza            )
**BASSAM AL-NAWIRI**                                      )
   Near Omar Ben Abed Al-Aziz Mosque        )
   The Sea St. Al-Hussiniah Neighborhood    )
   Al-Nssirat, Gaza                         )
**MUSA AL-SHINBARI**                                      )
   Near Beit Hanoon Hospital, Al-Quds Rd.   )
   Al-Shabat Neighborhood, Biet Hanoon,     )
   Gaza                                     )
**MUSA AL-KAFARNA**                                       )
   Al-Kafarna St, Boret Al-Shaowa           )
   Beit Hanoon,Gaza                         )
**BASSEM BARAKA**                                         )
   Abo Noyerah School, Al-Zannah St.         )
   Bani Suhilah Neighborhood                )
   Khan-Younis,Gaza                         )
**ANWAR DAHALEEZ**                                        )
   Near Annas Ben Malik Mosque,             )
   Emam Ali St. Zoa'rob circle              )
   Western Rafah-Rafah, Gaza strip          )
**IBRAHIM RAMADAN**                                       )
   193 P, near Herz Allah Stores            )
   Karm Al-Bolbs, Rafah, Gaza               )
**NIDAL SALAH**                                           )
   Main St, Abo Amer Neighborhood           )
   AbbasanAl-Kaberah, Khan-Younis, Gaza     )
**HAYAT ABU-DHARIFA**                                     )
   Abo Tharifah St,                         )
   Abo Tharifah Neighborhood                )
   Abbassan Al-Kaberah, Gaza                )
**MUHAMMAD ABU-MUTLAQ**                                   )
   Abo Ridat St. Al-Bassatin Neighborhood   )
   Khazaa'h, Khan-Younis, Gaza              )

**IBRAHIM ABU-EID** )
    **Main St. Tabbash Neighborhood** )
    **Abbasan Al-Kaberah, Khan-Younis, Gaza**)
**NAZEEH TABASH** )
    **Near Abo-Barakah Mosque** )
    **Abo Taaimah Neighborhood** )
    **Abbasan Al-Kaberah, Khan-Younis, Gaza**)
**YOUNIS ABU-TEER** )
    **Near Abo Baker Al-Sedik Mosque,** )
    **Al-nasser St. Mid-downtown** )
    **Abbasa Al-Kaberah, Khan-Younis, Gaza** )
**TAGRID ABU-TEER** )
    **Al-kedeeh transaction,** )
    **abo Al-nasser Kdeeh Internal St.** )
    **Abo Al-nasser neighborhood** )
    **Abbasan Al-kaberah, Gaza** )
**HAMZA ABU-TEER;** )
    **Al-kedeeh transaction,** )
    **abo Al-nasser Kdeeh Internal St.** )
    **Abo Al-nasser neighborhood** )
    **Abbasan Al-kaberah, Gaza** )
**HAMZA ABU-MUTLAQ** )
    **Abo Ridat St. Abo Metlek Neighborhood** )
    **Khazaa'h, Khan-younis, Gaza** )
**EYAD ABU-TEER** )
    **Near Al-kedeeh transaction,** )
    **Abo Al-nasser Kdeeh Internal St.** )
    **Abo Al-nasser neighborhood,** )
    **Abbasa Al-kaberah, Gaza** )
**SAFWAT ABU-TEER** )
    **Al-Eslah St., Abbasan Al-Kaberah** )
    **Khan-younis, Gaza** )
**AMANI ABU-TEER** )
    **Near Al-kedeeh transaction,** )
    **Abo Al-nasser Kdeeh Internal St.** )
    **Abo Al-nasser neighborhood,** )
    **Abbasa Al-kaberah, Gaza** )
**SAMI ABU-TEER** )
    **Near Al-kedeeh transaction,** )
    **Abo Al-nasser Kdeeh Internal St.** )
    **Abo Al-nasser neighborhood,** )
    **Abbasa Al-kaberah, Gaza** )

4

**RAMI ABU-TEER** )
    **Near Abo Baker Al-sedik, Mosque** )
    **Al-Eslah St. Mid downtown** )
    **Abbasan Al-Kaberah, Khan-younis, Gaza** )

**FATHI NAIM** )
    **Near the ratification** )
    **and the Decomentation Organization** )
    **(Al-Ta'leef w Al-Tawtheek),** )
    **Zmo St. Beit Hanoon, Gaza** )

**KHALID NAIM** )
    **Near the ratification** )
    **and the Decomentation Organization** )
    **(Al-Ta'leef w Al-Tawtheek),** )
    **Zmo St. Beit Hanoon, Gaza** )

**AWAD NAIM** )
    **Near the ratification** )
    **and the Decomentation Organization** )
    **(Al-Ta'leef w Al-Tawtheek),** )
    **Zmo St. Beit Hanoon, Gaza** )

**SALIM ABU-SALAH** )
    **Near Al-Sunati st. Abo-salah neighborhood** )
    **Abbasan Al-Kaberah,** )
    **Khan-younis, Gaza** )

**KHALIL TABASH** )
    **Near Palestine Bakery, the Main St.** )
    **Abbasan Al-Kaberah, Khan-younis, Gaza** )

**HUSSEIN TABASH** )
    **Tabbash St. Tabbash Neighborhood,** )
    **Abbasan Al-Kaberah,** )
    **Khan-younis, Gaza** )

**FALASTIN MADI, as next of kin of** )
    **SAMI MADI** )
    **Near Ibn Taimia Mosque,** )
    **Asskar Neighborhood,** )
    **Al-remal, Dir Al-balah, Gaza** )

**REHAM AL-BUR'I, as next of kin of** )
    **A'ID AL-BUR'I** )
    **Near Moa'sskar Jabalia,** )
    **Jabalia downtown, Gaza** )

**MAMDOUH AL-QARA, as next of kin of** )
    **WALA'A AL-QARA and** )
    **MUHAMMAD AL-QARA** )

Near Al-zannah St., Al-Kara St.          )
Abbasan Al-Kaberah,                       )
Khan-younis, Gaza                         )
**MAJID ABU-TEER**, as next of kin of     )
MUHAMMAD ABU-TEER No. 1 and               )
MUHAMMAD ABU TEER No. 2;                  )
Near Al-shalaf St.,                       )
Southern Abbasan,                         )
Khan-younis, Gaza                         )
**HAYAT ABU-DHARIFA**, as next of kin of  )
ISMAIL ABU-DHARIFA;                       )
Abo Tharifah St.,                         )
Abo Tharifah Neighborhood,                )
Abbassan Al-kaberah, Gaza                 )
**MUHAMMAD ABU-TEER** No. 3, as next of   )
kin of SULEIMAN ABU-TEER;                 )
near al-Shalaf St., Abbasan Al-Kaberah,   )
Khan-younis, Gaza                         )
**ABDULLAH ABU-SALAH,** as next of kin of )
AHMED ABU-SALAH;                          )
Near Abo-Salah neighborhood,              )
Abbasan Al-kaberah,                       )
Khan-younis, Gaza                         )
**ALI ABU-TEER,** as next of kin of       )
SHADI ABU-TEER;                           )
Near Osama ben Zied mosque,               )
Al-sunati St. Abbasan Al-kaberah,         )
Khan-younis, Gaza                         )
**SHIREEN QABLAN,** as next of kin of     )
IBRAHIM ABU-QABLAN;                       )
Near Khaleel Al-rahman mosque,            )
Abo teer al-shalaf neighborhood,          )
Abbasan Al-kaberah,                       )
Khan-younis, Gaza                         )
**AMAL QABLAN,** as next of kin of        )
IBRAHIM QABLAN;                           )
Abo musbeh neighborhood,                  )
Abbasan Al-kaberah,                       )
Khan-younis, Gaza                         )
**DHARIFA SAHAMOUR,** as next of kin of   )
AHMED SAHAMOUR;                           )
Near Main St., Ben Suhilah neighborhood)

6

Khan-younis, Gaza )
**RA'FAT BARAKA,** as next of kin of )
    MUHAMMAD BARAKA; )
    Near Bank of Palestine, the Main St. )
    Al-Zeer Neighborhood, )
    Abbasan Al-Saghirah, )
    Khan-younis, Gaza )
**SAFWAT ABU-TEER,** as next of kin of )
    NOUR ABU-TEER and )
    ZEINAB ABU-TEER; )
    Near Osama ben Zied mosque, )
    Al-sunati St. Abbasan Al-kaberah, )
    Khan-younis, Gaza )
**IBRAHIM ABU-TEER,** as next of kin of )
    KAMAL ABU-TEER and )
    AHMAD ABU-TEER; )
    Near Khaleel Al-rahman mosque, )
    Abo-Mattar Neighborhood, )
    Abbasan Al-kaberah, )
    Khan-younis, Gaza )
**MEDHAT ABU-YOUSEF,** as next of kin of )
    HANAFI ABU-YOUSEF; )
    Near Atawbah mosque, Abo Hanafi St. )
    Abo yousif Neighborhood, )
    Abbasan Al-kaberah )
    Khan-younis, Gaza )
**NADHAMI ABU-TEER,** as next of kin of )
    HUDHIFA ABU-TEER, )
    Near Khaleel Mosque, Al-Shalaf St. )
    Abo teer neighborhood, )
    Abbasan Al-kaberah, )
    Khan-younis, Gaza )
**WADDAH SOFAN** )
    Palestine )
**ALI ALI** )
    724 Edward Werth Drive )
    Rodeo, CA 94572 )
**SAAD MALLEY** )
    13564 S. Shannon Dr. )
    Homer Glen, IL 60491 )
**OSSAMA ALI AHMED ABO HASSAN** )
    Abo Souilem St. )

Tabbash Neighborhood, )
Southern Abbasan, )
Khan-younis, Gaza )
**HISHAM ABU AL-HASSAN** )
Ebsees Building, 4th Floor )
Next to Bank of Palestine )
Nablus, Palestine )
**TARIQ HUSSNI ABED AL-FATEH SABATIN** )
Next to Hussan Girl Secondary )
Hussan Village )
**MAHMOUD AHMED MUSSA SABATIN** )
Near by Mussa'b ben Omair, )
Hussan Village )
**RAJI MOHAMMAD ABED AL-AZZIZ** )
**SABATIN** )
Al-shurfah, Hussan Village )
**YOUSIF MOHAMMAD YAKOB ATTWAN** )
Near by the church of Al-Khader, )
Old town, Al-khader Village )
**NEDDAL ASSAD ATTWAN** )
Near by the church of Al-khader, )
Old town, Al-khader Village )
**JAWAD AL-HOROB** )
Near by the Dir Samit Boys School, )
Al-Karna Al-wasta St., Dir Samit Town )
**AHMED ABO RAHMAH** )
Mid of Town, Baaleen town )
 )
Plaintiffs, )
 )
v. )
 )
**SHELDON ADELSON;** )
**NORMAN BRAMAN;** )
**LAWRENCE ELLISON;** )
**DANIEL GILBERT;** )
**JOHN HAGEE;** )
**LEV LEVIEV;** )
**ESTATE OF IRVING MOSKOWITZ;** )
**IRVING I. MOSKOWITZ FOUNDATION;** )
**HAIM SABAN;** )
 )

8

ELLIOTT ABRAMS;                              )
                                             )
AMERICAN FRIENDS OF ARIEL;                   )
AMERICAN FRIENDS OF BET EL YESHIVA; )
AMERICAN FRIENDS OF HAR HOMA ;               )
AMERICAN FRIENDS OF ULPANA OFRA;             )
CHRISTIAN FRIENDS OF ISRAELI                 )
COMMUNITIES;                                 )
EFRAT DEVELOPMENT FOUNDATION;                )
FALIC FAMILY FOUNDATION, INC.;               )
FRIENDS OF ISRAEL DEFENSE FORCES;            )
GUSH ETZION FOUNDATION;                      )
HONENU NATIONAL LEGAL DEFENSE                )
ORGANIZATION;                                )
JEWISH NATIONAL FUND;                        )
KARNEI SHOMRON FOUNDATION;                   )
THE HEBRON FUND;                             )
                                             )
BANK LEUMI LE-ISRAEL B.M.;                   )
BANK LEUMI USA;                              )
BANK HAPOALIM B.M.;                          )
                                             )
G4S PLC;                                     )
G4S NORTH AMERICA;                           )
G4S ISRAEL;                                  )
                                             )
RE/MAX, LLC;                                 )
RE/MAX ISRAEL – IMPACT PROPERTY              )
DEVELOPERS LTD.;                             )
                                             )
AFRICA ISRAEL INVESTMENTS, LTD.              )
(AFI GROUP);                                 )
AFI USA;                                     )
DANYA CEBUS LTD.;                            )
ACCESS INDUSTRIES;                           )
CRH PLC;                                     )
HANSON ISRAEL LTD.;                          )
VEOLIA ENVIRONNEMENT S.A.;                   )
VEOLIA NORTH AMERICA;                        )
VEOLIA ENVIRONMENTAL SERVICES                )
(ISRAEL);                                    )
VOLVO GROUP, a.k.a. AB VOLVO (PUBL);         )

9

VOLVO BUSSAR AB;                                )
MERKAVIM TRANSPORTATION                          )
TECHNOLOGIES;                                    )
                                                 )
HEWLETT PACKARD ENTERPRISE CO.;                  )
HEWLETT-PACKARD ENTERPRISE                       )
SERVICES ISRAEL(EDS);                            )
MOTOROLA SOLUTIONS, INC.;                        )
MOTOROLA SOLUTIONS ISRAEL LTD.;                  )
ORBITAL ATK INC.;                                )
                                                 )
                Defendants.          )
_____              )

### AMENDED COMPLAINT FOR:

(I)     CIVIL CONSPIRACY
(II)    WAR CRIMES, CRIMES AGAINST HUMANITY, AND
        GENOCIDE
(III)   <span style="color:red">AIDING AND ABETTING THE COMMISSION OF WAR CRIMES</span>
(IV)    AGGRAVATED AND ONGOING TRESPASS

### TABLE OF CONTENTS

a.     INTRODUCTION/SUMMARY……………………………………...…11
b.     JURISDICTION……………………………………………...…………32
c.     VENUE……………………………………………………………………39
d.     PARTIES……………………………………………………………...…45
e.     ALLEGATIONS COMMON TO ALL DEFENDANTS……………………78
I.     CIVIL CONSPIRACY………………………………………………...103
II.    WAR CRIMES, CRIMES AGAINST HUMANITY, AND GENOCIDE…………145
III.   <span style="color:red">AIDING AND ABETTING THE COMMISSION OF WAR CRIMES</span>…………...180
IV.    AGGRAVATED AND ONGOING TRESPASS……………...………………184

COME NOW the Plaintiffs herein and hereby complain of the Defendants as follows:

## INTRODUCTION/SUMMARY
## CYCLE OF TRESPASS, DEMOLITION, AND CONVERSION

For the past 40 years, every President from Ford to Obama and their State Department spokespersons have all articulated a public policy which: (a) condemned settlement[1] expansion in East Jerusalem ("EJ") and the Occupied Palestinian Territories ("OPT[2]") and the violence that settler theft of private property necessarily entailed; and (b) recognized that both the Hague Convention and the Fourth Geneva Convention ("GCIV/Hague") principles governed the settlers' activities. Rotating members of Israel's High Court of Justice ("HCJ")[3] for 40 years, senior government officials, a special prosecutor, and a Defense Minister have similarly condemned the settlers' theft of private Palestinian property, have threatened criminal prosecution over settlement activity, and have also recognized that GCIV/Hague principles govern their activities. Defendants named herein who are domiciled in America or Israel had to know that: (a) each country's criminal laws; (b) the UN Charter and international convention principles they adopted—GCIV and Hague; and (c) their respective public policies prohibited

---

[1] The term "settlements" includes all Israeli civilian communities built on lands occupied or otherwise administered by Israel during its second occupation (post-1967 Six-Day War), including the settlements which are coconspirators with the Defendants named in this lawsuit, specifically, but not necessarily limited to, Ariel, Beit HaArava, Bet El, Efrat, Halamish, Har Homa, Kiryat Arba, Karnei Shomron, Nokdim, and Ofra.

[2] The term "OPT", includes, as context requires, EJ, the West Bank, Gaza, and other Palestinian territory.

[3] The Supreme Court of Israel is known as the "High Court of Justice" when it convenes on matters of first instance and matters related to the OPT. For the purposes of this lawsuit, the terms "Supreme Court of Israel" and "High Court of Justice (and its abbreviation 'HCJ')" are interchangeable.

theft of private property, arms trafficking, ethnic cleansing, and wholesale violence, including

malicious destruction of property.

    As explained *infra*, due to the massive funding provided by U.S. tax-exempt entities[4] and

their donors[5] to a number of settlements in the OPT, Defendants herein have been able to carry

out a very successful civil conspiracy, the goals of which were the expulsion of all non-Jews

from OPT and the creation of new segregated "Jewish-only" cities and villages.[6] These

Defendants have: (a) financed, encouraged, and deliberately collaborated with settlement

officials (including security coordinators) in the commission of wholesale violence,[7]  knowing

that would result in massive ethnic cleansing of the Palestinian population; and (b) after forcibly

expelling at least 400,000 Palestinians from the OPT, built for "Jewish-only" settlers some

56,000 new homes and apartments, 187 shopping centers,[8] and an extensive highway complex

linking up all settlements in the OPT.

---

[4] The term "tax-exempt entities" or simply "entities" includes, but is not limited to, Defendants American Friends of Ariel ("AFA"), American Friends of Bet El Yeshiva ("AFBEY"), American Friends of Har Homa ("AFHH"), American Friends of Ulpana Ofra ("AFUO"), Christian Friends of Israeli Communities ("CFOIC"), Efrat Development Foundation ("EDF"), Falic Family Foundation ("FFF"), Friends of Israel Defense Forces ("FIDF"), Gush Etzion Foundation ("GEF"), Karnei Shomron Foundation ("KSF"), and The Hebron Fund ("HF").

[5] The term "donors" includes, but is not limited to, Defendants Adelson, Braman, Falic Family, Gilbert, Hagee, Moskowitz, and Saban.

[6] *See, e.g.* http://www.nevetzuf-halamish.co.il/page.asp?pageID=39 (the settlement of Halamish requires potential residents from "all colors of the religious/secular rainbow" to submit an application and obtain approval from an "absorption committee" prior to being allowed to move there).

[7] The term "wholesale violence" shall hereinafter mean: murder, mayhem, physical assaults, looting, pillaging, destruction of agricultural property and homes, needless civilian deaths, war crimes, crimes against humanity, and genocide.

[8] As of 2009. *See* http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190. The Court will see herein that many media, government, and research sources have

In the process, they and their Israel-based coconspirators have deprived the Plaintiffs and their relatives of fundamental human rights as guaranteed under UN Charter principles, U.S. and Israeli law, Israel's Declaration of State Establishment ("Declaration"), and Customary International Law (see Exhibit A).[9] The Lieber Code, GCIV's predecessor, is just one example thereof, which guarantees such rights under U.S. law. It was signed into law by Abraham Lincoln in 1863, and prohibits murder, arson, and wanton violence during a military occupation under penalty of death. That criminal conduct, for the last 30 years, has been: (a) financed by U.S. tax-exempt entities and donors; and (b) engaged in by armed settler militia, their security coordinators, and Israeli army/G4S personnel. A specific example of the criminal activity funded by the U.S. tax-exempt entities and their donors is armed settlers trained in the use of sniper scopes engaging in live target practice against Palestinian farmers and maliciously wounding them while trying to access their olive groves, i.e., wanton and heedless disregard for human life.

The conspiracy starts with the donors making extraordinary tax-deductible contributions (approximately $1 billion every year) to "pass-through" tax-exempt entities, a.k.a., funnels. (See

been cited in the footnotes to this Complaint. These footnotes are not exhaustive, as the Plaintiffs expect to further substantiate the claims herein through discovery. The sources cited are simply intended to assist the Court in finding *prima facie* plausibility per *Iqbal*.

[9] For example the Lieber Code signed by President Abraham Lincoln in 1863 condemns, *inter alia*, murder, arson, and wanton violence—conduct which occurs in the OPT on a daily basis. *See* Our Harsh Logic: Israeli Soldiers' Testimonies from the Occupied Territories, 2000-2010, Breaking the Silence (hereinafter "Our Harsh Logic") (an IDF commander tells young soldiers "I want to see [Palestinian] bodies full of bullets" p. 79). The Lieber Code strictly prohibits wanton violence under penalty of death, and the Israeli army's war manual also condemns wanton violence. The term *wanton*, per West's law dictionary, implies a reckless disregard for the consequences of one's behavior. A wanton act is one done in heedless disregard for the life, limbs, health, safety, reputation, or property rights of another individual. *See* wanton. (n.d.) *West's Encyclopedia of U.S. Law, edition 2.* (2008) http://legal dictionary.thefreedictionary.com /wanton.

Exhibit B, Cycle of Trespass, Demolition, and Conversion). 24 hours later, the entities transfer the contributions to various settlements to: (a) hire full-time security coordinators whose job is to train settler militia in military tactics so that they can terrorize their Palestinian neighbors; (b) arm the settlers and have the security coordinator train them in the use of automatic weapons and sniper scopes; (c) establish and operate sniper schools; (d) fund the violent expulsion of Palestinians; (e) encourage the theft and destruction of private Palestinian property; and (f) transform the original hilltop tent encampments into vibrant "Jewish-only" gated communities with state-of-the-art facilities accessible by "Jewish-only" highways.

The U.S. donors/entities intended that their financial assistance (international wire transfers) sent to various settlements would be used for major settlement expansion activity, ethnic cleansing, wholesale violence, and theft and malicious destruction of property. Based on the banking protocol "Know Your Customer", Israeli banks Bank Leumi ("BL") and Bank Hapoalim ("BH") officials knew exactly what the proceeds of the international wire transfers would be used for, i.e., wholesale violence directed at Palestinian homeowners living near the settlements. These criminal activities violate U.S. public policy and numerous federal statutes like money laundering, Customary International Law[10] principles (Exhibit A) and Israel's own 1948 Declaration (basically a restatement of UN Charter principles), Israel's Anti-Nazi Law (see paragraph below), and its 1992 Basic Law on Human Dignity and Liberty ("BLHDL" statute). Israel's Declaration protects all "inhabitants" of the OPT i.e., Palestinians, not just members of the Jewish faith.

---

[10] The terms "Customary International Law" and "Law of Nations" are interchangeable herein. *See Filartiga v. Pena-Irala*, 630 F.2d 876 (1980).

This criminal activity also violates the Law of Nations (U.S. Constitution Art. I Sec. 8 Cl. 10) because it constitutes war crimes, crimes against humanity, and genocide under Nuremberg Principle VI and the Genocide Convention (hereinafter "comprehensive war crimes"). The donors/entities have violated Customary International Law principles by intentionally funding ethnic cleansing, wholesale violence, and theft and malicious destruction of private Palestinian property. They also violated: (a) at least five separate U.S. Department of the Treasury ("Treasury") tax-exemption regulations (e.g., failing to retain control over funds once sent overseas); (b) eight federal criminal statutes (e.g., money laundering, perjury, defrauding the IRS, and funding terrorist activity abroad); (c) Israel's money laundering statute; (d) its Nazi and Nazi Collaborators Punishment Law of 1950 ("Anti-Nazi Law"), Israel's version of the Nuremberg Principles;[11] (e) its clearly-defined anti-settlement public policy; and (f) its own Declaration and BLHDL.

The Declaration and BLHDL are still part of Israeli law, and were specifically enacted to protect, respectively, all "inhabitants" and "persons", not just Jewish citizens, from infringement of basic civil liberties. Thus, since Palestinians are inhabitants of the OPT, they have the right to peacefully occupy their homes, raise their families, send their children to school unmolested, have access to medical care facilities, and access and harvest their 400-year-old olive groves.

---

[11] Given the fact that Israel has adopted its own version of the Nuremberg principles, the conduct condemned in the Nuremberg Indictment of the Nationalist Socialist Government of Germany parallels the conduct of the IDF/G4S and armed settlers in the OPT, i.e., they "endeavored to obliterate the former national character of these territories. In pursuance of their plans, the defendants forcibly deported (Palestinian) inhabitants who were predominantly non-German (non-Jewish) and replaced them by thousands of German (Jewish-only) colonists." *See* Nuremberg Indictment of the Nationalist Socialist Government (International Military Tribunal, vol. 1, p. 63).

The U.S. donors/entities and their Israel-based coconspirators intended to and have deprived Palestinians of these basic human rights, which are enjoyed by "Jewish-only" settlers every day who live peacefully in gated communities built on private property protected by recorded "Jewish-only" land covenants, Hewlett Packard and Motorola ("HP/Motorola") sophisticated security systems, and G4S (a private security firm which has been operating in the OPT for 30 years) personnel on a 24/7 basis.

As shown herein, the laundered funds have been knowingly sent overseas by U.S. tax-exempt entities, and have enabled armed settlers, with help from Defendant G4S personnel and Israeli army (a.k.a. the Israel Defense Force or "IDF") reservists to threaten and intimidate the local Palestinian population on a daily basis. They have convinced at least 400,000[12] of them to abandon their homes and their 400-year-old olive trees. The annual funding is extraordinary, e.g., $1 billion every year[13] with $104 million going to the Israeli army in 2014.[14] The U.S. donors/entities knew and intended that increased financial assistance would promote wholesale violence directed at the local Palestinian population and therefore accelerate settlement expansion. They knew that motivated armed settlers, who coveted their Palestinian neighbors' property, would be able to, with their substantial financial assistance, sufficiently terrorize the local Palestinian population (poisoning water wells, slaughtering livestock, live target practice) and convince them to abandon their homes and olive groves.

---

[12] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

[13] *See* "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Fleisch, Theodore Sasson April 2012 p. 9.

[14] *See* para. 212.

As detailed herein, the settler militia forces did an excellent job after being trained by security coordinators in military tactics. Proof thereof is that at least 400,000, perhaps 500,000 Palestinians have literally been forced out of their villages since 1967.[15] As the causation-chain diagrams below confirm, each one of the Plaintiffs named herein can trace the cause of his damages from violent settlers in nearby settlements back through Israel-based settlements and their bank accounts to U.S. 501(c)(3) entities and wealthy U.S. donors.[16] Plaintiffs' expert is still preparing a complete database of all the criminal activities engaged in, for example, see Exhibit D (settler activities in Hebron) and that document will be produced in discovery. For the Court's edification, two illustrative causation-chain diagrams are depicted below:

---

[15] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.
[16] *See* Exhibit C, Plaintiff Damages Database, which traces the causal chain for each of the Plaintiffs' damages complained of herein from originating donors through transferring and/or receiving entities to the eventuating perpetrators. These are the causal chains Plaintiffs have reason to believe are responsible for their injuries. However, Plaintiffs reserve the right to supplement their claims after having the benefit of discovery.

## CAUSAL CHAIN OF DAMAGES FOR VILLAGE COUNCIL OF ABU AL-ASJA', ETC.



And similarly:

## CAUSAL CHAIN OF DAMAGES FOR HAR HOMA PLAINTIFFS



Since the U.S. donors/entities named herein have sent "clean" money abroad for the

purpose of committing specified unlawful activities including arms trafficking, they and all other

members in the causal chain have committed money laundering. *See* U.S.C. 1956(a)(2). Besides

18

funding rampant criminal activity in the OPT including ethnic cleansing which the entities characterize on their annual 990 forms as either "charitable" or "educational" in nature, they have: (a) financed and promoted religiously- and racially-discriminatory practices, i.e., funding "Jewish-only" highways, shopping malls, housing projects, and schools; (b) violated numerous other 501(c)(3) tax-exemption regulations, e.g. funding of theft and destruction of private property, which the host country, Israel, deems to be illegal; and (c) as already noted, violated at least eight federal criminal statutes, including the federal perjury statute. They committed perjury because when they were applying initially for tax-exempt status, entity officials never informed the IRS that they would be using contributions from donors to establish a settler militia unit or funding the purchase of military hardware, including sniper scopes, guard dogs[17], bulletproof vests, and night-vision goggles. Tax-exempt entity officials and their accountants could face substantial jail time, because each violation of the federal perjury statute alone carries a five-year prison sentence and a substantial fine.

Co-Conspirator Defendant Elliott Abrams ("Abrams"), for the last 25 years, has encouraged and been aware of the wholesale violence that the donors and tax-exempt entities have funded,[18] arguing that settlement expansion is a myth. In fulfilling his role as the settlements' paid self-appointed U.S. spokesperson, he has received substantial book royalties, speaking fees, paid trips to Israel and Europe, and lucrative consulting fee contracts, all engaged

---

[17] https://electronicintifada.net/blogs/adri-nieuwhof/israel-using-dutch-dogs-terrorize-palestinians.
[18] The Israel Lobby and U.S. Foreign Policy, John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 167. *See also* Elliot Abrams, Faith or Fear: How Jews Can Survive in a Christian America (New York: Simon & Schuster, 1997), 181.

in to promote the settlement enterprise. He has advocated and justified continued settlement

growth, which necessarily meant the theft of more private Palestinian property.

He has engaged in numerous overt acts (meetings, email exchanges, and telephone calls

with donors, Israeli Prime Minister staff members like Dov Weissglas, Yoram Turbowitz, and

Shalom Turgeman, and tax-exempt entity officials[19]), including some in this jurisdiction (he is a

featured speaker at AIPAC events and attends Israeli embassy events, has given congressional

testimony for at least 20 years condemning Palestinian violence, and has entertained Israeli

Prime Ministers during visits to Washington, DC), all activities engaged in to achieve the

primary goal of the conspiracy, i.e., expel all non-Jews from the OPT. He has: (a) met with or

spoken to aides to former Prime Ministers Sharon (e.g., Dov Weissglas), Barak, and Olmert in

New York, Washington, D.C., Europe (Rome meetings with Sharon), and Israel; and (b)

consistently condemned Palestinian violence, arguing disingenuously that the settlements have

not really expanded, nor do they frustrate U.S. foreign policy objectives.[20] His goal in engaging

in all of these activities is to convince the American people and Congress that Palestinian

farmers are the root cause of violence in the Middle East, a complete fabrication. He has largely

achieved that goal, as a recent House of Representatives resolution confirmed.[21]

---

[19] Israel Lobby 217, 218, 223, 224, 228.

[20] The Israel Lobby and U.S. Foreign Policy, John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 167. *See also* Elliot Abrams, Faith or Fear: How Jews Can Survive in a Christian America (New York: Simon & Schuster, 1997), 181.

[21] *See* Oct. 22, 2015 congressional hearing, "Words Have Consequences: Palestinian Authority Incitement to Violence," http://foreignaffairs.house.gov/hearing/hearing-words-have-consequences-palestinian-authority-incitement-violence, and resulting resolution, https://www.congress.gov/bill/114th-congress/house-resolution/293.

Defendant tax-exempt entities have all deliberately engaged in funding the settlers'

criminal activities and have abused their tax-exempt status because they function as "pass-

throughs"[22] by literally holding onto donor funds for 24 hours. In the case of FFF and FIDF, they

even directly fund the Israeli army and the criminal activities that its personnel have engaged in.

For example, as revealed in *Our Harsh Logic: Israeli Soldiers' Testimonies from the Occupied

Territories, 2000-2010*, IDF commanders repeatedly told young, impressionable recruits that

promotion was dependent on the number of Palestinians that they kill.[23] Their role in the

conspiracy was to solicit and accept financial contributions destined to be transferred to "Jewish-

only" settlements or the Israeli army to promote arms trafficking, wholesale violence, and

settlement expansion. The presence of at least 700,000 new settlers and 56,000 new expensive

apartments and homes for "Jewish-only" settlers[24] is prima facie evidence that the settlement

enterprise has been a very successful undertaking as a result of massive U.S. tax-exempt funding

($1 billion per year).

The laundered funds have also enabled international construction/support firms to

trespass on private Palestinian property and convert it to their own profitable use. These firms are

listed in the parties section and are U.K., U.S., French, German, Israeli, and Swedish

international conglomerates. They all knowingly built on private Palestinian property, with U.S.

tax-exempt entity funding, concert halls, yeshivas, hotels, desalination plants, solid waste

---

[22] *See* Hope Hamashige, Paul Lieberman, and Mary Curtius, "Bingo King Aids Israeli Right Wing," Los Angeles Times, May 9, 1996,http://articles.latimes.com/1996-05-09/news/mn-2155_1_bingo-hall.
[23] Compiled by Breaking the Silence, 2010 (hereinafter "Our Harsh Logic") p. 288.
[24] *See* http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.

facilities, cement factories, quarries, and urban/suburban transportation links like the Jerusalem transit system (hereinafter "settlement improvements").[25] All corporate defendants herein have encouraged and condoned the demolition and confiscation of thousands of Palestinian homes by adopting and implementing the agenda of U.S.-based tax-exempt entities and their donors. The reason—they all knew that the continued forcible expulsion of all non-Jews from the OPT would increase their bottom line and result in substantial windfall profits. More demolitions mean more housing developments and infrastructure improvements (e.g., "Jewish-only" highways) to build, more sales opportunities and brokerage commissions for RE/MAX, more orders for Motorola and HP computer software and security devices, more orders for concrete and cement products, more demolition and truck hauling business for Volvo, more construction and mortgage financing business for BL/BH, and more profits for all players to share in. The profits are substantial, as already detailed *infra*--$9.45 billion went to RE/MAX and BL/BH based on their settlement enterprise activities.

RE/MAX had an important role to play in fulfilling the goals of the conspiracy. As shown in Exhibit B, it has knowingly incentivized, encouraged and rewarded its co-conspirators by engaging in a 20 to 30-year successful marketing campaign in America and Israel to sell "old Arab houses" and new homes in gated first-class communities.[26] Thus, RE/MAX has financially rewarded its coconspirators for the aggravated and ongoing trespasses that they have encouraged, funded, or committed by seizing, occupying, and building permanent structures on private

---

[25] *See* Id.
[26] https://electronicintifada.net/content/why-colorado-firm-selling-apartments-israels-illegal-settlements/14029.

Palestinian property for "Jewish-only" settlers. Thus, like its coconspirators, RE/MAX has been instrumental in transforming original hilltop tent encampments into vibrant first-class cities and villages, and made a fortune doing so. Home-building activity itself, for example, was and still is a very lucrative endeavor, i.e., as of 2009, RE/MAX, BL/BH, and participating housing developers had grossed (based on RE/MAX property values) a total of $9.45 billion for building, marketing, and selling 26,000 new homes in the OPT.

Funding coming from U.S. tax-exempt-entities also enabled Defendant G4S's personnel to assist the IDF forces by providing the necessary manpower so that armed settlers (assisted by IDF personnel) could threaten and intimidate the Palestinian population on a daily basis, force their expulsion, and steal their adjacent property. They also help demolish Palestinian homes and burn down olive groves because the construction/support firms needed vacant space for suitable construction sites to build on. For at least 25 years, G4S has relieved IDF soldiers of various security responsibilities, allowing them to, *inter alia*, concentrate on ethnic cleansing activity with armed settlers. They guard OPT checkpoints, access portals in the separation wall,[27] refugee camps, retail shops and settler homes, and also oversee Israel's vast prison complex.[28] They make sure, with the aid of HP/Motorola's sophisticated tracking devices and thermal imaging systems, that armed settlers scanning the settlement perimeters can visualize from 2,300 feet out

---

[27] A separation barrier built by the Israeli government in the West Bank or along the 1949 Armistice Line known as the "Green Line". Upon completion, its total length will be about 430 miles and separate about 9.4% of the West Bank and 23,000 Palestinians from the bulk of that territory. *See* http://www.unrwa.org/newsroom/features/barrier-monitoring-unit?id=908.
[28] *See* http://www.whoprofits.org/company/g4s-israel-hashmira *and* "Corporate Complicity in Israeli Detention: G4S" by Addameer, available at http://www.addameer.org/userfiles/Factsheet15April.pdf.

any and all intruders like Palestinian farmers, and proceed to physically assault them, threatening to kill them if they return.[29] That is not an idle gesture because many Palestinian farmers have been murdered simply for trying to access their olive groves, which, through no fault of their own, are now located in expanded settlements or designated military zones which are off limits to all Palestinians.

G4S personnel have also collaborated in the arrest and incarceration of homeowners, i.e., "political prisoners" so that IDF soldiers can destroy or condemn their homes, claiming they have been abandoned.[30] For this reason, few Palestinians venture out of their homes overnight, knowing that their homes: (a) will not be there when they come back because they have been demolished; or (b) will be occupied by Jewish settlers when they return, protected by IDF/G4S personnel; or (c) have been cited for demolition in their absence based on false affidavits and fictitious security rationales.[31] They have good reason to be concerned—at least 49,000 Palestinian homes have been demolished or confiscated since the second occupation started in 1967.[32]

Over the past 30 years, the construction/support firms and their subsidiaries have played a vital role in the conspiracy. With U.S. donor/entity funding, they have committed, encouraged, or collaborated in aggravated and ongoing trespasses on private Palestinian property and converted those properties to their own profitable use and enjoyment. Evidence thereof is the fact

---

[29] http://www.whoprofits.org/company/hewlett-packard-hp.

[30] Palestine Inside Out: An Everyday Occupation, Saree Makdisi, 2008 (hereinafter "Palestine Inside Out") Kindle location 4208, 4214.

[31] Palestine Inside out Kindle location 4206. *See also* http://imeu.org/article/elad-the-jewish-national-fund-the-us-taxpayer-subsidized-judaization-of-sil.

[32] *See* http://icahd.org/ putting the specific number at 48,488 as of Nov. 9, 2015.

that as of 2009 they had built the majority of, if not all, of the 56,000 new apartments and houses and 187 shopping centers.[33] The original hilltop settlements, with six tents and two outhouses, are now fully-populated gated communities occupied by "Jewish-only" residents who have easy access to Ariel's university, first-class medical centers, paved superhighways, waste treatment facilities, interconnecting bridges and tunnels, and express bus services linking the "Jewish-only" settlements.[34] *How did that happen?* Settlement officials, during the last 40 years, have made repeated trips to America, during which they solicited and received billions of dollars in tax-deductible financial assistance, transferred into their Israeli bank accounts by U.S.-based BL/BH bankers.

As already stated, these improvements constitute aggravated and ongoing trespasses and illegal conversions of private property under U.S., Israeli, and international law (See Count IV). The lost rental value associated with these rental and commercial properties is, based on current RE/MAX listings, estimated at $100 million,[35] and is part of the $1 billion in damages claimed herein. As for the infrastructure improvements like "Jewish-only" highways, access ramps, tunnels, and the Tovlan waste facility,[36] they are now worth approximately $200 million, which amount is also part of the $1 billion in damages claimed herein.

Wealthy American donors like Moskowitz, Adelson, Hagee, and the Falic Family are co-conspirators as well because they have advocated and funded ethnic cleansing, wholesale

---

[33] *See* http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.
[34] Palestine Inside Out Kindle Location 2101.
[35] *See* FN 26.
[36] *See* https://electronicintifada.net/blogs/adri-nieuwhof/veolia-remains-active-garbage-dump-israeli-settlers.

violence and settlement expansion. They have, like their coconspirators, also engaged in money laundering, see 18 U.S.C. § 1956(a)(2),[37] by transferring clean funds abroad to promote arms trafficking, wholesale violence and ethnic cleansing. Defendants Moskowitz and Adelson have been obsessed with expanding the Zionist state, and have each contributed millions of dollars to fund the violent expulsion of the Palestinian population,[38] taking substantial illegal tax deductions, *desirous of having the U.S. taxpayer fund their political agenda*. They knew and intended, like their U.S. tax-exempt entity official partners, that their "charitable" contributions would result in wholesale violence being inflicted on the local Palestinian population to accomplish settlement expansion, and therefore more ethnic cleansing.

Ethnic cleansing of Palestinians from their homeland is nothing new. According to Israeli historian Beni Morris, "A Jewish state would not have come into being without the uprooting of 700,000 Palestinians. It was necessary… to cleanse the hinterlands, borders, main roads, [and] villages [of all non-Jews]."[39] This is the identical sentiment shared by all Defendants herein— *they are intentionally and literally cleansing East Jerusalem and the occupied territories of all non-Jews.* The disappearance of 49,000 Palestinian homes and 400,000 acres of olive groves[40] is

---

[37] Defendants Gilbert, Braman, Saban, and Ellison have not been named in the conspiracy described herein, but are named as Defendants in Counts II and III for intentionally funding the commission of war crimes by making significant contributions to the Israeli army, whose soldiers have been engaging in ethnic cleansing and war crimes for the past 30 years, *see generally* Our Harsh Logic.

[38] "Tax-Exempt Funds Aid West Bank Settlements," NY Times July 5, 2010. *See also* http://lajewsforpeace.org/Essays/Settlements/Funders.pdf.

[39] Palestine Inside Out Kindle Location 4763.

[40] *See* http://icahd.org/.

proof positive thereof,[41] as is the fact that 56,000 new "Jewish-only" apartments and homes now dot the OPT landscape.[42] Thus, the settlement-expansion activity and ethnic cleansing encouraged and justified by Defendant Abrams and funded by BL/BH, U.S. donors/entities have obviously achieved remarkable results.

HP/Motorola, with U.S. donors/entities' funding, have also been instrumental in promoting arms trafficking, settlement expansion, wholesale violence, and ethnic cleansing. Their sophisticated surveillance systems and equipment have protected, for at least 30 years, the armed settlers and their security coordinators who have knowingly ordered and committed violent criminal activities like murder, arson, and malicious destruction of private property. And, they have assisted IDF/G4S personnel in confining the Palestinian population to scattered isolated pockets of real estate, i.e., open-air prisons.[43] By doing so, they have ensured the safety of the settler population, a major selling point made by RE/MAX agents when marketing new homes in expanded settlements.[44] HP/Motorola officials, like all corporate defendant officials named herein, spent considerable time in the OPT, and therefore knew that: (a) the settlers were religious extremists dedicated to Zionist expansion; (b) they and their security coordinators despised their Palestinian neighbors and coveted their property; and (c) the settlers were armed

---

[41] *See also* Israel Lobby p. 96 ("There is not a single place built in this country that did not have a former Arab population." That was an admission by former Israeli Defense Minister Moshe Dayan in Walid Khalidi *All That Remains: the Palestinian Villages Occupied and Depopulated by Israel in 1948* p. xxxi). p. 96 BY 1962, Israel owned almost 93% of the land inside its pre-1967 borders. To achieve this outcome, 531 Arab villages were destroyed and 11 urban neighborhoods emptied of their inhabitants.
[42] http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.
[43] http://www.whoprofits.org/company/g4s-israel-hashmira.
[44] *See* FN directly above. *See also* "Palestine Today is an Open-Air Prison," http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html.

and trained in the use of automatic weapons and sniper scopes courtesy of funding coming from

U.S tax-exempt entities and their donors. As a result, HP/Motorola officials knew that these

settlers would eagerly inflict serious physical injury, for example, malicious wounding, on

Palestinian farmers, and more than likely kill them or simply let them bleed out.

BL/BH, co-conspirators/Defendants, have also played a significant role in achieving the

conspiracy's goals. Their U.S.-based Israeli bank branches have, for at least 30 years, perhaps

40, received funds from U.S. donors/entities, knowing those funds would be used to intentionally

promote wholesale violence, arms trafficking, and the expansion of the Zionist state (in the case

of BL, as recited in its 2013 annual report[45]). U.S.-based BL/BH officials knew, simply by

following "Know Your Customer" banking regulations that these funds would be transferred to

OPT settlements to: (a) arm and train the settler militia in military tactics; (b) rid the OPT of all

non-Jews by expelling the local Palestinian population, with force if necessary; and (c) result in

settlement expansion and wholesale violence.[46] Like the donors/entities, BL/BH officials have

also engaged in illicit money-laundering activity and income tax fraud. In the case of BL, it is no

stranger to income tax fraud, having paid $400 million in 2014 to stay a U.S. Justice Department

criminal prosecution premised on a criminal conspiracy to defraud the IRS.[47] The bank was

---

[45] *See* http://english.leumi.co.il/static-files/10/LeumiEnglish/Financial_Statements/LeumiProfile2013_1.pdf?lang=en, p. 12. On file with the Plaintiffs.

[46] The banks knew, for example, that as early as 2004 that members of Breaking the Silence had confessed to committing atrocities in the OPT. As Haggai Matar stated, none of Breaking the Silence's allegations have proven to be wrong. http://972mag.com/why-do-so-many-israelis-hate-breaking-the-silence/114763/.

[47] *See U.S. v. Bank Leumi Le-Israel B.M. et al*, 2:14-cr-00731-UA (C.D. Cal. 2014) Docket entry 24 Filed 12/23/14.

hiding assets and income sources which belonged to U.S. taxpayers trying to evade their income-tax obligations. At all relevant times herein, BL/BH officials were not performing routine banking services to promote legitimate business purposes for their tax-exempt entity customers. They were, just like all corporate Defendant officials named herein, instead ensuring that their customers' settlement-expansion agenda would be realized, even though that meant wholesale violence would be directed against the local Palestinian population (malicious wounding) and necessarily result in further ethnic cleansing and theft of private property.

Where real properties have been referenced herein, Palestinian ownership thereof has been conceded by the Israeli government, former Prime Minister Sharon, or by senior IDF officials. For example, senior IDF officials have conceded that they have been confiscating private Palestinian property based on alleged "security purposes" for at least 40 years. And the Israeli government itself has published a comprehensive database in 2009[48] (herein referred to as the Spiegel Database) wherein it admitted that many settlements had been built on private Palestinian property. So with respect to those particular settlements, there is no property ownership issue. With respect to all other property claims herein, the Israeli government recognizes Palestinian claims to private property under the Ottoman Land Code, Jordanian property law, and the British Land Ordinance of 1928. Consistent with those property codes, Plaintiffs' expert will identify the families who own the property on which now sit numerous shopping malls, housing projects, hotels, schools, factories, and industrial parks in the different

---

[48] http://www.haaretz.com/secret-israeli-database-reveals-full-extent-of-illegal-settlement-1.266936.

settlements. Members of those families are the Plaintiffs named herein entitled to recover damages from donors/entities whose funding made all this possible.

As a point of clarification, the Plaintiffs are not: (a) challenging IDF confiscations; (b) asking this Court to determine if OPT settlements are illegal; or (c) if Palestinians have a right to return to their homeland. The Court should find, however, that murder is still murder, and ethnic cleansing is still ethnic cleansing. It should also find, given compelling evidence like the book *Our Harsh Logic* which details the heinous war crimes committed by IDF personnel in the OPT (*see* Count II, War Crimes), that aggravated and ongoing trespass, arson, war crimes, and massive ethnic cleansing have been and are today a daily occurrence in the OPT—activity encouraged by Abrams and financed by BL/BH, U.S. tax-exempt entities, and their donors.[49] One example of that heinous criminal activity is an IDF commander's order that "I want to see Palestinians' bodies full of bullets."[50] Young, impressionable recruits fresh out of high school[51] religiously adhered to that order, to the detriment of many Palestinian families, including some of the Plaintiffs identified herein.

The Plaintiffs are asking for an award of $1 billion based on the following categories of damages: (a) back rent owed by BL, the conglomerates, and the settlements; (b) loss of loved ones including spouse, siblings and/or children; (c) loss of factories, retail markets, hotels, travel

---

[49] In the Silwan area of Jerusalem, Abu Tayeh neighborhood, local residents constantly hear the sounds of grenades, merchants closing shops, locals ready any moment to flee, broken window, and children screaming. Dozens of demolition orders have been issued against homes, residences, and commercial properties. Even the only mosque in the neighborhood is under threat of being demolished. *See* http://silwanic.net/?=silwan.

[50] Our Harsh Logic p. 79.

[51] http://www.wrmea.org/2016-march-april/israeli-settlements-come-at-a-high-price.html.

agencies, etc.; (d) infrastructure improvements destroyed in Gaza; (e) infrastructure destroyed in the OPT; (f) theft of thousands of acres in connection with the separation wall and the construction of 794 miles of bypass roads;[52] (g) counseling services for thousands of traumatized Palestinian children; (h) destruction of fertile agricultural properties (e.g., thousands of olive trees[53]); and (i) destruction of thousands of homes, which in some cases had been lived in for centuries by the families of Palestinian farmers.

Finally, this case is about U.S. individuals and tax-exempt entities intent on: (a) taking criminal advantage of the U.S. tax code by taking significant illegal tax write-offs and not reporting billions of dollars in contributions as income; and (b) encouraging and funding wholesale violence and arms trafficking abroad and comprehensive war crimes in order to advance their own political agenda—getting rid of all non-Jews in the OPT. The causes of action are: (1) Civil Conspiracy; (2) War Crimes, Crimes Against Humanity, and Genocide; (3) Aiding and Abetting the Commission of War Crimes; and (4) Aggravated and Ongoing Trespass. Plaintiffs hereby request that a jury hear and determine all of the factual issues herein, including the identity of all U.S. citizens, not just Defendants Abrams, Adelson, Braman, Ellison, Gilbert, Hagee, Moskowitz, and Saban, who either encouraged or funded the gruesome criminal activities described in *Our Harsh Logic* (e.g. aiming for the eyes in order to "take out an eye" and promotions being contingent on number of Palestinians murdered[54]) which activities were

---

[52] Palestine Inside Out Kindle location 614.
[53] http://www.counterpunch.org/2015/11/03/palestinian-olive-trees-destroying-a-symbol-of-life/.
[54] Our Harsh Logic pp. 102, 288.

purposefully engaged in by armed and angry settlers and IDF/G4S personnel for at least the past 30 years.

## JURISDICTION

1.      28 U.S.C. § 1331 is invoked on behalf of the non-U.S. citizen Plaintiffs against all Defendants in connection with Count II, War Crimes, Crimes against Humanity, and Genocide, Count III, Aiding and Abetting the Commission of War Crimes, and Count IV, War Crime of Pillage. These Counts fall under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("Alien Tort Statute" or "ATS"). This Court has jurisdiction under the ATS to adjudicate Plaintiffs' claims because they: (a) involve violations of Customary International Law; and (b) touch and concern the territory of the United States as described in detail throughout this Complaint. For example:

(a) Defendants Abrams, Adelson, Braman, Ellison, Gilbert, Hagee, Moskowitz, and Saban are U.S. citizens;

(b) The officials of all tax-exempt entities named herein are domiciled in America.

(c) Defendant tax-exempt entities AFA, AFBEY, AFHH, AFUO, CFOIC, EDF, FFF, FIDF, GEF, Honenu, KSF, and Hebron Fund are all domiciled and located in America.

(d) The foreign firms named herein like Veolia and AFI all have offices in America;

(e) BL/BH have officers in America, some of whom are U.S. citizens or have dual U.S./Israeli citizenship;

(f) Officials of foreign Defendants named herein conspired and collaborated with U.S.-based tax-exempt entities and donors and BL/BH U.S.-based officials and/or participated in the commission of war crimes, crimes against humanity, and genocide;

(g) Defendants in (a) and (b) above, formulated their plan to conspire, fund wholesale violence and arms trafficking, and otherwise collaborate in the commission of war crimes while in the United States;

(h)   Defendants in (a) and (b) above engaged in various activities here in the U.S. with respect to conspiring to evict all non-Jews from OPT. They: (1) funded and participated in National Basketball Association ("NBA") fundraising events for the Israeli army; (2) held meetings with settlement leaders, IDF representatives, and international conglomerate representatives in this judicial district and elsewhere within the United States[55]; (3) sent money to settlements and the IDF from the United States; and/or (4) from their different locations in America, they established and maintained regular telephone, email, fax, telegraph, mail, and other communications with overseas settlement officials, including security coordinators, and senior IDF military commanders to promote settlement expansion and ethnic cleansing.

2.      Congress's express intent in enacting the ATS was to give non-citizens access to U.S. courts to hold U.S. citizens and foreign nationals accountable for violations of international law norms that "touch and concern"[56] the United States, as Defendants' actions clearly do. For example, the U.S.-based donors/entities named herein have been engaging in money laundering activity for at least 35 years, and have repeatedly defrauded the IRS by making false statements on applications for tax-exempt status, and by filing fraudulent 990 and 1040 tax forms. The tax-exempt entity officials have also conspired to defraud the IRS by encouraging their donors to take illegal tax deductions for expenses incurred in numerous criminal activities, e.g., setting up militia units, establishing sniper schools, and committing ethnic cleansing and wholesale violence.

3.      The Torture Victim Protection Act of 1991 ("TVPA") as it amends 28 U.S.C. § 1350 (the ATS) is invoked on behalf of the U.S. citizen plaintiffs against all Defendants in Count II, similar to and on the same bases as the ATS invoked on behalf of the non-U.S. citizen Plaintiffs

---

[55] Israel Lobby 217, 218, 223, 224, 228.
[56] *Kadic v. Karadzic*, 70 F.3d 232 at 233, rehearing den'd, 74 F.3d 377.

above. The U.S. citizen Plaintiffs named herein have no potential remedies[57] to exhaust in Israel

because:

(a) The remedies sought are not available in the OPT or Israel. For example, to the extent a Palestinian or Palestinian-American wanted to sue individuals and entities in Israel for intentional murder, they could not do so. A stark example thereof is Rachel Corrie's parents, who tried to hold IDF soldiers responsible for the intentional murder of their daughter. They were denied any and all relief by the Israeli Supreme Court. Recently, members of the Dawabshe family tried to secure monetary redress in connection with the intentional burning down of their house, which cost three lives. Israeli Deputy Defense Minister Eli Ben-Dahan refused them access to Israel's courts.

(b) The Plaintiffs are filing this suit in Federal District Court for another reason—the various torts and atrocities alleged herein cannot be adjudicated in Israel. The HCJ has consistently rejected judicial disposition of these claims.[58] Thus, though they may be afforded all the rights and privileges of a citizen here in U.S. courts, in the OPT, the U.S. citizen Plaintiffs are treated as stateless individuals, second class citizens, and defeated prisoners of an occupying power. Unlike Israeli citizen settlers in the OPT, because of their race and/or their religion, the U.S. citizen Plaintiffs would be subject to a regime of military law, which does not recognize civil causes of action like civil conspiracy and aggravated trespass, nor claims premised on war crimes, crimes against humanity, and genocide.[59] Unlike non-Palestinian U.S. citizens, because they are Palestinians, these Plaintiffs have no access to Israeli courts.

(c) The remedies available in the OPT, in any case, are not adequate. Although it is possible for Palestinians to file limited grievances in military courts in the OPT, the U.S. citizen Plaintiffs are not able to hail the defendants into those military courts,

[57] The Alien Tort Statute, applicable to the non-U.S. citizen Plaintiffs herein, does not require exhaustion of local remedies. 28 U.S.C. § 1350.
[58] *See* The Role of National Courts in Applying International Humanitarian Law, Sharon Weill, 2014, p. 91.
[59] *See* The General's Son: Journey of an Israeli in Palestine, Miko Peled, 2010 (hereinafter "General's Son"). In 2010 Mr. Peled was arrested in the West Bank and taken to an IDF military station. The station commander complained about Mr. Peled, saying "look, he is an Israeli citizen, and he has rights. He is not a Palestinian that I can just beat up and throw in prison." General's Son p. 186. *See also* The Role of National Courts In Applying International Humanitarian Law (Sharon Weill), explaining how through a series of decisions the HCJ has effectively extended citizenship rights to Israeli settlers in the OPT while simultaneously relegating Palestinians in the same territory to military rule in which broadly-defined security interests trump basic civil rights.

34

and in any case, they could not file causes of action for war crimes, aggravated and ongoing trespass, or civil conspiracy in those military courts for two reasons: (1) Israel's Anti-Nazi Law of 1950 applies only to Jews in Israeli courts, which courts these Plaintiffs cannot access; and (2) military courts have limited jurisdiction, if any, to deal with these issues.

4.      In the event that Plaintiffs' claims under the ATS are dismissed with prejudice, 28 U.S.C. § 1332 Diversity Jurisdiction would be invoked on behalf of the Plaintiffs named herein with respect to all Defendants.

5.      18 U.S.C. § 1956(b)(2), modified by U.S.A. Patriot Act Title III, Sections 317 and 318, is the long-arm statute extending jurisdiction over entities which engaged in money-laundering transactions across international borders into Israel or the OPT (HP/Motorola, construction/support firms, RE/MAX) and laundering activities through foreign banks like BL and BH. It provides jurisdiction over foreign persons, specifically: "For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and…the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States."

6.      All foreign-based Defendants named herein have conspired for at least 30 years with U.S. tax-exempt entity officials to expand settlements and engage in arms trafficking, wholesale violence and ethnic cleansing. They have benefited enormously from 30 years of international wire transfers initiated by U.S. tax-exempt entities and processed by BL/BH officials in America,

so they have certainly been involved with "financial transactions that occur in whole or in part in the United States."

7.      18 U.S.C. § 981 as modified by the International Money Laundering Abatement and Financial Terrorism Act of 2001 is invoked against all Defendants other than those listed in Count IV. Per its legislative history, this act was intended to "strengthen the provisions put in place by 18 U.S.C. § 981, especially with respect to crimes by non-US nationals and foreign financial institutions in order to provide a clear national mandate to subjecting to scrutiny foreign financial institutions operating outside of America" like Defendants BL/BH.

8.      18 U.S.C. § 371, Conspiracy to Commit Offense or to Defraud the United States, is a statute intended to protect all U.S. government agencies from being defrauded or taken advantage of in some criminal manner. The IRS, for example, should not be deprived of normal tax revenues owed by U.S. taxpayers. As detailed herein, however, Defendants BL/BH conspired with U.S. taxpayers to do precisely that, from 2005 to 2012, as already referenced in the introduction. The donors and tax-exempt entities named herein have similarly conspired with their accountants to defraud the IRS by filing false applications for tax-exempt status and fraudulent 990 and 1040 tax forms. The U.S. donors, encouraged by tax-exempt entity officials, have taken illegal deductions for at least 20 years. A donor cannot take a charitable deduction, which is based on expenses incurred by officials overseas who are setting up and arming local militia units whose members are engaging in heinous criminal activity like wholesale violence, arms trafficking, and ethnic cleansing. That criminal activity is detailed in *Our Harsh Logic*.

36

9.      18 U.S.C. § 371 also applies to the activities engaged in by BL/BH officials based in

America. They knew, courtesy of "Know Your Customer" banking protocol, that when

executing wire transfers for their tax-exempt entity customers that the funds being transferred

overseas would be used to promote criminal activities, i.e., wholesale violence, arms trafficking,

and ethnic cleansing. Evidence of that conduct is that the tax-exempt entities blatantly

encouraged their donors to take tax write-offs for the purchase of military hardware and sniper

scopes. Thus, the banking officials knowingly conspired with their tax-exempt entity customers

to violate a number of U.S. criminal statutes like money laundering, terrorist financing, and arms

trafficking.

10.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over "all other

claims that are so related to claims in the action within such original jurisdiction that they form

part of the same case or controversy under Article III of the United States Constitution." Thus

this Court has supplemental jurisdiction over the Plaintiffs' state claims (i.e., Counts I and IV,

Civil Conspiracy and Aggravated Trespass) alleged herein.

11.     Fed. R. Civ. P. 4(k)(2) provides this Court personal jurisdiction over international

defendants who have transacted any business or contracted to provide services in this judicial

district pursuant to the District of Columbia Long-Arm Statute, D.C. Code Ann. § 13-423.

12.     Amnesty International's 14 Principles on the Effective Exercise of Universal Jurisdiction

lists grave breaches of the four Geneva Conventions as a basis for exercising universal

jurisdiction by any national court like this Federal District Court. As detailed herein, all

Defendants, besides repeatedly breaching Geneva Convention principles, have also breached

Nuremberg Principles during Israel's second occupation starting in 1967. Those breaches include: (a) willful killing; (b) torture or inhumane treatment; (c) willfully causing great suffering or serious injury to body or health; (d) arms trafficking; (e) extensive destruction or appropriation of property not justified by military necessity; (f) unlawfully deporting and/or transferring 400-500,000 indigenous Palestinians out of the OPT; and (g) confining the Palestinian population to open-air prisons in the occupied territory, i.e., ill treatment of an occupied population.

13.     Consistent with Amnesty International's principles on jurisdiction, the District Court of Jerusalem in 1961 decided the case of *Israel v. Eichmann*. The Court's jurisdiction was founded upon paragraph 12 of Israel's Nazi and Nazi Collaborators (Punishment) law 5710-1950. The court held regarding jurisdiction that the universal character of the crimes in question, war crimes, which are grave offenses against the Law of Nations itself, grant jurisdiction to any domestic court hearing such claims. There are detailed allegations pled herein (see Count II, for example) reciting the "grave" breaches committed and funded by the Defendants named herein against the Palestinian plaintiffs named herein.

14.     In Counts II and III of this lawsuit, Plaintiffs specifically allege that the Defendants named herein have either funded or committed war crimes, crimes against humanity, and genocide, which are in and of themselves grave crimes and crimes against the Law of Nations, see U.S. Constitution Art. I Sec. 8 Cl. 10.

**<u>VENUE</u>**

15.     Plaintiffs include Palestinian nationals domiciled abroad, Palestinian nationals domiciled in the United States, and Palestinian-American citizens, all of whom are domiciled in the United States and abroad, and all of whom have been injured in some manner by the tortious acts complained of herein.

16.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the activity, events, intentional acts, and omissions complained of herein on the part of the Defendants occurred in this judicial district. For example, Defendant Abrams has engaged in lobbying efforts for at least 20 years to convince congressional leaders that Palestinian farmers, not fanatical settlers, are responsible for wholesale violence in the OPT because they repeatedly attack settlements. The Palestinian farmers are not "attacking" the settlements, they are simply trying to harvest their olive groves, which are now located in the perimeters of an expanded settlement or in a military zone restricted to "Jewish-only" settlers.

17.     Plaintiffs' injuries have occurred as a direct result of activities engaged in within this judicial district by, *inter alia*, Defendants Abrams, Moskowitz, Adelson, Hagee, HP/Motorola, AFA, FFF, and other donors/entities in conjunction with activities engaged in jointly with lobbying groups such as the U.S. Israel Public Affairs Committee ("AIPAC").  All of the Defendants attend AIPAC's annual policy conference, where IDF senior officers and Defendant Abrams have been featured speakers.[60] Based upon information and belief, these Defendants all have AIPAC memberships and are actively involved in lobbying efforts pursued by the

---

[60] Israel Lobby p. 160.

Congressional Israel Allies Congress, which include securing congressional resolutions denouncing Palestinian violence.

18.     AIPAC, with Defendant Abrams' assistance, has engaged in extensive lobbying activity in this judicial district for the last 50 years designed to: (a) secure financial and political support for Israel;[61] (b) amend Treasury tax-exemption regulations so that tax-exempt entities do not have to disclose the country they are sending money to; (c) secure congressional resolutions condemning Palestinian violence; and (d) secure authority to eliminate any and all financial aid to the Palestinian Authority. According to Senator J. William Fulbright, who headed up the Senate Finance Committee hearings in 1963, AIPAC's predecessor, the American Zionist Council, had engaged in extensive money laundering activity 50 years ago in this judicial district.[62] Hence, AIPAC, Defendant Abrams, and the donors/entities referenced herein are all well acquainted with the U.S. money-laundering statutes.

19.     The construction/support firms have also engaged in extensive lobbying activity[63] in this jurisdiction. That activity included sending representatives from their U.S. offices to this jurisdiction in order to meet with donors, tax-exempt entity officials, and settlement officials regarding securing funding for construction projects to advance the settlement enterprise and ensure further settlement expansion in the process. They knew that arms trafficking, for example,

---

[61] *See* http://www.aipac.org/about/what-weve-accomplished.
[62] Israel Lobby p. 118, http://www.israellobby.org/Senate/default.asp.
[63] *See* http://www.opensecrets.org/lobby/lookup.php, showing *inter alia*, annual lobbyist payments by BL ($20,000), BH ($20,000) RE/MAX, G4S ($90,000), Access Industries ($240,000), CRH ($200,000), Heidelberg ($800,000), Hanson ($800,000), Veolia ($490,000), Volvo ($810,000), HP ($1.9 million), and Motorola ($1.5 million).

was necessary to ensure that settler militia would be able to forcibly expel all non-Jews living in their settlement area.

20.     This case concerns records maintained by the Treasury Department for the last 30 years, including: (a) the 990 annual tax forms for NGOs and any other reports by the individual donors and tax-exempt entities named herein; and (b) applications for tax-exempt status with all attachments, including the entities' corporate charters. As detailed herein, these entities have been funding ethnic cleansing, arms trafficking, and wholesale violence, which activities have certainly not been authorized by their charters. Thus, venue is appropriate because the important documents regarding all claims made against the tax-exempt entities herein and the individual donor Defendants (1040 income tax forms) are all located in this judicial district, i.e., documents like 990 and 1040 tax forms should have been filed in this judicial district with the Internal Revenue Service ("IRS").

21.     BL/BH both have major presences in California, New York, and Florida. Moreover, Defendant BL has purposely sent senior bank officials to the United States on a regular basis to service U.S. taxpayers who were desirous of hiding assets overseas.[64] BL, in order to assist U.S. taxpayers to avoid their lawful tax obligations, purposefully set up "dummy" offshore bank accounts for them, thus conspiring to commit income tax fraud.[65] BL/BH officials have accepted,

---

[64] *See U.S. v. Bank Leumi Le-Israel B.M. et al*, 2:14-cr-00731-UA (C.D. Cal. 2014). These transactions were designed to, and succeeded in, concealing U.S. taxpayers' undisclosed income sources from the Internal Revenue Service and served as a basis for criminal prosecution by the U.S. Department of Justice, headquartered in this judicial district. *See U.S. v. Bank Leumi Le-Israel B.M. et al*, 2:14-cr-00731-UA (C.D. Cal. 2014) (BL agreed to a deferred prosecution penalty of $400 million).
[65] Id.

for at least 30 years, millions of dollars' worth of bank deposits in the U.S., and intentionally

transferred those funds via international wire transfers to a number of segregated settlements to

knowingly promote various criminal activities, i.e., wholesale violence, arms trafficking, and

ethnic cleansing. These criminal activities resulted in the wholesale and ongoing theft of private

Palestinian property in EJ and the OPT[66] and enabled settlements to expand exponentially with

the criminal violence attendant to that expansion. BL/BH officials knew what these funds were

intended for, because "Know Your Customer" banking protocol dictates that bank officers know

what their customers are doing with the funds in their accounts. In the post 9/11 time frame,

based on U.S. Treasury regulations and Patriot Act provisions, all bank officers today must

particularly scrutinize international wire transfers, especially those going to the Middle East, to

ensure that such funds do not promote violence overseas.

22.     As detailed in paras. 32-85 *infra*, the corporate Defendants named herein have offices in

the United States, their officials have consistently visited the United States to conduct business

here and/or solicit U.S. financial entities to raise capital for their international endeavors and

businesses.

23.     Most of the Defendants herein have encouraged, promoted, or financed a broad public

relations campaign in the United States with an emphasis on efforts in the Metropolitan

Washington D.C. area, where prestigious media outlets, opinion makers, and congressional

members are located. Their intent is to further the goals of the conspiracy outlined in Count I by

---

[66] Id. *See also* http://www.whoprofits.org/company/leumi-bank (highlighting BL's activities in the settlements).

molding U.S. public opinion and influencing Congress to view Palestinians as "savages."[67] Senator Fulbright, in 1963, confirmed during Foreign Relations Committee hearings that AIPAC's predecessor had been engaging in that identical activity via money laundering.[68] Their three-fold message is that: (a) Palestinian farmers, not violence-prone settlers, are responsible for the continued violence in the OPT; (b) the settler population is constantly being attacked by their Palestinian neighbors, i.e., farmers living nearby; and (c) that settlement expansion is a fiction. By convincing Congress that settlement expansion has been grossly exaggerated, congressional leadership has no reason to hold hearings designed to educate the American public about such activity and its deleterious effect on Middle East peace.

24.     Defendant Abrams, for example, has written numerous articles, which have been published in this judicial district justifying settlement growth and the ongoing seizure of private Palestinian property. He also disseminates the disingenuous message that settlement expansion is a myth created by pro-Palestine UN officials.[69] During the last 20 years he has made a number of congressional appearances, and often is a featured speaker before committees which issue congressional resolutions: (a) condemning Palestinian violence; and (b) cutting off vital humanitarian aid to the Palestinians. Cutting off that financial aid, especially aid for Palestinian Authority security forces, simply increases the possibility of more wholesale violence.

---

[67] As stated by a prominent advertisement campaign on Washington, D.C. busses in 2014/2015.
[68] Israel Lobby p. 118, http://www.israellobby.org/Senate/default.asp.

[69] *See, e.g.*, "The Settlement Obsession: Both Israel and the United States Miss the Obstacles to Peace" Elliott Abrams, August 2011; and "Everything You Know about Israeli Settlements Is Wrong" Elliott Abrams, Uri Sadot, September 5, 2014.

25.     Defendant Abrams routinely meets here in Washington, D.C. and in Israel with pro-

settlement politicians and media representatives, senior AIPAC officials, and friendly

congressional aides in order to coordinate the dissemination of daily press releases to the effect

that settlements are not expanding, and that Mideast violence, which specifically violates

President Clinton's 1995 Executive Order, is a by-product of violent Palestinian homeowners

intent on attacking vulnerable settlers.[70]

26.     All of the conglomerates named herein like Volvo and HP/Motorola spend significant

time in this jurisdiction engaging in classic lobbying activities, ensuring that the settlement

leaders will have the necessary funds to expand the settlements and thus promote ethnic

cleansing, build "Jewish-only" segregated housing projects, bridges, and tunnels, and make other

vital infrastructure improvements.

27.     Based on information and belief, Veolia, for example, frequently sends representatives

from its Philadelphia office to lobby Congress and meet with Defendant Abrams, AIPAC

officials, friendly pro-settlement politicians, and think tanks based in Washington, D.C. BL has

hired a local lobbying firm, Pillsbury, Madison & Sutro, to protect its various investments in the

OPT.[71]

28.     All of the conspirators named in Count I attend various dinner galas held in the greater

Washington D.C. metropolitan area. Those gala events honor IDF soldiers who have served in

the Occupied Territories and wealthy pro-settlement donors and current and former senators like

Messrs. Lieberman and Schumer. As a result, they can mingle with friendly congressional staff

---

[70] Israel Lobby p. 224.
[71] http://www.opensecrets.org/lobby/clientsum.php?id=F7156&year=2000.

and AIPAC officials, and various congressional members who are pro-settlement advocates.

AIPAC events, of course, occur in this judicial district on an annual basis, and are always well

attended by settlement advocates like Abrams and Adelson. Adelson is such an influential

political donor that he was invited by Newt Gingrich as a guest to hear Prime Minister

Netanyahu's 2015 address to Congress.

## PARTIES

### I.     The Plaintiffs

29.     The Plaintiffs herein are American citizens in some cases for example, like Plaintiffs

Saad Malley and Linda Kateeb, but for the most part are Palestinian nationals from various

villages in the OPT. They themselves or their relatives have been injured, tortured, incarcerated,

had their homes and olive groves demolished or confiscated to promote settlement expansion,

witnessed their children being physically attacked and traumatized by armed settlers and IDF

veteran soldiers[72] and their retail businesses and outdoor food markets shuttered, and are now

confined to "open-air prisons" according to former Prime Minister Olmert.[73] Their children have

limited access to medical and educational facilities and have one of the highest rates of

emotional distress and dysentery in the world. As referenced herein, Swedish Prime Minister

Olof Palme compared the treatment of Palestinian children to Nazi Germany's treatment of

---

[72] As detailed in Our Harsh Logic.

[73] "Palestine Today is an Open-Air Prison," http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html. *See also* Meron Benvenisti, "Founding a Binational State" (Ha'aretz, Apr. 22, 2004) (describing Gazan Palestinians as being contained in a "huge holding pen").

Jewish children in WWII concentration camps.[74] The Plaintiffs have relatives, including children and spouses, who have been murdered or are still incarcerated as political prisoners and have been tortured like Plaintiff Al-Tamimi. All of this heinous criminal activity has been funded by the U.S. tax-exempt entities and donors and BL/BH officials and is thoroughly detailed in *Our Harsh Logic*, *Witness in Palestine: A Jewish American Woman in the Occupied Territories*, and *Palestine Inside Out*.

30.     As a direct result of home confiscations and demolitions, many Palestinians have become refugees living on international handouts at the level of $2 per day. They are now scattered all over the OPT with family members living apart from each other. They have applied for licenses from area military commanders to live together like a normal family. That office routinely denies those applications, hoping that will encourage the Palestinian applicants to leave the only country they have ever known. Their children have been traumatized by the ongoing wholesale violence and malicious property destruction funded by the U.S. donors/entities named herein. For example, they have personally witnessed the demolition of their ancestral homes (which have been in families for centuries) and their 400-year-old olive groves, and the maiming and murder of their parents.[75]

31.     Taking the allegations in this complaint and applying them to the specific damages suffered by the Plaintiffs herein, the Plaintiffs currently believe and allege that their damages resulted from the flow of funds from donors to transferring entities to recipient settler organizations and corporations in the OPT as outlined in Exhibit C. Plaintiffs incorporate Exhibit

---

[74] http://www.olofpalme.org/wp-content/dokument/820701b_tco_kongress.pdf.
[75] *See* Our Harsh Logic p. 40.

C into the allegations of this lawsuit, but reserve the right to amend the causal chains as more details come to light in discovery.

## II.     The Defendants[76]

### a)  Donor Defendants

32.     All donor Defendants share a pro-Zionist agenda and are dedicated to doing anything they can to promote the growth of settlements in the OPT. As confirmed by various Israel-based NGO studies, the donors have adopted a "by hook or by crook" strategy.[77] They all knew that their financial support would necessarily entail the ethnic cleansing of all Palestinian families living near OPT settlements. The donors have all engaged in money laundering because they have transferred funds overseas with the intention of funding wholesale violence, ethnic cleansing, and malicious property destruction. All of the donors have conspired with their tax-exempt entities to defraud the IRS by taking illegal tax write-offs which are based on expenses incurred by settlement officials in setting up sniper schools and purchasing sniper scopes and military hardware for the settlers.

33.     Defendant **Sheldon Adelson** is domiciled in Nevada, and has been a zealous advocate of segregated OPT settlements. He has, for the last 40 years, openly encouraged the forcible expulsion of all non-Jews in the OPT. He has been named in all Counts herein except Count

---

[76] Where there exists a question regarding any of the following Defendants' liability for acts taken by their agents, independent contractors, or employees, the Plaintiffs allege *respondeat superior* liability because all of those agents, independent contractors, and employees were, at all relevant times, acting within the scope of either their engagement, contract, or employment.

[77] http://www.btselem.org/download/201007_by_hook_and_by_crook_eng.pdf.

IV—the War Crime of Pillage. He has funded the illegal theft of private Palestinian properties

and has engaged in money laundering in violation of 18 U.S.C. 1956(a)(2) by transferring at least

$100 million[78] across international borders to fund various criminal activities—arms trafficking,

theft and malicious property destruction, the forcible expulsion of the local Palestinian

population, and wholesale violence.

34.     Defendant **Norman Braman** is a wealthy businessman domiciled in Florida and runs the

Braman Family Charitable Foundation. He has openly advocated for the FIDF[79] and settlement

expansion and the attendant malicious property destruction, wholesale violence, and ethnic

cleansing. He and his various friendly 501(c)(3)s have transferred at least $10 million to

Defendants FIDF, AFA, CFOIC, and other U.S. tax-exempt entities which have, for at least 20

years, laundered funds in support of the aforementioned criminal activities. He has been named

in Counts II (War Crimes) and III (Aiding and Abetting the Commission of War Crimes).

35.     Defendant **Lawrence Ellison** is the founder of Oracle and is domiciled in California. He

and his wife enthusiastically support IDF criminal activities, and they have donated not less than

$10 million to the IDF, based on a donation they made in 2014 alone.[80] Each donation that he has

directed to be sent abroad to promote unlawful activity is an instance of money laundering.

Money laundering penalties are quite steep, i.e., $500,000 for each monetary transaction engaged

in.[81] Defendant Ellison has openly advocated in defense of Israeli army activities in the OPT,[82]

---

[78] *See* http://lajewsforpeace.org/Essays/Settlements/Funders.pdf.

[79] http://worldredeye.com/2014/03/fidf-gala-saluting-the-women-of-the-idf/.

[80] http://www.timesofisrael.com/hollywood-gala-raises-a-record-33-million-for-idf/#ixzz3JBayfWVj.

[81] *See* para. 110.

and he has also been named in Counts II and III (Aiding and Abetting the Commission of War Crimes).

36.     Defendant **Daniel Gilbert** is the chairman and founder of Rock Ventures and Quicken Loans Inc., and is the majority owner of the NBA's Cleveland Cavaliers. He has not been named in the civil conspiracy count (Count I), although discovery herein may reveal that he did play a vital role in that conspiracy. Defendant Gilbert, however, has been named in Count II (War Crimes) and Count III (Aiding and Abetting the Commission of War Crimes). Based upon information and belief, he is an American citizen domiciled in Ohio, and like all fellow donors, he views all Palestinians to be terrorists and commends IDF soldiers for fighting "Arab terror."

37.     Defendant **John Hagee**, domiciled in Texas, is the founder and National Chairman of the Christian-Zionist organization Christians United for Israel (CUFI). He has been named in Counts I, II, and III. He has consistently advocated and funded the violent expulsion of all non-Jews from EJ and the OPT based on perceived biblical imperatives, knowing full well the consequences thereof.[83] Defendant Hagee and his tax-exempt entities (CUFI, John Hagee Ministries, and Global Evangelism Television) have engaged in money laundering in violation of 18 U.S.C. 1956(a)(2) by raising and transferring approximately $100 million[84] across international borders to fund criminal activity. That activity includes arms trafficking, theft and malicious property destruction, the forced expulsion of the entire local Palestinian population living near the settlements, and the promotion of wholesale violence on the part of armed settler

---

[82] Id.

[83] "Tax-Exempt Funds Aid West Bank Settlements," New York Times June 7, 2010 http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html?_r=0, Israel Lobby p. 134.

[84] Id. *See also* http://lajewsforpeace.org/Essays/Settlements/Funders.pdf.

militia to be directed at their Palestinian neighbors (poisoning water wells and livestock, malicious wounding, sporadic live target practice).

38.     Defendant **Lev Leviev** is the founder and chairman of Defendant Africa Israel Investments, Ltd. (see para. 61 *infra*). He also owns the company Leader Management and Development, a company that is developing the settlement of Zufim on the land of the West Bank village of Jayyous, and on the land of other neighboring Palestinian villages.[85] According to the Israeli government's 2007 Spiegel database, Leader Management and Development, in conjunction with the Land Redemption Fund, was responsible for establishing the settlement of Zufim along with its infrastructure.[86] Defendant Leviev is the principle donor to the Land Redemption Fund, which has secured some 20,000 dunams of land in the OPT for settlement expansion through covert and often coercive purchases involving Palestinian collaborators.[87]

39.     Defendant Dr. **Irving Moskowitz** has been named in all Counts except Count IV, is domiciled in California, and has, for the last 40 years, openly advocated the violent expulsion of all non-Jews from the OPT.[88] He has been instrumental in transferring large sums of money to settlements in the OPT and he has also funded an exclusive Jewish enclave in EJ.[89] He and his foundation have engaged in money laundering in violation of 18 U.S.C. 1956(a)(2) by

---

[85] https://adalahny.org/document/699/open-follow-letter-daphne-guinness-re-ties-leviev.
[86] Id.
[87] Id.
[88] *See* http://www.theguardian.com/commentisfree/cifamerica/2009/aug/06/irving-moskowitz-israel-obama-settlements.. *See also* "Tax-Exempt Funds Aid West Bank Settlements," New York Times June 7, 2010 http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html?_r=0.
[89] *See* FN directly above. *See also* http://lajewsforpeace.org/Essays/Settlements/Funders.pdf.

transferring approximately $100 million[90] across international borders to fund arms trafficking, theft and malicious property destruction, the violent expulsion of all Palestinians from the OPT (a.k.a. ethnic cleansing), and wholesale violence as defined herein. He has recently completed a fraudulent property transaction near Bethlehem whereby he obtained possession of a Christian church in the OPT which is now occupied by soldiers and "Jewish-only" settler families intent on making that place of worship their home.[91] Defendants Irving Moskowitz, Estate of Irving Moskowitz, and Irving Moskowitz Foundation shall be referred to herein as simply "Defendant Moskowitz."

40.     Defendant **Haim Saban** has been named in Counts II and III, and is a wealthy businessman in the financial services and entertainment sector domiciled in California. Through his various philanthropic entities, he has transferred approximately $10 million to the FIDF, which transferred those funds to the Israeli army. In 2013 he donated $2.3 million and in 2014 he donated $3.6 million,[92] knowing that the money would result in the Israeli army's ongoing campaign of wholesale violence, malicious wounding, war crimes, crimes against humanity, and genocide directed at the Palestinian population as detailed in Count II (War Crimes). The death of Plaintiff Abu Amer's 14 family members is only one example of that horrendous criminal activity. As detailed herein, all FIDF donors had to know the nature of the vicious criminal activity engaged in by armed settlers and Israeli army soldiers in the OPT as early as 2003, when

---

[90] Israel Lobby p. 150.
[91] http://mondoweiss.net/2015/05/settlement-clandestine-international/.
[92] http://www.timesofisrael.com/hollywood-gala-raises-a-record-33-million-for-idf/#ixzz3JBayfWVj, http://jewishinsider.com/1379/haim-saban-donates-1m-to-fidf-for-simon-cowell-to-sing-go-go-power-rangers/.

members of the group "Breaking the Silence" admitted as much, as more fully detailed in para. 196. The members of Breaking the Silence are veteran officers and enlisted men and women who: (a) served extensive tours during 2000-2010 in the OPT; and (b) gave sworn testimony about the atrocities they were ordered to inflict on the Palestinian population. They also confirm that their mission was never to defend Israel, but to protect and encourage rampaging armed settlers.[93]

   **b) Settlement and IDF Advocate/Promoter**

41.      Defendant **Elliott Abrams** (Abrams), domiciled in Virginia, is employed in this judicial district by the Council on Foreign Relations. For the last 30 years, perhaps longer, he has been the settlements' unofficial paid American spokesperson, extolling the virtues of settlement expansion and the settlers' inherent right to reclaim historic biblical land now owned by Palestinians.[94] He has also urged senior aides to former Prime Ministers Sharon, Barack, and Olmert and settlement officials to continue annexing privately-owned Palestinian property[95] knowing that settlement expansion would necessarily entail the violent expulsion of the local Palestinian population. He knew, like all Defendants named herein, that would occur because, as explained *infra*, all of the property around or near segregated settlements was owned and

---

[93] Our Harsh Logic p. 288.
[94] This is in line with the tax-exempt entity Shuva Israel's suggestion that "12,000 Christian Zionists sign up and give $12 per month, equaling $144,000 monthly ($1.728 million yearly) to support the Jewish community settlements in the eternal biblical heartland of Israel." *See* https://electronicintifada.net/content/activists-work-stop-tax-exempt-donations-israeli-settlements/8955.
[95] Israel Lobby p 223.

occupied by Palestinian homeowners and farmers.[96] Thus he has encouraged classic ethnic cleansing, which he knew, as an attorney, had been banned by America's Lieber Code, signed by Abraham Lincoln in 1863, Israel's Anti-Nazi Statute, its own 1948 Declaration, and by numerous international conventions including UN Charter principles and the UDHR. As Defendant Abrams is well aware, the UN has repeatedly issued a number of rapporteur reports and resolutions detailing and condemning the various criminal atrocities which have been committed by his heroes—armed settlers and Israeli army soldiers serving in the OPT to defend Israel's ongoing occupation.

### c)  Pro-Settlement Tax-Exempt Entity Defendants

42.     Each one of the tax-exempt entity Defendants listed in this section have: (a) violated Customary International Law, including but not limited to America's 1863 Lieber Code, Israel's Anti-Nazi Statute, Israel's Declaration, GCIV, the Hague Convention, and numerous international conventions including UN Charter principles and the UDHR; (b) committed the crime of perjury, because none of them disclosed on their applications for tax-exempt status that the contributions they receive would be augmenting[97] the settlements' ability to purchase

---

[96] Our Harsh Logic p. 349. As one IDF soldier stated, "try finding land that doesn't have private land on it. Good luck with that."

[97] The court in *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008) held that "if the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result…a donor who knew the aims and activities of the organization would know that Hamas was gunning for Israelis…and that donations to Hamas, *by augmenting Hamas's resources*, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in

military hardware (arms trafficking), train settlers in use of automatic weapons and sniper

scopes, and hire security coordinators to oversee and encourage the criminal activities of the

settler militia; (c) knew, like their donors, that the local Palestinian population would be maimed

and murdered by violence-prone settlers with those funds. Those funds allowed them to engage

in arms trafficking by purchasing sniper scopes, high-powered rifles, and other military

hardware, and receive training in military tactics from hired settlement security coordinators.

Thus it was reasonably foreseeable to all U.S. donors and tax-exempt entity officials, especially

after visiting the settlements they were sponsoring, that the settlers would eagerly and readily

inflict wholesale violence on the local Palestinian population, which would convince them to

abandon their homes and olive groves;[98] (d) all committed the crime of money laundering

because they sent funds overseas to fund criminal activities; (e) violated numerous tax-exempt

Treasury regulations, including the requirement that they maintain strict control over and

monitor all "charitable" funds sent overseas; and (f) committed tax fraud along with their donors

because they advised their donors to take illegal tax deductions based on expenses incurred in

funding criminal activities like setting up sniper schools or arms trafficking.

43.     Defendant **American Friends of Ariel** ("AFA") is located in Florida, and is a 501(c)(3)

funnel or "pass-through" entity managed and operated by individuals similarly dedicated to the

expulsion of all non-Jews from the OPT and the expansion of "Jewish-only" settlements. It has

---

Israel. And given such foreseeable consequences, such donations would appear to be intended to
intimidate or coerce a civilian population…" (internal quotations removed).
[98] *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F3d 1123 (the plaintiffs must
be able to show murder of son by Hamas was reasonably foreseeable result of donation).

funded that activity for over 30 years[99], knowing that armed settlers, assisted by IDF/G4S

personnel, would repeatedly attack and in some cases murder Palestinian farmers for simply

trying to access their olive orchards.

44.    Defendant **American Friends of Bet El Yeshiva** (AFBEY) is located in Forest Hill, New

York and plays much the same role as AFA, see para. 43, but for the settlement of Bet El.

AFBEY boasts that it "hosts the largest and most prestigious New York [fundraising] dinner of

any Israel organization."[100] All of the funds raised at that event, of course, are transmitted

overseas 24 hours later to the Bet El settlement bank account. They knowingly sent those monies

overseas to promote and encourage criminal activity, i.e., wholesale violence directed at

Palestinians, arms trafficking, and theft of private property. Bet El operates a sniper school with

U.S. taxpayer financial assistance in which it trains settlers in the use of sniper scopes, automatic

weapons and military tactics to be used against their Palestinian neighbors.[101]

45.    Based upon information and belief, Defendant **American Friends of Ulpana Ofra**

("AFUO"), although ostensibly organized to support an all-girls' school in the segregated

"Jewish-only" settlement of Ofra, it actually serves as the American entity that receives funds

that are then transferred overseas to support the expansion of the segregated settlement of

Ofra.[102] Ofra, like all settlements named herein, was built on private Palestinian property. In fact,

---

[99] http://www.friendsofariel.org/about/about-friends-of-ariel/.
[100] http://betelinstitutions.com/dinner-reservations2015-about-us/.
[101] http://idfprepacademy.org/ (the logo depicts the profile of a settler aiming at a target with an automatic weapon).
[102] As reported by the real-estate corporation and "settlement movement" Amana (established 1978), Ofra was one of the first communities built by Amana, with the express purpose of "developing communities in Judea, Samaria, The Golan Heights, The Galilee, The Negev and

at least 85% of Ofra is located on stolen private property.[103] Like all tax-exempt entities, AFUO

committed the crime of money laundering every time it authorized the proceeds of a wire

transfer to be sent overseas and deposited into Ofra's Israeli bank account.

46.    Members of Defendant **Christian Friends of Israeli Communities** ("CFOIC"), address

P.O. Box 508330, Colorado Springs, CO 80949, including its pastors, fervently believe that the

settlers are "fulfilling prophecy and pointing the way for the rest of the Jewish people back to

their roots."[104] CFOIC openly admits to funding the return of "Jewish-only" settlers to the West

Bank, and it specifies on its website that it will "provide practical support for vital community

needs to all West Bank settlements."[105] That practical support included funding arms trafficking

and providing settlers with military hardware who, with the assistance of IDF/G4S personnel,

could intimidate Palestinians on a daily basis. The armed militia poisoned water wells and

livestock, and threatened to and did demolish their homes, whether occupied or not. It has

directly provided funding to at least 22 settlements, including the settlements, which are

---

Gush Katif. This goal includes not only the establishment of communities and their supportive
industries and social services but their continued maintenance and development. The critical
nature of Amana's work lies in insuring a strong, vibrant presence in the only areas which can
provide quality living for the inevitable overflow from the crowded Tel Aviv, coastal region.
This presence is a guiding force in protecting the conditions necessary for a Jewish State.") *See*
http://www.amana.co.il/?CategoryID=101&ArticleID=166.
[103]

http://peacenow.org.il/eng/sites/default/files/Breaking_The_Law_formal%20data_March07Eng.
pdf#page=11. *See also* http://www.btselem.org/download/200812_ofra_eng.pdf, accessed
January 19, 2016 ("Ofra does not meet three of the four requisite criteria set by Attorney Talia
Sasson and adopted by the government of Israel, without which an Israeli settlement in the West
Bank cannot be considered lawful under local law.") p. 32.
[104] http://www.cfoic.com/what-is-settlement/. *See also* Israel Lobby p. 107.
[105] http://www.cfoic.com/what-is-settlement/.

coconspirators with the Defendants, named herein.[106] CFOIC officials continued to provide that

critical funding even after Israel's 1993 settlement ban went into effect. CFOIC officials have

funded arms trafficking, theft of private property, and the consequential expansion of Har Homa

for over 24 years,[107] such that Har Homa now houses over 30,000 "Jewish-only" residents.[108]

CFOIC, like all tax-exempt entities named herein, knew that armed settlers would engage in theft

and malicious destruction of private property and attack their Palestinian neighbors on a daily

basis, even engaging in live target practice at them.[109]

47.      Defendant **Efrat Development Foundation** (EDF) is located in Mineola, New York and

plays much the same role as AFA, see para. 43, but for the settlement of Efrat, established in

1983. EDF's mission is to grow the settlement of Efrat, to "promote settlement activity," and to

ensure that the land Efrat occupies remains "eternally connected to the Jewish people."[110] Its

well-funded local militia participates in aggressive paramilitary activities and has maimed and in

some cases murdered Plaintiffs named herein, or their relatives, who live near the town of

---

[106] *See* Israel Lobby p. 134, http://www.cfoic.com/projects/, http://www.c4israel.us/c4i-us/projects/help_the_jews_at_home/christian_friends_of_israeli_communities_cfoic , and http://corporateoccupation.org/charity-and-ethnic-cleansing-christian-friends-of-israeli-communities/.

[107] *See* http://homat-shmuel.co.il/%D7%A9%D7%9B%D7%95%D7%A0%D7%AA-%D7%94%D7%A8-%D7%97%D7%95%D7%9E%D7%94/.

[108] Palestine Inside Out Kindle location 2172.

[109] *See* Palestine Inside Out Kindle location 1211, http://www.nytimes.com/2010/11/09/world/middleeast/09mideast.html?_r=1&ref=middleeast and http://www.bbc.com/news/world-middle-east-11721475.

[110] http://www.kerenefrat.org/.

Bethlehem.[111] The militia engages in daily physical assaults and malicious wounding of

Palestinian residents, sporadic live target practice, slaughter of their livestock and poisoning of

their water wells, and destruction of their agricultural lands and ancestral homes.

48.     Defendant **Falic Family Foundation** ("FFF"), located in Florida, has its own 501(c)(3)

named "Friends of the IDF," which supports Manhigut Yehudit, the ideological movement that

advocates "the conquest and annihilation of the entire Gaza population."[112] It has committed

millions of dollars in "charitable" donations to similar entities such as Ateret Cohanim that

espouse the violent expulsion of all non-Jews from EJ and the OPT.[113] It has funded this criminal

activity in areas located near the settlements, which are coconspirators with the Defendants

herein.[114] The FFF is especially involved in funding the criminal activity (wholesale violence,

arms trafficking, theft, malicious destruction of private property, arson, and murder), which has

been engaged in, by IDF/G4S personnel and armed settler militia members for at least 30

years.[115] That pattern of criminal activity has been confirmed by members of Breaking the

Silence and their sworn testimony is detailed in the book *Our Harsh Logic*.

49.     Defendant **Friends of Israel Defense Forces** (FIDF) is a U.S. tax-exempt entity that

abuses its tax-exempt status by functioning as a U.S. financial "pass-through" whose sole

---

[111] http://www.kerenefrat.org/. *See* "Goals for 2016" section depicting settler militia wearing bulletproof vests and carrying automatic weapons in the process of conducting paramilitary operations outside of the settlement.
[112] *See* http://www.dailymail.co.uk/news/article-2715466/Israeli-official-calls-concentration-camps-Gaza-conquest-entire-Gaza-Strip-annihilation-fighting-forces-supporters.html#ixzz39RVFMrLb; and http://www.jewishisrael.org/israel-will-prevail-by-moshe-feiglin/.
[113] *See* http://mondoweiss.net/2014/12/settlement-netanyahu-america.
[114] Id.
[115] Id.

purpose is to solicit and accept financial contributions destined to be transferred to the Israeli

army (IDF).[116] FIDF officials have, for the last 30 years, engaged in money-laundering activity

and also knowingly transferred funds to the IDF in violation of 18 U.S.C. 960, Expedition

Against a Friendly Nation, because it was furnishing money for a military entity engaged in

conflict in the OPT, whose inhabitants are at peace with the U.S. FIDF does so to advance the

donors'/entities' long-term goals: first, engage in arms trafficking and supply military hardware

to settler militia members; second, eventually expel all non-Jews from OPT and employ violent

means to do so; and third, to steal as much private Palestinian property as possible to

accommodate the increasing housing needs of the growing settler population and the

development plans of the construction/support firms named herein.[117]

50.      Defendant **Gush Etzion Foundation** ("GEF") plays much the same role as AFA for the

settlement of Nokdim and other settlements in the Gush Etzion region, which are all built on at

least 30% private Palestinian land.[118] GEF is a 501(c)(3) "pass-through" entity managed and

operated by individuals dedicated to funding arms trafficking and the violent expulsion of all

non-Jews from the OPT. GEF has funded the expansion of Nokdim and other settlements in the

---

[116] http://www.fidf.org/page.aspx?pid=285.

[117] "Tax-Exempt Funds Aid West Bank Settlements," New York Times June 7, 2010
http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html?_r=0,
http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-
significantly/#QQTmB6sWCUH3hkU2.97,
http://www.un.org/press/en/2015/gapal1345.doc.htm.

[118]
http://peacenow.org.il/eng/sites/default/files/Breaking_The_Law_formal%20data_March07Eng.
pdf#page=11, http://www.gush-etzion.org.il/communities.asp.

OPT for over 30 years,[119] knowing that armed fanatical settler militia members would routinely attack their Palestinian neighbors to convince them to abandon their homes and their 400-year-old olive groves. The settlers, on a daily basis, engage in live target practice and poisoning their neighbors' livestock and water wells in an effort to convince them to abandon their ancestral homes. In the process, like all tax-exempt entities named herein, GEF has engaged in money laundering activities, and conspired to defraud the IRS as well.

51.     Defendant **Honenu National Legal Defense Organization** ("Honenu"), located in New York and Israel, is a 501(c)(3) organization that is involved in the solicitation and misuse of charitable funds and its tax-exempt status in order to support Israeli terrorists who have engaged in acts of violence against Palestinians and Arab Israelis.[120] Honenu has sent funds to: (a) the family of an Israeli convicted of killing 7 Palestinians in May 1990; (b) the families of two Israelis convicted of attempted murder in the 2002 plot to bomb a Palestinian school; (c) the family of an Israeli imprisoned for kidnapping and abusing a Palestinian boy in 2010; and (d) the family of the assassin of Prime Minister Rabin.[121] Honenu officials have encouraged the violent settlers who inflicted injuries upon, *inter alia*, Plaintiff Tamimi, by assuring them that Honenu would provide free legal service and/or pay the legal fees associated with defending any charges relating to the attacks. They even assured the attackers that their families would be provided for should they be arrested and incarcerated. This is the identical activity which Prime Minister

---

[119] *See* http://lajewsforpeace.org/Essays/Settlements/Spenders.pdf, http://www.gush-etzion.org.il/foundation.asp.
[120] http://honenu.org/.
[121] *See* http://www.truah.org/images/Honenu_8.24.2015.pdf.

Netanyahu has consistently labeled as "pure terrorism" and the promotion of violence, at least

when it comes to Palestinian terrorists.

52.      Defendant **Karnei Shomron Foundation** (KSF) is also a 501(c)(3) and is located in New

York, NY and plays much the same role as AFA, see para. 43, but for the settlement of Karnei

Shomron. KSF's mission is to "continue to populate" the settlement of Karnei Shomron, to

"successfully connect all the hills."[122] These are the same private properties, i.e., "Palestinian

hills" that former Prime Minister Sharon told settlers to seize starting in the 1970s. KSF officials

also solicit funds from their donors to pay for military training and weapons instruction for the

settlers[123] knowing the consequences thereof, i.e., more ethnic cleansing, wholesale violence, and

additional theft of private property. KSF officials, like all tax-exempt entity officials, and the

entity's tax accountant, can be prosecuted for: (a) violating the federal perjury statute because

they never disclosed that they would be funding this type of criminal activity when they filed

their application for tax-exempt status; and (b) have repeatedly filed fraudulent 990 annual

returns which do not disclose the criminal activities that they are funding with "charitable"

donations.

53.      Defendant **The Hebron Fund** ("HF") plays much the same role as AFA, but for the

settlement of Kiryat Arba near Hebron.[124] HF is a U.S. tax-exempt "pass-through" entity

managed and operated by individuals dedicated to the violent expulsion of all non-Jews from the

---

[122] http://www.ginaplus.org/kshomron/foundation.htm "Security for the Community" link.
[123] Id. See also http://www.karneishomron.co.il/?CategoryID=606.
[124] *See* https://hebronfund.org/about-us/about, Palestine Inside Out Kindle location 3616, 3135, http://www.aljazeera.com/indepth/features/2014/02/living-fear-hebron-2014218114052729956.html, http://www.hebron.com/english/articles.php?cat_id=135.

OPT and the continued expansion of "Jewish-only" settlements in the Hebron area. HF officials, subsidized by U.S. taxpayers, have knowingly financed settlement expansion and its attendant violence in the OPT for over 36 years.[125] Their officials also knew that if the Palestinian homeowners did not leave the area of their own volition, bulldozers and Volvo wheel loaders would arrive the next morning to demolish their homes, whether occupied or not. In the process it has engaged in money laundering activities, conspired to defraud the IRS, and financed arms trafficking and the commission of war crimes. At all relevant times, Hebron Fund officials and its donors knew that this conduct violated Israel's Declaration, U.S./Israeli law, each country's clearly-defined anti-settlement public policy as well as Customary International Law.

54.    The **Jewish National Fund** is a multinational fund with offices in countries worldwide. It receives millions of dollars from wealthy Jews from around the world and other donors most of which are tax-exempt contributions. For example, contributions from the FIDF or the Friends of Ariel. JNF's mission is to acquire and develop lands exclusively for the benefit for the Jewish population residing in the OPT. During 1948-1950, it has expropriated illegally the land of 372 Palestinian villages, which had been ethnically cleansed by Zionist forces.  Bank Leumi and JNF financed that ethnic cleansing activity. JNF personnel actively participated in the physical destruction of many villages. Also, JNF participated in military operations conducted by IDF personnel to conquer these villages. JNF has a long record of discrimination against Palestinians as reported by the U.N. and NGOS like Amnesty International and Human Rights Watch. All

---

[125] Id. *See also* General's Son Kindle location 3603, Palestine Inside Out Kindle location 1825, 2370, 3602. http://mondoweiss.net/2015/11/prison-ghettoization-hebron. *See also* Palestine Inside Out Kindle Location 1411.

this activity is in clear violation of international law and the fourth Geneva Convention that forbids confiscation of private property and the settling of occupied citizens [Jewish settlers] in Occupied Territories. Ethnic cleansing, exploitation of private property, and wanton violence are war crimes. The use of tax-exempt organizations in these activities violates the domestic law in many countries where JNF is domiciled. The illegal practice of JNF has been documented in numerous reports including the August 2005 report "Financing Racism and Apartheid by JNF.". American bankers that were complicit in the financing of these war activities include Bank of America, National Trust, and Savings Association of San Francisco. They lend JNF a total of $15 million to finance ethnic cleansing and establish Jewish only settlements in Palestine. That amount would be $100 million in terms of present value analysis. One of the atrocities that the Banks and JNF financed occurred in Eilaboun, the home village of Haick, that was a site of a massacre which occurred on Friday, October 29, 1948. Violent settlers financed by Bank Leumi and JNF attacked the village which was predominantly a Christian village. They gathered all civilians, killed 31 young men and women and expelled all elderly villages. See the account of this atrocity and other atrocities in the U.N. library UNA13/3.3.1atrocities.

### d) Defendant Banks

55.   Defendant **Bank Leumi Le-Israel** is located at 24-32 Yehuda Halevi St., Tel-Aviv 65546, Israel. Bank Leumi Le-Israel is an Israel-based megabank with 13,000 employees and

several branch offices worldwide, including four in the United States.[126] Defendant Bank Leumi

USA is its subsidiary, and is located at 579 Fifth Avenue, New York, NY 10017. Bank Leumi

officials based in America have transferred millions of dollars every year[127] to various

settlements knowing (by virtue of the recognized banking protocol "Know Your Customer") that

the funds would be used to expand OPT settlements by arming the settler population, who in turn

would attack (and sometimes kill) their Palestinian neighbors to encourage them to abandon their

homes and their 400-year-old olive groves. The Israel-based BL officials encouraged settlement

expansion activity for two reasons: (a) fewer Palestinians would be left in the areas surrounding

the settlements; and (b) more housing stock would be available for new settlers, which meant

additional lucrative business for the bank. Bank Leumi Le-Israel, Bank Leumi USA, and their

agents shall be jointly referred to herein as "Defendant Bank Leumi," "Bank Leumi," or "BL".

56.     Since its founding in 1921, Defendant **Bank Hapoalim** ("BH") has played essentially the

same role as BL (see para. 55, *supra*) in terms of supporting settlement expansion. BH boasts its

role as the largest bank in Israel and its "pivotal role in the rapid growth of Israel's economy."[128]

BH is headquartered at 50 Rothschild Blvd., Tel Aviv 66883, Israel, and has a directly-controlled

office in New York City at 1177 Avenue of the Americas, New York, NY 10036. BH operates

---

[126] *See* http://english.leumi.co.il/WnnnWn/Worldwide_Map/19727/,
https://www.leumiusa.com/Article/US_Locations/3703/, *and*
http://english.leumi.co.il/FigBusiness/Leumi_Group/3263/.

[127] *See* http://english.leumi.co.il/FigBusiness/Leumi_Group/3263/ (emphasizing commitment to Zionist enterprise).

[128]
http://www.bankhapoalim.com/wps/portal/int/article?WCM_GLOBAL_CONTEXT=bhint/int/home/irelations/g
rouprofile&contentIDR=fc5b19004525ffdcbfe5bffb5c0731e6&useDefaultDesc=0&useDefaultText=0&proceed=1.

many locations throughout the OPT,[129] including a vast network of ATM facilities in places such

as Ariel University, has engaged in extensive construction financing in the OPT, and advertises

the availability of financing residential and infrastructure improvements there as well (for

example, large billboards erected outside of settlements), all in the name of settlement expansion.

### e) Defendant Construction/Support Firms

57.     Defendant **G4S PLC** is located at The Manor, Manor Royal, Crawley, West Sussex,

RH10 9UN, United Kingdom. It has a U.S. subsidiary headquartered in Florida, G4S North

America, which is the leading security firm in the U.S. some 54,000 employees in the U.S. and

Canada,[130] including employees and an office in this judicial district.[131] G4S PLC is the world's

largest security firm, employing over 700,000 individuals globally.[132] According to retired

archbishop Desmond Tutu, Defendant G4S has played a major role in facilitating "Israel's brutal

occupation and abhorrent prison system."[133] G4S also supplies equipment to Israeli prisons, and

is thus complicit in IDF's practice of routinely locking up Palestinian political prisoners in order

to confiscate or demolish their homes in their absence.[134] It has further collaborated in the

---

[129] https://www.bankhapoalim.co.il/wps/portal/PoalimPrivate/branches. *See also*
http://whoprofits.org/company/ hapoalim-bank (indicating it has provided loans to settlement
projects in nearly every  major OPT settlement).
[130] http://www.g4s.us/en-US/.
[131] http://www.g4s.us/en-
US/Site%20Tools/Contact%20us/G4S%20Local%20Offices/G4S%20Washington%20DC/.
[132] http://www.g4s.us/en-US/.
[133] *See* http://www.theguardian.com/business/2014/jun/04/desmond-tutu-g4s-israeli-prisons-
noam-chomsky.
[134] *See* Addameer "Corporate Complicity in Israeli Detention: G4S"
http://www.addameer.org/userfiles/Factsheet15April.pdf, on file with the Plaintiffs, *and*
http://www.whoprofits.org/company/g4s-israel-hashmira.

systematic torture and ill treatment of Palestinian prisoners, including children held in solitary

confinement.[135] Its Israeli subsidiary, Defendant G4S Israel, is located at Granit Street 14, Petah

Tikva, Israel. It employs some 8,000 people in Israel and the OPT.[136] It is the largest security

contractor in Israel, having acquired Hashmira and, in 2010, Aminut Moked Artzi, the previous

first- and second-largest security firms in Israel.[137] G4S PLC, G4S North America, G4S Israel,

and their officers and employees shall be jointly referred to herein as either "Defendant G4S" or

simply "G4S."

58.     Defendant **RE/MAX**, headquartered in Denver, Colorado, is a domestic and international

real estate firm with offices all over the globe. Since at least 1995 (discovery will establish

conclusively when it joined the civil conspiracy described in Count I), it has serviced very

lucrative markets in both America and Israel.[138] It has worked with BL/BH banking officials,

Veolia, AFI, and other developers of residential and commercial mixed housing units in the

settlements. In its marketing of Israeli real estate opportunities to Americans, it extols the virtues

of being able to purchase and live in an "old Arab house."[139] And it does so knowing that the

terrified Palestinian homeowners had been forcibly evicted from their homes to create the new

housing stock its agents were selling to the settlers. It knew and encouraged the tax-exempt

---

[135] *See* Palestine Inside Out Kindle location 1428, 3090; General's Son Kindle locations 3783, 4091, 4148, http://www.addameer.org/userfiles/Factsheet15April.pdf *and* http://www.btselem.org/english/torture.

[136] *See* http://www.g4s.co.il/he-IL/.

[137] http://www.whoprofits.org/company/g4s-israel-hashmira, http://www.g4s.co.il/he-IL/Who-we-are/History/.

[138] Palestine Inside Out Kindle Location 2188, 5572; http://whoprofits.org/company/remax-israel-impact-property-developers.

[139] https://electronicintifada.net/content/why-colorado-firm-selling-apartments-israels-illegal-settlements/14029.

entities to continue funding the ongoing demolition of Palestinian homes by armed settler militia members with G4S/IDF assistance. They did so because that criminal activity meant more settlement expansion and thus resulted in additional housing stock for RE/MAX agents to sell and additional empty construction sites ripe for development by construction firms.

59.     Defendant RE/MAX Israel – Impact Property Developers Ltd. is an Israel-based subsidiary of Defendant RE/MAX, and is responsible for listing and selling settlement properties built on private Palestinian property to "Jewish-only" purchasers.[140] As of April 16, 2015, such properties listed for sale included apartments in the segregated settlements of Har Gilo, Had Nes, Har Homa, and Ma'ale Adumim.[141] That number grew substantially through 2015, and as of November 2015, RE/MAX was offering 80 properties for sale in 18 different settlements with a combined value approaching $36 million.[142] RE/MAX at all relevant times knew the source of the housing stock it was selling. Its agents also knew that seizing and converting private Palestinian property necessarily entailed the violent expulsion of Palestinian homeowners, i.e., ethnic cleansing and therefore further settlement expansion. It played a vital role in the civil conspiracy by completing the trespass/demolition/conversion cycle (see Exhibit B) by selling "old Arab homes" and housing units built on private Palestinian property.

---

[140] Id. (the RE/MAX agent asked "are you Jewish?" and added "you have to check the properties—if their owners say they can sell an apartment to non-Jewish people.")
[141] Screenshots on file with the Plaintiffs.
[142] https://theintercept.com/2016/02/11/why-is-remax-selling-properties-in-illegal-israeli-settlements/.

60.     There are now 56,000 new homes and apartments in the OPT[143] which RE/MAX agents have successfully marketed to complete the aforementioned trespass/demolition/conversion cycle. *See* Exhibit B. Without RE/MAX's diligent and successful efforts, its coconspirators could not have made the billions of dollars they did in promoting the settlement enterprise—RE/MAX Israel was a major driving force behind expansion of all OPT settlements. For example, it has a franchise, Atid, which is located in Ma'ale Adumim, a settlement in the West Bank that specializes in real estate transactions in the settlements. Defendants RE/MAX and RE/MAX Israel – Impact Property Developers Ltd. and their agents shall be jointly referred to as "Defendant RE/MAX" or simply "RE/MAX."

61.     Defendant and co-conspirator **Africa Israel Investments Ltd.**, the AFI Group, located at 4 Derech Hachoresh St. Yahud, Israel is a company owned and controlled by Defendant. Lev Leviev, a London-based diamond billionaire.[144] AFI USA is the U.S. subsidiary of AFI, located at 229 W 43rd St. #10, New York, NY 10036. Danya Cebus is an AFI subsidiary located at Yoni Netanyahu 1c, Or Yehuda, Israel, which has made various infrastructure improvements for "Jewish-only" settlers in the settlements near the village Bil'in.[145] AFI officials encouraged settlement expansion and knew that their work crews were building permanent improvements on property owned by Palestinians. It knew it was building permanent improvements on property owned by Palestinians, which property was vacant only because all non-Jewish property owners

---

[143] http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.
[144] *See* http://www.afigroup-global.com/.
[145] General's Son p. 142.

had been forcibly expelled from the area.[146] The AFI Group, its subsidiaries, officers, employees, and agents are referred to herein as "Defendant AFI" or simply "AFI."

62.     Defendant **Veolia Environment S.A.,** located at 36-38, avenue Kléber, 75116 Paris, France, has contracted over the last 30 years with various settlements to provide essential infrastructure, transport, and waste removal services in the OPT.[147] Its Israel-based subsidiary, YRAV Sherutei Noy 1985, is located at 1 Abba Eban Blvd., Herzliya, Israel.[148]  Veolia Environement S.A. has availed itself of the jurisdiction of the United States by visiting U.S. firms to discuss investment opportunities and funding in the occupied territories. It has also established a branch, Veolia North America, located at 200 E Randolph Dr, Suite 7900, Chicago, IL 60601 and with multiple other offices in the U.S.[149] Defendants Veolia Environnement S.A., YRAV Sherutei Noy 1985, Veolia North America, and their agents shall be jointly referred to as "Defendant Veolia" or simply "Veolia."

63.     At all relevant times, in constructing these residential and infrastructure improvements, Veolia officials based in Israel saw first-hand how their company was committing repeated aggravated and ongoing trespasses on private Palestinian property which had been converted to their own use and enjoyment. Veolia officials also knew that the land they were building these permanent improvements on was vacant and ready for development because all non-Jewish

---

[146] General's son Kindle location 2669.

[147] *See* http://www.whoprofits.org/content/veolias-activities-israel-and-opt-overview *and* http://www.whoprofits.org/content/veolia-tries-sell-its-activities-israel-two-reported-deals-are-still-pending.

[148] *See* http://www.whoprofits.org/content/veolias-activities-israel-and-opt-overview.

[149] *See* http://www.veolianorthamerica.com/en/all-locations.

property owners, in the name of settlement expansion, had already been forcibly expelled from the area by violent armed settlers assisted by G4S/IDF personnel.

64.     Defendant **Volvo Group** is a Swedish multinational public company that manufactures trucks, buses, construction equipment and marine and industrial engines. Through its subsidiary Volvo Bussar, Volvo Group owns 26.5% of Merkavim. Together these Defendants shall be referred to herein as "Defendant Volvo" or simply "Volvo". The Volvo Group provides heavy machinery used for the demolition of Palestinian houses in the West Bank and East Jerusalem, construction of Israeli settlements and construction of the separation wall.[150] In the South Hebron Hills area, Volvo wheel loaders were used to demolish houses in the Palestinian village of Umm al-Khayr and to block roads. Volvo track excavators and wheel loaders were also used for house demolitions in the Palestinian neighborhoods of Tzur Baher, Silwan, Wadi Qaddum, Sheikh Jarrah, Beit Hanina and Issawiya in East Jerusalem.[151] The company's equipment was used for the construction of the Har Gilo settlement and the Barkan Industrial Zone.

65.     Volvo heavy-duty construction trucks and its machinery were used for the construction of the Huwwara checkpoint, Route 443 (a segregated "Jewish-only" West Bank road) and the separation wall near the Palestinian village of Al-Walaja.[152] Volvo Group excavators and wheel loaders were also used for the demolition of houses of Palestinian citizens of Israel inside the Green Line (the 1949 Armistice Line). Volvo heavy machinery was used in multiple demolitions in the city of Lod. In addition, the company's wheel loaders were repeatedly used in the

---

[150] http://whoprofits.org/company/volvo-group-ab-volvo
[151] Id.
[152] Id.

numerous attempts (total of 86) to evict the Bedouin community of Al-Araqib from its land in the Negev desert.[153]

66.     Volvo Bussar's subsidiary, Merkavim, supplies armored buses for Egged lines in the OPT. The rest of Merkavim is owned by Mayer's Cars and Trucks, which is the exclusive distributor of Volvo in Israel. Volvo Group buses are also used by the Central Company for the Development of Samaria and the Company for the Development of the Binyamin Council in the West Bank, for transportation services to the settlements.[154]

67.     Much like the activities of all construction/support firms, Volvo's activities in the OPT go far beyond simple sales transactions and the leasing of heavy-duty construction trucks and wheel loaders to promote legitimate business purposes. Their extensive activity in the OPT confirms that Volvo, like all corporate Defendants named herein, is today and has always been a friendly collaborator in the settlement enterprise. As detailed herein, its employees have played a vital role in implementing the agenda of settlement leaders, i.e., settlement expansion and the forcible expulsion of all Palestinian neighbors. Proof thereof is that the settler organization Samaria Regional Council owns and operates a Volvo-licensed garage.[155] Also, two additional Volvo-certified garages operate in the OPT in the industrial zones of Mishor Adumim and Atarot. Based upon information and belief, all of those garages have been knowingly built on private Palestinian property.

---

[153] Id.
[154] Id.
[155] Id.

68.     The Israel Prison Service confirmed that the Volvo Group and its subsidiary Merkavim provide services to the Israel Prison Service, including buses for the transportation of prisoners such as Plaintiff Al-Tamimi. In addition, the Volvo Group supplied maintenance trucks to the Jerusalem Light Rail project, which connects settlements in the Jerusalem area with the city center.[156] In light of Volvo's extensive material support for the settlement enterprise, as detailed herein, their officials have known, and know today, that Volvo was not simply providing heavy machinery and trucks and routine construction services to settlement officials to promote legitimate business purposes. Volvo officials, like all corporate Defendant officials based in Israel, were actually advancing the agenda of their collaborators—settlement officials who were focused on arms trafficking, wholesale violence, settlement expansion, and resultant ethnic cleansing of the local Palestinian population. All of these officials knew that settlement leaders coveted the nearby private property owned and occupied by Palestinians.

69.     Defendant **Hewlett Packard Enterprise Co.** ("HP"), located at 3000 Hanover Street, Palo Alto, CA 94304-1185, has been doing a very profitable business in the OPT for at least 40 years, and has a $6 billion investment portfolio there. It has provided essential information and computer technology, including very sophisticated surveillance devices to any number of settlements in the OPT. It knew that servicing that equipment and providing employees to teach armed settlers how to use that equipment would enable settlement security coordinators and armed settlers to maliciously wound any and all Palestinian farmers trying to access their olive groves. It provides critical security services to the settlement leaders to maintain control of the

---

[156] Id.

Palestinian population and protect segregated settlements from disgruntled Palestinian farmers and homeowners. That is a big selling point for RE/MAX agents when marketing properties in the expanded settlements. Palestinian farmers have been shot by armed settlers equipped with sniper scopes when attempting to tend to their olive groves. Their homes or olive groves have been confiscated illegally or demolished so that a parking lot, for example, can be built for the settler population.[157] HP has an office in this jurisdiction, located at 709 G St NW, Washington, DC 20001, from which it conducts daily business, including lobbying activities in support of its international business ventures, including those in the OPT.[158] It has hired lobbying firms in this jurisdiction, including Mehlman Castagnettie, Washington Tax & Public Policy Group, Innovative Federal Strategies, and Rock Creek Counsel.[159]

70.     Through its subsidiary, Hewlett-Packard Enterprise Services of Israel (EDS), located at Sapir 7, Herzeliya 46852, Defendant HP is the prime contractor of the Basel System, an automated biometric access control system installed and maintained by HP in checkpoints throughout the OPT.[160] This system effectively controls which portions of the population will be allowed into Greater Israel, and systematically discriminates against non-Jews. At all relevant times, HP officials, especially their subsidiary officials doing business in Israel, knew that they were providing essential services for two reasons.

---

[157] *See* http://www.whoprofits.org/company/hewlett-packard-hp.
[158] http://www8.hp.com/us/en/contact-hp/office-locations.html,
http://www.whitepages.com/business/hewlett-packard-washington-dc-3.
[159] http://www.opensecrets.org/lobby/clientlbs.php?id=D000000716&year=2015.
[160] http://www.whoprofits.org/HP, http://www.whoprofits.org/sites/default/files/hp_report-
_final_for_web.pdf.

71.     Their services and equipment ensured the rapid growth of settlements, which necessarily entailed the violent expulsion of all non-Jews, who were the only individuals who owned private property in the area near or around the settlements. Besides improving their bottom line, the other reason HP officials provided and sold surveillance equipment, including the Basel system, as referenced earlier, is that their equipment enabled security coordinators and armed settlers to engage in live target practice and otherwise intimidate their Palestinian neighbors. As a result of providing that surveillance equipment, reckless armed settler militia could maliciously wound Palestinian farmers tending to their olive groves and shepherds tending to their flock. HP officials knew that that would be a direct consequence of providing settlement officials with that surveillance equipment. While HP officials, employees and agents did not actually poison water wells or feed Palestinian farmers' livestock barley seeds laced with rat poison, their surveillance devices protected the vandals and criminals who committed such activity. These entities and their agents shall be jointly referred to herein as "Defendant HP" or simply "HP."

72.     Defendant **Motorola Solutions Inc.**, located at 1303 E. Algonquin Road, Schaumburg, Illinois, 60196, is the parent company of Defendant Motorola Solutions Israel.[161] These entities and their agents shall be jointly referred to herein as "Defendant Motorola" or simply "Motorola." Just like HP's extensive and profitable operations in the OPT, Motorola has been providing essential protection services (expensive thermal imaging systems) since 1967 for two reasons. First, their services and equipment ensured the rapid growth of settlements, which necessarily entailed the violent expulsion of all non-Jews, who were the only individuals who

---

[161] http://whoprofits.org/company/motorola-solutions.

owned private property in the area near or around the settlements. The other reason they

provided that equipment, just like HP did, is that it allowed security coordinators and armed

settlers to engage in live target practice, the victims of which were their Palestinian neighbors.

Motorola officials based in Israel knew that kind of daily violence would ensure the rapid

expansion of settlements, because that necessarily entailed the expulsion of all non-Jews—the

only individuals who owned private property in the area.[162]

73.     Approximately 47 settlements, including those that are coconspirators with the

Defendants herein, have been supplied with Motorola's radar detector system, which includes

radars and cameras to detect and track human movement outside the settlements.[163] In most

cases, these radar stations have to be built on private Palestinian land, because there was no other

private property available to confiscate.[164] The reason being that the Israeli government, as early

as 1992, had frozen state property in terms of its availability for settlement expansion. Where

such stations have been built on private Palestinian land, they constitute aggravated and ongoing

trespass, see Count IV.[165] That radar detection system and their thermal imaging systems are also

used in the separation wall complex, in the wall around Gaza, and on military bases.[166] There are

---

[162] Id.

[163] Id. *See also* http://corporateoccupation.org/tag/motorola/.

[164] Id.

[165] Id. *See also* http://www.interfaithpeaceinitiative.com/profiting.pdf,
http://presbypeacefellowship.org/content/divestment-caterpillar-hewlett-packard-and-motorola-solutions#.VmHJMXarTIU.

[166] http://whoprofits.org/company/motorola-solutions.

at least 100 military bases located on private Palestinian property, which had been confiscated by IDF officials for security purposes during the last 40 years.[167]

74.    Motorola's Israeli subsidiary, Motorola Solutions Israel, has developed and provided the "Mountain Rose" communication system for the Israeli army, which is a specifically-designed mobile system for field conditions, and it is being used by soldiers in the occupied West Bank.[168] Additionally, the company provided Israel Police with the Astro25 communication system.[169] Israel Police special patrol units use this system to coordinate field operations and implement the "shoot first" policy, which those units have employed in EJ for approximately 30 years. Based on that policy, officers routinely confront young Palestinians armed with knives who are incensed about Israel's continuing occupation. The officers do not attempt to disarm these young men, but prefer to murder them outright. IDF soldiers have utilized that practice during the last 5 months of 2015—they have killed, rather than wounded, approximately 150 Palestinians.[170]

75.    The Government Electronics Department (GED) of Motorola Solutions Israel, which had been responsible for developing military technologies for Motorola Israel and producing electronic bomb fuses for the Israeli Army, was acquired by Aeronautics Defense Systems in April 2009.[171] Those bomb fuses are very important, and were used extensively during the three Gaza invasions. Without those bomb fuses, schools, apartment buildings, hospitals, and UN

---

[167] Id.
[168] Id.
[169] Id.
[170] http://www.voanews.com/content/report-says-one-killed-3-wounded-in-tel-aviv-shooting/3127348.html.
[171] http://whoprofits.org/company/motorola-solutions.

offices would not have been destroyed so systematically and efficiently during the three separate most recent Gaza invasions.

76.     In February 2012, Israel Railways awarded a tender for the installation of Internet access on 630 carriages and all train stations to Motorola Solutions Israel.[172] These carriages and train stations are used by 500,000 "Jewish-only" settlers, who depend on the availability of Internet access on a daily basis while commuting to Jerusalem, Tel Aviv or Haifa. The contract included providing the A1 fast train line from Tel Aviv to Jerusalem with the same Internet capability.[173] The A1 route crosses the Green Line international border in two areas into the occupied West Bank. In some parts the route passes through privately owned Palestinian lands. Any use of occupied Palestinian land and resources to satisfy the transportation needs solely of Israeli citizens is deemed illegal under both Hague and Geneva Convention principles, UDHR, UN Charter principles, numerous UN conventions, and Israel's own Declaration.

77.     Defendant Orbital ATK, Inc. is headquartered in Dulles, Virginia and is one of the world's largest producers of air-, sea- and land-based tactical missiles and missile defense interceptors, fusing and warheads for tactical missiles and munitions. It markets advanced defense electronics for next-generation strike weapon systems, missile warning and aircraft survivability, and special-mission aircraft, and is the leading producer of medium- and large-caliber ammunition, medium-caliber gun systems and precision munitions guidance kits. It is the largest U.S. producer of small-caliber ammunition.[174] Orbital ATK is the successor company to

---

[172] Id.
[173] Id.
[174] http://www.orbitalatk.com/about/company-overview/

Thiokol Aerospace, which marketed and sold white phosphorus munitions to the Israeli army

knowing that they would be used experimentally and indiscriminately against the Gaza

population, including the Plaintiffs and their families herein, in the three most recent Gaza

invasions.[175] Orbital ATK is also the successor company to Alliant Techsystems (ATK), which

provided cluster bomb munitions to the Israeli army knowing that those cluster bombs would be

used to intimidate, maim, and murder a civilian population, including many of the family

members of the Plaintiffs herein. ATK further provided the rubber bullets used to maim and

murder Palestinian protesters.[176]

## ALLEGATIONS COMMON TO ALL DEFENDANTS

78.     The allegations contained in this section are not designed to be comprehensive in nature,

by any means. However, they do serve to put the causes of action pled herein in perspective and

enable the Court to draw some big-picture conclusions, including: (a) the settlement enterprise

has been an intentional, profitable, and ongoing activity for at least 40 years; (b) it entailed the

expulsion of approximately 400,000 Palestinians from the OPT; (c) it also resulted in the

demolition or confiscation of 49,000 Palestinian homes; (d) without the massive financial

assistance provided by U.S. donors/entities, settlement expansion would have been impossible;

---

[175] https://www.hrw.org/news/2009/03/25/israel-white-phosphorus-use-evidence-war-crimes ("In
the recent Gaza operations, Israeli forces frequently air-burst white phosphorus in 155mm
artillery shells in and near populated areas. Each air-burst shell spreads 116 burning white
phosphorus wedges in a radius extending up to 125 meters from the blast point. White
phosphorus ignites and burns on contact with oxygen, and continues burning at up to 1500
degrees Fahrenheit (816 degrees Celsius) until nothing is left or the oxygen supply is cut. When
white phosphorus comes into contact with skin it creates intense and persistent burns.")
[176] http://afsc.org/sites/afsc.civicactions.net/files/documents/Israel-
Palestine%20Investment%20Screen%20-%20Companies%20List.pdf

(e) in providing that critical funding, U.S. donors/entities have violated numerous Treasury tax-exemption regulations and at least eight federal criminal statutes; (f) as a result of funding that criminal activity, they are all subject to criminal prosecution for their money laundering and arms-trafficking activity; and finally (g) at least eight U.S. Presidents, their Secretaries of State, and congressional leadership have all unequivocally and repeatedly condemned settlement expansion and its violent consequences for almost 40 years.

**a) History of Aggravated and Ongoing Trespass Activity and Attendant Violence (ethnic cleansing, home demolitions and confiscations, and wholesale violence) in the Occupied Palestinian Territories**

79.     As detailed herein, the funding provided by the donors/entities has resulted in a constant influx of violent Jewish settlers into the OPT, with tragic consequences: (a) ongoing confiscation of private Palestinian property, i.e., 49,000 homes have been confiscated or demolished[177]; (b) the presence of thousands of armed settlers schooled in the use of sniper scopes and automatic weapons by the settlement's security coordinator; (c) daily violent attacks on Palestinian homeowners and farmers by settlers armed with military hardware purchased with funds from U.S. tax-exempt entities; (d) the slaughtering of livestock and the poisoning of water wells and

---

[177] This would be equivalent of annexing or demolishing all the homes in Berkeley, California. *See* http://icahd.org/, putting the specific number at 48,488 as of Nov. 9, 2015. It is very difficult to ascertain the precise number of homes which have been confiscated, damaged and destroyed over the past 30 years. The Israeli government is not keen on letting the world know what that number is, and in the case of the significant Bedouin population, their villages are not even recognized by the Israeli government. Hence, no statistics are available regarding Bedouin home demolitions or confiscations. If Gaza is included in the figure, during the latest 2014 incursion alone, over 100,000 homes were destroyed or seriously damaged. Whether the number is 49,000 or 100,000 homes, it is wanton property destruction, a criminal activity prohibited by America's 1863 Lieber Code and the Israeli army's War Manual.

destruction of electric grids; (e) devastation of the Palestinian agricultural sector, especially destruction of olive groves; and (f) the forcible expulsion of at least 400,000 Palestinians since 1967.[178]

80.     As a result of these tax-exempt entities funding wholesale violence, the OPT has experienced explosive settlement growth, i.e., 750,000 settlers now live in the OPT.[179] According to Mr. Henry Seigman, former U.S. Jewish Congress CEO—"The Middle East peace process may be the most spectacular deception in modern diplomatic history…[it] served primarily to provide a cover for the systematic confiscation of Palestinian land."[180] Since 1967 at least 400,000 Palestinians have been forced out of the OPT,[181] and the number of settlements now total approximately 190.[182] IDF veterans, who actually served in the OPT during 2000-2010, have admitted that "Israeli actions have systematically led to the *de facto* annexation of large sections of the West Bank through the dispossession of Palestinian residents by tightening control over them and instilling fear."[183]

---

[178] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.
[179] "Tax-Exempt Funds Aid West Bank Settlements," New York Times June 7, 2010 http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html?_r=0, http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-significantly/#QQTmB6sWCUH3hkU2.97, http://www.un.org/press/en/2015/gapal1345.doc.htm.
[180] Palestine Inside Out Kindle location 1631.
[181] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.
[182] http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-significantly/#QQTmB6sWCUH3hkU2.97, http://www.un.org/press/en/2015/gapal1345.doc.htm.
[183] Our Harsh Logic p.1.

81.     In 1978, Housing Minister Sharon, the father of the settlements,[184] encouraged five

Jewish families to seize hilltops in Palestinian territory now known as Ariel.[185] Ariel now has

25,000 permanent residents,[186] but since it was built outside of Israel proper, it has a lot of

detractors. Israeli Journalist Gideon Levy—"[it] should never have been founded in the first

place…it is a blatant violation of GCIV."[187] Zahara Gal-on, Meretz political party—Ariel was

established on "stolen lands."[188] When the government accredited Ariel's university, 165 leading

Israeli academics condemned that act, vowing they would not teach there because it was not

located in Israel proper.[189]

82.     Seizing hilltops owned by Palestinians occurred as well in Ma'ale Adumim in EJ in the

1970s.[190] Planning architect Thomas Leitersdorf's goal was to "capture as much area as possible

by placing a few people on numerous hills."[191] Mr. Benvenisti, former deputy mayor of

Jerusalem, admitted that the city's 1967 borders were specifically designed to result in "a

maximum amount of vacant space and a minimum of Arabs."[192]

---

[184] "The Settlement Obsession: Both Israel and the United States Miss the Obstacles to Peace" Elliott Abrams, August 2011, p. 148.
[185] http://www.friendsofariel.org/about/about-ariel/.
[186] http://mondoweiss.net/2012/07/settler-college-granted-israeli-university-status.
[187] "What Can Israeli Arabs Learn at Ariel?" Haaretz May 8, 2005. Mr. Levy was referring to article 49(6) of GCIV, which bars an occupier from sending in or encouraging its own citizens to live in the occupied territory it administers. State Department legal advisor Harold Hansell took the same position in 1978 when asked by the House International Affairs Committee to render an opinion on the applicability of article 49(6) to the settlements.
[188] http://mondoweiss.net/2012/07/settler-college-granted-israeli-university-status.
[189] *See* "Spain Bans Ariel University from International Contest," Jerusalem Post Sept. 22, 2009, http://www.standwithus.com/news/article.asp?id=1179.
[190] Palestine Inside Out Kindle location 2082.
[191] Palestine Inside Out Kindle location 2071.
[192] Palestine Inside Out p. 119.

83.     In 1982, settlers seized more private Palestinian property now known as Nokdim by setting up a tent encampment of six families.[193] As of that date, according to Zeev Ben-Yosef, Deputy Head of the Settlement Division of the World Zionist Organization, "any Israeli withdrawal from Judea and Samaria…is now impossible. The situation there is now irreversible."[194] He cited a 30-year settlement-expansion plan, which called for 1.4 million Jews living in the West Bank by 2010.[195] Thus, settlement expansion was no accident, but designed and planned to accommodate the housing needs of new settlers. That activity has resulted in the forced displacement of 400,000 Palestinians and the demolition and confiscation of 49,000 Palestinian homes.

84.     With respect to Nokdim, in 2006, Peace Now, an Israeli NGO, claimed and has proof in terms of land registration records that at least Palestinians own 30% of Nokdim.[196] The HCJ decided to revisit the issue of proper land ownership in Nokdim because general allegations had surfaced concerning "under-the-table" financing, forged deeds, false affidavits given by settlement leaders to the IDF regarding the need for security seizures, and illicit construction permits were responsible for the explosive growth in settlements.[197] In fact, in 1992 an official

---

[193]
http://peacenow.org.il/eng/sites/default/files/Breaking_The_Law_formal%20data_March07Eng.pdf#page=11.
[194] "Taking Over the West Bank: The Israelis' Irreversible Settlements," Lesley Hazleton, The Nation, Dec. 18, 1982.
[195] Id.
[196]
http://peacenow.org.il/eng/sites/default/files/Breaking_The_Law_formal%20data_March07Eng.pdf#page=11.
[197] General's Son p. 142,
http://www.peacenow.org.il/eng/sites/default/files/Sasson_Report_EngSummary_0.pdf (the

government report specifically found that settlers had "made false affidavits, misused the absentee property law, and received illegal transfers of public property and tens of millions of shekels of public funds."[198]

85.     That court opinion came after an embarrassing disclosure made by the government in 2009. The government had maintained its own private comprehensive database (the Spiegel database) on settlement expansion,[199] which detailed the complicity of government officials and private sector companies in widespread illegal construction in West Bank settlements. That database revealed that private companies building settlements in the West Bank like the construction/support firms named herein (some of whom were BL/BH and RE/MAX customers) had widely ignored: (a) the local municipal building code; and (b) Israeli law, by seizing private property owned by Palestinians,[200] the same claim advanced herein in Count IV. This comprehensive 2009 database corroborated the findings made by Israeli Special Prosecutor Talia Sasson four years earlier, i.e., that individuals (settlers) and private companies (conglomerates named herein) had been stealing property owned by the state or by Palestinians.[201] She wrote a scathing report on illegal settlement activity, and recommended the criminal prosecution of

_____

"Sasson Report," stating that "the claim that the political approval for establishing outposts was false"). *See also* http://www.haaretz.com/israel-news/.premium-1.700794 (the results of a February 2016 investigation reveal that 14 out of 15 acquisitions by Amana, a settler real estate organization which holds marketing events in the U.S., were forged. Said one straw-man purchaser: "I signed so many times for many lands…I told them I am signing for all Palestinians.")

[198] http://imeu.org/article/elad-the-jewish-national-fund-the-us-taxpayer-subsidized-judaization-of-sil.

[199] English excerpts available at http://www.yesh-din.org/sys/images/File/SpiegelDatabaseEng.pdf.

[200] Id.

[201] Id.

government officials who had issued illicit construction permits and/or funded settlements with "under-the-table" monies.[202] Her report was promptly buried and forgotten about,[203] and her recommendations, i.e., evacuation of settlements and outposts, were never implemented.

86.     These illegal seizures were not inadvertent or accidental intrusions on private property, but were planned, permanent trespasses[204]: (a) encouraged by U.S. donors/entities, Abrams, HP/Motorola, RE/MAX, BL/BH officials, construction/support firms, and settlement leaders; and (b) funded by U.S. tax-exempt entities and their donors, BL/BH, and rogue government officials. Former Justice Minister Tzipi Livni—"Money meant to build settlement construction is given 'under the table' with no transparency or oversight."[205] Most of that illegal money is laundered funds which came from U.S. donors using U.S. financial pass-throughs. *It is a significant problem—total contributions to Israeli NGOs in 2007 were $1.729 billion.*[206]

87.     This funding has had devastating consequences for the Palestinian Plaintiffs named herein. 190 villages out of 250 villages in northern Palestine have been emptied.[207] Armed settlers forcibly evicted homeowners with help from IDF/G4S personnel and Volvo front-end

---

[202] Sasson Report.

[203] *Compare* http://www.haaretz.com/gov-t-okays-sasson-report-panel-set-up-to-implement-it-1.152983 *with* http://www.haaretz.com/israel-news/netanyahu-appointed-panel-israel-isn-t-an-occupying-force-in-west-bank-1.449895.

[204] Sharon's intentions went much beyond Ariel, in fact, he stated "Everybody has to move, run and grab as many [Palestinian] hilltops as they can to enlarge the [Jewish] settlements because everything we take now will stay ours...Everything we don't grab will go to them." –Ariel Sharon, Israeli Foreign Minister, addressing a meeting of the Tsomet Party, Agence France Presse, Nov. 15, 1998. *See also* Witness in Palestine p. 385. This is an admission from Sharon that they would be taking property that did not belong to them.

[205] http://www.reuters.com/article/us-palestinian-israel-settlements-idUSKBN0EZ0JA20140624.

[206] "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Fleisch and Theodore Sasson April 2012 p. 9.

[207] Palestine Inside Out p. 257.

wheel loaders. The result—220,000 more Palestinians became refugees.[208] Kirbet Yerza is not an isolated case. Today, according to official government data, over 11,000 demolition orders affecting some 13,000 structures, including homes, are currently outstanding in Area C of the West Bank.[209] As a result, at least 50,000 Palestinians joined the already-swollen ranks of homeless refugees.[210]

88.    Violent demolition of homes has similarly occurred in the Negev village of Al Araqib where 604 structures and 36 rain-collecting cisterns were destroyed.[211] If the last 2015 demolition of that village is included, the village has been demolished at least 86 times. The tents in Al Araqib were destroyed because they were sitting on valuable real estate, which the construction/support firms wanted to develop, BL/BH wanted to finance, HP/Motorola and G4S wanted to protect, and RE/MAX wanted to market.

89.    The settlers have no fear that they will be stopped from attacking unarmed Palestinian homeowners or arrested by IDF/G4S personnel even though GCIV principles require the occupier's military forces to protect the local population and their property and function as trustees. According to Israeli journalist Mr. Akiva Eldar, "[the settlers] can literally get away with murder."[212] As cited in *Our Harsh Logic*, IDF forces, even if they wanted to, could not

---

[208] Id. Kindle location 4223.

[209] http://www.un.org/apps/news/story.asp?NewsID=51826#.VmH2d3arTIU.

[210] Palestine Inside Out Kindle location 3836.

[211] http://www.amnestyusa.org/research/reports/annual-report-israel-and-the-occupied-palestinian-territories-2013?page=2.

[212] http://mondoweiss.net/2015/09/israel-legitimizes-vigilante.

control these violent settlers. And because they are Jewish, they even receive free legal defense representation courtesy of a U.S. 501(c)(3) entity, Defendant Honenu.[213][214]

90.     David Shulman, a resident of Taayush near the south Hebron hills, knows all about violence-prone settlers because of first-hand experience with them. He brought blankets to Palestinian herders (because of freezing temperatures at night), and armed settlers were furious at him, screaming, "What kind of Jew are you?" He said, "I am a Jew, that is why I am here." He described what Palestinians face every day, i.e., "the settlers displayed pure, rarified, unadulterated, unreasoning, uncontainable human evil.[215] Their goal was to uproot a few thousand cave dwellers with their babies and their lambs who have never hurt anybody and never posed a security threat. *They led peaceful impoverished lives until the settlers came, and since then there has been no peace*." That is a common complaint among the Palestinians living in the OPT.

91.     Not content with confiscating and/or destroying 49,000 Palestinian homes, in 2000, the government started building a "temporary" 196-mile separation wall, according to former Prime Minister Sharon.[216] Volvo trucks performed the necessary hauling of the concrete and cement products. The architect designer assigned to build the wall, Dan Tirza, admitted, "in giving me

---

[213] http://honenu.org/.

[214] Honenu actually sent funds to: (a) the family of an Israeli convicted of killing 7 Palestinians in May 1990; (b) the families of two Israelis convicted of attempted murder in the 2002 plot to bomb a Palestinian school; (c) the family of an Israeli imprisoned for kidnapping and abusing a Palestinian boy in 2010; and (d) the family of the assassin of Prime Minister Rabin. *See* http://www.truah.org/images/Honenu_8.24.2015.pdf, on file with the Plaintiffs.

[215]   Palestine Inside Out Kindle location 2326.

[216] Palestine Inside Out Kindle location 610.

the job, I was to include as many Israelis inside the fence and leave as many Palestinians outside."[217]

92.    The UN has documented a separate tragic and ongoing injury that the separation wall has inflicted on the Palestinian population, i.e., continuous denial of vital medical care, a clear indication of an ongoing pattern of genocide. Between 2002 and 2003, the number[218] of Palestinians in the OPT able to access medical facilities in EJ fell by half, and it has continued to decline.[219] Al-Makassed Hospital reported a 50 percent drop in emergency room treatments after the wall went up around Jerusalem, from 33,000 in 2002 to 17,000 in 2005.[220] The St. John Eye Hospital also reported a dramatic fall in treatments.[221] Augusta Victoria Hospital marked a one-third drop in its patient load once more restrictive IDF controls over Palestinian access to EJ went into effect.[222]

93.    Despite the 186-mile separation wall and thousands of HP/Motorola security systems, settlement officials still claim in false affidavits submitted to area military commanders that continued destruction of Palestinian homes is necessary to protect the settlement population.[223] Settlement officials, with IDF/G4S complicity, have repeatedly abused the "security" rationale

---

[217] http://mondoweiss.net/2015/12/israels-security-provided/.
[218] Palestine Inside Out Kindle location 1365.
[219] Saree, Makdisi, Palestine Inside Out p. 75.
[220] Id.
[221] Id.
[222] Id. at 76.
[223] This false claim concerning security is the reason why the majority of private property seizures by area military commanders can be legitimately challenged, i.e., settlement officials had prepared false affidavits concerning the issue of security. Plaintiffs, however, are not trying to challenge these illegal property seizures herein, but merely seek back rent and interest from the time that the property was initially seized and occupied.

and have stolen more Palestinian property in the process. For example, based on an order issued by the area military commander, hundreds of acres of valuable Palestinian farmland were bulldozed in 1979 in Kiryat Arba for "security purposes."[224] Instead of erecting a 100-foot security barrier to protect themselves from terrorists, the settlers built a "Jewish-only" parking lot on the property.[225]

94.     RE/MAX, HP/Motorola and the construction/support firms like Volvo and Heidelberg Cement have all benefited enormously from demolitions and confiscation of private Palestinian property. In fact, Heidelberg Cement grossed $5-6 million in 2014 and paid an annual tax of $585,000 to the Regional Council of Judea and Samaria for their operations.[226] Also, HP has a $6 billion investment portfolio based on OPT investments alone.[227] Motorola has made a fortune by supplying settlements with sophisticated thermal imaging systems. In fact, it boasts that its Israel division is the most profitable in the company. As already noted, RE/MAX and housing developers grossed $9.45 billion dollars in marketing 26,000 new homes in the OPT.

95.     Veolia, AFI, and Volvo shareholders have similarly benefited enormously from home demolitions. Without the availability of large tracts of vacant property, cleared of all non-Jews, to develop, the construction/support firms would be unable to build vital infrastructure

---

[224] Palestine Inside Out Kindle location 2371. *See also* "Hebron, Area H2: Settlements Cause Mass Departure of Palestinians," B'tselem, https://www.btselem.org/download/200308_hebron_area_h2_eng.pdf.
[225] Palestine Inside Out Kindle location 2371.
[226] https://www.hrw.org/news/2016/01/20/dispatches-corporations-perpetuate-injustices-settlements.
[227] http://www.whoprofits.org/company/hewlett-packard-hp. *See also* http://presbypeacefellowship.org/content/divestment-caterpillar-hewlett-packard-and-motorola-solutions#.Vmb_zLiDGko.

improvements for the growing settler population. Thus, they relied on and encouraged the

criminal activities described herein. They knew they would be promptly notified when private

property suddenly becomes available as construction sites after armed settlers have engaged in

additional ethnic cleansing. Once notified, AFI and Veolia construction superintendents are

immediately dispatched to the construction site, and start to pour concrete foundation footings to

cover up any evidence of the Palestinian village that used to occupy that property. Volvo wheel

loaders and trucks are then made available to demolish any remaining structures and assist in

foundation-footing construction activity and the removal of construction debris.

96.      The Palestinian agricultural sector has been devastated, to say the least. Armed settlers,

protected by IDF/G4S personnel, have destroyed *at least 900,000 olive trees* since 2005.[228] A

2007 report published by UNOCHA stated that in the area around the Palestinian town of

Qalqilya, some 1,800 farming families do not have an able-bodied member with a license to

access their agricultural property.[229] Some 82% of Palestinian farmers in 2007 could not even

access their own land, and if they try to do so, they would have been shot at by either armed

settlers or IDF/G4S personnel.[230]

---

[228] *See* http://mondoweiss.net/2013/10/palestinian-equivalent-destroying. *See also* Palestine Inside Out Kindle location 617.

[229] Palestine Inside Out Kindle location 646. Most Americans have no idea that Palestinians need to apply for special licenses issued by senior IDF officials to visit a sick father who lives in another village, attend a university, enter Jerusalem for medical care or work opportunities, access their olive groves, or even leave the country. Most Palestinians are fearful of doing so, for a very good reason, i.e., they will not be allowed back in, in violation of fundamental human rights laws. *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

[230] The long-term goal is to destroy the olive oil industry, since it is one of the few vibrant sectors of the Palestinian economy still operating, i.e., it employs 100,000 Palestinian citizens.

## UNITED STATES CONDEMNATION OF SETTLEMENTS
## AND CRIMINAL STATUTES VIOLATED BY U.S. DONORS AND TAX-EXEMPT ENTITY OFFICIALS

97.     Since 1968, numerous U.S. presidents and Department of State spokespersons have been very clear in pronouncing the official U.S. policy on Israel's 68-year military occupation, its duties as an occupier, and the daily violence brought on by the spectacular growth of settlements. Therefore, all U.S. citizens, U.S. tax-exempt entities, U.S. companies named herein, and BL/BH U.S.-based officials had to know that the activity that they financed, encouraged, or engaged in to promote the settlement enterprise specifically violated America's clearly-defined anti-settlement public policy. Official U.S. policy pronouncements include:

(a)     In 1969, almost 50 years ago, Charles Yost, U.S. Permanent Representative to the UN under the Nixon administration stated that: "An occupier (referring to Israel) may not confiscate or destroy private property," and "an occupier [like Israel] must maintain the occupied territory as intact without interference with the customary life of the area."[231] The intentional, inhumane, systematic, and reckless destruction of homes, olive groves, water wells, hospitals, and schools to promote settlement expansion and ethnic cleansing activity has completely destroyed the "customary life" that all Palestinians enjoyed before Israel's 48-year second occupation started in 1967. The first occupation, of course, started in 1948-49.

(b)     In 1980 Cyrus Vance, U.S. Secretary of State, stated: "United States Policy regarding settlements is unequivocal and has been a matter of longstanding record…*settlements are illegal, and Article 49 paragraph 6 of GCIV is applicable*," i.e., "all occupiers [like Israel] are bound to preserve private properties for the rightful owners"[232] and

---

[231] "U.S. Policy on the Illegality of Israeli Settlements under International Law," (excerpted from Ambassador Daniel Kurtzer, "Do Settlements Matter? An American Perspective," Middle East Policy, vol. 16, issue 3, fall 2009), J Street
https://s3.amazonaws.com/s3.jstreet.org/images/One_Pager__Illegality_of_Settlements_under_Intl_Law.pdf.
[232] http://www.cmep.org/content/us-statements-israeli-settlements_short, accessed December 8, 2015.

ensure that their customary life can go on as usual. 25 years later, Israeli Prosecutor Sasson echoed that identical sentiment and recommended that: (1) criminal charges be filed against government officials for financing illegal outposts and issuing illicit construction permits; and (2) illegal settlements be evacuated.[233] Secretary of State Vance tasked U.S. State Department attorney Herbert J. Hansell to research the issue of the legality of the settlements. Attorney Hansell, much like Special Prosecutor Sasson, Defense Minister Shaul Mofaz, the Israeli HCJ for forty years, and hundreds of other international legal scholars, concluded that they violated the terms of the Geneva Convention. Defense Minister Mofaz identified the problem succinctly: "these people have been stealing private property."[234]

(c) In 1989 Thomas Pickering, Permanent U.S. Ambassador to the UN, stated that "Since the end of the 1967 war, the United States has regarded Israel as the occupying power in the Occupied Territories, which includes the West Bank, Gaza, EJ, and the Golan Heights…[235]Israel's occupation is governed by the Hague Convention of 1949 and the Hague Regulations of 1907."[236]

(d) 24 years ago, in 1991, Secretary of State Baker testified on the Hill and: (a) condemned the settlements and declared that such activity was a violation of U.S. policy; and (b) informed Congress that Israeli Prime Ministers had given him verbal assurances that no part of the U.S. aid package would be used to fund settlement expansion. After hearing his candid assessment of the matter, Congressman Obey, chairman of the Subcommittee on Foreign Relations Affairs, agreed strongly that "this [settlement] activity is in violation of U.S. policy." Thus, settlements violate U.S. policy whether they are technically legal or not.

(e) In 1995, Treasury and U.S. President Bill Clinton, in Executive Order 12947, condemned individuals and entities who finance acts of violence in the Middle East. It cited the need to protect national security, foreign policy, and the U.S. economy. Section 1(c) of Executive Order 12947 forbids any person from engaging in a transaction within the U.S. that either evades, avoids, or attempts to violate a provision set forth in the Order. Provision 1(b) prohibits providing financial support for violent acts occurring in the Middle East. Because Defendants Hagee, Moskowitz, and Adelson have intentionally financed the purchase of military hardware for settlers to promote settlement expansion and thus ethnic cleansing, and because Falic Family

---

[233] Sasson Report, http://www.peacenow.org.il/eng/sites/default/files/Sasson_Report_EngSummary_0.pdf.
[234] https://www.yesh-din.org/userfiles/file/Reports-English/Yesh%20Din%20-%20Chasar%20Takdim%20English%20-%20Web-%2016_6.pdf p. 45.
[235] http://www.cmep.org/content/us-statements-israeli-settlements_short.
[236] Id.

members and Gilbert have directly funded IDF soldiers' criminal activity, they have all financed and promoted acts of violence in the Middle East. Thus they have engaged in conduct which directly contravenes this Executive Order, and can be designated by Treasury as Specially Designated Global Terrorists, and their bank accounts can be frozen.

98.    There are other numerous pronouncements which have similarly condemned settlement expansion, wholesale violence, and the expulsion of the local Palestinian population.[237] These pronouncements were made by U.S. presidents (Ford, Nixon, Bush I, Bush II, Clinton, and Obama) State Department spokespersons like Richard Boucher, and Secretaries of State (Colin Powell, Condoleezza Rice, Hillary Clinton) and by former U.S. Ambassador to the UN Susan Rice.

99.    To ensure that Israel would adhere to its commitment to halt settlement activity of any nature and thus comply with America's emphatic anti-settlement public policy, U.S. officials, including former Secretary of State Baker, repeatedly requested and received verbal assurances from Israeli Prime Ministers that the government would not use "state" property or spend U.S. aid in the OPT settlements.[238] To circumvent this provision, settlement leaders used dollars sent to them by U.S. tax-exempt entities such as CFOIC to continue funding the forcible expulsion of

---

[237] For example, the U.S. also voted in favor of UN Resolutions 672 and 681 in 1990 which criticize Israel's deportation of Palestinians. Israel Lobby p. 367.

[238] In 1991, Prime Minister Yitzhak Shamir promised that any funds received by Israel from America would "not be used in any manner to expand existing settlements or create new settlements in the West Bank." *See* "Baker Cites Israel for Settlements," NY Times, May 23, 1991 http://www.nytimes.com/1991/05/23/world/baker-cites-israel-for-settlements.html *and* "Tax-Exempt Funds Aid West Bank Settlements," NY Times July 5, 2010. *See also* Arms Export Control Act of 1976 (AECA), 22 U.S.C. §2754 (aid must be solely for "internal security" and "legitimate self defense"). *See also* Letter from Rep. Kucinich to Condoleezza Rice, Secretary of State, Jan. 5, 2009 (Citing the AECA, stating that Israel's most recent attacks neither further internal security nor do they constitute "legitimate" acts of self-defense).

the local Palestinian population. And, courtesy of America's tax code, they still continue to receive millions of dollars every month from these Christian Zionist entities to fund settlement expansion. Settlement expansion, of course, necessarily entails ethnic cleansing, arms trafficking, and further confiscation of private Palestinian property. Ironically, that funding coming from Christian evangelical groups has turned Bethlehem, the birthplace of Jesus Christ, into a virtual ghost town.

**b) International Condemnation of Illegal Aggravated and Ongoing Trespass Upon Private Property**

100.    The Nuremberg Principles, GCIV and the Hague Convention principles all prohibit civilian deaths and the destruction of homes, hospitals, and schools in an occupied territory and define such acts as either war crimes or crimes against humanity. But these activities are engaged in by IDF/G4S personnel and violent settlers every day in the OPT, and render the occupation of the OPT an ongoing and continuing series of war crimes. America has, since 1863, courtesy of the Lieber Code adopted by President Lincoln, condemned these activities in very clear terms, i.e., individuals engaging in such activity are subject to the death penalty.

101.    There have been a series of UN resolutions that condemned every aspect of the settlement enterprise and the violence promoted thereby. There are also numerous treaties and conventions which have been violated by all of the defendants named herein. They are far too numerous to list in this paragraph, thus the UN resolutions, treaties, and conventions and the principles that have been violated are listed in Exhibit A—Customary International Law.

**b)  Statutory Violations**

### i.  18 U.S.C. § 1956(a)(2), Money Laundering

102.    The Defendants have all conspired to and did engage in activity which constitutes money

laundering under **18 U.S.C. § 1956(a)(2)**, which provides, in pertinent part:

> (2) "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or
> transfer a monetary instrument or funds from a place in the United States to or through a
> place outside the United States or to a place in the United States from or through a place
> outside the United States—
>
>> (A) with the intent to promote the carrying on of specified unlawful
>> activity…(as detailed *infra*, para. 119)
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the
> monetary instrument or funds involved in the transportation, transmission, or
> transfer, whichever is greater, or imprisonment for not more than 20 years, or
> both.

103.    All Defendant tax-exempt entities have engaged in money-laundering activities by way

of the cross-border transmission of funds by: (a) receiving donations at their addresses in the

United States; (b) transferring those funds by mail or wire across international borders to various

settlements including the settlements which are coconspirators with the Defendants herein; and

(c) knowing that those funds would be used by settlement leaders to arm the local settlement

population and have them engage in ethnic cleansing and wanton property destruction with

IDF/G4S assistance. In the case of FFF and FIDF, they also sent funds directly to the Israeli

army, whose soldiers have committed the heinous atrocities already described herein. Thus,

Defendant FIDF officials not only face possible jail time, the organization itself can be fined

$500,000 for each transaction which resulted in funds being transferred overseas.

104.    Defendant donors have similarly engaged in the cross-border transmission of funds by donating money directly to the IDF and to various tax-exempt organizations, e.g. the Falic and Moskowitz Family Foundations. They knew and requested that these entities send the money to their preferred settlement in order to forcibly expel more non-Jews from the OPT and secure private Palestinian property in order to expand settlement boundaries. They were totally indifferent to the violence they knew such financial assistance would result in, i.e., wanton destruction of property, wholesale violence, and ethnic cleansing.  Thus, these Defendants not only face possible jail time, they can be fined $500,000 for each transaction whereby they transferred funds to their preferred settlements or to the Israeli army to promote wholesale violence and other specified unlawful activities. In the case of a major donor like Moskowitz, the fine could easily reach $1 billion if the transfers he made in the last ten years are doubled.

105.    The individual donors knew and intended that their donations would promote the carrying on of one or more of the aforementioned specified unlawful activities described herein, *see* para. 119, and in the case of Moskowitz, Adelson, and Hagee, they publicly encouraged the forcible expulsion of all non-Jews, fearing that Jerusalem would be "lost" if they didn't do so.[239] The term "lost" as used by Abrams, Moskowitz, Adelson, and Hagee means, of course, that there are still some non-Jews living either in the OPT or in EJ.

106.    There is ample evidence that Moskowitz, through his foundation, engaged in money laundering activities. As reported in the L.A. Times, "many beneficiaries of [Moskowitz's tax-

---

[239] Israel Lobby p. 150. Hagee has also expressed his view that Israel should not comply with international law. *See* http://www.charismanews.com/world/45501-john-hagee-if-you-re-not-for-israel-you-re-biblically-ignorant-or-not-christian.

exempt foundation] are U.S. 'pass-through' organizations designed to fund the expansion of settlements in the OPT and the purchase of property in EJ." He has encouraged the destruction of two of the holiest sites in the minds of over one billion devotees, the Dome of the Rock and the Al-Aqsa mosque. He has repeatedly stated that Israel "cannot allow Jerusalem to be lost,"[240] and his funding has already accomplished that. He has funded the pass-through entity Defendant AFBEY with $785,000 in laundered funds.[241] AFBEY has directly violated Israeli criminal law, its well-defined public policy, its Declaration and Basic Law Number 2, and HCJ precedent because its senior officials have repeatedly demanded that IDF personnel refuse to carry out legitimate court orders to destroy illegal settlements and outposts and unauthorized security barriers.

107.    The tax-exempt entities and the individual donors named herein have accomplished the illegal objectives they set out to achieve many years ago when they agreed to become part of the conspiracy as described herein. Their financial contributions have promoted ethnic cleansing (400,000 Palestinians forcibly removed)[242], added at least 650,000 settlers, probably more, to the OPT, and has also resulted in a "Jewish-only" enclave being established in EJ, financed in large part by donor Moskowitz through the American Friends of Everest Foundation, of which he is sole owner. Moskowitz' purpose in funding that foundation was to establish a "Jewish-only" enclave. Currently, the Sub Laban family is the last Palestinian family living in a large apartment

---

[240] http://www.algemeiner.com/2012/04/15/thank-you-cherna-irving-moskowitz/.
[241] http://lajewsforpeace.org/Essays/Settlements/Funders.pdf.
[242] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

complex in the formerly all-Muslim quarter of EJ.[243] The settlers, supported by Ateret Cohanim and financed by Defendant Moskowitz, are trying to remove that family by cutting off electrical power sources to their apartment and forcibly removing air conditioning equipment to make it appear that the family has abandoned their apartment, invoking the terms of the racist Israeli Absentee Property law. Not only is this another example of criminal activity that U.S. taxpayers are subsidizing on a daily basis, it constitutes classic racketeering criminal activity.

108.    The tax-exempt entities have also financed, as of August 2008, the construction of 794 kilometers of bypass roads in the West Bank, which are now worth $1 billion. The roads all have a 50-75 meter buffer zone on each side.[244] Many settlements, which have been funded by the tax-exempt entities named herein, have been built on key water sources such as the Western Aquifer Basin. As a result, the normal water supply has been curtailed to the Palestinian citizens. Some 313,000 Palestinians are not even connected to a water network. Those Palestinians that are connected are only allowed 86 liters per day, while the settlers receive over 200 liters per day. The problem is that of the 86 liters that the Palestinians receive, only 60 are potable. That is the reason why Palestinian children have one of the highest dysentery rates in the world.[245]

109.    BL/BH officials have likewise engaged in the cross-border transmission of funds by executing wire transfers from wealthy donors and tax-exempt entities in the United States to ADF, numerous settlements, the Israeli army, and to other organizations which support

---

[243] https://electronicintifada.net/content/last-palestinian-family-jerusalem-neighborhood-fear-eviction-any-moment/14368.

[244] http://www.ochaopt.org/documents/opt_prot_maan_apartheid_roads_dec_2008.pdf.

[245] https://electronicintifada.net/blogs/adri-nieuwhof/israeli-settlers-use-six-times-more-water-palestinians-new-report, http://www.al-monitor.com/pulse/originals/2013/04/westbank-water-restrictions-israel.html.

settlement expansion and the attendant wholesale violence it promotes. Based on the banking protocol "Know Your Customer," BL/BH officials knew exactly what the funds would be used for (see paras. 119-122 *infra*)—promotion of wholesale violence, arms trafficking, ethnic cleansing, theft and malicious property destruction. Thus, BL/BH officials not only could face jail time, but the banks themselves can be fined $500,000 for each transaction they participated in whereby funds were transferred overseas to the settlements or to the Israeli army whereby funds were knowingly transferred overseas to promote criminal activities. That fine could easily reach $6 billion for BL/BH given the fact that their officials have been knowingly transferring such funds overseas to OPT settlements for at least 30 years consistent with the 30-year settlement-expansion plan referenced in para. 92.

110.     At all relevant times herein, all of the Defendants, not just BL/BH, knew and/or were deliberately indifferent to the fact that the wire transfers initiated by the tax-exempt entities and by individual wealthy donors were to be used to promote the carrying on of specified unlawful activity, namely promotion of wholesale violence in the OPT, i.e., home demolitions, murder, mayhem, destruction of valuable agricultural property, illegal arrests, incarceration, and torture.

111.     The specified unlawful activities which these funds were intended to promote are *occupation, incarceration, destruction of homes, and war crimes*, including:

(a)  Murder. 18 U.S.C. § 1956(c)(7)(B)(ii).
(b)  Destruction of property by means of explosive or fire. Id.
(c)  Crimes of violence. Id.
(d)  Offenses with respect to which the United States would be obligated by a multilateral treaty (e.g., Nuremberg Principles or the Law of Nations), either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States. 18 U.S.C. § 1956(c)(7)(B)(vi).

(e) Offenses relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce. 18 U.S.C. § 1956(c)(7)(D).
(f) Firearms trafficking. Id.
(g) Conspiracy to kill, maim, or injure property in a foreign country. Id.
(h) Terrorist acts abroad against United States nationals. Id.
(i) International terrorist acts transcending national boundaries. Id.

112.    The settlements and all corporate Defendants named herein, including

construction/support firms, received some of the funds transferred across international borders

with the intent to use them directly or indirectly to further one or more of the specified unlawful

activities stated above. For example, all of the conspirators, *see* subsection 121(g) *supra*,

conspired to kill or maim and murder Palestinian homeowners and destroy their valuable private

property in order to accomplish settlement expansion and ethnic cleansing. Again, while G4S,

RE/MAX, and/or HP/Motorola officials did not order and their employees did not actually

poison water wells and slaughter livestock, their personnel and surveillance tracking devices and

real-estate marketing services protected the individuals (armed settlers and security coordinators)

who planned and committed such criminal activity.

113.    As a result of engaging in those specified criminal activities, each of the Defendants, at

the time that they facilitated, transmitted, or received funds overseas, either directly or indirectly,

has violated 18 USC § 1956(a)(2), laundering of monetary instruments, because they knew that

some if not all of the funds transferred overseas by the tax-exempt entities would be used to

accomplish one or more of the aforementioned specified unlawful activities in the course of

promoting the violent expulsion of all non-Jews from the OPT. HP, like Motorola, had to know,

for example: (a) that settler militia had been trained in the use of automatic weapons and sniper

scopes; and (b) continuing to provide security systems to settlement security coordinators and to

IDF/G4S personnel would result in the constant maiming and murdering of Palestinian homeowners and farmers. For the last 40 years, HP/Motorola officials doing business in the OPT always had the option of terminating all OPT business activity. They could explain to shareholders that they did so because of the numerous international human rights violations that they observed, along with the wholesale violence and ethnic cleansing being engaged in by their partners.[246] In other words, their partners were violating HP/Motorola official corporate human rights policies. They, like all corporate Defendants based in Israel, however, decided not to do so.

114.    Thus, by continuing to engage in that conduct, each of the Defendants has knowingly and intentionally violated 18 U.S.C. § 1956(a)(2), laundering of monetary instruments. The transfer of clean funds overseas to accomplish an illegal activity is classic "money laundering" activity.[247] In 1995, President Clinton and Treasury labeled this funding as terrorist activity. Thus, the U.S. donors and tax-exempt entities have been knowingly funding and promoting terrorist activity in the Middle East for at least 30 years. The OFAC division of the Treasury Department, with less substantial evidence, e.g., newspaper clippings, has designated thousands of individuals of Arab descent who have promoted and funded identical terrorist activity in the Middle East, most recently Hezbollah financiers like Abd al Nur Shalan on July 21, 2015.

---

[246] Disgruntled shareholders have petitioned HP's board for this very relief. *See* https://www.indybay.org/newsitems/2015/03/18/18770095.php.
[247] Money laundering experts have commented on the difference between Section 1956(a)(1) and 1956(a)(2). "Section (a)(2)(A) criminalizes international money laundering and prohibits transfer outside the U.S. with intent to promote carrying on of specified unlawful activity…(a)(2) contains no requirement that the funds transferred outside the U.S. constitute illicit proceeds" pp. 850-851 "Money Laundering Control Act of 1986," Jimmy Gurule, Notre Dame Law Scholarship. *See also* World Bank definitions of money laundering and terrorist financing.

115.    As a direct result of engaging in that criminal conduct, Defendants have inflicted

enormous injuries on the Plaintiffs and their relatives, as already detailed herein. The Defendants

intended to and have prevented the Palestinian citizenry from living in peace, protecting their

families, tending to their farms and olive orchards, and enjoying their neighborhood safe from

violence, a clear violation of Israel's own Declaration, which is an identical recital of UN

Charter principles. Israel's Declaration, enacted in 1948, unconditionally guarantees all of its

"inhabitants" (not just members of the Jewish faith) these fundamental rights, and is still a vital

part of Israel's national legal system, and has never been rescinded by the Knesset.

### ii.  Additional Statutory Violations

**116.**    Based on the activity described *supra* , all Defendants have also conspired to and did

engage in activity which constitutes a violation of the following statutes:

(a)  18 U.S.C. § 1341 *Mail Fraud*, which criminalizes the use of the mails to commit a
     fraud, in this case defrauding the United States, specifically the IRS and Treasury.
     The donors and tax-exempt entities have filed false applications for tax-exempt status
     and false 1040 income tax forms and 990 tax-exempt entity forms;

(b)  18 U.S.C. § 1343, *Fraud by Wire, Radio, or Television*, which criminalizes the use of
     wire, radio, or television communication to commit a fraud, in this case defrauding
     the United States, specifically the IRS and Treasury. The donors and tax-exempt
     entities have filed false applications for tax-exempt status and false 1040 income tax
     forms and 990 tax-exempt entity forms;

(c)  18 U.S.C. § 1952 *Interstate and Foreign Travel or Transportation in Aid of
     Racketeering Enterprises* (the "Travel Act"), which criminalizes interstate or foreign
     travel to promote unlawful activity. The donors and tax-exempt entity officials
     routinely visit Washington, DC to confer with Defendant Abrams and AIPAC
     officials, and travel all over America to either solicit or make tax-deductible
     contributions to promote wholesale violence, arms trafficking, and theft and
     malicious property destruction. Just like Defendant Abrams, they also travel to Israel
     three or four times a year to, *inter alia*, review settlement expansion progress, and
     meet with government officials, settlement leaders, RE/MAX, HP/Motorola officials,

BL/BH officials, IDF leadership, and construction/support firm officials. Encouraging and funding settlement expansion is always on their agenda;

(d) 18 U.S.C. § 2441, *War Crimes*, which criminalizes the commission of war crimes including torture, cruel or inhuman treatment, murder, mutilation, maiming, or intentionally causing serious bodily injury (maliciously wounding Palestinian farmers and letting them bleed out). This conduct has been thoroughly documented for at least 20 years in various UN Rapporteur reports and reports prepared by Amnesty International and various Israel-based NGOs. Recently *Our Harsh Logic* was published, detailing a 10-year pattern of criminal atrocities committed by IDF veterans. The sheer number of reports on this subject is staggering;

(e) 18 U.S.C. § 2339C, *Prohibitions Against the Financing of Terrorism*, which codifies into U.S. law the UN Convention against Terrorist Financing and prohibits U.S. nationals from directly or indirectly, by any means, funding acts abroad (i.e., the Middle East) intended to intimidate a population (live target practice, poisoning livestock and water wells, burning olive groves). As just one example of such financing, FDIF sent $60 million in one month (December 2014)[248] to encourage and fund IDF criminal activities directed at the local Palestinian population, including the commission of war crimes, attested to by members of Breaking the Silence and Israeli air force pilots[249];

(f) 18 U.S.C. § 960, *Expedition Against a Friendly Nation*, which criminalizes the furnishing of money or taking part in a military expedition against a state, colony, or people with whom the United States is at peace. The donors, tax-exempt entities, G4S, and RE/MAX, HP/Motorola, and BL/BH officials have been engaging in such conduct for at least 30 years, and Defendant Abrams has aided and abetted this expedition against the Palestinian civilian population for at least 25 years; and

(g) 18 U.S.C. § 956, *Conspiracy to Kill, Kidnap, Maim, or Injure Persons or Damage Property in a Foreign Country*, which criminalizes any conspiracy to commit any of the aforementioned crimes abroad. All Defendants, including Defendant Abrams, have engaged in such conduct for at least 30 years. As a direct result of the civil conspiracy described herein, thousands of Palestinians have been murdered, permanently injured, witnessed the destruction of 900,000 olive trees, lost loved ones, lost bodily limbs and eyesight, have had their legs amputated and their homes burned

---

[248] *See* http://www.hollywoodreporter.com/news/haim-saban-helps-raise-31m-837947 *and* http://www.hollywoodreporter.com/news/haim-saban-raises-34m-support-747379.
[249] *See* http://www.seruv.org.il/english/article.asp?msgid=55&type=news.

down with civilian relatives inside. These injuries are a direct result of the massive financial assistance rendered each year ($1.729 billion[250]) to Israel-based NGOs.

117.    In conclusion, as is obvious, all of the Defendants named herein have conspired to and did engage in activity that constitutes a violation of U.S. money-laundering statutes, arms-trafficking provisions, and the statutes listed in para. 124 *supra*, the clearly-articulated anti-settlement U.S. public policy and the international covenants and treaties listed in Exhibit A.

**COUNT I:**
**CIVIL CONSPIRACY TO EXPEL ALL NON-JEWS FROM THE OPT**
**AGAINST ALL DEFENDANTS EXCLUDING GILBERT, BRAMAN, SABAN,**
**ELLISON, AND THE DEFENDANTS NAMED IN COUNT IV**

118.    This Count incorporates and is meant to be read in conjunction with the other allegations in this Complaint, including the allegations recited in the introduction, parties and the common allegations sections.

119.    Detailed herein are the particulars as to: (a) how and why the conspiracy started; (b) the identity of each conspirator; (c) the nature of the role each conspirator played; (d) how they communicated and worked with each other to ensure the violent expulsion of all non-Jews from the OPT; (e) the incentive each conspirator had in terms of joining the civil conspiracy; (f) the financial rewards that they received as a result of participating in the conspiracy; and (g) the U.S. and Israeli criminal laws, the Customary International Law principles (Exhibit A), and the respective U.S. and Israeli anti-settlement public policies they violated in engaging in specific acts to accomplish the goals of the conspiracy.

---

[250] "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Fleisch and Theodore Sasson April 2012 p. 9.

120.    About 40 years ago, wealthy Jewish Americans learned that their Israeli brethren had

seized Palestinian property in the OPT per Prime Minister Sharon's advice to seize any and all

Palestinian-owned hilltops. They wanted to make financial contributions so that the hilltop tent

enclaves would survive, thrive, and grow into permanent villages. They set up tax-exempt

entities and foundations, worked with friendly pro-settlement 501(c)(3) tax-exempt entities, also

known as financial pass-throughs or funnels. These pass-throughs received the "charitable"

donations and transferred the funds to the settlements knowing the violent consequences thereof,

i.e. wholesale violence and ethnic cleansing. All Defendant donors, especially Defendant

Moskowitz took substantial illegal tax write-offs and made extensive use of these pass-

throughs[251] to ensure that Jerusalem would become a "Jewish-only" city.

121.    Other settlement leaders learned about Ariel's success, and set up their own tax-exempt

entities, i.e., "Friends of [Settlement X]". Settlement leaders visited America to meet with donors

and BL/BH officials. They chose BL for two reasons: (a) its history of funding ethnic cleansing

in Palestine going back to 1948; and (b) its commitment to the expansion of the Zionist state.[252]

They chose BH for U.S. banking activity services for two reasons: (a) because of its significant

presence in both America and Israel and; (b) the banks extensive advertising activities for

promoting availability for long-term mortgages in settlements in order to purchase homes in

Jewish-only settlements. The leaders had two urgent concerns—protection and expansion of the

---

[251] Hope Hamashige, Paul Lieberman, and Mary Curtius, "Bingo King Aids Israeli Right Wing," Los Angeles Times, May 9, 1996, http://articles.latimes.com/1996-05-09/news/mn-2155_1_bingo-hall.

[252] *See* http://english.leumi.co.il/static-files/10/LeumiEnglish/Financial_Statements/LeumiProfile2013_1.pdf?lang=en, p. 12.

settlements. Settlement expansion was a priority because it meant more settlers and thus more funding coming from America. With that unlimited funding, settlement leaders knew they could dramatically expand their settlements by arming violence-prone settlers and training them in military tactics so that they could aggressively confiscate more real property owned by their Palestinian neighbors.

122.    To achieve settlement expansion, settlement leaders, with the unlimited financial assistance coming from U.S. tax-exempt entities: (a) purchased and issued sophisticated military hardware to violence-prone settlers; (b) set up and operated sniper schools where settlers learned how to fire automatic weapons and use sniper scopes; (c) hired a full-time security coordinator whose mission was to train settlers in military tactics so that they could continue to intimidate and threaten their Palestinian neighbors on a daily basis; (d) encouraged settlers to aggressively confiscate more Palestinian property, using violent means if necessary; (e) contracted with G4S for protection services, HP/Motorola; (f) contracted with BL/BH and RE/MAX for essential banking and real-estate services; and (g) purchased sophisticated HP/Motorola security systems to protect the settler population on a 24/7 basis. Because of the tax-exempt financial assistance and the settlers stealing more private Palestinian property, Ariel went from six tents and two outhouses to 25,000 permanent settlers today with first-class housing developments, a major university complex, a concert hall, and a state-of-the-art medical facility (funded by Defendants Adelson and Braman[253]).

---

[253] Norman Braman is a big Ariel supporter, i.e. he gave $311,000 to Ariel from 2004-2008 and hosted a "Peace with Security" fundraiser dinner in Fort Lauderdale, Florida in 2007. Defendant Moskowitz and Morton Klein, president of the Zionist Organization of America, were there. The

123.    BL/BH received the bulk of the settlement banking business and together processed thousands of wire transfers on an annual basis, starting in approximately 1970. They soon realized that the Treasury Department was not at all concerned about this activity, i.e., it never requested the banks to prepare suspicious activity reports given the quantity of funds involved. That knowledge emboldened settlement leaders, who quickly realized in the early 1970s that they could grow their settlements with impunity with no fear that the Treasury Department would intervene to curtail their activities. Both these banks knew, courtesy of "Know Your Customer" banking protocol, that their tax-exempt entity customers' goal was to eradicate the non-Jewish population living near the settlements. With the active assistance of these banks, annual funding eventually flowed on a massive scale from America, i.e., in 2007 alone, $1.729 billion dollars went to Israel-based NGOs.[254]

Based on the prospect of that massive funding, settlement leaders realized that they needed the services of an America-based settlement advocate—Defendant Elliott Abrams. They needed someone in America who could: (a) write puff pieces extolling the virtues of the settlement movement; (b) head off any congressional interest in the growing settlement enterprise; and (c) extol the virtues of brave settlers and IDF soldiers and justify the theft of private Palestinian property by them, which, in some cases (e.g. Plaintiff Kateeb) was owned by

year before, Ariel's mayor visited the U.S. specifically to commend donors including Mr. Braman. https://lobelog.com/rubios-biggest-donor-funded-west-bank-settlement/, http://www.jpost.com/Jewish-World/Jewish-Features/Sheldon-Adelson-pledges-25m-to-Ariel-University-360480.
[254] "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Fleisch, Theodore Sasson April 2012 p. 9.

American citizens. As detailed herein, Defendant Abrams has accomplished all of those objectives.

124.    The elements of civil conspiracy are: (1) **an agreement** (donors, tax-exempt entities, Abrams, settlement leaders, BL/BH, and construction/support firm officials) between two or more persons; (2) **to participate in an unlawful act**, (ethnic cleansing, malicious theft and property destruction, arming settlers, teaching them how to use automatic weapons and sniper scopes, illegal property confiscation, murder/mayhem) **or a lawful act** (hire a full-time security coordinator, contract with BL/BH for banking services, contract with HP/Motorola and G4S for surveillance devices, thermal imaging systems, and security protection, transfer of funds overseas, amend 501(c)(3) regulations, or contract with construction/support firms to build new housing developments, shopping malls, and infrastructure improvements) in an unlawful manner (to promote criminal conduct, ethnic cleansing, and wholesale violence overseas including malicious theft of and destruction of private property); (3) **an injury** (loss of loved ones, homes, factories, retail shops, and agricultural property, physical harm, severe psychological or emotional distress) caused by an **unlawful overt act** (arming settlers so that they could engage in live target practice against Palestinian farmers, setting up and operating sniper schools, theft of private property, wholesale violence, malicious property destruction, home demolitions, funding IDF/G4S criminal activities) performed by one of the conspirators (tax-exempt entities, the settler population, their security coordinators, G4S personnel, Abrams, donors, and BL/BH officials in Israel and America) to the agreement; and (4) that **the overt acts** were done pursuant

to and in furtherance of the common scheme (goal: rid the OPT of all non-Jews). *Halberstam v. Welch*, 705 F.2d 472 (1983).

125.    Abrams' overt acts alone included: (a) meeting secretly with Israeli Prime Minister aides[255] and encouraging them to keep announcing new settlements and in the process continuing to expel the local Palestinian population; (b) giving congressional testimony and speeches over the past 30 years condemning Palestinian violence and promoting the idea that Palestinians are the root cause of violence in the Middle East; (c) publishing articles to the effect that settlement expansion is a myth; and (d) discussing the need for additional funding for settlement expansion with various donors including Defendant Adelson. He is a frequent Capitol Hill visitor and, like all donors named herein, regular attendees at AIPAC's annual convention and pro-settlement gala fundraising dinners, where Abrams and IDF "war heroes" are featured speakers.

126.    *The financial assistance provided by U.S. donors and tax-exempt entities proved invaluable for a number of reasons*. First, as of 1992, the Israeli government had banned settlements *in toto*. Second, as a result, charitable contributions dried up because Israeli citizens could no longer take tax write-offs for making donations to settlements. Third, Secretary of State Baker (Defendant Abrams' republican colleague) and other U.S. officials were assured by Israeli Prime Ministers that they would not use either state property or American financial assistance to expand settlements. Fourth, since the Israeli government froze settlements in 1993, illicit "under-the-table" financial assistance was no longer available for the settlements. Hence, there was only one viable and reliable source of substantial financial assistance—U.S. donors and tax-exempt

---

[255] Israel Lobby pp. 217, 218, 223, 224, 228.

entities. They did not disappoint settlement leaders; in fact, they were sending $1.7 billion to Israel-based NGOs in 2007.

127.    The conspiracy has two classes of participants—individuals and entities based in America and Israel. The U.S. donors/entities and their co-conspirators, including Abrams and BL/BH U.S. employees, have all conspired to encourage, raise, solicit, contribute, or transfer significant sums overseas to promote settlement expansion. The coconspirators all knew what the settlement leaders would do with the funds coming from U.S. tax-exempt entities: (a) arm the settler population with military hardware; (b) train them in the use of automatic weapons and sniper scopes; (c) hire a full-time security coordinator to plan and oversee the ethnic cleansing activities of the local militia; and (d) encourage militia members, with the assistance of IDF/G4S personnel, to terrorize and violently expel their Palestinian neighbor who were peacefully occupying nearby property tracts that the settlement leaders coveted.

128.    The funding also enabled settlement officials to contract with construction/support firms to build permanent residential and infrastructure improvements.[256] To keep up with the growing demand for more housing accommodations, vacant "old Arab houses" were marketed and sold to new settlers by RE/MAX brokers. Like the construction firm officials, they were not concerned about ethnic cleansing activity or the origin of the housing stock, i.e., homes abandoned by terrified Palestinians or illegally condemned for fictitious security reasons based on false affidavits submitted by settlement officials to area military commanders.

---

[256] A UNOCHA report in July 2007 found that "almost 40% of the West Bank is now taken up by Israeli infrastructure including roads, settlements, and military outposts." That is how much the international conglomerates have changed the landscape in the West Bank. Palestine Inside Out p. 19.

129.     HP/Motorola officials played a critical role in the conspiracy by providing the settlements with skilled staff who knew how to install and operate complex surveillance devices and thermal imaging systems. These devices and systems convinced prospective homebuyers that the settlements they were looking at were safe and secure. This became a major selling point pursued by RE/MAX agents. HP/Motorola employees worked on a daily basis with the settlement's security coordinator to ensure that there would be 24/7 surveillance and tracking of the local Palestinian population. The reason—disgruntled Palestinians would not be able to threaten settlers and/or access their olive groves, now located in the expanded settlements. The settlements were able to purchase sophisticated and expensive military hardware, forcibly expel their Palestinian neighbors, build new housing accommodations, hire full-time security coordinators, and purchase expensive HP/Motorola surveillance devices only because of the massive financial aid they received from the U.S. tax-exempt entities.[257] Without that annual subsidy the settlements were in no financial position to engage in such activity. For example, to fully protect the settlement, numerous HP/Motorola devices would be necessary and by themselves would approximately cost $50,000.

130.     *Israel-based conspirators* for the last 30 years have requested, received, disbursed, or otherwise enriched "Jewish-only" settlements with laundered funds coming from America. With those laundered funds, construction/support firms including AFI, Volvo, and Veolia made it possible for the settlements to thrive and expand. They destroyed Palestinian villages with Volvo wheel loaders, poured building foundations with concrete products, reinforced structural steel

_____

[257] "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Fleisch, Theodore Sasson April 2012 p. 9.

pylons with concrete encasings, and built expensive housing developments, shopping malls, and infrastructure improvements (tunnels, highways, light rail, solid waste facilities) on private Palestinian property. HP/Motorola officials' role was simple—make sure with their surveillance equipment that families living in the expanded settlements felt secure because armed settlers, security coordinators and IDF/G4S forces could monitor the physical movement of the Palestinian population on a 24/7 basis. A safe family environment was a major selling point for RE/MAX agents when conducting tours of available homes in the newly expanded settlements.[258] They also educated new homeowners about the 24/7 security provided by G4S personnel. This safe family environment concept had also convinced BL/BH officials to offer long-term mortgage financing to new settler homeowners.

131.    Besides monitoring and protecting the settlement perimeters with HP/Motorola equipment, G4S personnel have assisted IDF forces in demolishing homes, agricultural fields, mosques, schools, and hospitals, and confining the local Palestinian population to isolated real estate tracts. G4S personnel not only intentionally looked the other way when violent settlers were poisoning water wells and livestock, they also condoned violent attacks on Palestinian homeowners and farmers, some of whom were murdered trying to access their olive groves. HP/Motorola security devices and sophisticated thermal imaging systems allowed G4S personnel and violent settlers an ability to detect these farmers from 1700 feet out. G4s personnel had been instructed by their superiors to not stop settlers from terrorizing their Palestinian neighbors, for a good reason. They were afraid that such activity would cause them to lose valuable security

---

[258] http://www.ginaplus.org/kshomron.htm, "Security for the Community" link.

protection contracts. Thus, the laundered funds originating in America not only funded ethnic cleansing, arms trafficking, and wholesale violence,[259] it also resulted in: (a) lucrative security protection contracts for G4S; (b) additional orders for state-of-the art tracking devices and thermal imaging systems from Israel-based HP/Motorola dealers; (c) additional orders for Volvo wheel loaders and; (d) the construction of additional homes and apartment buildings for the new settlers.

132.    On the U.S. side, the donors/entities, BL/BH officials, and Defendant Abrams have cooperated with each other, have served on similar boards and committees (Abrams' wife serves on the board of Emergency Committee for Israel), have coordinated their fundraising activities and their trips to Israel with each other, have coordinated their lobbying efforts with the Israel Allies Caucus and AIPAC, and consulted each other almost on a daily basis. They meet in Washington, D.C. at various AIPAC and congressional events and communicate by telephone,[260] email, fax, and text, discussing among themselves and with settlement officials how to fund and continue the violent expulsion of all non-Jews in the OPT.[261] The tax-exempt entities and other pro-settlement organizations like ZOA held numerous fundraising events all over America: (a) extolling the virtues of brave settlers and their annexation of private property; (b) encouraging the further expulsion of all non-Jews from the OPT; and (c) honoring settlement advocates like Defendant Abrams and donors like Defendants Hagee, Adelson, Braman, Saban, and Gilbert for

---

[259] As defined in the introduction to this Complaint.

[260] Zionist Organization of America President Morton Klein boasts that he has the personal cell phone numbers of congressional leaders and Sheldon Adelson in the U.S. and Israel. http://mondoweiss.net/2014/03/christie-promptly-apologizes.

[261] Israel Lobby p. 137 (indicating several of the Defendants meet at regular Washington, D.C. events).

their significant financial contributions ($500 million) to expand the settlements and subsidize Israeli army activities in the OPT ($104 million in 2014).

133.     Defendant Abrams also played a crucial role as a co-conspirator by giving congressional testimony and speeches and authoring articles claiming that Palestinians are the root cause of Mideast violence, and that the settlements are not actually expanding. His role included telling settlement leaders and Israeli government leaders that when final borders were set, they would keep most of the property the settlers have unlawfully confiscated due to his and AIPAC's lobbying expertise. He makes the identical point in his articles, and literally tells the U.S. Congress which specific settlements Israel will retain once final borders are set.[262]

134.     He has had discreet discussions in America, Israel, and Europe with Messrs. Dov Weissglass and Yoram Turbowitz and Shalom Turgeman, former aides to Prime Ministers Sharon and Olmert, on topics including the need for additional settlement funding and expansion, which he knew meant the continued expulsion of all non-Jews from the OPT and EJ. He routinely informs government officials of his travel plans to Israel to coordinate meetings and publicity.[263] These officials set up press conferences and interviews with friendly pro-settler Israeli politicians and newspapers. As America's premier pro-settlement advocate, he repeats in these interviews his standard line, i.e., settlement expansion is a myth and that the two-state solution will never happen. His latest challenge as a member of the conspiracy is to protect and advance the objectives of the settlement enterprise by working with senior AIPAC officials,

---

[262] "The Settlement Obsession: Both Israel and the United States Miss the Obstacles to Peace" Elliott Abrams, Aug. 2011; and "Everything You Know about Israeli Settlements Is Wrong" Elliott Abrams, Uri Sadot, Sept. 5, 2014.
[263] Israel Lobby 217, 218, 223, 224, 228.

Hillary Clinton, Haim Saban, Senator Schumer and Representative Lowey to kill the international Boycott Divest and Sanction ("BDS") movement and any EU support therefor.

135.    Construction/support firm officials routinely discuss with donors what projects they want to fund in the OPT, knowing they have the financial means to do so and a fervent desire to set up "Jewish only" settlements and enclaves in OPT. BL/BH officials want to know what construction projects the settlement leaders and the construction/support firms are interested in building in the Occupied Territories and which projects the banks can finance. They knew that funding settlement expansion: (a) would be lucrative in terms of bank fees, carrying charges, and interest rates; (b) would result in more Palestinian homes being demolished to be occupied by new settlers, who would need mortgage financing, ATM access, and essential banking services; and (c) that housing project and shopping mall developers would need both construction and permanent financing.[264] Both banks wanted new business, and viewed the settler population as a captive banking customer market. They knew that market would generate long-term sustaining and substantial fees for the bank because of the constantly expanding settlements and the illegal confiscation of the private Palestinian property.

136.    On the Israeli side, construction/support firm officials routinely discuss upcoming residential and infrastructure projects with each other as well as with HP/Motorola, G4S, BL/BH, and settlement officials, and RE/MAX brokers. The settlement officials:

_____

[264] If BL/BH had not serviced the settlement market and provided vital banking services like the availability of ATM machines to the settler population, they would have been forced to commute to Jerusalem, Tel Aviv, or Haifa on a regular basis to secure such vital banking service including long-term mortgage financing.

    (a) discuss how to secure maximum funding from U.S. 501(c)(3)s, and discuss construction projects (highway links with other settlements, waste facilities, light rail, and more housing projects) that the settlers need with their Israel-based coconspirators;

    (b) negotiate contracts with G4S/IDF officials and HP/Motorola officials regarding the 24/7 security that will be afforded to settlers' homes and businesses; and

    (c) discuss essential banking and real-estate marketing services that BL/BH and RE/MAX can offer new "Jewish-only" settlers.

137.   Their daily activity consisted of frequent telephone calls and email exchanges with U.S. tax-exempt entity officials and their donors to ascertain the amount of funding that they could anticipate receiving to achieve further settlement expansion and the continued expulsion of all non-Jews from the OPT. Settlement officials needed to train settler militia, steal more private Palestinian property for development, and hire a full-time security coordinator to oversee settler militia criminal activities. They also needed to purchase more military hardware and sniper scopes for settlers intent on terrifying their Palestinian neighbors by means of live target practice and malicious wounding of Palestinian farmers. HP/Motorola sophisticated thermal imaging systems and surveillance devices allowed settlers and IDF forces the ability to identify a trespasser 1,700 feet out.

138.   Settlement officials and IDF reservists (a.k.a. "war heroes") coordinate their travel plans to America to appear as honored guests at fundraising events held by U.S. coconspirators[265] like

---

[265] The mantra espoused by the U.S. tax-exempt entity FIDF is: "They protected us so we must protect them." The obvious question is, protect them from what—unarmed Palestinian farmers desirous of harvesting their olive crops? Terrorist attacks are not the most common cause of death for Israeli soldiers, whether committed by unarmed Palestinian farmers or otherwise. These days, suicide is. From 1992 to 2005, more than 450 soldiers committed suicide, averaging more than one every two weeks. http://www.ifamericansknew.org/stat/suicideidf.html.

AFA and FIDF. Settlement leaders and security coordinators, BL/BH, RE/MAX,

construction/support firms, and HP/Motorola officials all host and entertain U.S. donors and tax-

exempt entity officials who visit Israel to observe military operations and see the results of their

financial contributions, i.e., more homes and apartment projects, military barracks, settlers,

paved roads, schools, thermal imaging systems, and *no Palestinians*. Seeing substantial progress

in terms of settlement expansion and the construction of new homes and apartment buildings,

when they return home they urge friends to give additional money through FFF and FIDF to

support IDF personnel in combatting "Arab terror" and in assisting settlers in confiscating

private Palestinian property.

139.    BL/BH, HP/Motorola, RE/MAX, and construction/support firm representatives attend

these events, purchasing corporate tables to express their support. The conspirators discuss when

funds are coming from America, how much, which settlements will secure the bulk of the funds,

which NBA professionals, U.S. dignitaries like Abrams, and friendly pro-settlement

congressional members like Senator Schumer will be visiting Israel, and which nearby

Palestinian villages violence-prone settlers can readily transform into "Jewish-only" enclaves to

be protected by security coordinators and settler militia, HP/Motorola surveillance devices and

thermal imaging systems, and IDF/G4S personnel.

140.    The same officials routinely sponsor dinner galas when wealthy U.S. donors visit Israel.

These officials want to know which projects the donors will be underwriting in either EJ or the

OPT. BL/BH and construction/support firm officials discuss the commencement of cement and

concrete pourings and "Jewish-only" highway improvements with settlement officials in Gush

Etzion and Kiryat Arba Hebron. They coordinate travel arrangements and schedules for visiting U.S. tax-exempt entity officials and donors, and also coordinate their own travel plans to the U.S. These same officials coordinate U.S. travel plans to discuss with donors and tax-exempt entities: (a) military hardware needed for militia members; (b) construction projects needed for settlement expansion; (c) protective surveillance devices needed from HP/Motorola; and (d) AIPAC's upcoming annual Washington, D.C. event where they can mingle with sympathetic congressional members, lobbyists, potential donors, and fellow conspirators like Abrams, Adelson, Hagee, and Moskowitz.

141.     The U.S.-based conspirators similarly knew and intended that the criminal activity that they funded would be an everyday occurrence in the OPT, and thus violated the U.N. charter, Israel's Declaration, international convention principles, U.S. criminal law (i.e., theft of private property, arms trafficking, murder, mayhem, and money laundering), and the U.S.' clearly-articulated anti-settlement public policy. The Israeli based conspirators also knew that this criminal activity was an ongoing daily occurrence in the OPT, and that it violated Israeli criminal law (theft, arms trafficking, malicious destruction of property, assault, battery, murder, mayhem), and its well-articulated public policy (the 1993 Settlement Ban, elimination of tax breaks for settlement donors, and no longer giving away free state property for settlement expansion).

142.     There is ample evidence that, much like their U.S.-based coconspirators, all of the Israel-based conspirators were on notice and knew that rampant criminal activity was going on in the OPT starting with the publication of a government report issued in 1992. That report specifically referenced the rampant theft of private property, building with illicit construction permits, and

violating local building codes. Besides this report, in 1991, then-Secretary of State Baker received assurances from Israeli Prime Ministers that state property would no longer be used for establishing new settlements or expanding existing settlements. *Hence, the only private property available for confiscation and development was owned by the local Palestinian population living near the settlements.* Also, in 1993, besides eliminating tax breaks for settlement donors, the Israeli government imposed a settlement ban reiterating that "state property" had been "frozen" and could no longer be used for expanding existing settlements or starting new ones.[266] Hence, starting in 1993, any private property used for expanding settlements had to have been illegally confiscated from Palestinian property owners living near the settlements. This was a serious problem that settlement officials and former Prime Minister Sharon knew about only too well. In fact, Prime Minister Sharon and his aides had discussed this very issue with Defendant Abrams on a number of occasions, *i.e. how to ensure settlement expansion, but not be accused of ethnic cleansing.*

143.    Ten years later, in 2003, Israeli State Comptroller Goldberg reported that a majority of the construction projects that Israeli banks, including BL/BH, were financing in the OPT had been built on private Palestinian property.  Two years later, in 2005, Israeli Special Prosecutor Sasson sounded the death knell for settlement expansion. She found that individuals and construction companies, some of whom were the conspirators or their customers and business

---

[266] General's Son Kindle location 1225, http://www.deseretnews.com/article/396521/CAPTION-ONLY--RABIN-HALTS-EXPANSION-OF-WEST-BANK-SETTLEMENT.html?pg=all, http://www.nytimes.com/1992/07/25/world/baker-hails-israeli-freeze-hints-at-approval-of-loan.html.

associates, had been stealing private property for years.[267] She stated that there is no such thing as a semi-authorized outpost—"an unauthorized outpost is a settlement which does not fulfill at least one of the above mentioned conditions, and *I must emphasize that an unauthorized outpost is not a semi-legal outpost. Unauthorized means illegal.*"[268] She even recommended initiation of criminal prosecutions, which made headlines in the Israeli press.[269]

144.    Her recommendation to initiate criminal proceedings shocked settlement officials and corporate officials of the Defendants named herein, because for the first time they realized they could face possible jail time for promoting settlement expansion. All of these officials knew about her report for another reason—it meant the end of the profitable settlement enterprise, as they knew it, because she had recommended wholesale evacuation of all illegal outposts and settlements. As is obvious, even without the benefit of the Sasson report, all Israel-based conspirators knew that criminal activity was occurring on a major scale in the OPT, i.e., they had, on a daily basis, been observing that massive ethnic cleansing was taking place, private property was being stolen, deeds were being forged, and false affidavits were being written up by settlement officials to justify the seizure of additional Palestinian property by the area military commanders. They encouraged and financed all of these activities because that promoted unbridled settlement expansion, further expulsion of all non-Jews from the OPT, and therefore additional windfall profits. At all times, the corporate Defendants herein knew that they were

---

[267] Because BL/BH were so active in the OPT, and companies like Veolia, RE/MAX, G4S, and AFI were similarly active in the OPT in terms of constructing homes and shopping malls, some of the individuals that Sasson accused of stealing property were indeed BL/BH customers, as discovery herein will prove conclusively.
[268] Sasson Report.
[269] *See, e.g.*, http://www.haaretz.com/legitimization-of-land-theft-1.214201.

implementing the agenda of U.S.-based tax-exempt entities and their donors, and intended to do so.

145.    To sum up, to further the goals of the conspiracy, all of the conspirators have committed numerous and repeated overt acts for at least 30 years, e.g., the **Defendant tax-exempt entities** have transferred huge amounts of monies to the Israeli army and to the settlements. Their goal was and is today to arm the settlers in order to fund their ethnic cleansing efforts, i.e., the violent expulsion of their Palestinian neighbors and the further annexation of their real property.

**Moskowitz, Adelson, and Hagee**, using tax-exempt financial "pass-throughs," have all contributed substantial monies to encourage and fund the same criminal activities. The donors knew that unless the local Palestinian population was forcibly expelled from the OPT settlement expansion was impossible. They also knew that without the concerted effort of the construction firms named herein, settlement expansion could not occur, i.e., there would be no new homes for settler families to occupy.

146.    As already noted, **Abrams** had repeatedly encouraged senior aides of former Prime Ministers Sharon, Barack, and Olmert and donors like Saban, Hagee, and Adelson to continue to engage in and fund these same criminal activities. He has consistently justified settlement expansion even though he knew it necessarily entailed the expulsion of the local Palestinian population[270] and the confiscation of their homes and destruction of their olive orchards. He also knew that in 1991, Prime Minister Yitzhak Shamir had repeatedly promised senior U.S. officials

---

[270] Israel Lobby p. 224. *See, e.g.*, "The Settlement Obsession: Both Israel and the United States Miss the Obstacles to Peace" Elliott Abrams, August 2011; and "Everything You Know about Israeli Settlements Is Wrong" Elliott Abrams, Uri Sadot, September 5, 2014.

that any U.S. financial assistance would "not be used in any manner to expand existing settlements or create new settlements in the West Bank."[271] Thus Abrams, an experienced attorney, had to know just by reading the Sasson report or hearing about Prime Minister Shamir's commitment from his republican colleague, Secretary of State Baker, that by encouraging settlement officials like Prime Minister Sharon's senior aide, Dov Weissglass, to keep announcing new settlements and keep annexing private property and promoting ethnic cleansing, he was promoting violence in the Middle East. By collaborating with war criminals and promoting such violence and arms trafficking, Abrams was necessarily violating President Clinton's 1995 Executive Order, America's Lieber Code and War Crimes Statute, Israel's 1993 settlement ban, Israel's own Declaration, the 1995 Interim Peace Treaty, and America and Israel's clearly-defined anti-settlement public policy.

147.    There is considerable evidence that: both **BL and BH** officials were: (a) desirous of promoting the Zionist dream, which was premised on ethnic cleansing and theft of private property; (b) played a vital role in fulfilling the conspiracy's goals by adopting and implementing the agenda of U.S.-based tax-exempt entities and donors; and (c) based on "Know Your Customer" protocol, knew exactly[272] what their tax-exempt customers were doing—funding

---

[271] *See* "Baker Cites Israel for Settlements," NY Times, May 23, 1991 http://www.nytimes.com/1991/05/23/world/baker-cites-israel-for-settlements.html *and* "Tax-Exempt Funds Aid West Bank Settlements," NY Times July 5, 2010. *See also* Arms Export Control Act of 1976 (AECA), 22 U.S.C. §2754 (aid must be solely for "internal security" and "legitimate self defense").

[272] Coincidentally, BH evidenced the intimate knowledge it has of its customers' activities when it informed the Israeli Finance Ministry in 2016 that it would stop doing business with its Palestinian counterparts unless Israel provides it with protection from legal action in the event that funds transferred to Palestinian banks are used for terrorist activities.

settlement expansion by violently expelling all non-Jews living in the area. These banking officials knew that settlement leaders coveted their Palestinian neighbors' property. This was consistent with BL's mission statement on growing the Zionist state; (d) knew that funding such criminal activity violated U.S. and Israeli laws and each country's anti-settlement public policy; (e) knew the consequences of settlement expansion, i.e., ethnic cleansing, arms trafficking, theft and malicious destruction of private property; and (f) like their coconspirators, made huge profits promoting and financing settlement expansion by implementing the agenda of pro-settlement U.S. donors and tax-exempt entities. As already noted herein, BL/BH, RE/MAX, and housing developers grossed $9.45 billion just by building and marketing 26,000 new homes in the OPT.

148.    Given their pattern of extensive banking activity in the OPT and the fact that there was not any private property available to confiscate other than that owned by local Palestinians, BL/BH officials had to know that the majority, if not all, of the housing development projects that they were financing in the OPT had been built on private Palestinian property. Indeed, BL/BH officials who were servicing settlement customers knew courtesy of banking protocol ("Know Your Customer" rules and regulations) that their banks were complicit in settlement expansion and ethnic cleansing. The websites of their U.S. customers clearly revealed the reason why they were sending massive amounts of financial assistance overseas via international wire transfers, i.e., encourage explosive settlement expansion.[273] They encouraged their donor to take a tax deduction and send them a contribution, and that would enable settlement leaders to

---

http://hamodia.com/2016/02/18/bank-hapoalim-nervous-about-dealing-with-palestinian-banks/. This, of course, is the identical activity that BL and BH are accused of herein.
[273] *See, e.g.,* http://www.cfoic.com/background-information/, https://www.hebronfund.org/about-us/about.

procure more military hardware for the settlers.[274] More armed settlers trained in the use of automatic weapons and sniper scopes by the settlements' security coordinators meant an enhanced ability to engage in live target practice using Palestinian farmers as targets. The arms trafficking permitted the violent settlers to confiscate more Palestinian homes that once belonged to terrified Palestinians who had reluctantly vacated the area after repeated criminal assaults on family members. Realizing that violent settlers had poisoned their livestock and water wells also hastened their departure.

149.     BL/BH, RE/MAX, HP/Motorola, and the officials of the construction/support firms named herein all knew exactly what was going on in the OPT because when they visited the settlements on a regular basis, they observed first-hand the results of U.S. donor/entity funding. They made frequent visits to: (a) discuss security issues with settlement security coordinators; (b) see what the U.S. tax-exempt entity funding had accomplished, i.e., more homes, shopping malls, hotels, and apartment complexes, and very few, if any, Palestinians; and (c) the growth that the settlements had experienced as a result of the massive financial aid coming from U.S. tax-exempt entities. That growth, of course, was made possible because of the massive funding provided by the U.S. based 501(c)(3)s and their donors which resulted in the forcible expulsion of the local Palestinian population. During those visits, all of those officials observed that the local Palestinian population had virtually disappeared and that their homes and olive groves had been either abandoned or demolished. They could also see that new settlers were arriving almost on a daily basis looking to secure housing accommodations that did not exist. Thus, all corporate

---

[274] *See* https://www.oneisraelfund.org/projectsnew/default.asp?id=8, *and* http://www.ginaplus.org/kshomron.htm, "Security for the Community" link.

Defendant officials realized that there would be an ongoing need to confiscate more private Palestinian property based on the arrival of new settlers, i.e., where would their families live? All Israel-based corporate Defendants knew that the arrival of more settlers meant more lucrative business opportunities for all of their companies *as long as they adopted and implemented the agenda of U.S.-based tax-exempt entities and donors.*

150.     These officials were not concerned about, and indeed were indifferent to, the fact that they had been regularly informed that their employees had been participating in or condoning an ongoing pattern of theft of private property, arms trafficking, ethnic cleansing, and the violation of Israeli criminal and property laws. They were instead focused on reaping enormous profits by expanding the settlements and implementing the agenda of U.S.-based tax-exempt entities and donors. They all knew that new housing units would be needed for the new settlers, which would be marketed by RE/MAX, financed by BL/BH, built by construction/support firms, and protected by G4S personnel and HP/Motorola surveillance equipment. Settlement officials were focused on a larger tax base, new shopping malls, hotels, hospitals, and universities as a result of the massive financial aid provided by U.S. tax-exempt entities. In encouraging and participating in this ongoing pattern of criminal activity, all corporate Defendant officials knew that their companies were not performing routine banking (BL/BH), construction (construction/support firms), real-estate (RE/MAX), or security protection services (HP/Motorola, G4S) to promote their companies' legitimate business purposes. All of these officials much like Defendant Abrams instead were making sure that they were simultaneously advancing the mission of their U.S. pro-settlement tax exempt entity customers. That mission, which they embraced

124

enthusiastically, promoted settlement expansion with all of its attendant violent consequences including theft of private property, arms trafficking, wholesale violence, and ethnic cleansing.

151.    All corporate Defendant officials based in Israel knew as early as 1992 that settlement expansion was a direct result of false affidavits, forged deeds, illicit under-the-table financing, illicit building permits, and construction work that violated local building codes. They also knew in 2005 that Special Prosecutor Sasson had issued a scathing and controversial report on criminal settlement activity. She found that settlers throughout the OPT and construction companies, some of whom were RE/MAX, HP/Motorola, and BL/BH customers, had been stealing private property for years.[275] She even recommended initiation of criminal prosecutions, which made front-page headlines in the Israeli press. Thus, all corporate Defendant officials based in Israel were well-acquainted with her report and concerned about two repercussions: (a) if they continued to implement the agenda of U.S.-based tax-exempt entities and donors, they could possibly face criminal prosecution; and (b) if her findings were implemented, that would mean the end of the profitable settlement enterprise. Her recommendations, including evacuation of all illegal settlements and outposts, of course, were never implemented. Defendant Abrams made sure that her report was never publicized in America in order to ensure that there would be no executive or congressional action undertaken to halt settlement expansion.

152.    U.S. donors/entities and BL/BH officials have funded infrastructure projects necessitated by settlement expansion, e.g. light rail, the Jerusalem Center City project, and the Tovlan waste

---

[275] Because BL/BH were so active in the OPT, and companies like Veolia, RE/MAX, G4S, and AFI were similarly active in the OPT in terms of constructing homes and shopping malls, some of the individuals that Sasson accused of stealing property were indeed BL/BH customers, as discovery herein will prove conclusively.

disposal facility. They also continued to finance and build new housing developments and shopping malls in both EJ and the OPT, even after the settlement ban had been announced in 1993. They knowingly violated that government ban as long as it was in effect, and thereby violated Israel's Declaration, its war crimes statute, its clearly defined anti-settlement public policy, and various property and criminal statutes. They did so by offering essential banking services and below-rate long-term mortgage financing to settler customers who they knew had stolen private property, according to the Sasson Report. Thus, the banks were knowingly accepting collateral, which were the fruits of the settlers' criminal activity. In the process, they were encouraging these settler militia to continue with theft of private property. The reason— both BL and BH were eager to finance the renovation and/or purchase of abandoned Palestinian homes and promote the availability of construction and long-term mortgage financing in the Occupied Territories.

153.    **G4S** officials, like BL/BH, RE/MAX, and construction/support firm officials, have likewise played a significant role in the conspiracy by collaborating in the violent expulsion of the Palestinian population. They knowingly supplied the necessary manpower to assist armed settlers and IDF personnel in demolishing approximately 49,000 Palestinian homes, incarcerating at least 50,000 political prisoners,[276] staffing prisons, preventing Palestinians from entering access ramps to "Jewish-only" highways and guarding unauthorized security barriers which were located all over the OPT, and designed to impede the local movement of the Palestinians. On

---

[276] According to anti-arbitrary detention activist group Addameer, 650,000 Palestinian men have been incarcerated between 1967 and 2010, amounting to 40% of the OPT's male population in 2010. Palestine Inside Out p. 79.

numerous occasions G4S in order to assist IDF soldiers would routinely disregard and not enforce court orders requiring the dismantling of these unauthorized security barriers. Their material support resulted in confining the local Palestinian population to isolated "open-air prisons."[277]

154.    Defendant G4S's subsidiary, G4S Israel, is in charge of all OPT security, and works on a daily basis with IDF forces to terrorize the local Palestinian population by, *inter alia*, encouraging physical attacks by armed settlers on the local population. G4S personnel also: (a) facilitated the illegal annexation of private Palestinian property and therefore ethnic cleansing; (b) knew the means employed by the settlers to secure that property, i.e., violent physical attacks and the poisoning of water wells and livestock; (c) have provided the physical means to arrest and incarcerate over 50,000 "political" prisoners; and (d) have protected the "Jewish-only" settlers who have illegally seized private Palestinian real property and moved into homes recently vacated by terrified Palestinian families.[278] These families saw what had happened to their neighbors, i.e., live target practice, daily threats to their life and property, and the poisoning of water wells and livestock.

155.    Like HP/Motorola, G4S provides security scanners and services to checkpoints in the West Bank, and has been instrumental in isolating the besieged territory of Gaza. G4S has provided security equipment and protection services to: (a) the West Bank Israeli police

---

[277] "Palestine Today is an Open-Air Prison," http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html.

[278] Palestine Inside Out Kindle location 2374 ("they throw stones at the houses, shatter windows, chase after children, beat them with clubs and strike them with stones, aim their rifles at the children, and damage land and trees…they took control of three or four dunums of our land, they put up a fence between us, erected tents and huts…and put up Israeli flags.")

headquarters located near the segregated settlement of Maale Adumim; (b) private businesses, supermarket chains, and corporations based in illegal OPT settlements; (c) the Ketziot, Damon, and Megiddo prisons and the Jerusalem and Keshon detention facilities; (d) provides and services full body scanners, luggage screening equipment to several checkpoints in the West Bank; and (e) G4S is a minority holder in Shal Havet, which company has provided various expensive security services to private settler homes in the West Bank.

156.    Like Volvo, HP/Motorola's human rights corporate policies, G4S's own Business Ethics Policy commits it to abiding by Israeli laws, Israel's Declaration, and a host of international human rights conventions. It specifically states: "the G4S Human Rights Policy demonstrates our commitment to respect human rights…we conduct our business for the good of local communities, taking steps to minimize any disturbance as a result of our operations." "Disturbances" in the OPT which G4S officials have condoned, encouraged, and sometimes even participated in for 20 years include home demolitions, training settler militia in military tactics, and shooting at Palestinian farmers who try to access their olive groves. G4S personnel routinely look the other way while settler militia are engaging in live target practice directed at their Palestinian neighbors, poisoning water wells, slaughtering livestock, and destroying vital local electric grids. The reason- G4S senior officials were worried that their long-term security contracts would not be renewed if G4S personnel actually protected Palestinian home owners as is required under various international human rights conventions.

157.    **RE/MAX** has, for at least 30 years, also played a critical role in the conspiracy. It has successfully marketed illegal residential housing projects built by the construction/support firms

128

on private Palestinian property. RE/MAX officials knew that daily physical assaults engaged in by violent settlers and more home demolitions meant fewer Palestinians to deal with, more Jewish settlers, more housing stock to sell, more surveillance equipment to purchase, more security protection contracts with G4S, more commission income for RE/MAX brokers, more residential mortgage business for BL/BH, and more profits for everyone involved in the settlement enterprise. These are all the vital components of the trespass/demolition/conversion cycle. *See* Exhibit B.

158.    For at least 25 years, RE/MAX has rewarded and encouraged its coconspirators like Volvo, G4S, and settlement officials to continue demolishing Palestinian homes, creating suitable construction sites, and developing housing projects in the OPT by serving as an exclusive marketing agent for Israeli properties in the U.S. and Israel.[279] It has been quite successful in these efforts, and in doing so, made a fortune as noted earlier RE/MAX and its partners grossed $9.45 billion just by constructing and marketing 26,000 new homes for Jewish-only settlers. But in the process it has violated Israel's Declaration, its BLHDL, both U.S. and Israeli well-defined anti-settlement public policies, and 18 U.S.C. § 956(b), conspiracy to destroy property in a foreign country.[280] As detailed herein, Abrams, the tax-exempt entities, donors, and

---

[279] RE/MAX agents must "work with integrity." It is difficult to see how recording restrictive land covenants and profiting from segregated housing complies with this injunction. http://www.remax-israel.com/History.aspx?Lang=en-US.

[280] "Whoever, within the jurisdiction of the United States, conspires with one or more persons, regardless of where such other person or persons are located, *to damage or destroy specific property* situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, or any railroad, canal, bridge, airport, airfield, or other public utility, public conveyance, or public structure, or any religious, educational, or cultural property so situated, shall, if any of the conspirators commits

BL/BH U.S.-based officials have all conspired to "effect any object of the conspiracy", i.e., arms trafficking and the expulsion of all non-Jews from the OPT, which are clear violations of the aforementioned criminal conspiracy statutes.  RE/MAX officials, like all U.S.-based corporate Defendant officials, if found to have violated this statute can face imprisonment of up to 25 years.

159.    **The settlements**, although not named as Defendants in this Count, have similarly played a major role in the conspiracy. Through ADF, KGE, JCH, CFOIC, Hebron Fund, Keren Efrat other Israel-based funds, and their own settlement-specific bank accounts, these settlements have been the willing recipients of laundered funds transferred by U.S. tax-exempt entities. Their officials spent those laundered funds to: (a) buy military hardware for the settlers—arms trafficking; (b) procure the services of their America-based unofficial spokesperson, Defendant Abrams; (c) hire a full-time security coordinator who would be able train them in the use of automatic weapons and sniper scopes; and (d) build new homes, schools, hospitals, and universities on confiscated Palestinian property. Settlement officials knew, like the BL/BH and construction/support firm officials and U.S. donor/entity officials, however, that these facilities and structures had been built for the most part on private Palestinian property, not government state property. Thus, BL/BH officials based in the U.S., and tax-exempt entity officials were intentionally and knowingly funding criminal activity which specifically violated Israel's 1948 Declaration, its criminal statutes (theft of private property, arms trafficking, malicious wounding, money laundering) and Treasury's 501(c)(3) tax-exemption regulations.

---

an act within the jurisdiction of the United States to effect any object of the conspiracy, be imprisoned not more than 25 years."

160.     **Defendants construction/support firms, Motorola, and HP all played vital roles in the conspiracy.** The construction/support firms have successfully completed various construction projects which necessarily followed and entailed the displacement of the local Palestinian population from the OPT, i.e., AFI/Veolia construction superintendents could not authorize the pouring of concrete foundation footings in empty construction sites within a crowded Palestinian civilian population center. In the case of HP/Motorola, as already explained, they have provided critical surveillance and tracking equipment, which settlement officials relied on for their security, and which RE/MAX relied upon to sell more housing units. The residential and infrastructure improvements, and the purchase of sophisticated expensive HP/Motorola surveillance equipment, have been funded by the U.S. tax-exempt entities and their donors, and enabled the settler population to secure and utilize: (a) illegal electric and water hookups to master local service lines; (b) local segregated bus services linking the "Jewish-only" settlements; (c) light rail projects linking the settlements to Tel Aviv and Jerusalem, which can only be used by Jewish settlers; (d) solid waste facilities (e) new and expanded parks, nature centers, recreational facilities; and (f) homes, shopping malls, concert halls, hospitals, childcare centers, and schools for "Jewish-only" children.[281] Without these improvements, there would have been no settlement expansion, and 100,000 Palestinian families would still be living in the OPT.

161.     **Defendant Veolia** and other construction firms played a critical role in the growth of the settlements. It has been and is a direct beneficiary of the millions of dollars that have been

---

[281] https://afsc.org/resource/israel%E2%80%99s-settlement-policy-occupied-palestinian-territory.

transferred overseas illegally by the tax-exempt entities, and thus have conspired to violate both U.S. and Israeli money-laundering statutes. It has: (a) a $500 million contract with Israel's city pass consortium to build a light rail link on occupied Palestinian property; (b) supported the settlements' restrictive water supply policies in the OPT; (c) still operates the Tovlan waste facility (built on private Palestinian property); (d) performs all solid-waste disposal for IDF military barracks; and (e) its real estate company, established in early 2007, encourages Jews to come to the OPT "to learn how you can own a house and provide growth of the Zionist dream in 'Jewish-only' settlements". That "dream," of course, is possible only as the result of ethnic cleansing implemented on a major scale and funded by U.S.-based donors/entities.

162.    **Defendant AFI** has been similarly instrumental in completing various construction projects in the OPT. Its CEO Defendant Mr. Leviev has also made substantial contributions to Israel's Land Redemption Fund, which is the entity that acquires Palestinian land for "Jewish-only" settlers. He and the AFI leadership knew that acquiring Palestinian land for "Jewish-only" settlers had to entail the expulsion of the local Palestinian population and the demolition of their homes, because there was no other private property to confiscate. And they had to know that armed settlers coveted their neighbors' real property, and were desperate to acquire that property, and would therefore engage in violent behavior to accomplish this, e.g., attacking the local Palestinian population, live target practice, and poisoning water wells and livestock. Because of Mr. Leviev's involvement in criminal settlement activities, the United Nations Children's Fund (UNICEF) decided to reject any contributions made by him.[282]

---

[282] http://www.reuters.com/article/us-un-israel-leviev-idUSN2047885820080620.

163.     AFI personnel working for Leader Management and Development, another company owned by AFI CEO Lev Leviev, have been very active in the settlement known as Zufim,[283] and it has: (a) built 14 separate housing projects there; (b) destroyed revenue-producing olive orchards; (c) bulldozed large portions of the nearby Palestinian town of Jayyous with Volvo wheel loaders; (d) filled Jayyous's water wells in with topsoil with the assistance of IDF/G4S personnel; and (e) confiscated all the greenhouses then being used by Palestinian farmers. All of these activities violate UN Charter principles, which had been incorporated into Israel's Declaration, GCIV, and Hague Convention principles, and the Israeli army War Manual, which prohibits the needless destruction of properties in occupied areas by occupying agents like AFI and Veolia and/or its military forces.

164.     AFI: (a) owns a 35% interest in the cross-Israel highway; (b) constructed Highway 431; (c) built Israel's first private penitentiary in Beersheba; (d) financed the Jerusalem and Tel Aviv light rail projects that link up those cities to the settlements; and (e) built and partially financed a critical transportation network for "Jewish-only" settlers, including highways, bridges, interchanges, tunnels, and railways in and around the segregated settlements, which provide easy access to and from urban employment centers like Haifa and Tel Aviv. Without that vital suburban transportation network, the original settlers would still be living in isolated pockets in the OPT in trailer camps, and, more importantly, they would not have been able to retain their jobs which were located in Israel's major employment centers, not in the isolated hilltop

---

[283] https://adalahny.org/document/699/open-follow-letter-daphne-guinness-re-ties-leviev.

settlements. They would have been forced to abandon their trailer parks in order to provide for their families.

165.    HP/Motorola officials fulfilled other critical settlement needs by providing the infrastructure technology for the surveillance and repression of the Palestinian population in order to promote settlement expansion and the ongoing violent expulsion of the local Palestinian population—the primary goals of the conspiracy.  In fulfilling those needs, HP officials blatantly disregarded its "core value," i.e., the promotion of "human rights." Ironically, it boasts that it works with the Danish Institute for Human Rights to promote a positive worldwide profile and to ensure that its corporate leadership and overseas partners demonstrate respect for basic human rights. *HP's "Global Citizenship" policy is equally impressive on paper*, i.e., develop solutions that strengthen the right of all world citizens to health and education. Unfortunately, the "solutions" that HP Israeli  based officials and their local partners (settlement coordinators, settlement officials, construction/support firm officials, BL/BH officials, and IDF/G4S personnel) have encouraged, adopted and implemented in the OPT are totally at odds with its global citizen policy and its disingenuous commitment to its core value—respecting human rights. *Query:* how do you respect human rights when you encourage ethnic cleansing, the theft of private property and the destruction of Palestinian homes? HP officials, like Motorola's, had to know that UN Charter and GCIV principles mandated that as "trustees," they and their partners had to protect the occupied population, not the newly-arrived trespassing settlers. However, on their watch, Palestinians named herein have witnessed repeated and ongoing

134

maiming and murdering of their spouses and relatives, destruction of churches, mosques, homes, hospitals, daycare facilities and schools by HP/Motorola's above-referenced partners.

166.     HP's manual "Winning the Right Way" is supposed to ensure that its partners (IDF/G4S personnel and settlement leaders) do not authorize or engage in physical punishment of a civilian population.[284] HP officials, however, have collaborated, much like Motorola officials, in acts of physical punishment on a daily basis courtesy of HP's vital support for partners like IDF/G4S personnel, security coordinators, and settler militia. Armed settlers, their security coordinators, and IDF/G4S personnel have routinely deprived Palestinians of fundamental civil liberties, in violation of Israel's Declaration which protects all "inhabitants" from infringement of their civil liberties. In addition, G4S personnel have engaged in and condoned the ill treatment and torture of incarcerated Palestinian citizens. The acts of physical punishment, including torture, which HP partners have engaged in constitute conduct that violates HP's own corporate human rights policy and Israel's Declaration (which is a restatement of UN Charter principles) which Israel adopted 50 years ago. As noted earlier, 40 years ago, HP officials had the option of abandoning all business activity in the OPT, but chose not to do so. Disgruntled HP shareholders have been advocating that withdrawal policy for years, to no avail.

167.     Through its subsidiary, Hewlett-Packard Enterprise Services of Israel (EDS), Defendant HP is the prime contractor of the Basel System, which is an automated biometric access control

---

[284] *See* http://h30261.www3.hp.com/~/media/Files/H/HP-IR/documents/sbc-dropdown/march-2015/sbc-english-print.pdf p. 11. HP further states that it "upholds and respects human rights as reflected in the United Nations Universal Declaration on Human Rights (UDHR), the UN Global Compact, and the UN Guiding Principles on Business and Human Rights" and admits that it has a "responsibility to remedy if rights are not upheld." http://www8.hp.com/us/en/hp-information/global-citizenship/governance/humanrights.html.

system installed and maintained by HP in at least twelve West Bank checkpoints. These checkpoints are not designed to help Israel defend itself, rather they are designed to limit Palestinians from procuring employment as a day laborer and vital services such as medical care. It also provides similar access control systems to the other settlements, including Nokdim.[285] Much like Motorola, HP has also supplied the separation wall sensors, and thermal imaging and video cameras lining the separation wall, making it impossible for Palestinians to perform as day laborers or receive medical care or access their olive groves.[286]

168.    It has also violated its own corporate human rights policies and practices by:

   (a)  Providing services and technology to the IDF and to the Israeli Prison Authority, knowing that both entities engaged in comprehensive war crimes and torture; and

   (b)  Provided services and technologies to two of the largest OPT settlements in the West Bank: Modi'in Illit and Ariel, knowing the nature of the criminal activity (ethnic cleansing, wholesale violence, theft of private property) responsible for their remarkable growth.

169.    Similar to HP officials, **Motorola** officials have collaborated with IDF/G4S personnel and the settlers to deny Palestinian citizens fundamental civil liberties (e.g., freedom from daily violent physical attacks and freedom of movement) guaranteed by Israel's Declaration, the UN charter, and numerous international conventions and treaties, see Exhibit A. Like HP officials, Motorola officials, even after witnessing wholesale violence, arms trafficking, and ethnic cleansing activities that the armed settlers were engaged in on a daily basis, also decided not to abandon its lucrative business activities in the OPT 40 years ago. It has continued to provide

---

[285] *See* http://www.nokdim.co.il/%D7%94%D7%99%D7%99%D7%A9%D7%95%D7%91-%D7%A9%D7%9C%D7%A0%D7%95/%D7%91%D7%99%D7%98%D7%97%D7%95%D7%9F.

[286] *See* Palestine: Peace Not Apartheid, Jimmy Carter, Nov. 14, 2006.

surveillance equipment, communication devices, and sophisticated radar systems to ensure that no Palestinian can get close to, let alone enter, a settlement. Even an unarmed farmer trying to gather some spare olives in his basket would be barred from doing so. As already detailed herein, Motorola, like its fellow conspirators, by continuing to provide, for at least 40 years, extensive surveillance protection services, had to know that it was violating its own corporate human rights policy, basic human rights afforded all world citizens, and UN charter principles (and therefore Israel's Declaration). Like HP, it was also facilitating the crime of money laundering because some of the funds transferred overseas eventually ended up in Motorola Israel's bank account after settlement leaders distributed the proceeds of the BL/BH wire transfers which had been initiated by tax-exempt entities in America. That money-laundering scheme is an ongoing activity, i.e., in 2007, $1.7 billion in laundered funds were sent to Israeli NGOs whose goal was ridding the OPT of all non-Jews.

170. Motorola, like HP, at least on paper, commits itself to abiding by "the core tenets of the International Labour Organization's fundamental conventions and the United Nations Universal Declaration of Human Rights" as well as other internationally recognized standards.[287] However, their Israel-based officials have been violating their own corporate human rights policies for at least 40 years by its ongoing association and collaboration with partners like settlement security coordinators, settlement officials, construction/support firm officials, and G4S personnel. Motorola officials, furthermore, have similarly committed to avoiding, directly or indirectly, participating in money-laundering activity and terrorism funding in connection with its overseas

---

[287] http://www.motorolasolutions.com/en_us/about/company-overview/corporate-responsibility/resources/human-rights-policy.html.

business operations,[288] yet its Israel-based officials have been doing so for the last 40 years. As explained in President Clinton's 1995 executive order 12947, promoting violence in the Middle East by financing arms trafficking constitutes terrorism financing, thus, the Treasury Department has a valid basis for designating these Israeli based officials as specially designated terrorists.

171.    Motorola Israel, and therefore its parent, Motorola, have profited handsomely from settlement expansion and the ongoing occupation of Palestinian property, earning over $1 billion in annual revenues in 2007. As Motorola's chief operating officer Mike Zafirovski put it: "Our investment in Israel is one of the most successful we have made."[289] Unfortunately, the success of that investment has been and is largely dependent on, and has resulted in, the violent expulsion of the Palestinian population, arms trafficking, the commission of war crimes (ethnic cleansing), and wanton property destruction, which America's Lieber Code outlawed in 1863 under penalty of death.

172.    Motorola, for at least 30 years: (a) has enabled violence-prone settlers to violate international law on a daily basis through the development and sale of products specifically designed to maintain and grow settlements; (b) has been the leading designer and manufacturer of fuses for bombs and guided munitions used by the Israeli military during the three Gaza invasions, which resulted in the wholesale destruction of the Gaza infrastructure. In terms of the loss of human life, Plaintiff Abu Amer lost 14 family members; (c) has provided stinger missiles and precision weapons to the IDF. Those weapons have reduced Gaza to a post-WWII Berlin scenario—an area strewn with rubble, bombed out buildings, burned out ambulances and UN

---

[288] http://www.motorola.com/us/Corporate-Responsibility/corporate-responsibility.html.
[289] https://adalahny.org/campaign-main-document/576/motorola-nycbi.

emergency vehicles, and a long list of civilian casualties including children. These activities constitute war crimes because they resulted in complete and utter devastation[290] of residential and infrastructure improvements as confirmed by members of Breaking the Silence—they were ordered "not to leave a single house standing."[291]

173.    Without Motorola's surveillance devices and sophisticated thermal imaging systems, OPT settlements could not have survived or thrived, and its settlement population would not have been protected from Palestinians incensed that they had been forcibly evicted from their homes and could no longer access their olive groves. By facilitating this criminal activity, i.e., theft and malicious property destruction, Motorola officials knowingly promoted wholesale violence and violated Customary International Law, *see* Exhibit A. They knowingly provided protection and safe haven for IDF/G4S forces, armed settlers, and settlement coordinators who had ordered or actually engaged in wholesale violence and ethnic cleansing of the local Palestinian population. In some cases IDF forces killed them outright, as New York Times Pulitzer Prize-winning reporter Christopher Hedges vividly detailed in his Gaza Diary.[292] Thus, both HP and Motorola officials collaborated in the commission of war crimes as defined in U.S. and Israeli war crimes statutes (*see* Count II herein.)

174.    For at least 30 years, Motorola, HP and all corporate Defendants named herein had the intent to and did participate in the aforesaid illegal conspiracy and knew that they were, in the process, violating U.S. and Israeli criminal statutes, each country's well-articulated anti-

---

[290] Based on UN estimates, it will take anywhere from $8-12 billion dollars to rebuild Gaza.
[291] *See* http://mondoweiss.net/2015/11/killed-israeli-veteran/, Our Harsh Logic p. 79.
[292] *See* Chris Hedges, "A Gaza Diary," http://www.bintjbeil.com/articles/en/011001_hedges.html.

settlement public policies, and the U.S. and Israeli Army's War Manuals. They also violated

Israel's Declaration, numerous UN mandates and resolutions, and Customary International Law,

including the Nuremberg Principles and the Law of Nations. *See* Exhibit A.

175.     The death and widespread destruction brought about by the 30-year ongoing pattern of

funding of criminal activities by the tax-exempt entities and their donors was a direct,

foreseeable and intended result of the conspiracy participated in by all of the Defendants named

herein. They all intended to and did enable (Defendant Abrams, tax-exempt entities, RE/MAX

officials, BL/BH officials, construction/support firm officials), finance (donors/entities, BL/BH),

encourage (Abrams, BL/BH officials, RE/MAX and construction/support firm officials), protect

(HP/Motorola, IDF/G4S personnel) and/or commit the acts of violence (IDF/G4S personnel,

violent settlers, and their security coordinators) described herein against the Plaintiffs and their

relatives.

176.     The damages suffered by the Plaintiffs, i.e., loss of loved ones including children,

destruction of homes, destruction of revenue-producing arable property, poisoning of water

wells, slaughtering of livestock, destruction of electric grids, diminished water supply capacity,

and destruction of schools, mosques, and hospitals, are the direct and proximate result of the

aforesaid conspiracy participated in by the Defendants. The conspirators have been quite

successful in that endeavor, primarily because of the tremendous financial assistance given by

the U.S. tax-exempt entities and their donors. That funding, unfortunately, is still occurring on a

massive scale—the settlements are securing approximately $1 billion per year from tax-exempt

entities. In 2007, $1.7 in laundered funds were sent overseas to Israel-based NGOs intent on ridding the OPT of all non-Jews.

177.    In engaging in the above activities and advancing their primary objective of driving all non-Jews out of EJ and the OPT, all of the Defendants named herein had the specific intent to promote and advance the carrying on of the above specified unlawful activities. They knew and were totally indifferent to the fact that: (a) their efforts would promote arms trafficking, wholesale violence, ethnic cleansing, and the death of innocent civilians; and (b) that the Israeli government as of 1993 had outlawed new settlements and the use of state property to promote expansion of existing settlements in the OPT. Hence, they knew that they were violating Israeli criminal law (theft of private property, arms trafficking, and malicious property destruction), Prime Minister Rabin's ban on such activity; Israel's own Declaration, and its human rights statute—the BLHDL.

178.    In sum, as a result of the aforementioned efforts by the various conspirators, 49,000 homes have been demolished, 50,000 political prisoners have been incarcerated, 2,089 children have been killed just since 2000,[293] with tens of thousands wounded or maimed, hundreds of thousands of children need psychological counseling, 900,000 olive trees have been uprooted or destroyed, Palestine's agricultural sector has been devastated, and the settlements have significantly expanded their borders by seizing and occupying nearby Palestinian property. In addition, after three military invasions in the past ten years, Gaza is now a devastated wasteland as reported by various UN officials, and the Palestinians who live there. According to former

---

[293] http://www.ifamericansknew.org/stat/children.html.

Premier Olmert, besides being confined to isolated open-air prisons, the local Palestinian population is actually living in WWII-style ghettos.[294]

179.      Assaf Sharon, an assistant professor at Tel Aviv University and co-chair of Molad, a liberal Israeli think tank, has succinctly summed up the nature of the ongoing criminal activity in the OPT. She has stated recently that Susya (a village in the South Hebron Hills in the midst of a longstanding legal battle to prevent its demolition) is an excellent example of what is going on in the OPT courtesy of funding coming from U.S. tax-exempt entities and their donors: "Palestinian shacks built by poor peasants who were forcibly evicted from their homes are [now] being destroyed, although its indisputably their own land, and while [at the same time] their neighboring illegal outposts, some of which are on private Palestinian land, are growing unhindered."[295] All Israel-based corporate Defendant officials and BL/BH officials, including RE/MAX and G4S officials, have known for at least 20 years that thousands of Palestinian villages like Susya have already been demolished by their own employees, partners, and collaborators like settlement security coordinators, and Volvo wheel loader operators.

180.      All of the heinous atrocities and brutal acts of violence detailed herein that are the direct result of the aforementioned conspiracy, unfortunately, are continuing today. As recent as November 18, 2015, San Jose State University elected to divest from Motorola, HP, G4S, and other conglomerates for their ongoing complicity in human rights abuses in the OPT. Even today, the settlement of Karnei Shomron publicly advertises its plan to "continue to populate" its

---

[294] "Palestine Today is an Open-Air Prison," http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html.

[295] http://www.tabletmag.com/jewish-news-and-politics/197244/shoot-the-messenger.

community and "successfully connect all the hills" (owned by Palestinians) in the region by arming and training its settlers and annexing more private Palestinian property.[296] As recently as December 11, 2015, IDF forces in Hebron murdered Uday Irshaid. The 24-year-old Palestinian was shot and killed just six weeks after these same soldiers killed his sister Dania, 17 years old. Amnesty international has stated that the killing appeared to be a "summary execution."[297] This "extrajudicial killing" is what Senator Leahy has recently complained about in a letter to Secretary Kerry.

WHEREFORE the Plaintiffs herein have suffered damages as a result of the activities described herein. These activities include war crimes, property destruction, agricultural destruction, loss of loved ones, loss of businesses, damaged infrastructure items, damaged homes, poisoned water wells, slaughtered livestock, and other losses. Based on documented RE/MAX land and housing value assessments, and the opinion of Plaintiffs' expert knowledgeable in land and housing values in the Middle East, the Plaintiffs demand judgment against the Defendants, jointly and severally, for $1 billion in damages, consisting of: (a) business damages attributed to the loss of agricultural crops, retail stores, hotels, open air commercial markets, lost tourist revenue, etc.; (b) damages caused by the destruction of OPT infrastructure components that the Plaintiffs and/or their relatives can no longer make use of because they have been destroyed;  (c) damages caused by the destruction of Gaza infrastructure components (based on UN valuations); (d) damages based upon an estimated fair rental value opined by the aforementioned expert in land and housing values in the Middle East for all private

---

[296] http://www.ginaplus.org/kshomron.htm, "Security for the Community" link.
[297] *See* http://www.maannews.com/Content.aspx?id=769295.

property seized temporarily by IDF forces but still occupied since 1967; (e) damages for the pain and suffering caused by the destruction of homes, olive trees, schools and hospitals, and the deprivation of basic human rights guaranteed by Customary International Law; (f) damages to set up a fund to provide psychological counseling services to the children of the Plaintiffs named herein; (g) damages which represent at least 42 percent of the fair market rental value of all properties as calculated by the aforementioned expert, which properties are now occupied by Jewish-only settlers;[298] and (h) damages represented by properties which are now occupied by infrastructure improvements like the Tovlan Waste Facility built by the construction/support firms, including the valuable private property confiscated by IDF authorities when they built the separation wall. This figure, of course, is dependent on the number of Plaintiffs who join this suit.

The $1 billion requested herein by the Plaintiffs includes an appropriate award of punitive damages for the intentional and malicious conduct engaged in by all the Defendants named in this Count, pre and post-judgment interest, costs of this action, attorney's fees and such other and further relief as the Court may deem appropriate under the circumstances herein. An award of punitive damages is warranted because, as described herein, all of the Defendants have

---

[298] For example, it is conceded that 100% of the property Ariel is located on is private Palestinian property, and 30% of Nokdim's property, perhaps more, is private. *See also* Palestine Inside Out p.18. A 2006 Peace Now report found that as of November 2006, privately held Palestinian land—not state land—accounted for some 40% of the land used for Jewish settlements in the West Bank. As referenced in Israel Lobby, p. 91, "this seizure of Palestinian property violates not only Israeli law, but also a fundamental principle of democracy—the protection of private property." *See also* "West Bank Sites on Private Land, Data Shows," Steven Erlanger, NY Times Mar. 14, 2007 *and* "Legitimization of Land Theft," http://www.haaretz.com/legitimization-of-land-theft-1.214201.

engaged in, encouraged and funded massive ethnic cleansing, arms trafficking, theft and destruction of private property, all in total disregard for U.S./Israeli law and clearly-defined anti-settlement public policy, America's Lieber Code, Israel's Declaration, UN Charter principles, UN resolutions, and Customary International Law.

### COUNT II:
### WAR CRIMES, CRIMES AGAINST HUMANITY, AND GENOCIDE IN VIOLATION OF THE LAW OF NATIONS BY ALL DEFENDANTS

181.    This Count incorporates and is meant to be read in conjunction with the other allegations in this Complaint, including the allegations recited in the introduction, parties and the common allegations sections.

182.    Apart from the corporations named in Count IV, which committed the war crime of pillage, there are two separate categories of war criminals that the Plaintiffs are complaining of herein. The first category is composed of donors/entities, armed settlers, settlement security coordinators, and G4S personnel. Their criminal conduct was detailed in Count I, i.e., they all have funded, promoted, encouraged, assisted, and facilitated wholesale violence, ethnic cleansing, arms trafficking, malicious wounding of their Palestinian neighbors, and theft and destruction of private property. These are all notorious war crimes as explained *infra* because they have resulted in the ill treatment of an occupied population, i.e., the Palestinians.

183.    The second category of war criminals are: (a) Israeli army soldiers and their commanding officers who gave orders to shoot to kill and to "fill Palestinian bodies with bullets," and told impressionable 18-year-olds just out of high school that promotion was dependent on the number

of Palestinian kills recorded;[299] and (b) individual donors who financed such criminal activity by making tax-deductible donations to the FIDF. Based on the facts alleged herein, these donors had to know what that funding would result in, i.e., ethnic cleansing of all Palestinian neighbors living near the settlements as a result of wholesale violence being directed at them, including home demolitions, theft of private property, malicious wounding, live target practice, and poisoning livestock and water wells.

184.    All donor Defendants named in this Count have made significant contributions to the Israeli army ($104 million in 2014), and as a result have violated the following statutes and conventions: (a) Nuremberg Principles; (b) U.S. War Crimes Statute; (c) Israel's Anti-Nazi Statute; (d) Genocide Convention; (e) Article 73 of the UN Charter, which requires that occupiers act as trustees over the occupied population's property; and (f) America's 1863 Lieber Code. See Exhibit A for a more comprehensive list of Customary International Law.

185.    "War crimes" and "crimes against humanity" are defined in Section VI of the Nuremberg Principles, in 18 U.S. Code § 2441 (the "War Crime Statute") as modified by the U.S. Military Commission Act of 2006. They have also been codified in Israel's Anti-Nazi Law of 1950. The definitions include murder, *ill treatment of a civilian population in occupied territory*, pillage,[300]

---

[299] Unfortunately, these criminal commands are put into actual practice on a daily basis in the OPT. On February 21, 2016, Mohammed Abu Khalaf attacked two Israeli border guards with a knife. He was shot, disarmed, and incapacitated. While he lay on the cobblestones in the vicinity of the Damascus gate, the border police continued to fire rounds into him, shocking his body with the wave of bullets. Witnesses were "astonished by the quantity of live-fire shot into the downed Palestinian." http://mondoweiss.net/2016/02/video-israeli-police-continue-firing-after-palestinian-attacker-is-incapacitated/.

[300] Article 4(2)(g) Additional Protocol II of 1977, which governs "armed conflicts not of an international character" explicitly prohibits pillage.

destruction of private property, and persecution based upon religious or racial grounds. The

Nuremberg Principles and its charter were adopted by all UN members. Both Israel and the U.S.

consider the Nuremberg Principles to be part of their domestic Customary International Law

(See Exhibit A) and the Law of Nations,[301] see *Israel v. Eichmann* (Jerusalem District Court

1961, case no. 40/61).

186.     *Most importantly, Nuremberg Principle VII provides that complicity in the commission of*

*a war crime or a crime against humanity is a crime itself under International Law*. Thus, all of

the Defendants named in this Count have committed a separate crime under International Law

because they have been complicit (American tax-exempt entities and donors funding Israeli army

operations—$104 million alone in 2014) and/or collaborated in the following criminal activities:

encouraging (donors named herein, tax-exempt entity officials Abrams, settlement leaders,

settlement security coordinators, the Defendants named in Count IV, BL/BH officials), funding

(the donors named herein, tax-exempt entities, BL/BH), and facilitating (BL/BH,

construction/support firms, the Defendants named in Count IV, RE/MAX, G4S, Motorola, HP)

the commission of comprehensive war crimes as defined herein.[302]

187.     As detailed in *Our Harsh Logic*, veteran IDF soldiers who have actually served in the

OPT have repeatedly committed heinous criminal activities which have been funded by IDF

---

[301] America's founding fathers took specific recognition of the "Law of Nations" doctrine, and it is the only one referenced in the Constitution, see Art. I Sec. 8 Cl. 10.
[302] Plaintiffs have not named the CEOs of the corporate Defendants as separate defendants in this complaint because their corporations are responsible for their actions under a *respondeat superior* theory, and ample precedent exists for pursuing Alien Tort Statute (ATS) remedies against corporations. *See, e.g., John Doe I v. Nestle, USA*, No. 10-56739 (9th Cir. 2013) (holding corporations can face liability for claims brought under the ATS, cert. denied).

donors named herein via tax-deductible contributions to FIDF. Their war crime atrocities were

detailed in that book, and were based on personal sworn accounts of 700 IDF senior commanders

and line soldiers who actually served (2000-2010) in the OPT on extended tours and who are

currently members of Breaking the Silence. The soldiers detailed the heinous war crimes that

they committed on an ongoing basis for ten years in the OPT at the direction of senior IDF

military officials. That criminal activity was not engaged in to defend Israel, but to protect the

settler population while they were terrifying their Palestinian neighbors. As recited in *Our Harsh

Logic*, the IDF soldiers' mission was to "protect the settlers' rampaging," i.e., maiming and

murdering their Palestinian neighbors.[303] These war crimes and atrocities committed by IDF

veteran personnel included, but are not by any means limited to:

(a) Soldiers ordered by their commanders to "fill Palestinian bodies with bullets," who
did so, resulting in needless civilian deaths.[304] For example, Plaintiff Barghouthi lost
her brother while he was back from the U.S. to visit family, and Plaintiff Abu Amer
lost 14 family members as a result of the war crimes repeatedly committed in Gaza;

(b) Impressionable 18-year-old recruits were told by commanding officers and clearly
understood that moving up in the ranks was dependent on the number of
"Palestinian kills" that they accumulated.[305] Thus, IDF personnel were encouraged
and incentivized to murder as many Palestinian civilians as they could when they
entered a Palestinian village at 2 a.m. looking for weapons. As detailed in the book,
the only "weapons" they ever found were knives and forks;

(c) Some of these soldiers laughed at traumatized Palestinian children seeing their
mothers' body parts smeared all over the living room wall;[306]

(d) They told of a routine, daily practice of demolishing homes on a whim without any

---

[303] Id. p. 79-80, 288.
[304] Our Harsh Logic p. 79
[305] Id.
[306] Id. p. 40.

specific authority or order to do so;[307]

(e) They saw young, traumatized Palestinian children urinating or defecating in their pants as a result of either witnessing demolition of their homes or violent attacks on their parents;[308]

(f) They were told by their commanding officers to put the "rifle barrel between the teeth [of wounded Palestinians] and then shoot";[309]

(g) The officers attest to the fact that there was wholesale looting, i.e., soldiers stole cash, family heirlooms, computers, and lots of valuables, jewelry for the most part, i.e., a consistent pattern of looting;[310]

(h) At 2:00 am upon entering a village, they were ordered to throw grenades at doors and explosives up on the roof to wake up and terrify sleeping Palestinian family members. *Why?* To show the Palestinians who was in control of their lives 24/7;[311]

(i) They would spray herbicidal germination-preventing material on olive groves and other private Palestinian agricultural land near the separation wall, poisoning 293 acres of fertile agricultural property in December 2015 alone. That conduct constitutes malicious and wanton destruction of private property—a war crime;[312]

(j) They often observed their colleagues, encouraged by senior officials, killing horses, sheep, and other livestock—needless and wanton slaughter of farm animals.[313] The soldiers knew that Palestinian shepherds and farmers depended on their livestock for

---

[307] Id. p. 47.

[308] Id. The extent of the mental and physical distress on children goes back to the late 1980s. The Swedish Branch of Save the Children released in May 1990 a thousand-page report that detailed the effects of the conflict on the children in the OPT. Between 23,600 and 29,900 children required medical treatment for their injuries received from IDF beatings during 1987-1988. Almost one third of the children were ten years or under. One fifth were five and under. One third suffered broken bones, including multiple fractures. Israel Lobby p. 100. Another example of such violence occurred when IDF soldiers, taking target practice, shot ten-year-old Abir Aramin in the head while she was walking home from school, holding hands with her older sister. Her sister describes how she "suddenly flew out of her hand and lay bleeding on the ground." General's Son p. 148.

[309] Id.

[310] Id.

[311] Id.

[312] http://www.haaretz.com/opinion/.premium-1.701213.

[313] Our Harsh Logic p. 186.

their livelihood;

(k) They were told to delay and sometimes prevent emergency vehicles and ambulances from going through checkpoints, virtually ensuring that any wounded Palestinians lying on the street would bleed to death.[314] In terms of vicious activity which have, in certain cases, caused IDF soldiers to have post-traumatic stress disorder, persistent nightmares, and commit suicide,[315] they were ordered to "throw grenades and then bullets in the head [of Palestinians]."[316] They were also told to inflict serious bodily harm, including the loss of eyesight—"aim for the eyes to take out an eye."[317]

188.   They were also ordered on occasion to prevent water trucks accessing various Palestinian villages dependent on such supplies because they were not hooked up to any water system.[318] They told of Palestinian day laborers being crushed to death at various checkpoints while waiting for approval at checkpoints to enter a military zone or settlement to work.[319] In referring to the settlers who would go on violent rampages against their Palestinian neighbors, when asked about this practice, the soldiers responded, "stopping the settlers? The army can't do a thing."[320] "The settlers do whatever they want."[321] In fact, "our overall mission is to 'provide security' for the settlers' rampages."[322]

189.   The situation is so bad that settlement security coordinators consider themselves to be

---

[314] Id.

[315] Terrorist attacks are not the most common cause of death for Israeli soldiers, whether committed by farmers or otherwise. These days, suicide is. From 1992 to 2005, more than 450 soldiers committed suicide, averaging more than one every two weeks. http://www.ifamericansknew.org/stat/suicideidf.html.

[316] Our Harsh Logic p. 77.

[317] Id. p. 102.

[318] Id. p. 247.

[319] Id. p. 250.

[320] Id. p. 324.

[321] Id. p. 344.

[322] Id. p. 288.

commanding officers of IDF soldiers assigned to protect the settlers.[323] Battalion commanders often gave orders to shoot to kill at noncombatants like medical personnel trying to recover wounded or dead Palestinians. All of the soldiers repeatedly state "I am ashamed at what I did".[324] As Israeli journalist Haggai Matar stated, none of Breaking the Silence members' allegations have proven to be wrong.[325] In fact, Chris Hedges, New York Times Pulitzer Prize winner, in his "Gaza Diary" specifically corroborated the routine practice of murdering 13-year-olds by IDF soldiers.[326]

190.     Corporate Defendants also played a critical role in the commission of war crimes and other atrocities (live target practice) directed at Palestinian families living near settlements. HP/Motorola officials, for example, like all corporate Defendant officials herein, having been active in the settlement enterprise for 40 years, knew what the settlers were capable of, and knew that they coveted their Palestinian neighbors' property. Nevertheless, they continued to provide settlement officials with hundreds of sophisticated thermal imaging devices and tracking and surveillance equipment, knowing full well that their equipment would enable settler militia trained in the use of sniper scopes to maliciously wound and sometimes murder Palestinian farmers. Thus, by continuing to sell that surveillance equipment to the settlements for at least 30 years, HP/Motorola officials were acting as friendly, supportive collaborators, and were therefore complicit in the commission of violent criminal attacks (malicious wounding) on Palestinian farmers trying to penetrate settlement perimeters to access their own private property. Through

---

[323] Id.

[324] Id., passim.

[325] http://972mag.com/why-do-so-many-israelis-hate-breaking-the-silence/114763/.

[326] http://www.bintjbeil.com/articles/en/011001_hedges.html.

no fault of their own, their olive groves suddenly became located in expanded settlements, i.e., military security zones.

191.    HP/Motorola equipment is so exceptional that Palestinian farmers who manage to successfully navigate through multiple concrete barriers can be identified as a target 700 meters (2,300 feet) away. Once detected by armed settlers trained in using high power sniper scopes, the farmers are quickly wounded and left to bleed out. Engaging in live target practice against Palestinian farmers is a routine military exercise for the armed settler militia, which activity has been condoned by G4S personnel for at least 30 years. Just like IDF soldiers, rampaging settlers had orders from their security coordinators not to wound Palestinian farmers, but to shoot to kill.

192.    That criminal activity, of course, constitutes "ill treatment of a civilian population" which, as already referenced, is a separate war crime under the War Crimes Statute. Construction/support firms similarly collaborated with settlement officials in the commission of war crimes. Readymix and Heidelberg Cement officials, for example, helped build the separation wall and also provided settlements with additional expensive concrete security barriers when ordered by settlement leaders to do so. Those barriers became checkpoints protected by G4S personnel, but area military commanders for "security" reasons did not authorize them. Settlement security coordinators ordered them to be intentionally placed around settlements to impede the progress of Palestinian civilians who were trying to visit relatives in a nearby village, escort their children to school, access their olive groves or secure critical medical care. That is why former Premier Olmert stated that the Palestinian population was basically confined to open-air prisons 24/7.

193.     RE/MAX, BH/BL, and construction/support firm officials had also spent 20-30 years in

the OPT, and therefore also knew what the armed settlers and their security coordinators were

capable of doing. They had not only profited from their wholesale violence and ethnic-cleansing

activity, but had witnessed first-hand that criminal activity on a daily basis for at least 30 years

when visiting the settlements. Thus, by collaborating with and encouraging security coordinators

and/or armed settlers to commit a host of violent criminal acts, e.g., theft and malicious

destruction of property, all corporate Defendant officials based in Israel intentionally

encouraged, facilitated, or engaged in activity which resulted in the ill treatment of a civilian

population. Thus they all had acted as friendly and supportive collaborators by working with

settlement officials on a daily basis to confiscate additional Palestinian property and cleanse the

neighborhood of all non-Jews.

194.     In the case of BL/BH officials, along with RE/MAX officials, they encouraged and

financed settlement expansion, knowing that conduct necessarily entailed ethnic cleansing,

wholesale violence, theft and malicious destruction of private property, and thus the ill treatment

of a civilian population. BL/BH officials knew, like all the Defendants named herein, that the

security coordinators that they worked with on a daily basis (some of whom were their

customers) and settler militia coveted their neighbors' property, because there was no other

property to confiscate in the area. Those officials eagerly provided long-term mortgage financing

to new settlers, and RE/MAX officials provided marketing services to enable them to purchase

new homes in the expanded settlements. These new homes, however, were only made available

for purchase by the new settlers because of the violent criminal activity (ethnic cleansing), which

had been engaged in by the local settler militia and supervised by their security coordinators. Thus BL/BH, RE/MAX, and all corporate Defendants named herein, were knowingly enjoying the fruits of the settlers' criminal activity.

195.    The construction/support firms also played a crucial role in ethnic cleansing activity. Once they learned that a suitable construction site had become available as a result of the settler militias' additional ethnic cleansing activities, AFI/Veolia construction superintendents would be immediately dispatched to the site and start pouring concrete footings and foundations. That preliminary demolition and foundation work enabled the construction firms to build new schools, day-care centers, and apartment projects and homes for the new settlers to live in. Without affordable and secure housing accommodations and schools for their children, the new settlers would have returned to expensive urban employment centers like Tel Aviv or Haifa, where they used to live.

196.    Besides the treaties and conventions already referenced herein, the U.S. and Israel are also signatories to the United Nations Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), U.N.T.S. 277. That Convention affirmed Lieber Code and Nuremberg Charter principles and defined "genocide" to mean:

> Any of the following acts *committed with intent to destroy, in whole or in part, a*
>
> *national, ethnical, racial or religious group,* as such:[327]

---

[327] Based on vicious racially-motivated comments made by Israeli government officials and military leaders, the acts described herein were certainly engaged in with the intent to destroy the Palestinian population. For example: "The Palestinian threat harbors cancer-like attributes"— current Minister of Defense Yaalon; "Palestinians should go, as should the physical homes in which they raise the snakes"—current Justice Minister Shaked (encouraging "destruction of

(a) *Killing members of the group* (atrocities admitted by members of the Breaking the Silence movement; atrocities committed against Gaza fishermen (see para. 224); atrocities (murdering 12-year-olds) witnessed by NY Times Pulitzer Prize winner Chris Hedges as recorded in his "Gaza Diary", and Amnesty international reports[328], 2003 Pilots' Letter: 27 pilots refused to engage in war crimes, i.e., carpet bombing in Gaza, which killed Plaintiff Abu Amer's 14 family members during the third Gaza invasion in 2014. Pilot Yonatan Shapira, the main author, specifically remarked about a Palestinian family of 9 people living in Gaza and having to hide out in a hospital so that they would not be murdered. According to him, "this is a war crime—ongoing slaughter of innocent people"[329]); or

(b) *Causing serious bodily or mental harm* to members of the group (the 2003 Pilots' Letter, UN Rapporteur and Amnesty International reports, Save the Children reports, Breaking the Silence, and various Haaretz articles, Addameer reports, B'tselem reports, and *Our Harsh Logic;*[330] the B'tselem and Addameer are both Israel-based NGOs which focus on settlement activity and prison conditions); or

(c) *Deliberately inflicting on the group conditions of life* calculated to bring about its physical destruction in whole or in part (deprivation of access to medical facilities by the placement of unauthorized checkpoint concrete barriers and the construction of the separation wall built with the assistance of Volvo truck hauling activity, outfitted with sophisticated HP/Motorola surveillance devices, including thermal imaging systems, see paras. 75-82 herein, destruction of ambulances, emergency vehicles, hospitals,

---

Palestine's elderly, women, cities, villages, property, and infrastructure"); "Palestinians are beasts…they are not human"—current Deputy Defense Minister Ben-Dahan; and "Preventing the spread of Palestinian citizens is a national duty"—Former Housing Minister Atias. http://imeu.org/article/extremism-incitement-to-racial-hatred-senior-israeli-officials-in-their-own, http://www.haaretz.com/news/housing-minister-spread-of-arab-population-must-be-stopped-1.279277.

[328] Palestine Inside Out p. 183 (IDF use of Palestinians as human shields, torturing prisoners, blocking ambulances, wanton destruction of property meet definition of crimes against humanity). *See also* Chris Hedges, "A Gaza Diary," http://www.bintjbeil.com/articles/en/011001_hedges.html, *and* http://www.amnestyusa.org/research/reports/annual-report-palestinian-authority-2011?page=2.

[329] http://www.seruv.org.il/english/article.asp?msgid=55&type=news.

[330] Former Prime Minister Rabin infamously gave the order to "break the bones" of Palestinians participating in the 2001 uprising against the occupation. http://mondoweiss.net/2010/11/the-real-yitzhak-rabin, http://www.haaretz.com/news/broken-bones-and-broken-hopes-1.173283.

agricultural property, demolition of 49,000 homes by armed settler militia and IDF personnel, poisoning water wells and livestock, incarcerating 50,000 political prisoners with G4S assistance, and isolating and confining the preponderance of the Palestinian population to open-air prisons staffed by G4S personnel).[331]

197.    U.S. donor/entity officials, BL/BH officials holding dual citizenship, and HP/Motorola

and RE/MAX USA officials are all U.S. citizens and thus are also bound by America's 1863

Lieber Code and a number of international conventions adopted by the U.S., including GCIV,

Hague, UN Charter principles, the UDHR, and Nuremberg Principles. They have all: (a)

encouraged ethnic cleansing and wholesale violence or financed arms-trafficking activity, and

thus breached Customary International Law, directly or otherwise; and/or (b) provided funding

to settlement leaders to arm violent settlers and hire security coordinators who could train them

in the use of automatic weapons and sniper scopes. They knew what the results would be of

encouraging and funding that activity (arms trafficking) because settlement leaders and armed

militia both coveted their Palestinian neighbors' property. All corporate Defendant officials

based in Israel knew that the settlers had an impressive track record of murdering and maiming

their Palestinian neighbors and forcibly evicting them from their homes.

198.    Thus they have all violated UN Charter principles, Israel's Declaration, GCVI, Hague,

and Nuremberg Principles. The reason—like their corporate defendant partners RE/MAX,

BL/BH, and construction/support firms, they have "collaborated" or been "complicit" in war

crimes committed by armed militia, settlement security coordinators, and IDF/G4S personnel.

All of these individuals engaged in in "murder ill treatment of the civilian population in the

---

[331] *See generally* Our Harsh Logic.

occupied territory, plunder of private property, extermination (ethnic cleansing), persecutions based on political, racial, or religious grounds, and wanton destruction of villages." Not only have the donors and tax-exempt entity officials named herein funded and committed war crimes, they have also violated various provisions of the Anti-Terrorism Act (18 U.S.C. 2339C "Prohibitions against the Funding of Terrorism"). That statute forbids the funding of terrorist activities abroad, i.e., funding wholesale violence directed at a civilian population in order to intimidate them.

199.    In a similar fashion, the donors and tax-exempt entities have also violated President Clinton's 1995 Executive Order 12947 by financing violence in the Middle East. That order, which was written by Treasury officials, was premised on the fact that such activity frustrates American foreign policy objectives in the Middle East, i.e., a peaceful resolution of the ongoing belligerent occupation of Ottoman Palestine. That activity alone has enabled Treasury's OFAC division to designate thousands of Arab citizens (most of them Muslims) as terrorists. This is another example of the double standard that senior Treasury officials have employed in the war on terror.

200.    U.S. tax-exempt entities and U.S.-based BL/BH officials who prepared and executed their international wire transfers into settlement and Israeli-army bank accounts specifically violated America's 1863 Lieber Code, the Israeli army's War Manual, and the Anti-Terrorism Act (18 U.S.C. § 2339C) because they knowingly financed the activities of individuals (armed settlers, settlement security coordinators, and G4S personnel) who engaged in, *inter alia*, wanton destruction of property. HP/Motorola officials who are American citizens did the same thing, but

in a different manner. Their sophisticated surveillance equipment protected known criminals like settlement leaders, armed militia, and their security coordinators who had either ordered or engaged in murder, mayhem, arms trafficking, wanton property destruction, and arson. Thus, all Defendants, not just the donors/entities named herein, have been acting as friendly and supportive collaborators with security coordinators and armed settlers in any number of settlements to commit wholesale violence, ethnic cleansing, breaches of Customary International Law, and war crimes in violation of Section VII of the Nuremberg Principles.

201.    All corporate Defendants encouraged the ongoing theft of private property for a simple reason—windfall profit taking. They all knew that construction firms needed vacant sites on which they could build new housing projects, schools, and shopping malls to be financed by BL/BH and which RE/MAX officials could market to new settlers. They were arriving every day to different settlements in the OPT, looking for secure and affordable housing which was not available to them in expensive urban centers like Haifa and Tel Aviv.

202.    Much like RE/MAX and construction/support firm officials, BL/BH officials had to know as early as 1992 that aggressive settlers (their customers) were stealing and trespassing on private Palestinian property and setting up trailer parks with no building permits and violating municipal building codes in the process.[332] And they also had to know as early as 2003 (when members of Breaking the Silence began publishing their sworn testimonials, see para. 196, that war crimes, e.g., ill treatment of a civilian population (poisoning water wells and livestock, live target practice), were being committed on a daily basis in the OPT by their customers—armed

---

[332] According to the 1992 Israeli government investigation, http://imeu.org/article/elad-the-jewish-national-fund-the-us-taxpayer-subsidized-judaization-of-sil.

settlers, settlement officials, and G4S personnel. BL/BH officials knew what IDF personnel were capable of, having funded the identical criminal activity, which occurred during the first occupation starting in 1948 (known as the "Nakba").

203.    For approximately 25-30 years, FIDF senior officials and FFF members similarly committed war crimes by continuing to transfer massive amounts of funds to the Israeli army, knowing full well what the army's mission was, i.e., protect rampaging settlers who were engaging in wholesale violence, including ethnic cleansing and the violent subjugation of the Palestinian population.[333] They have also repeatedly violated 18 U.S.C. 960, *Expedition Against a Friendly Nation*, because they knowingly furnished money, and still do ($104 million in 2014), to a foreign military entity engaged in conflict in the OPT[334], whose inhabitants are at peace with the U.S. government. For at least 20 years (discovery will provide the specifics thereof), Defendant FIDF's senior officials and FFF members have intentionally assisted and cooperated with settlement security coordinators (paid by settlement officials with funds originating in America) and armed settlers by providing the necessary funding to promote settlement expansion by stealing the only private property available in the neighborhood, which was unfortunately owned and occupied by non-Jews.

204.    With that funding and the purchase of sophisticated HP/Motorola surveillance devices, military hardware and sniper scopes, the settlers were able to continue terrorizing their Palestinian neighbors and confiscate and demolish 49,000 Palestinian homes and thousands of

---

[333] http://www.fidf.org/page.aspx?pid=285.
[334] In December 2014 alone, FIDF gave $60 million in financial assistance to the IDF. *See* http://www.hollywoodreporter.com/news/haim-saban-helps-raise-31m-837947 *and* http://www.hollywoodreporter.com/news/haim-saban-raises-34m-support-747379.

acres of olive groves to: (a) promote settlement expansion; (b) accommodate the ever-increasing

housing needs of new settlers; and (c) make construction sites available for the

construction/support firms so that they could build new apartment projects and homes. Thus,

they acted as friendly, supportive collaborators by encouraging armed settlers to terrorize the

local Palestinian population and engage in ethnic cleansing and wholesale violence. Because all

corporate Defendant officials were instrumental in either encouraging, funding, or assisting the

armed settlers in that heinous criminal activity (e.g., HP employees instructing settlers on the use

of surveillance devices) or standing idly (G4S personnel) by while the settlers engaged in such

activity under the supervision of the settlement's security coordinator, they have also

collaborated in terms of ethnic-cleansing, arms trafficking, wholesale violence, poisoning water

wells and livestock, and wanton property destruction (olive groves) engaged in by the settler

militia.

205.    Like FIDF and FFF members, the donors named herein have also been long-time

financial supporters of the IDF. In fact, in 2006 Defendant Gilbert received a special award from

FIDF in specific recognition of the significant financial contributions he had made to the IDF in

prior years.[335] Assuming the award was based on his contributions from 2005 on, he has funded

IDF criminal activity, and therefore collaborated with senior IDF officials, for at least ten years,

which time frame includes at least two devastating Gaza invasions.[336] As already noted, based

---

[335] https://www.youtube.com/watch?v=x9JQnHwDkMs&feature=youtu.be.
[336] Based on *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir.
2008), money sent to groups that have both "charitable" and criminal elements is fungible. Thus,
Defendant Gilbert cannot assert a defense herein that he intended that his contributions only went
to fund, for example, college scholarships for Israeli war veterans. He knew of and is therefore

upon numerous Haaretz articles and editorials, the Pilots' Letter, Breaking the Silence, Amnesty

International, and UN rapporteur reports, all Donors named herein had to know that they were

financing the commission of war crimes and collaborating with the perpetrators thereof. They

also knew that unless local Palestinian property owners were forcibly expelled, settlement

expansion was impossible. These war crimes have been meticulously detailed in *Our Harsh*

*Logic*, and were a daily occurrence in the OPT according to at least 700 IDF veterans who had

served there to protect rampaging settlers during 2000-2010 on extended tours, i.e., members of

Breaking the Silence.

206.    Based on the various FIDF donors' tax brackets (e.g., Defendant Gilbert owns a very

profitable NBA franchise and is worth more than $4 billion, and Defendant Adelson is worth

more than $25 billion) and an analysis of FIDF's annual budgets, the donors have: (a)

contributed, over a ten-year period, anywhere from $300 to $600 million[337] (since in 2014 alone

they contributed $104 million, the amount given over the ten-year period could reach $1 billion)

to fund IDF personnel's criminal activities (i.e., ethnic cleansing, home demolitions, murder,

mayhem, arms trafficking, and breaking bones of Palestinian demonstrators[338]); and (b) have

taken the maximum amount of tax deductions available to them for these charitable

contributions, relying on the tax-exempt entities' alleged "educational" and "charitable"

---

liable for funding the IDF's criminal acts, including assisting armed settlers with home
demolition activities after they committed physical attacks on Palestinian homeowners and
farmers, and in some cases murdering them.

[337] Since Gilbert is worth more than $4 billion (http://www.forbes.com/profile/daniel-gilbert/),
the Court may assume that he needed substantial tax write-offs.

[338] http://mondoweiss.net/2010/11/the-real-yitzhak-rabin, http://www.haaretz.com/news/broken-bones-and-broken-hopes-1.173283.

activities. Thus, American taxpayers have been subsidizing a foreign army's ongoing pattern of war crimes activity. *Query: How could the donors' tax accountants view either arms trafficking or wholesale violence as being "charitable" or "educational" in nature?*

207.      In taking these deductions the donors did not disclose to the IRS that: (a) they were exploiting a financial pass-through entity in America—the FIDF; or (b) their tax-deductible contributions were actually funding an foreign army whose members condoned, facilitated, and in some cases encouraged and participated in the commission of comprehensive war crimes, including following orders to "shoot to kill" Palestinians or to "take out an eye" if possible. Members of Breaking the Silence and the author of the famous Pilots' Letter, air force pilot Yonatan Shapira, both confirmed that war crimes were being committed in the OPT on a regular basis. Pilot Shapira actually confessed that "I was a member of a terrorist organization"[339], i.e., the Israeli air force, and condemned the carpet bombing he and his fellow pilots routinely engaged in to ensure there would be wholesale devastation in the Gaza strip. Thus, collective punishment in its most devastating form was repeatedly visited on innocent Palestinian civilians living in Gaza on a daily basis. The third Gaza invasion lasted approximately 49 days.[340]

208.      The donors will no doubt claim that their funding incidentally advanced "educational" or "charitable" activities overseas as described on FIDF's 990 annual tax form filed with the IRS. However, their funding also enabled and supported IDF personnel continuing to engage in

---

[339] https://electronicintifada.net/content/i-was-part-terror-organization-says-israeli-pilot-turned-activist/14253, http://www.seruv.org.il/english/article.asp?msgid=55&type=news.
[340] http://www.theguardian.com/world/2014/aug/26/gaza-ceasefire-israel-palestinians-halt-fighting.

heinous criminal activities in the OPT,[341] i.e., war crimes, wholesale violence, and ethnic cleansing. As the founder of the Breaking the Silence movement stated, he had been ordered to engage in the "ongoing slaughter of innocent people," and he knew, just like his comrades and collaborators like armed settler militia units, that this was a war crime.[342] All U.S. FIDF donors had to know that funding a foreign army's military operations, which necessarily involved the violent subjugation and ill treatment of a civilian population,[343] violated the Lieber Code and, based on that statute alone was deemed to be a war crime. All FIDF donors are well-educated savvy businessmen who diligently kept up on all developments that concerned Israel in any respect, but especially the Israeli army, their favorite charity. All of them repeatedly visited Israel, and specifically the settlements, to see the benefits of their donations and observe their heroes in action. They observed that IDF personnel were in total control of all settlement areas 24/7. They watched IDF personnel engage in patrols around the settlements, looking for Palestinian farmers that they could wound in order to impress their visiting dignitaries and financial supporters.

209.    All FIDF donors and their accountants knew that they could not disclose to the IRS that the foreign entity, which their charity was funding, had engaged in extensive criminal activities

---

[341] The court in *Boim* held that "if the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, *he is treated by the law as if he had in fact desired to produce the result*…a donor who knew the aims and activities of the organization would know that Hamas was gunning for Israelis…and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would appear to be intended to intimidate or coerce a civilian population…" (internal quotations removed).

[342] http://www.democracynow.org/2014/7/24/amidst_brutal_operation_in_our_name.

[343] *See* Our Harsh Logic.

that violate Customary International Law. If those donors had done so on their tax returns or in a letter of explanation from their accountants, they would not have been able to take any "charitable" tax deductions, i.e., 501(c)(3)s are not expected, and are not allowed, to fund war crimes or criminal activity of any nature. Thus, the IRS would disallow any donations to such organizations during an audit. In addition, the tax-exempt entity officials and their accountants could be criminally prosecuted, just like BL was, for defrauding the IRS. Entity officials had encouraged their donors to take illegal deductions concerning expenses incurred in setting up schools. Entity officials and their accountants can also be prosecuted for violating federal perjury statutes, since they never disclosed on their sworn 501(c)(3) applications that they would be using tax-deductible contributions to purchase military hardware, set up sniper schools, and train settler militia in military tactics designed to convince their Palestinian neighbors to permanently vacate the area.

210.     Besides his own financial donations, Gilbert has arranged for a prestigious national sports organization, i.e., the NBA, to sponsor various fundraising events for the IDF's benefit.[344] He has worked closely with his billionaire friend and colleague Defendant Adelson to promote those events, who also writes off contributions to FIDF on his tax returns and also shares Gilbert's ethnic-cleansing agenda. Last year, he made a $5 million tax-deductible contribution to FIDF. With Defendant Gilbert's assistance, Defendant Adelson (subsidized by the U.S. taxpayer) has funded all-expenses-paid-for trips to Israel for NBA players to hang out with Israeli soldiers. The goal is to influence their thinking on the issue of Middle-Eastern violence and embrace

---

[344] http://mondoweiss.net/2014/09/friends-israeli-fundraisers.

Defendant Abrams' mantra—the peaceful settlers raising their families are constantly being attacked by violent Palestinian famers armed with baskets to collect olives.

211.    The NBA players, of course, return home not knowing that armed settlers with IDF/G4S assistance actually violently assault their Palestinian neighbors on a daily basis, use their sniper scopes to engage in live target practice against Palestinian farmers, slaughter their livestock, and poison their water wells. The settlers, much like Mafioso musclemen, hope that terrorizing their Palestinian neighbors will cause them to abandon their ancestral homes and 400-year-old olive groves. These activities obviously result in the violent subjugation and ill treatment of innocent civilians—a heinous war crime under any circumstances. By encouraging, funding, endorsing, organizing, and participating in these IDF fundraising events, and funding some of the expenses associated with these trips to Israel, the NBA has: (a) put its stamp of approval on IDF criminal activity, including a "shoot to kill" mission, war crimes, ethnic cleansing, and genocide; and (b) aided and abetted violations of America's 1863 Lieber Code and international conventions adopted by the U.S.

212.    All Defendants herein had to know the type of heinous criminal activity being engaged in by armed and aggressive settlers and IDF/G4S personnel in the OPT, for any number of reasons. As early as 1990, ethnic cleansing, wanton property destruction, heavy civilian casualties, incarceration, and torture of political prisoners as well as children, were all common knowledge in Israel. Haaretz articles and editorials repeatedly reported on and criticized these criminal activities and settlement expansion. That activity, i.e., ill treatment and violent subjugation of a civilian population, of course, constitutes classic war crimes under the Nuremberg Principles and

165

the U.S. War Crimes Statute. It also violates the UN Genocide Convention.

(a) **1948: Ethnic Cleansing:** In 1948, when Israel was first established, Israeli army senior officials stated publicly that the purpose of Operation Matate ("Sweep") was to expel all non-Jews then living in Ottoman Palestine.[345] This government directive was in stark violation of the unanimous UN resolution which mandated that "all inhabitants," including Palestinians residing there, were to set up and continue to reside in the new Israeli state, and adopt as state law the principles of the UN charter. One particularly gruesome example of the terror inflicted on the indigenous Palestinian population was the October 1948 Al-Dawayima massacre, when Israeli soldiers and commanders: (1) locked Arab men and women inside of houses, and then army explosive engineers blew the houses up, taking a page right out of the Israeli army's war manual; (2) smashed the skulls of Palestinian children with cudgels; (3) shot infants and their mothers; and (4) raped and then shot Arab women.[346]

(b) **1988: Ethnic Cleansing, Wanton Property Destruction:** In 1988, the *IDF Master Plan for the Conquest of Palestine* was published, and therefore was available for all Israeli citizens and business entities operating there to read. That war manual specifically explained how forcible expulsion of the Palestinian population could be accomplished "by destroying villages, setting fire to them, by blowing them up, by planting mines in their rubble…in case of resistance, the armed forces must be wiped out and the population expelled outside the borders of the state." See Walid Khalidi "**Master Plan for the Conquest of Palestine**"[347], Journal of Palestinian Studies issue 1 1988 pages 4-20. Senior Israeli army officials are guided by these same principles today, for example, they still tell young, impressionable 18-year-old recruits that promotion in the army is dependent on the number of Palestinian kills they score, which ensures countless civilian deaths, with pictures confirming the same.[348] Since FIDF donors named herein actually funded these criminal activities, they have acted as "collaborators" with war criminals under the Lieber Code, the

[345] Palestine Inside Out p. 226. *See also* Israeli historian Beni Morris' remark, *supra* p.16.
[346] http://mondoweiss.net/2016/02/barbarism-by-an-educated-and-cultured-people-dawayima-massacre-was-worse-than-deir-yassin/.
[347] According to Defendant Hagee, other evangelists, Newt Gingrich, and Donor Adelson, there never was such a country known as "Palestine." Yet this IDF manual on guidelines for crushing the Palestinian population specifically references the conquest of "Palestine." Even though IDF forces deported at least 700,000 Palestinians in 1948-49, the territory that those forces invaded, i.e., Palestine, is still a country and recognized as such by the UN based on longstanding Hague and Geneva Convention principles. The JNF website even specifically references "Ottoman Palestine" in terms of its alleged environmental activities. http://www.jnf.org/about-jnf/history/.
[348] Our Harsh Logic p. 80.

Nuremberg Principles, the War Crimes Statute, and Israel's Anti-Nazi Statute.

(c) **1990: Israeli Media Coverage:** As early as 1990, Israel's newspaper Ha'aretz began running editorials condemning settlement expansion and building new settlements, citing the fact that such activity violates Israeli law and public policy.[349] Settlement expansion, of course, necessarily results in ethnic cleansing, wholesale violence, and the illegal seizure and destruction of private property. That activity is deemed to be ill treatment of a civilian population, i.e., a war crime. With respect to FIDF donors, in 2005, an article was published in Ha'aretz accusing the Israeli army of becoming a "killing machine." That same sentiment was expressed also in 2005 by former Shin Bet officials, i.e., IDF conduct is "totally immoral."[350]

(d) **1994 Hebron Massacre:** On February 25, 1994, the extremist U.S. settler Baruch Goldstein opened fire on a crowd of Palestinians gathered to pray inside Hebron's Ibrahimi Mosque on Ramadan. He murdered 29 Palestinians and injured another 125 before he was overpowered. Based on Exhibit D, an expert report on Hebron settler activity, the Hebron settlers continue to commit wholesale violence and ethnic cleansing. As discovery will show, both BL and BH have financed Hebron settlement expansion, RE/MAX officials have marketed property in Hebron, and construction/support firms have made residential improvements there. All of these officials had to know, simply by visiting the settlements' websites,[351] whether Hebron or others, that security coordinators located there were training settlers in the use of automatic weapons and sniper scopes to perpetrate wholesale violence against their Palestinian neighbors.

(e) **1995: International NGO Reports, U.S. State Department, and UN Rapporteur Reports:** Israel-based NGOs as well as Amnesty International have documented the same atrocities.[352] The U.S. State Department has published annual country-specific human rights reports on human rights abuses in Israel and the OPT. Finally, UN Rapporteurs have thoroughly documented these atrocities, and numerous articles

---

[349] www.haaretz.com/print-edition/opinion/making-the-law-a-laughingstock-1.208691.

[350] Israel Lobby pp. 100-101.

[351] *See*, e.g., http://www.ginaplus.org/kshomron/foundation.htm "Security for the Community" link; http://www.kerenefrat.org/; and http://idfprepacademy.org/ (the logo depicts the profile of a settler aiming at a target with an automatic weapon).

[352] Amnesty International, for example, has confirmed that three Israeli border guards confessed to forcing a group of Palestinian minors to eat sand and kiss their boots after having forgotten to carry their IDs. Some of the soldiers confessed further that they used the minors as ash trays, putting out their cigarettes on their skin. http://www.amnestyusa.org/research/reports/annual-report-palestinian-authority-2011?page=2.

describing these identical atrocities have appeared in several international papers in America, Europe and Israel.

(f) **2001: International Media Coverage:** International reporters who have actually visited the OPT have observed these identical atrocities and reported on them. For example, New York Times Pulitzer Prize-winning reporter Chris Hedges personally witnessed IDF forces during the 2001 Gaza invasion taunting Palestinian children and then killing them in cold blood: *"I have never before watched soldiers entice children like mice into a trap and murder them for sport."*[353] Murdering those children in cold blood is obviously a heinous war crime. Thus all FIDF donors have collaborated in and been complicit in the commission of war crimes as that term is defined in Section VII of the Nuremberg Principles.

(g) **2001: Atrocities:** IDF soldiers, as they were leaving Gaza, scrawled vile and disgusting graffiti on the outside walls of Palestinian homes (i.e., extolling the pro-settlement terrorist Kahane, proclaiming death to all Arabs, and boasting about raping Arab women), they also celebrated the atrocities committed during the First Gaza Invasion 2001 by proudly wearing t-shirts showing a very pregnant Muslim woman wearing a hijab with the crosshairs of a sniper scope placed over her belly. The t-shirts bore the inscription: "One shot, two kills".[354] These are the same "moral" soldiers that Prime Minister Netanyahu frequently praises in his UN and U.S. congressional speeches.

(h) **2003: Wholesale Theft of Private Property:** Comptroller Goldberg reported in 2003 that there had been wholesale theft of private property (clear criminal activity) in the OPT and various local building ordinances had been violated in the process of constructing residential and infrastructure improvements in the settlements. He also concluded that BL/BH bank customers, i.e., construction/support firms hired by the settlement leaders, had secured illicit construction permits, which is now a crime under Israeli criminal law. Those illicit construction permits resulted in further illegal settlement expansion, which resulted in ethnic cleansing and further confiscation of private property. These activities, of course, constitute ill treatment of a local civilian population;

(i) **2003: War Crimes, Wholesale Violence, and Wanton Property Destruction:** In 2003, 27 reserve Israeli pilots wrote an open letter (now famously called the "Pilots' Letter") candidly expressing their reasons for withdrawing from the service,

---

[353] Chris Hedges, "A Gaza Diary," http://www.bintjbeil.com/articles/en/011001_hedges.html.
[354] Haaretz, "Dead Palestinian Babies and Bombed Mosques – IDF Fashion 2009," http://www.haaretz.com/dead-palestinian-babies-and-bombed-mosques-idf-fashion-2009-1.272500, accessed December 10, 2015.

including the war crimes they were being ordered to commit.[355]

(j) **2004: Military Expeditions, Torture, Civilian Deaths:** There was not one, but three Gaza invasions in which thousands of Palestinian civilians were murdered.[356] IDF veterans, as early as 2004, had specifically detailed (at www.breakingthesilence.org.il) the atrocities that they committed from 2000-2010 in the OPT and in Gaza. They are members of "Breaking the Silence", and have apologized for committing these comprehensive war crimes.[357] IDF veterans, of course, knew first-hand how the Palestinians were being abused in the OPT, including routine savage beatings they had to endure upon being arrested, as detailed in (k) *infra*. One example detailed in the book *Our Harsh Logic* was aiming for Palestinians' eyes "to take out an eye."[358] Mr. Yonatan Shapira, former air force pilot, in 2005 remarked with respect to the devastating carpet bombing which leveled buildings, hospitals, and UN quarters in Gaza: "I was a member of a terrorist organization."[359] Treasury Department's OFAC division has designated thousands of Muslim individuals who belonged to terrorist organizations based upon minimal evidence, i.e., newspaper clippings.

(k) **2005: Continued Ongoing Theft and Destruction of Private Property in the OPT:** In 2005, Special Prosecutor Sasson and Foreign Defense Minister Shaul Mofaz had respectively documented and condemned the ongoing criminal activity occurring in the OPT, i.e., malicious destruction and theft of private property by BL/BH customers, i.e., settlement officials, RE/MAX officials, armed settlers, and private-sector housing developers hired by settlement leaders. See paras. 92-93, 152-

---

[355] Palestine Inside Out p. 170 (Listing, *inter alia*, sonic booms three to four times every night over Gaza, terrifying children; Badly burned people; unprecedented numbers of amputees; destruction of Gaza's only power plant such that they could not refrigerate foods and had to spend their evenings in darkness; hospitals and medical clinics lacked power and fuel for emergency generators, and had to close; and no dialysis or MRI equipment).

[356] Senior IDF officials refer to this as "grazing". They tell young recruits that every few years or so, the "grass must be mowed," i.e., Gaza needs to be invaded. http://www.jpost.com/Opinion/Columnists/Mowing-the-grass-in-Gaza-368516.

[357] IDF soldiers were ordered not to have a single house left standing, and stated that the political mission they were assigned to achieve was immoral, i.e., enforce a military regime over millions of civilians deprived of civil rights and basic liberties. They stated that broken houses and uprooted olive trees were everywhere. https://electronicintifada.net/content/i-was-part-terror-organization-says-israeli-pilot-turned-activist/14253, http://www.seruv.org.il/english/article.asp?msgid=55&type=news.

[358] Our Harsh Logic p. 102.

[359] https://electronicintifada.net/content/i-was-part-terror-organization-says-israeli-pilot-turned-activist/14253, http://www.seruv.org.il/english/article.asp?msgid=55&type=news.

152, 158-159 herein. Prosecutor Sasson had even recommended criminal prosecutions, which made headlines in Israel and which all Defendants named herein had to be aware of because her report was the proverbial "death knell" for settlement expansion. Theft of private property, or malicious destruction thereof, by an occupier's agents violates not only GCIV principles and America's Lieber Code, but basic Israeli property law, its clearly-defined public policy, and its Declaration.[360] And, such activity constitutes ill treatment of a civilian population.

(l) **2010 to Present: Discrimination Widely Known:** In 2010 Miko Peled, the son of famous Israeli military general Matti Peled, a decorated Israeli war hero, was arrested and taken to an IDF military station in the OPT. The station commander remarked after looking at his passport that *"look, [Mr. Peled] is an Israeli citizen, and he has rights. He is not a Palestinian that I can just beat up and throw in prison."*[361] Beatings are an everyday occurrence for Palestinians, who unfortunately are arrested simply for demonstrating or Facebook postings.

(m) Recently, the 24-year-old Palestinian activist Sireen Khudiri had her neighborhood invaded by 25 military jeeps, had her home ransacked by IDF/G4S personnel, and had all of her family's computers confiscated.[362] *Her crime—posting peaceful but pro-Palestine messages on Facebook.* Similarly, settler extremists celebrated the murder of 18-month-old Ali Dawabshe at a wedding celebration by repeatedly stabbing a printed photograph of the toddler, who was burned to death in an arson attack on their West Bank home last summer. IDF soldiers were in attendance at the wedding, and even lent their rifles to the dancing revelers. Soldiers from the same battalion were charged with assaulting Palestinian prisoners in custody.[363] Since all FIDF donors have funded this type of criminal activity for at least 20 years, they are "collaborators" as that term is defined in Nuremberg Principle VII.

213. To sum up and reiterate, without the funds provided by BL/BH, U.S. donors and tax-exempt entities, settlements officials would not have had the means necessary to: (a) expand settlements, which necessarily entailed ethnic cleansing and theft of private property; (b) hire

---

[360] *See also* <u>The Role of National Courts in Applying International Humanitarian Law</u>, Sharon Weill, 2014, p. 91.

[361] General's Son p. 186. *See also* Witness in Palestine P. 15 "I'm not doing this because you've done anything wrong, I'm doing this because you are Palestinian and I want you dead."

[362] <u>http://samidoun.net/2014/01/sireen-khudiri-released-report-from-solidarity-movement-for-a-free-palestine/</u>.

[363] <u>http://www.jpost.com/Arab-Israeli-Conflict/Soldier-whose-gun-was-used-in-extremist-wedding-celebration-sent-to-prison-439090</u>.

full-time security coordinators or purchase sophisticated HP/Motorola surveillance devices and military hardware for settler militia members; and (c) train militia members in the operation of HP/Motorola surveillance devices and in use of automatic weapons and sniper scopes. Without the sophisticated HP/Motorola surveillance devices and the ability to use sniper scopes, armed settlers would not have been able to routinely and maliciously wound Palestinian farmers trying to access their olive groves or poison their water wells and livestock at 2:00 am.

214.     Without the use of automatic weapons, stun grenades, sniper scopes, and night-vision goggles, they and their IDF/G4S cohorts would not have been able to convince 400,000 Palestinians to involuntarily abandon their ancestral homes and 400-year-old olive groves. Finally, without suitable housing accommodations, schools, and a transportation network linking the settlements, the early settlers would have abandoned their tent outposts 40 years ago.

215.     The Defendants named herein, in one way or another, have collaborated with and encouraged IDF/G4S personnel, settlement security coordinators, and armed settlers to commit the war crimes against their Palestinian neighbors as detailed herein. However, their violence was not limited to Palestinian neighbors. They have also murdered U.S. citizens like Rachel Corrie in 2003. She was run over twice by an armored tractor operated by Israeli army personnel while trying to save the house of a Palestinian doctor in the OPT. They also maimed 22-year-old U.S. citizen Brian Avery by intentionally shooting him in his face, requiring multiple operations and permanent disfigurement. His crime—he was demonstrating on behalf of the International

Solidarity Movement.[364]

216.    Besides funding IDF's criminal activity in the OPT, FFF and FIDF donors have also

partially financed the Second (2008) and Third (2014) Gaza Invasions. During these invasions,

IDF forces murdered approximately 3,500 civilians[365] including the 14 family members of

Plaintiff Abu Amer, destroyed hospitals, bombed UN facilities and even schools, and effectuated

collective punishment[366] against the Gazan population. According to *The General's Son*, one

atrocity of many committed by IDF soldiers in Gaza involved local fishermen who had their

boats purposely destroyed by IDF gunfire.[367] They were then forced into the water and told to

dog paddle as long as they could. After two hours, still guarded by IDF soldiers, all of them

drowned.[368] *Their crime, much like driving while black on the New Jersey turnpike—fishing*

*while being Palestinian.*

217.    As already noted, all of the criminal conduct detailed herein violates Nuremberg

Principle VI, the UN Genocide Convention, U.S. and Israeli war crimes statutes, Israel's

Declaration, its criminal statutes, the Israeli army War Manual and America's Lieber Code,

---

[364] https://electronicintifada.net/content/brian-avery-shooting-when-will-we-realise-there-cant-be-many-accidents/4510.

[365] If Defendant Gilbert or other FIDF donors had any doubts about what they were funding, they should watch the video-recorded admissions of former IDF commando Ido Gal Razon, now suffering from PTSD because of the many atrocities he committed. He states: "I killed more than 40 people for you." https://youtu.be/6TkKm2eEV1A.

[366] Collective punishment is prohibited by GCIV, and it is defined as a general penalty, pecuniary or otherwise, inflicted on the population on account of the acts of individuals for which it cannot be regarded as collectively responsible. https://www.icrc.org/customary-ihl/eng/docs/v2_rul_rule103.

[367] General's Son p. 159.

[368] Id. *See also* Palestine Inside Out p. 168-170. (35,000 Gazans depend on fishing for food and income. 22% of Gazan children suffer from stunted mental and physical growth due to malnutrition. 16% have anemia.)

which both prohibit unnecessary and malicious property destruction. This criminal conduct also

violates Article 73 of the UN Charter, which imposes a trusteeship duty upon the occupying

power and its agents—like the corporate Defendants herein. Not only have IDF/G4S personnel,

funded by U.S. tax-exempt entities and individual donors named herein, violated international

conventions like GCVI and Hague, they have also violated Israel's own domestic law regarding

the sanctity of property ownership[369] and affording protection of civil rights to "all inhabitants"

(not just Jewish citizens) as provided for in its own 1948 Declaration.

218.     All Defendants named herein have, for at least 20 years, also been violating Israel's war

crime statute, various criminal law provisions (arson, theft, and destruction of private property),

and its clearly defined anti-settlement public policy (see paras. 107, 159 herein). And, because

the HCJ has opined that Hague and the Warsaw Convention principles apply,[370] IDF/G4S

personnel and settlement security coordinators, funded by FIDF donors, have also been violating

those conventions on a daily basis. For example G4S personnel were instructed by senior G4S

officials to basically look the other way when armed settler militia, supervised and encouraged

by the settlement's security coordinator, were violently assaulting Palestinian farmers or

poisoning their livestock and water wells. There was a good reason for G4S personnel not to stop

that criminal activity—the company would lose out on future profitable security protection

---

[369] Israel lobby p. 91 ("Illegal seizure of Palestinian property violates not only Israeli law but also a fundamental principle of democracy, i.e., the protection of private property.") *See also* Sasson Report, statement by Defense Minister Mofaz para. 275(d).

[370] Although settlement leaders and advocates like Abrams argue that the Warsaw Convention does not apply to them, before the first settlement was established, Israel had already adopted (as of 1948) the Warsaw Convention, the UN Charter, the UDHR, and enacted its own Declaration, which was a restatement of UN Charter principles.

contracts to be awarded by settlement leaders. G4S senior officials, much like all corporate

Defendant officials, also knew that those leaders could terminate any existing contracts awarded

to G4S or any of the corporate Defendants named herein, for any number of settlements.

219.     **G4S**, like all the other corporate Defendants named herein, has acted as IDF's

accomplice in all of the criminal activities it and armed settlers have engaged in in the OPT and

Gaza. As an entity it is culpable under numerous international conventions, for any number of

reasons. **First**, like all corporate Defendants named herein, it knew what the settlement leaders'

agenda was, i.e., massive ethnic cleansing accomplished by wholesale violence committed by

armed settlers, because its personnel, including senior officials, had witnessed and been told

about this criminal activity on an everyday basis for at least 20 years. **Second**, all corporate

Defendants knew that G4S personnel were guarding a mushrooming settler population,[371] i.e.,

clear evidence of ethnic cleansing and a specific violation of GCIV principles ("Jewish-only"

citizens coming into the occupied territory). **Third**, all corporate Defendants knew that

approximately 400,000 Palestinians had apparently vanished,[372] leaving behind valuable homes

and olive groves. **Fourth**, all corporate Defendant personnel facilitated the commission of

comprehensive war crimes by funding, assisting or protecting armed settler militia, supervised by

settlement security coordinators, and IDF reservists in condemning and demolishing 49,000

Palestinian homes and destroying Palestine's agricultural sector. **Fifth**, all corporate Defendant

---

[371] "Tax-Exempt Funds Aid West Bank Settlements," NY Times July 5, 2010  *and*
http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-significantly/#QQTmB6sWCUH3hkU2.97,
http://www.un.org/press/en/2015/gapal1345.doc.htm.

[372]  *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

officials have knowingly violated their company's own corporate human rights policies. **Sixth**, G4S has specifically collaborated in the commission of "war crimes" and "crimes against humanity" (as defined in the UN Genocide Protocol) by taking over a host of security duties (protecting settlers) normally performed by the IDF. The settlements could not have afforded G4S protection services without the funding provided by U.S. donors/entities.

220.     G4S's willingness to perform these duties had grave consequences for the Plaintiffs named herein. By taking over those duties, G4S freed up a large number of IDF soldiers to demolish and confiscate 49,000 Palestinian homes, arrest and incarcerate thousands of law-abiding Palestinians, and to arm and train violence-prone settlers in military tactics, thus affording them the means to inflict bodily harm on law-abiding Palestinian citizens on a daily basis. G4S personnel, like all construction/support firm officials, knew because of daily confrontations between Palestinian farmers and armed settlers which they witnessed for at least 20 years, that wholesale violence was a daily occurrence in the OPT. They also knew that the settlers, armed with high-powered rifles, sniper scopes, guard dogs, and night-vision goggles, unless prevented from doing so by either IDF or G4S forces, would be able to convince all local Palestinian homeowners to abandon their properties—the goal of the conspiracy described herein.

221.     **FIDF** officials, along with Defendant Abrams, also played a major role in promoting to Americans the false premise that Palestinian farmers and homeowners are the root cause of violence in the Middle East, not rabid, rampaging, out-of-control settlers described in the book

*Our Harsh Logic.*[373] To reinforce this message, IDF soldiers (a.k.a. "war heroes") are paid by settlement leaders with funds provided by U.S. tax-exempt entities to travel to America and be featured guests at fundraising dinner galas attended by pro-settlement U.S. congressional members, donors and tax-exempt entity officials. The attendees, of course, never hear from the members of Breaking the Silence or their candid admissions of war crimes in the book *Our Harsh Logic.* They have repeatedly described in excruciating detail the atrocities that they have committed while serving in the OPT and Gaza. They readily admit that they were there to protect the settler population, not to defend Israel,  by breaking bones, live target practice, poisoning water wells, slaughtering livestock, destroying electric grids, home demolitions, and wholesale violence.

222.    **Defendant Abrams**, as already specifically described herein, for approximately 20 years has engaged in a pattern of conduct designed to intimidate, punish, and crush the spirit of the Palestinian people. He has done an excellent job in that regard, and has largely succeeded in that endeavor. Because he has consistently encouraged U.S. donors, tax-exempt entity officials, and Israeli Prime Minister Olmert's senior staff (e.g. Messrs. Turgeman and Turbowitz) to continue financing and confiscating more private Palestinian property, some 49,000 Palestinian homes were eventually destroyed or confiscated in the OPT based on his advice. He has also deprived Palestinians located in Gaza of freedom of movement. They are essentially confined to an outdoor prison.[374]

---

[373] *See* Our Harsh Logic p. 288.
[374] "Palestine Today is an Open-Air Prison," http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html. *See also* Meron Benvenisti, "Founding

223.     In 2005, James Wolfensohn, former president of the World Bank, had personally

negotiated the "Agreement on Movement and Access" to afford maximum freedom of movement

to the Gazan population. But Abrams personally sabotaged this agreement[375] because he knew

that if the Gazan population continued to be confined to an open-air prison,[376] that would

heighten tension in the area, and lead to more bloodshed and violence. That would promote his

agenda—more violent episodes in the OPT serve to convince Congress and the American people

that Palestinian farmers are terrorists, not the violence-prone settlers intent on stealing their

neighbors' property. He has been very successful in promoting that agenda—he has just recently

secured another congressional resolution condemning Palestinian violence.[377]

224.     Just like Defendant Abrams, **Volvo** and all other international conglomerates will no

doubt claim that they had no knowledge that their encouragement (Abrams), surveillance

equipment (HP/Motorola), or construction equipment (Volvo and other construction/support

firms) were being used to promote ethnic cleansing and wholesale violence. However, that

defense was repeatedly rejected by the International Military Tribunal ("IMT") at Nuremberg,

---

a Binational State" (Ha'aretz, 22 April 2004) (saying Gazan Palestinians are in a "huge holding pen").

[375] "All the Dreams We Had Are Now Gone." http://www.haaretz.com/israel-news/all-the-dreams-we-had-are-now-gone-1.225828, Palestine Inside Out p. 275.

[376] Israel lobby 91. *See also* FN 73 above.

[377] For example, Abrams testified at a recent hearing held in November 2015 in the House of Representatives which resulted in a resolution condemning Palestinian violence. He always makes himself available for such hearings, and never misses an opportunity to condemn alleged Palestinian violence in his role as America's spokesperson for the settlement movement. Given the fact that he is a convicted felon for lying to Congress about the Iran-Contra Affair, it is difficult to comprehend why House leadership repeatedly invites him to give testimony under oath about an issue as important as funding and promoting Middle-East Violence, i.e., the substance of President Clinton's 1995 Executive Order 12947, written by senior Treasury officials.

finding such individuals and entities to be collaborators in war-crime activities. In any case, in

the late 1990s, all individuals and entities operating in Israel knew just by reading newspapers or

any number of UN resolutions that settlement expansion, ethnic cleansing, and wholesale

criminal activity were occurring on a daily basis in the OPT.

225.     In fact, in the case of Volvo senior officials, they had to know that as early as 1982 that

Swedish Prime Minister Olof Palme had compared Israelis' treatment of Palestinian children to

Nazi Germany's treatment of Jewish children in WWII concentration camps.[378] In fact, Volvo

officials knew that its heavy machinery and wheel loaders had demolished the ancestral homes

where these children had grown up. Recently, Swedish Foreign Minister Margot Wallstrom

requested that Israeli officials institute a probe concerning "extrajudicial executions of a number

of Palestinians." This is only one example of the many condemnations issued by senior Swedish

officials concerning various aspects of the occupation, including the construction of the

separation wall,[379] and therefore ill treatment of the civilian population, a war crime.

226.     Volvo officials, like the other corporate Defendant officials, intentionally blinded

themselves to that heinous war criminal activity, for a very good reason—huge profits, which

improved their bottom line and enriched their shareholders. In any case, Volvo officials, just like

---

[378] http://www.olofpalme.org/wp-content/dokument/820701b_tco_kongress.pdf.

[379] In 2004, Sweden's Defense Minister condemned the separation wall. Many other ministers have made similar comments. http://www.timesofisrael.com/swedish-ministers-have-history-of-pro-palestinian-activism/. The Swedish Branch of Save the Children released in May 1990 a thousand-page report that detailed the effects of the conflict on the children in the OPT. Between 23,600 and 29,900 children required medical treatment for their injuries received from IDF beatings during 1987-1988. Almost one third of the children were ten years or under. One fifth were five and under. One third suffered broken bones, including multiple fractures. Israel Lobby p. 100.

all corporate Defendant officials named herein who were based in Israel knew that a 1992 investigative report was issued by the government, along with Comptroller Goldberg's 2003 report, Prosecutor Sasson's 2005 report, and the 2009 Spiegel government database. All of these damaging reports revealed that extensive criminal activity was occurring in the OPT on a daily basis, and that Volvo employees, like all corporate Defendant employees, were very much involved in that criminal activity.

227.    And, as early as 2004, members of Breaking the Silence confessed to heinous war crimes. Thus, Israel-based Volvo officials, and in fact all corporate officials of the firms named herein, were not simply engaging in routine rentals and sales of construction equipment like wheel loaders. Their personnel were encouraging the theft of private property and ethnic cleansing. Their employees were assisting in the ethnic cleansing of some 400,000 Palestinians and daily wholesale violence like home demolitions (wheel loaders) and live target practice, and thus promoting the agenda of U.S. donors/entities and settlement officials. All of these corporate Defendant officials knew that settlement leaders had a fixation about settlement expansion, and coveted the local real property, which was, unfortunately, owned and occupied by their Palestinian neighbors. Thus, they all promoted settlement expansion and the forcible expulsion of the local Palestinian population because that meant additional lucrative construction, real estate, banking, security protection, and real estate marketing business opportunities. Of course, they knew that settlement expansion necessarily entailed wholesale violence and theft and destruction of private Palestinian property, but also that, without that criminal activity, settlement expansion and windfall profits would have been impossible.

WHEREFORE, the Plaintiffs named herein request damages in the amount of $1 billion, premised on the fact that they have been forcibly evicted from their ancestral homes, have witnessed the murder of spouses and children, the destruction of olive groves, grazing land, and fertile agricultural property, the poisoning of water wells and livestock, and have witnessed the demolition of homes with relatives inside. They have seen how terrified their children were after escaping physical injury at the hands of fanatical settlers attacking them on the way home from school. That is only one reason, of many, that there needs to be a fund set up to provide for psychological counseling for the children of the parents named herein.

**COUNT III:**
**AIDING AND ABETTING THE COMMISSION OF WAR CRIMES BY DEFENDANTS ABRAMS, ADELSON, BRAMAN, ELLISON, GILBERT, HAGEE, MOSKOWITZ, AND SABAN, G4S, RE/MAX, BL/BH, JNF, AND ORBITAL ATK**

228.    This Count incorporates and is meant to be read in conjunction with the other allegations in this Complaint, including those recited in the introduction and the parties and the common allegations sections. This Count relies upon and specifically tracks the allegations made in Count II, i.e., the commission of war crimes.

229.    Per *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), the elements of an aiding and abetting claim are: (a) the party whom the defendant aids must perform a wrongful act that causes an injury, e.g., on the facts pled herein, the maiming and murdering of a defenseless civilian population; (b) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, e.g., based on the facts herein, all defendants named in this Count knew exactly what each other was doing—ridding the

180

OPT of all non-Jews by the violent subjugation of a civilian population; and (c) the defendant must knowingly and substantially assist the principal violation. Based on the facts herein, these Defendants financed, encouraged, participated in, and condoned the war crimes that the Israeli army and violent settlers committed almost on a daily basis.

230.    With regards to element (a), as explained in Count II, supra, each of the Plaintiffs have suffered substantial injuries at the hands of the Israeli army, violence-prone armed settlers, corporations like G4S, RE/MAX, BL/BH and Orbital ATK, and individuals like Defendant Abrams whom they collaborated with in the commission of various criminal acts, including war crimes as defined under both U.S. and Israeli war crimes statutes. Abrams was instrumental in raising millions of dollars to fund the forcible expulsion of all non-Jews in the OPT. HE encouraged both settlement officials and government officials to keep on stealing Palestinian property to expand the settlements. The chain of causation involved and the damages that the Plaintiffs complain of herein are outlined in detail in Exhibit C. As detailed in Count II, Israeli army veterans who served in the OPT during 2000-2010 admitted to: (a) protecting settlers who would go on violent rampages and poison water wells and livestock; (b) witnessing, participating in, and committing war crimes, including the murder and maiming of unarmed Palestinian civilians; and (c) the violent subjugation of a civilian population. These same veterans employed the services of G4S personnel and worked hand-in-hand with violence-prone settlers and G4S personnel in terms of commission of various criminal activities. These same Israeli army veterans and violence-prone settlers employed various weapons and armaments provided and sold to the Israeli army by Defendant Orbital ATK. In the case of Defendant Abrams, he

encouraged the financing of this criminal activity, including war crimes. His conduct has been detailed herein in various paragraphs, especially in Count I. He raised millions if dollars to fund arms trafficking. These were crucial funds because outfitting a 50-militia unit with assault rifles cost approximately $650,000.

231.     With regards to element (b), based upon information and belief, all the Defendants named herein have made contributions to the Israeli army and violent settlers, whether through FIDF, direct donations, or otherwise for example 501(c)(3)s like JNF or Friends of Ariel. For example, Defendants BL/BH: (a) hosted various fundraising dinners which featured honored guests like IDF veterans, who would impress the audience with how they murdered and maimed innocent Palestinians; and (b) these banks were also the entities which transferred millions of dollars to the IDF, e.g., wire transfers totaling $104 million went to the IDF in 2014 alone. Also, BL/BH and RE/MAX provided vital and essential services to the settler population. BL and JNF have been financing the violent expulsion and murder of Palestinians since 1948.  Without RE/MAX's marketing efforts and without BL/BH long-term mortgages, the settlers could not have survived in the hilltop encampments. When settlers came to different settlements to secure housing, RE/MAX agents sold them "old Arab houses," and assured them that nearby Palestinian villages will be de-populated. All these Defendants knew or had reason to know at that time that their donations direct or otherwise, went to support the Israeli army, because they specifically directed their funds to go there. (*See* para. 192, *supra*) They further knew of the frequent newspaper articles, news broadcasts, and other media sources discussing the punitive home demolitions, indiscriminate bombings of civilian centers, extrajudicial killings, and other tortious activities

being committed by the Israeli army. *See* para. 220, *supra*). Thus, they were on actual notice as to the brutal activities that they were financing (BL/BH) or, in the case of Defendant G4S, participating in and condoning, in the case of Orbital ATK, supplying weapons for, or in the case of RE/MAX and Defendant Abrams, collaborating in and encouraging such activity. As already noted Abrams was instrumental in raising millions of dollars to fund the violent expulsion of all non Jews of the OPT.

232.     With regards to element (c), as further elaborated in Count II, all Defendants named in this Count had reason to know of or actually knew of the war crimes, crimes against humanity, genocide, and other atrocities that were being committed on a daily basis by violent settlers and the Israeli army, including those committed against the Plaintiffs herein. (*See* paras 210-233, *supra*). Thus, each of these Defendants assisted and/or facilitated or encouraged the Israeli army and violence-prone settlers in the commission of war crimes. Per *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008), money sent to groups that have both "charitable" and criminal elements is fungible. Thus, the fact that the Defendant donors named herein and JNF donors designated their contributions to an educational activity [sniper schools] or to a "charitable" arm of the Israeli army per contributions to the FIDF[380] instead of to directly support a certain battalion or brigade does not in any way diminish their knowing financing, support, and encouragement of war crimes.

233.     Plaintiffs herein have been damaged as a result of their violent subjugation by the Israeli

---

[380] *See, e.g.,* http://www.fidf.org/page.aspx?pid=277 (providing options to donate directly to the IDF through "adopt a battalion" and "adopt a brigade" links as well as options to donate to ostensibly more "charitable" arms of the FIDF like "education and culture" or "wellbeing and recreation").

army, G4S personnel, and armed settlers, all of whom were intent on using violent means to rid the OPT of all non-Jews, including some of the Plaintiffs named herein. These perpetrators were financed by the donors, 501(c)(3)s, and JNF. Injuries alleged herein include physical injuries, loss of life, limb, homes, olive groves, livestock, water wells, and loved ones. *See* Exhibit C.

WHEREFORE the Plaintiffs request damages in the sum of $1 billion for their damages arising out of the war crimes, crimes against humanity, and genocide committed by the Israeli army and violence-prone settlers and aided and abetted by all of the Defendants named in this Count.

### COUNT IV:
### AGGRAVATED AND ONGOING TRESPASS
### AGAINST ALL DEFENDANTS WHO HAVE BEEN TRESPASSING ON PRIVATE
### PALESTINIAN PROPERTY DURING THE OCCUPATION

234.    This Count incorporates and is meant to be read in conjunction with the other allegations in this Complaint, including the allegations recited in the introduction, parties and the common allegations sections.

235.    The Defendants herein are BL/BH, RE/MAX, HP/Motorola, construction/support firms, G4S.

236.    The elements of an aggravated and ongoing trespass are:

(a) *Knowledge that the tortfeasor is intentionally intruding upon property* owned by an individual other than the tortfeasor. All of the Defendants named herein knew that they were, and are today, intruding upon private Palestinian property. (1948 IDF Master Plan, published in 1988; Housing Minister Sharon's 1970 warning to fellow citizens that they had to seize hilltops owned by Palestinians; a 1992 official Israeli investigation found that Elad and other settler groups, in order to confiscate additional private Palestinian property, had "made false affidavits, misused the absentee

184

property law, and received illegal transfers of public property and tens of millions of shekels of public funds"; assurances given by Israeli Prime Ministers to Secretary of State Baker starting in 1991 that no state property would be used for settlement expansion; the existence of the Israeli government's 30-year settlement-expansion plan disclosed in 1982 by Zeev Ben-Yosef, Deputy Head of the Settlement Division of the World Zionist Organization; Comptroller Goldberg's 2003 report; Special Prosecutor Sasson's 2005 report; Israeli Government 2009 comprehensive settlement report; B'tselem periodic reports on land records; and IDF admission re 30 years of private property confiscation.

Based upon the considerable evidence detailed herein, Ariel has been conceded to be a 100% trespasser, and therefore all hotels, shopping malls, schools, and apartment projects and homes located there are deemed to be intentional intrusions upon private property owned by Palestinian Plaintiffs. The same applies to Nokdim (at least 30%), and all other settlements at an average of 42%. In the case of Ariel and Ofra, if current homeowners produce deeds from Palestinian landowners, they have been forged, based upon Plaintiffs' land records expert's opinion. These people may have been intentionally deceived by settlement officials, who routinely prepare fake deeds to attract new home buyers.[381])

(b) *The intrusion and occupation is more than temporary in nature.* The Defendants named herein have been trespassing and occupying private Palestinian property for at least 30 years. In the case of residential, commercial, and infrastructure improvements made in Ariel, that intrusion started as early as 1987. The growth of the settlement of Ariel, however, was part and parcel to the government's 30-year settlement expansion plan referenced in (a) above, which was disclosed in 1982 by Zeev Ben-Yosef. The only issue is the precise amount of private property that was trespassed on by the Defendants named herein and is currently occupied by residential improvements, hotels, schools, etc. For example, in the case of Ariel, all residential improvements, including universities and hospitals in the entire settlement, are deemed to be permanent structures. A different type of permanent occupation concerns private Palestinian property which has been confiscated for military reasons. Construction/support firms, with BL/BH financing, built military barracks, mess halls, medical field hospitals, and armories on those properties. These "temporary" structures have been occupying private Palestinian property for at least 30 years.

All Defendants knew, obviously, that the residential, commercial, and infrastructure improvements that they were financing, building, occupying, leasing, and exploiting (e.g., quarries) were permanent in nature. The same analysis holds with respect to RE/MAX offices, BL/BH financial centers, G4S barracks, mess halls, detention facilities, and offices, private hotels, shopping centers, quarries,

---

[381] *See* General's Son p. 142 re how buyers are duped into thinking that they legitimately own the property.

desalination facilities, concrete plants, and Volvo's vast and permanent garage network. All of these permanent structures, which are of an ongoing and continuous nature, have been financed by FIDF donors (IDF barracks and retirement homes) and BL/BH;

(c) *The intrusion must be ongoing and continuous*. The housing projects, shopping malls, yeshivas, hospitals, universities, prisons, solid waste facilities like Tovlan, and other infrastructure improvements like tunnels and bypass highways erected by construction/support firms and financed by BL/BH are all permanent in nature, and have been continuous and ongoing trespasses on private property. As referenced in (b) above, IDF military structures are permanent in nature as well, and therefore constitute ongoing and continuous trespass activity. Not a single settlement or corporate Defendant named herein has ever suspended the construction or operation of residential and infrastructure improvements that they own or lease. Thus, they have engaged in ongoing and continuous trespass activity on private Palestinian property;

(d) *The tortfeasor has knowledge that he continues to occupy property* not owned by himself. As early as 1948, all Israeli citizens were on notice courtesy of Israel's Declaration about the rights of all *inhabitants* (not only members of the Jewish faith) to acquire and hold private property. In 1982, Zeev Ben-Yosef revealed the existence of the government's 30-year settlement-expansion plan. In 1993, settlements were banned and confiscating private property was declared to be illegal. In 2003, Comptroller Goldberg reported that theft of private property was rampant in the OPT. In the same year, Secretary of State Baker received assurances from various Prime Ministers that no state property would be used for settlement expansion. As noted in Sasson's 2005 report, the HCJ confirmed that the settlements violated Hague and GCIV principles.[382] In 2005, Special Prosecutor Sasson sounded the death knell of the settlement enterprise, and recommended that outposts and settlements be evacuated. She recommended that individuals and company officials be prosecuted if they had

---

[382] With regards to the settlement known as Ofra, according to Vice Prime Minister Hiam Ramon, "all 450 houses of Ofra are built on privately-owned Palestinian land." http://archive.peacenow.org/entries/archive4812. *See also* "HCJ to state: Demolish nine structures in the settlement of Ofra," B'tselem 9 Feb. 2015: "Unlike in other cases concerning illegal Israeli construction on Palestinian land in the West Bank, the state claimed in this petition that due to "special circumstances", the usual priorities for enforcement of planning and building laws did not apply in this case. The "special circumstances", the state explained, were that most structures in Ofra had been unlawfully erected on privately-owned Palestinian land, i.e. their status was almost identical to that of the nine structures under examination. The state's problematic argument was that as almost the entire settlement of Ofra had been built on privately-owned Palestinian land, there was no justification to demolish those particular nine structures – although they were new and the petition was filed before they were completed."

conspired to steal private property and expand illegal settlements with under-the-table financing. Shaul Mofaz, Israeli Defense Minister, stated in 2005 as well that the problem was that settlers (BL/BH customers) and construction/support firms (RE/MAX and BL/BH customers) hired by settlement leaders in the OPT were repeatedly stealing private property in the name of settlement expansion.[383]

Thus, all Defendants named herein know today, and knew for at least 30 years, that they were violating international law, Israel's Declaration, U.S./Israeli property law and each country's clearly-defined anti-settlement public policy by encouraging, financing, seizing, trespassing upon, occupying, protecting, exploiting, and building structures on large tracts of private property not owned by them; and

(e) *The tortfeasors eventually convert private property owned by Palestinians by continuing to occupy and/or profit from it.* In the case of commercial, residential, and infrastructure improvements made in the various settlements, the Defendants who built those improvements were all involved in annexing more Palestinian property. The reason—settlement officials needed to accommodate more settler families and, by building new housing projects and homes, increase their tax base and their annual budget. The construction/support firms, G4S, and BL/BH, have all made enormous profits courtesy of their continuous occupation and use of private Palestinian property. As detailed herein, see intro pp. 16-17 and para. 179, the settlement enterprise has been a very profitable endeavor for all parties concerned.

RE/MAX, HP/Motorola, construction/support firms, and G4S personnel have and today occupy industrial parks, office suites, warehouses, garages, and military barracks, all located in the OPT on private Palestinian property. In the case of BL/BH, hundreds of ATMs in the OPT, retail banking outlets, and mortgage financing centers.[384]

All Defendants named in Count IV have continued to exploit private Palestinian property by extracting valuable mineral resources and sending them to Israel-based suppliers. These suppliers have made enormous profits as a result of stealing Palestinian natural resources. For example, Heidelberg grossed $5-6 million in 2014 and paid $585,000 in royalties to the Regional Council for Judea and Samaria.[385] Palestinians, including the Plaintiffs named herein, who own property on which are now located quarries and cement factories, and which Defendants in Count IV are pillaging, lose at least $241 million per year according to the World Bank.

237.   A landowner whose property has been trespassed upon, of course, has an obligation to

---

[383] https://www.yesh-din.org/userfiles/file/Reports-English/Yesh%20Din%20-%20Chasar%20Takdim%20English%20-%20Web-%2016_6.pdf.

[384] http://whoprofits.org/company/readymix-industries.

[385] https://www.hrw.org/news/2016/01/20/dispatches-corporations-perpetuate-injustices-settlements.

bring the trespass to the attention of the local authorities. As detailed herein, however, that appears to be a worthless endeavor, for a number of reasons. The Plaintiffs have, for the last 30 years and on numerous occasions, done so to no avail. Palestinian farmers and homeowners have tried on a number of occasions to register complaints with local police, local representatives of the OPT area military commander, and IDF/G4S personnel, for example, about armed settlers taking over and occupying their private property. These complaints are never taken seriously, and have never been officially reported to the area military commander. As a result, Palestinian farmers and homeowners are still waiting on action from them. And, just as important, none of the Plaintiffs complaining of damage or loss have ever relinquished their property interests, formally or informally, even though they have been victims of wholesale violence. In the case of Palestinian farmers who try to access their olive groves, after they have been shot at a few times, they understandably give up trying to harvest their crops, fearing they or their family members will be shot at, violently attacked or in some cases murdered. They do not ever relinquish their property rights, which have been in their families for years, even though they are forced out of their ancestral homes.

238.    Some 48,048 complaints have been registered with the UN based upon property destruction and confiscation solely arising out of the construction of the separation wall.[386] Those complaints have also not been acted upon, because the Israeli government will not allow UN investigators into the country to verify the details of those complaints. Moreover, various opinions issued by the HCJ certainly do not invite formal complaints about a 30-year pattern of

---

[386] As of June 19, 2015. http://www.un.org/ga/search/view_doc.asp?symbol=a/es-10/683&submit=search&lang=e.  For updated figures see http://unrod.org/.

ethnic cleansing, aggravated and ongoing trespasses and the continuous illegal theft of private

property. The HCJ recently ruled that Palestinian property owners whose property is and has

been trespassed upon for years and exploited by quarry operators and Defendants named in

Count IV have no remedy.[387] In the case of these Palestinian owners of property occupied by

quarries, cement factories, desalination plants, and ICL water processing plants and evaporation

pools, the occupier agents have claimed that the area military commander gave them licenses to

exploit the property.[388] Even though these licenses are illegal based on bedrock principles of

international law discussed in Count IV, the HCJ has ruled otherwise. So aggrieved Palestinian

property owners who have had their homes demolished or confiscated or their land exploited

have no remedy to pursue in Israeli courts. Just recently, Israeli Deputy Defense Minister Eli

Ben-Dahon announced that surviving family members of the Dawabshe family who had their

house burned down and the mother, father, and son murdered, are not entitled to any

compensation because that law only applies to "Israeli citizens."[389]

239.     Consistent with the overriding goal of the conspiracy described in Count I, i.e., rid EJ and

the West Bank of all non-Jews, the settlers, with IDF/G4S personnel assistance, and funded by

U.S. donors/entities, have seized and continue to occupy private property not owned by them. As

a result, the construction/support firms have built new housing projects which were funded by

---

[387] *See, e.g. Yesh Din v. Commander of IDF Forces in the West Bank*, HCJ 2164, Dec. 2011.
[388] *See, e.g.* http://repo.icl-group.com/Lists/ReportsManagement/other/2013%20Corporate%20Responsibility%20Report.pdf p. 88.
[389] https://electronicintifada.net/blogs/ali-abunimah/how-israel-protects-its-settlers-who-burn-palestinian-children-alive. *See also* The Role of National Courts in Applying International Humanitarian Law, Sharon Weill, 2014 p. 91.

BL/BH, protected by G4S personnel and HP/Motorola surveillance devices, and today are being marketed by RE/MAX. During this 30-year period, they have engaged in aggravated and ongoing trespasses and assorted criminal activity. They have physically annexed adjacent private property not owned by them, encouraged and funded the ongoing violent confiscation thereof, built permanent structures on the property, protected the expanded settlements, and expelled any and all non-Jews in order to continue promoting settlement expansion.

240.     The **construction/support firms** have constructed vital residential, retail, and military improvements on private Palestinian property, including housing projects, hotels, shopping malls and military barracks. **BL/BH** have also knowingly engaged in a 30-year pattern of aggravated and ongoing trespass by expanding their physical presence in the OPT—extensive banking financial center network, drive-in banking facilities, and ATM machines, in an ongoing effort to accommodate the needs of the growing settler population, e.g., in Kiryat Arba[390]. The aforementioned banking facilities are permanent in nature and were built knowingly by the construction conglomerates on Palestinian property, and are today occupied by BL/BH personnel. **RE/MAX**, like BL/BH, has built, leased, and staffed an extensive network of real estate offices in the OPT to service the growing settler population. It has built its own structures or has leased property from the various construction/support firms or housing developers to accommodate the real estate personnel who are trying to sell "old Arab houses" or units in newly-constructed housing units. All of these structures are permanent in nature, and constitute ongoing trespass activity.

---

[390] BL website locations list Kiryat Arba and other settlements where BL has a physical presence. http://english.leumi.co.il/LECurrency/25047/.

241.     **Veolia, Volvo and AFI** have completed significant residential construction improvements (housing developments and shopping malls) with the assistance of Volvo employees. Those employees haul trash away from construction sites, deliver new cement products for foundations, and in some cases destroyed Palestinian villages using Volvo wheel loaders. These companies have built hundreds of infrastructure items, which are all permanent improvements and which represent continuous and ongoing aggravated trespasses on private Palestinian property. This trespass activity was made possible by the wholesale annexation and continuous occupation of private Palestinian property by the armed settlers and IDF/G4S personnel. That activity has resulted in permanent infrastructure improvements like highways, access ramps, tunnels, overpasses, industrial parks, factories, garages, warehouses, and the Tovlan waste facility.[391]

242.     All of the permanent residential and infrastructure improvements described herein were built on private Palestinian property, and are money-making enterprises earning substantial profits for these corporate Defendants, e.g., housing developments, hotels, office buildings, and shopping malls. Thus, these Defendants have, for at least 30 years, intentionally converted private Palestinian property for commercial development and profit taking and for use and enjoyment by the settler population.

243.     As referenced in the introduction and thoroughly explained in FN 455, RE/MAX, BL/BH, and housing developers alone grossed $9.45 billion for building 26,000 homes in the OPT. The owners of these properties are entitled to the profits made by these corporate

---

[391] https://afsc.org/resource/israel%E2%80%99s-settlement-policy-occupied-palestinian-territory.

Defendants as a result of their illegal criminal trespasses, including any and all profits generated by RE/MAX sales and closings. The profits are substantial because most of the facilities, both residential and infrastructure improvements, have been sitting on private Palestinian property for at least 30 years. In the case of Heidelberg, that company, by virtue of exploiting Palestinian-owned resources, grosses $5-6 million per year and pay $585,000 in taxes to a regional settlement group, which is an avid supporter of settlement expansion.[392]

244.     **HP/Motorola** officials played a vital role in the civil conspiracy described herein and in the ongoing pattern of aggravated and ongoing trespass. They ensured that Palestinians would be confined to open-air prisons, have their homes confiscated or demolished, be denied vital medical care, have livestock slaughtered, and have their 400-year-old olive groves be placed off limits due to segregated settlement expansion. In terms of specifics, HP/Motorola officials: (a) requested construction/support firms to build stand-alone factories, warehouse and storage facilities; (b) needed office space for their executives; (c) leased thousands of square feet in office buildings built in the OPT and now owned by AFI/Veolia; (d) needed to lease warehouse space to store their inventory of surveillance devices and thermal imaging systems; and (e) needed garage facilities for their vans, delivery trucks, and company cars, which they needed to visit the different settlements. The products they were selling were essential in ensuring the safety of the settler population. Thus they facilitated their coconspirators' ongoing and aggravated trespass activity, for example, RE/MAX agents repeatedly used the "safety" issue in marketing new homes in the OPT. As with any large company operating in the OPT, their

[392] https://www.hrw.org/news/2016/01/20/dispatches-corporations-perpetuate-injustices-settlements.

workforce and executive officers now occupy numerous office buildings that were constructed

on private Palestinian property. Like their coconspirators, both HP and Motorola made

substantial profits[393] by conspiring with the other Defendants named herein to deprive the

Palestinians of fundamental human rights guaranteed by international contentions (Hague and

GCIV) and to all OPT inhabitants, as provided for in Israel's Declaration. In doing so, they have

also violated a number of provisions contained in America's 1863 Lieber Code, e.g., wanton

property destruction.

245.    All officials of the corporate entities named in Count IV also played a vital role in an

ongoing pattern of aggravated trespass. They have been occupying private Palestinian property

for at least 30 years. They have all benefited from the aggravated trespass activity because they

have extracted and exploited vital and valuable mineral resources owned by Palestinian Plaintiffs

named herein. In the case of Heidelberg and Nesher, they have operated cement factories and

quarries, and have generated significant profits based upon that activity. In the case of ICL, by

diverting water from the northern basin of the Dead Sea to the otherwise-dry southern basin, they

have been making windfall profits for at least 40 years. The reason—they are extracting valuable

resources owned by Palestinians named herein in connection with the operation of their

evaporation pools.[394] All Defendants named in Count IV grossed enormous profits, which should

have been placed in a "Palestine Development Fund" and eventually distributed to the owners of

---

[393] For example, Motorola's CEO stated that "our investment in Israel is one of the most successful we have made." https://adalahny.org/campaign-main-document/576/motorola-nycbi.
[394] http://www.huffingtonpost.com/2011/06/13/dead-sea-shrinking-flooding_n_875784.html? and http://repo.icl-group.com/Lists/ReportsManagement/other/2013%20Corporate%20Responsibility%20Report.pdf, p. 90.

the property from which the natural resources were extracted, i.e., Palestinian Plaintiffs named herein.

246.    Defendants' acts of trespass have become "aggravated" because they decided, in some cases 30 years ago, to encourage (Abrams, settlement officials, BL/BH, RE/MAX) to erect (all corporate profiteers identified in Count IV and construction/support firms), fund (BL/BH, U.S. donors/entities), or protect (HP/Motorola and G4S) permanent construction improvements on private property and thereby profit from the settlers' initial illegal trespass and the subsequent ongoing conversion of private Palestinian property. The Defendants named in this Count have made substantial profits as a result of their 30-year pattern of aggravated and ongoing trespass. As already noted, Heidelberg grossed $5-6 million on an annual basis as a result of their aggravated trespass activity and exploitation of natural resources.[395]

247.    Pursuant to GCIV principles adopted by Israel when it became a state in 1948, all trespassers have an obligation: (a) to pay back rent owed since the date of the initial trespass; (b) to pay rent for the property as long as they remain on it; (c) to furnish an accounting to the rightful owners based on the activities conducted on that property; (d) turn over all profits made during the duration of the trespass; and (e) vacate the area and return the property to the owner once the occupation concludes. These long-overdue rent obligations and accumulated profits stemming from the 30-year pattern of aggravated and ongoing trespasses described herein are part of the $1 billion dollars in damages claimed in this suit.

---

[395] https://www.hrw.org/news/2016/01/20/dispatches-corporations-perpetuate-injustices-settlements.

248.    In the case of an occupier or its commercial agents or military personnel, various international treaties like GCIV and the Hague Convention provide that they all act as "trustees" for the rightful owner of private property. They, of course, could claim private property on a temporary basis to prevent, for example, snipers attacks. Under those circumstances, they could temporarily seize a building occupied by those snipers. Of course, they have to return that building to the rightful owner once the sniper problem is solved. In addition, Article 73 of the UN Charter requires that "Members of the United Nations which have or assume responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the interests of the inhabitants of these territories are paramount, and *accept as a sacred trust the obligation to promote to the utmost, within the system of international peace and security established by the present Charter, the well-being of the inhabitants of these territories*." Thus, the Defendants named herein are all, and should have been acting as, trustees in terms of having an ongoing and fiduciary obligation to protect the private property of the local Palestinian population. As is obvious, they have completely failed in terms of discharging this fiduciary obligation.

249.    This bedrock principle of international law has been cited by the HCJ (with rotating members) for 40 years, as well as leading legal luminaries in America and Israel, including Cyrus Vance and Israeli Prosecutor Sasson. During the period of the occupation, the trustee and its agents must protect all of the property of the local population and, after the occupation ends, return it to the rightful owners. In this instance, all of the property that must be returned to Palestinian citizens has been trespassed upon and/or exploited, and is now being used, exploited,

and occupied by the Defendants named in Count IV, the construction/support firms, or

RE/MAX/HP/Motorola/G4S and BL/BH officials. Since the occupation has not yet ended, the

owners of these properties are entitled to the value of all improvements made thereon,[396] and the

value of natural resources extracted from their properties (gross profits earned) by the

Defendants named in Count IV. Thereafter, while the occupation lasts, the owners are entitled to

receive a yearly rental payment for each residential, commercial, and infrastructure improvement

including all quarries ($1 million annual rent based upon RE/MAX Israel listings) because these

trespassers are occupying, exploiting, and using private property and engaging in very profitable

money-making enterprises, e.g., construction of homes, shopping malls, and hotels, the Tovlan

Waste Facility, quarries, and cement factories in the OPT.

250.    As a result of the active and consistent support from the Defendants named herein and

those named in Count IV and the 30-year pattern of ongoing trespasses, the citizens of all

settlements are today enjoying the benefits of homeownership and a comfortable lifestyle, and

are continuing to benefit from the illegal aggravated and ongoing trespass initiated by the first

settlers who trespassed on hilltops owned by Palestinians 40 years ago. Based on Special

Prosecutor Sasson's 2005 report, all of these aggravated and ongoing trespasses have become

criminal trespasses because the settlers knew, as Defense Minister Mofaz stated in 2005, that

they had no authority to trespass on private properties or claim them as their own property, let

---

[396] Such values will necessarily require expert opinion, but a rough estimate of the value of Ariel, with its university, concert hall, hospital, yeshivas, bathhouses, and 25,000 residents, is somewhere between $15 and $20 billion. *See* http://www.dailymail.co.uk/news/article-2650431/Just-city-worth-Meet-billionaires-net-wealth-purchase-home-town.html (estimating Napa, California at $29.5 billion with slightly over twice the population of Ariel).

alone erect permanent improvements thereon with BL/BH financing. In fact, Defense Minister

Mofaz stated specifically "this phenomenon (theft of private property) must be combated."[397]

251.     A different type of financial injury caused by this pattern of aggravated and ongoing

trespasses has resulted from the growth of the settlement known as Har Homa. Because of its

position in between Jerusalem and Bethlehem, it has cut off tourism dollars to Palestinian

vendors and hotel owners in Bethlehem to the amount of $1.4 billion per year.[398] Har Homa and

the other 21 settlements around Bethlehem are steadily strangling access to the ancient city,

causing tremendous economic damage in the process. Based on the last year these statistics were

available, 156 days were subject to the curfew.[399] This is an intended result of the aggravated and

planned trespasses complained of herein.

252.     Another example of the damages caused by the 30-year pattern of aggravated and

ongoing trespass is the economic hardship visited on Palestinian farmers all over the OPT. For

example, in the Jebel Theeb region, much like in other fertile agricultural sectors, volunteers

from the Italian organization "Harvesting Peace Project" trying to help certain Palestinian

orchard owners with their olive crop harvest were prevented from doing so by armed guards

protecting the settlement of Nokdim. The problem typically develops when, at the gate outside of

Nokdim, the volunteers are repeatedly told that the Palestinian property is now located in a

"military" zone, and therefore no one has access to the olive orchards even though they are

owned by Palestinian farmers. Even though the farmers showed their certified statements of

---

[397] https://www.yesh-din.org/userfiles/file/Reports-English/Yesh%20Din%20-%20Chasar%20Takdim%20English%20-%20Web-%2016_6.pdf p. 45.
[398] http://www.reuters.com/article/mideast-westbank-tourism-idUSL6N0TW12C20141212.
[399] Palestine Inside Out Kindle location 3297.

ownership in Hebrew, the armed guards still refused them entry, and have continued to do so for ten years. This is another example of how Palestinians have registered their complaints regarding aggravated and ongoing trespasses on their property with IDF soldiers to no avail. The soldiers do not even write up these incidents where Palestinian farmers report the occurrence of repeated aggravated and ongoing trespasses on their property. During the last encounter, an armed settler on his way out of the settlement asked a G4S guard if he could kill the Palestinian farmers and their helpers.

253.     From the beginning of these settlements' existence, and due to their geographical proximity to Palestinian villages, fertile agricultural land and water resources, hundreds of thousands of Palestinian citizens have had their private properties trespassed upon, exploited, appropriated, seized, and occupied by the numerous OPT settlements, quarries, and cement factories described in Count IV. All permanent improvements in those settlements, i.e., hotels, schools, Volvo garages, factories, industrial zones, and shopping malls are all evidence of permanent trespassing activity. As a result, all of the Plaintiffs listed herein have been injured because they lost the use of valuable arable property and natural mineral resources and the profits flowing therefrom for at least 30 years. These are all the foreseeable and intended results caused by the 30-year pattern of aggravated and ongoing trespasses committed by the Defendants named herein.

254.     All of the Defendants named in this cause of action desired to and have intentionally and maliciously interfered with the real estate possessory rights of the various Plaintiffs named herein by their repeated aggravated and ongoing trespasses made over the last 30 years. The

continuous and intentional intrusions on private Palestinian property set forth herein constitute intentional, aggravated, criminal, and unlawful trespasses upon the private real property of Plaintiffs, to which the lawful property owners did not consent. These intrusions are deemed to be criminal trespasses under U.S., Israeli, and international legal principles.

255.    The damages suffered by the Plaintiffs were the direct and proximate result of the aforesaid repeated aggravated and ongoing trespasses upon the Plaintiffs' real property.

WHEREFORE, the Plaintiffs demand judgment against the Defendants named herein as a result of their 30-year pattern of aggravated and ongoing trespass. Until discovery allows the Plaintiffs to ascertain the amount of profits that the Defendants named in this Count have realized over the last 30 years, they are unable to provide the Court at this time with a specific estimate of those profits. The best estimate at this time is $200 million. And, for as long as the occupation lasts, each of the settlements should pay $1 million per year in rent based on RE/MAX valuations. As for the construction/support firms and the settlements located in private Palestinian property, they also have to start paying an annual rental sum based upon RE/MAX land values, when the occupation ends. The Court should additionally order Defendants BL/BH, RE/MAX, HP/Motorola and the construction/support firms to render an accounting to the Plaintiffs of the profits they made during the course of their occupation, and pay that sum to the property owners consistent with their trusteeship obligations as provided for in the GCIV and Hague Conventions. Plaintiffs also request punitive damages, pre and post-judgment interest, costs of this action, attorney's fees and such other and further relief as the Court may deem appropriate under the circumstances because the intrusions detailed herein have been purposeful,

ongoing, and permanent in nature, and violate basic tenets of international law, and U.S./Israeli

law and each country's clearly-defined public policy. Wherefore the Plaintiffs herein request that

judgment be entered against all the Defendants named herein in the sum of $1 billion.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all claims so triable.

Respectfully Submitted,

*/s/ Martin F. McMahon*
Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiffs*

Sameer Jarrah, Esq.
Of Counsel
Admitted in Jordan
sameerjarrah@yahoo.co.uk
*Counsel for Plaintiffs*