| Page 1: [1] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

_____

| Page 9: [2] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

)

| Page 9: [2] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

)

| Page 9: [3] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

)

| Page 9: [3] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

)

| Page 9: [4] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

)

| Page 9: [4] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

)

| Page 9: [5] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

2

————————Section Break (Next Page)————————

| Page 9: [6] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

      )
    **AHAVA – DEAD SEA LABORATORIES;**   )
**NORDSTROM,**

| Page 9: [7] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

    **ISRAEL CHEMICALS LTD.,**     )
)

| Page 9: [8] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

(III)

| Page 9: [8] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

(III)

| Page 9: [9] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

      ORGANIZATIONS ACT (RICO) VIOLATION UNDER 18 U.S.C. §
      1962(c)
   (V)   WAR CRIME OF PILLAGE

| Page 9: [10] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

…………………………………………………………...…31 e.

| Page 9: [10] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

…………………………………………………………...…31 e.

| Page 9: [11] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

I.

| Page 9: [11] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

I.

| Page 9: [12] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

II.

| Page 9: [12] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

II.

| Page 9: [13] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

    III.

| Page 9: [13] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

    III.

| Page 9: [14] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

IV.   RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
     VIOLATION UNDER 18 U.S.C. § 1962(c)……………………………………...…160
V.   WAR CRIME OF PILLAGE………………………………………………………172

| Page 9: [15] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

3
Section Break (Next Page)

| Page 11: [16] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

187 shopping centers,[8] and an extensive highway complex linking up all settlements in the OPT.

| Page 12: [17] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

---

[6] *See, e.g.* http://www.nevetzuf-halamish.co.il/page.asp?pageID=39 (the settlement of Halamish requires potential residents from "all colors of the religious/secular rainbow" to submit an application and obtain approval from an "absorption committee" prior to being allowed to move there).

[7] The term "wholesale violence" shall hereinafter mean: murder, mayhem, physical assaults, looting, pillaging, destruction of agricultural property and homes, needless civilian deaths, war crimes, crimes against humanity, and genocide.

[8] As of 2009. *See* http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190. The Court will see herein that many media, government, and research sources have been cited in the footnotes to this Complaint. These footnotes are not exhaustive, as the Plaintiffs expect to further substantiate the claims herein through discovery. The sources cited are simply intended to assist the Court in finding *prima facie* plausibility per *Iqbal*.

[9] For example the Lieber Code signed by President Abraham Lincoln in 1863 condemns, *inter alia*, murder, arson, and wanton violence—conduct which occurs in the OPT on a daily basis. *See* Our Harsh Logic: Israeli Soldiers' Testimonies from the Occupied Territories, 2000-2010, Breaking the Silence (hereinafter "Our Harsh Logic") (an IDF commander tells young soldiers "I want to see bodies full of bullets" p. 79). The Lieber Code strictly prohibits wanton violence under penalty of death, and the Israeli army's war manual also condemns wanton violence. The term *wanton*, per West's law dictionary, implies a reckless disregard for the consequences of one's behavior. A wanton act is one done in heedless disregard for the life, limbs, health, safety, reputation, or property rights of another individual. *See* wanton. (n.d.) *West's Encyclopedia of U.S. Law, edition 2*. (2008) http://legal dictionary.thefreedictionary.com /wanton.

——————Section Break (Next Page)——————

| Page 12: [18] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 12: [19] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

6
Section Break (Next Page)

| Page 13: [20] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

[10] The terms "Customary International Law" and "Law of Nations" are interchangeable herein. *See Filartiga v. Pena-Irala*, 630 F.2d 876 (1980).

[11] Given the fact that Israel has adopted its own version of the Nuremberg principles, the conduct condemned in the Nuremberg Indictment of the Nationalist Socialist Government of Germany parallels the conduct of the IDF/G4S and armed settlers in the OPT, i.e., they "endeavored to obliterate the former national character of these territories. In pursuance of their plans, the defendants forcibly deported (Palestinian) inhabitants who were predominantly non-German (non-Jewish) and replaced them by thousands of German (Jewish-only) colonists." *See* Nuremberg Indictment of the Nationalist Socialist Government (International Military Tribunal, vol. 1, p. 63).

7

Section Break (Next Page)

| Page 14: [21] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

---

[12] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

[13] *See* "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Fleisch, Theodore Sasson April 2012 p. 9.

[14] *See* para. 213.

[15] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

8

Section Break (Next Page)

| Page 14: [22] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 15: [23] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

write-off)

## Section Break (Continuous)

Column Break

| Page 15: [24] Deleted | | Page 15: [25] Deleted | |
|---|---|---|---|
| Tina Dukandar | | Tina Dukandar | |
| 8/4/16 12:22 PM | | 8/4/16 12:22 PM | |

**The Hebron Fund**

(U.S. 501(c)(3), does not report donation as income)

$

**Community of Hebron**

(funds received part of the $1.7 billion sent to Israel in 2007)

$

Column Break

(armed settlers expel Palestinian neighbors and buy HP/Motorola surveillance systems, settlement hires security coordinator who trains settlers on use of automatic weapons and marshals the settlers to commit wholesale violencet. Settlement hires construction/support firms to build housing projects to bemarketed by

Column Break

ses and family members, agricultural property, homes, and retail markets, had water wells poisoned and animals slaughtered by settlers, suffered from environmental waste runoff, and were deprived of their natural

injures

(like Plain tiffs in other villag es, they have lost spou

(looks for a friendly 501(c)(3), takes a huge tax

$

**Settlement of Kiryat Arba**

International Boundary

Column Break



**Page 15: [26] Deleted          Tina Dukandar                    8/4/16 12:22 PM**



**Page 15: [27] Deleted          Tina Dukandar                    8/4/16 12:22 PM**

Section Break (Continuous) **Moskowitz, Adelson, Hagee, other** $

**Page 15: [28] Deleted Tina Dukandar    8/4/16 12:22 PM**

—Column Break—

American
Friends of
Har Homa,
Christian
Friends of

$

Communities

—Column Break—

"Har Homa

Page 15: [29] Deleted
Tina Dukandar
8/4/16 12:22 PM

Development
Fund" or
similar

$

Page 15: [30] Deleted
Tina Dukandar
8/4/16 12:22 PM

bank account

—Column Break—

Settlement of
Har Homa

—Column Break—

Is
aa
c,
M
in
a
Is

injures

haq, Qais
Ishaq, and
Ra'afat Ishaq

(forcibly expelled
from their lands by
settlers/construction
/support firms
assisted by G4S/IDF
forces. Settler homes
built in place of their
homes and
agricultural property)

—————————————

International Boundary

[16] *See, e.g., Ahmad et al.*

| Page 15: [31] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

*Christian Friends of Israeli Communities et al.*, 13-cv-3376 (SDNY 2014).

9

—Section Break (Next Page)—

| Page 16: [32] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

---

[17] https://electronicintifada.net/blogs/adri-nieuwhof/israel-using-dutch-dogs-terrorize-palestinians.

[18] The Israel Lobby and U.S. Foreign Policy, John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 167. *See also* Elliot Abrams, Faith or Fear: How Jews Can Survive in a Christian America (New York: Simon & Schuster, 1997), 181.

Section Break (Next Page)

| Page 16: [33] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 17: [34] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 17: [35] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

---

[19] Israel Lobby 217, 218, 223, 224, 228.

[20] The Israel Lobby and U.S. Foreign Policy, John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 167. *See also* Elliot Abrams, Faith or Fear: How Jews Can Survive in a Christian America (New York: Simon & Schuster, 1997), 181.

[21] *See* Oct. 22, 2015 congressional hearing, "Words Have Consequences: Palestinian Authority Incitement to Violence," http://foreignaffairs.house.gov/hearing/hearing-words-have-consequences-palestinian-authority-incitement-violence, and resulting resolution, https://www.congress.gov/bill/114th-congress/house-resolution/293.

[22] *See* Hope Hamashige, Paul Lieberman, and Mary Curtius, "Bingo King Aids Israeli Right Wing," Los Angeles Times, May 9, 1996,http://articles.latimes.com/1996-05-09/news/mn-2155_1_bingo-hall.

————————Section Break (Next Page)————————

| Page 18: [36] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

The profits are substantial, as detailed *infra*.

---

[23] Our Harsh Logic p. 288.
[24] *See* http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.
[25] *See* Id.

—————Section Break (Next Page)—————

| Page 18: [37] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 19: [38] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

---

[26] https://electronicintifada.net/content/why-colorado-firm-selling-apartments-israels-illegal-settlements/14029.

[27] A separation barrier built by the Israeli government in the West Bank or along the 1949 Armistice Line known as the "Green Line". Upon completion, its total length will be about 430 miles and separate about 9.4% of the West Bank and 23,000 Palestinians from the bulk of that territory. *See* http://www.unrwa.org/newsroom/features/barrier-monitoring-unit?id=908.

13

─────── Section Break (Next Page) ───────

| Page 19: [39] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 19: [40] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

[29]

| Page 20: [41] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 20: [42] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

---

[28] *See* http://www.whoprofits.org/company/g4s-israel-hashmira *and* "Corporate Complicity in Israeli Detention: G4S" by Addameer, available at http://www.addameer.org/userfiles/Factsheet15April.pdf.

[29] http://www.whoprofits.org/company/hewlett-packard-hp.

[30] Palestine Inside Out: An Everyday Occupation, Saree Makdisi, 2008 (hereinafter "Palestine Inside Out") Kindle location 4208, 4214.

[31] Palestine Inside out Kindle location 4206. *See also* http://imeu.org/article/elad-the-jewish-national-fund-the-us-taxpayer-subsidized-judaization-of-sil.

[32] *See* http://icahd.org/ putting the specific number at 48,488 as of Nov. 9, 2015.

Section Break (Next Page)

| Page 20: [43] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 21: [44] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

---

[33] *See* http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.

[34] Palestine Inside Out Kindle Location 2101.

[35] *See* FN 26.

[36] *See* https://electronicintifada.net/blogs/adri-nieuwhof/veolia-remains-active-garbage-dump-israeli-settlers.

[37] Defendants Gilbert, Braman, Saban, and Ellison have not been named in the conspiracy described herein, but are named as Defendants in Counts II and IV for intentionally funding the commission of war crimes by making significant contributions to the Israeli army, whose soldiers have been engaging in ethnic cleansing and war crimes for the past 30 years, *see generally* Our Harsh Logic.

15

Section Break (Next Page)

| Page 22: [45] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

---

[38] "Tax-Exempt Funds Aid West Bank Settlements," NY Times July 5, 2010. *See also* http://lajewsforpeace.org/Essays/Settlements/Funders.pdf.

[39] Palestine Inside Out Kindle Location 4763.

[40] *See* http://icahd.org/.

[41] *See also* Israel Lobby p. 96 ("There is not a single place built in this country that did not have a former Arab population." That was an admission by former Israeli Defense Minister Moshe Dayan in Walid Khalidi *All That Remains: the Palestinian Villages Occupied and Depopulated by Israel in 1948* p. xxxi). p. 96 BY 1962, Israel owned almost 93% of the land inside its pre-1967 borders. To achieve this outcome, 531 Arab villages were destroyed and 11 urban neighborhoods emptied of their inhabitants.

[42] http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.

16

———————————————— Section Break (Next Page) ————————————————

| Page 22: [46] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 23: [47] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

---

[43] http://www.whoprofits.org/company/g4s-israel-hashmira.

[44] *See* FN above. *See also* "Palestine Today is an Open-Air Prison," http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html.

[45] *See* http://english.leumi.co.il/static-files/10/LeumiEnglish/Financial_Statements/LeumiProfile2013_1.pdf?lang=en, p. 12. On file with the Plaintiffs.

[46] The banks knew, for example, that as early as 2004 that members of Breaking the Silence had confessed to committing atrocities in the OPT. As Haggai Matar stated, none of Breaking the Silence's allegations have proven to be wrong. http://972mag.com/why-do-so-many-israelis-hate-breaking-the-silence/114763/.

————————————Section Break (Next Page)————————————

| Page 24: [48] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 24: [49] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 24: [50] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

There are Defendants named in Count V herein, e.g., Israel Chemicals Ltd. and Ahava –

Dead Sea Laboratories, who have no material relationship with the US tax-exempt entities and

donors. They have, however, much like the construction/support firms, made enormous profits by

---

[47] *See U.S. v. Bank Leumi Le-Israel B.M. et al*, 2:14-cr-00731-UA (C.D. Cal. 2014) Docket entry 24 Filed 12/23/14.
[48] http://www.haaretz.com/secret-israeli-database-reveals-full-extent-of-illegal-settlement-1.266936.

Section Break (Next Page)

exploiting Dead Sea minerals and other natural resources owned by Palestinian property owners named herein. For example, they have operated quarries or extracted valuable minerals from Palestinian-owned property for 30-40 years, and are still profiting from those operations. ICL, in fact, has an illegal monopoly on the extraction and exploitation of Dead Sea minerals as a result of racist and discriminatory licensing policies adhered to by area military commanders.

| Page 24: [51] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

bullets."[50] Young, impressionable recruits fresh out of high school[51] religiously adhered to that order,

| Page 24: [52] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

| Page 25: [53] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

---

[49] In the Silwan area of Jerusalem, Abu Tayeh neighborhood, local residents constantly hear the sounds of grenades, merchants closing shops, locals ready any moment to flee, broken window,

| Page 25: [54] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

children screaming. Dozens of demolition orders have been issued against homes, residences, and commercial properties. Even the only mosque in the neighborhood is under threat of being demolished. *See* http://silwanic.net/?=silwan.
[50] Our Harsh Logic p. 79.
[51] http://www.wrmea.org/2016-march-april/israeli-settlements-come-at-a-high-price.html.

Section Break (Next Page)

and

| Page 26: [55] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

_____

| Page 30: [56] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 35: [57] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 36: [58] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

_____

[72] As detailed in Our Harsh Logic.

[73] "Palestine Today is an Open-Air Prison," http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html. *See also* Meron Benvenisti, "Founding a Binational State" (Ha'aretz, Apr. 22, 2004) (describing Gazan Palestinians as being contained in a "huge holding pen").

[74] http://www.olofpalme.org/wp-content/dokument/820701b_tco_kongress.pdf.

32

Section Break (Next Page)

| Page 36: [59] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

32.     Plaintiffs contemplate that more Palestinian nationals will join herein, for any number of

reasons: (1) 400-500,000 Palestinians have been forcibly expelled from the OPT; (2) 49,000

Palestinian homes have been demolished and/or confiscated in the OPT; (3) a total of 48,048 claims

have been filed with the United Nations Register of Damage (UNROD) based on confiscation and

property destruction resulting from the separation barrier;[76] (4) four separate Israeli government

reports issued in 1993, 2003, 2005, and 2009 have confirmed that settlement expansion is the direct

result of illicit under-the-table financing, illicit construction permits, false affidavits concerning

security issues, and wholesale intentional theft of private property; (5) a large percentage, if not all,

of the 56,000 new homes and apartments in the OPT have been built on private Palestinian

property; in the case of Ariel, 100% of new homes and apartments were built on private Palestinian

property; and (6) Plaintiffs' counsel has been contacted by many potential plaintiffs who are

currently seeking original land registration documents to authenticate their claims of theft and

destruction of private property and aggravated and ongoing trespass, which is a time-consuming

process.

## II.

1.

| Page 48: [60] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

disclose the criminal activities that they are funding with "charitable" donations.

---

[123] *See* http://www.truah.org/images/Honenu_8.24.2015.pdf.
[124] http://www.ginaplus.org/kshomron/foundation.htm "Security for the Community" link.
[125] Id. See also http://www.karneishomron.co.il/?CategoryID=606.

Section Break (Next Page)

55.

| Page 48: [61] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 49: [62] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

**d)**

2 .

| Page 59: [63] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 59: [64] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

---

[187] Id.
[188] http://www.voanews.com/content/report-says-one-killed-3-wounded-in-tel-aviv-shooting/3127348.html.
[189] http://whoprofits.org/company/motorola-solutions.
[190] Id.
[191] Id.

Section Break (Next Page)

| Page 60: [65] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

85.     Defendant **Ahava – Dead Sea Laboratories** (with its subsidiaries and agents, hereinafter Defendant "Ahava") is a private Israeli cosmetics company that manufactures skin care products made of mud and mineral-based compounds from the Dead Sea. Its main manufacturing plant and showroom are in Mitzpe Shalem, a segregated "Jewish-only" settlement on the Dead Sea in the OPT. Ahava, by extracting valuable salts and other minerals from private Palestinian property stolen by the Mitzpeh Shalem settlement, has engaged in the war crime of plunder as defined in Count V below, and thus must disgorge all profits from such activity to the Palestinian people, including Plaintiffs herein. Ahava North America is its U.S. subsidiary, headquartered in New York. That subsidiary has entered into a contract with U.S.-based **Defendant Nordstrom, Inc.** ("Nordstrom") as one of its major licensees. Nordstrom has marketed Ahava products for a number of years in their extensive line of upscale retail shops and online. By doing so, Nordstrom has committed the war crime of pillage as detailed in Count V. It has acted as a collaborator because it is an end user of products extracted from private Palestinian property. Based upon information and belief, Nordstrom has made substantial profits based on the licensing agreement it has with Ahava North America.[192]

86.     Defendant **Israel Chemicals Ltd.** ("ICL") is an Israel-based multinational manufacturing company that develops, produces and markets fertilizers, metals and other special-purpose chemical products. ICL employs settlers from segregated "Jewish-only" settlements,[193] which helps to advance the settlement enterprise. ICL serves primarily three markets: agriculture, food and engineered

---

[192] http://www.whoprofits.org/sites/default/files/ahava_report_final.pdf.
[193] http://repo.icl-group.com/Lists/ReportsManagement/other/2013%20Corporate%20Responsibility%20Report.pdf

Section Break (Next Page)

materials. It has repeatedly appropriated and exploited Palestinian natural resources for at least 40

years. ICL produces approximately one third of the world's bromine, and is the world's sixth-largest

potash producer. It is a manufacturer of specialty fertilizers and specialty phosphates, flame

retardants and water treatment solutions.[194] ICL has production facilities in many countries, including

the United States (Missouri, New Jersey, Kansas, Indiana, and California).[195]

| Page 65: [66] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

[233] These orders obviously heighten neighborhood tension—thousands of poor Palestinian

households are at imminent risk of forcible displacement and have no alternative housing.

| Page 65: [67] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

Treasury regulations because 501(c)(3)s are expected to lessen the financial burden of a municipal

---

[229] "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Fleisch and Theodore Sasson April 2012 p. 9.
[230] Palestine Inside Out p. 257.
[231] Id. Kindle location 4223.
[232] "Tax-Exempt Funds Aid West Bank Settlements," New York Times June 7, 2010
http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html?_r=0,
http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-significantly/#QQTmB6sWCUH3hkU2.97
[233] http://www.un.org/apps/news/story.asp?NewsID=51826#.VmH2d3arTIU.
[234] Palestine Inside Out Kindle location 3836.

Section Break (Next Page)

agency coping with a serious homeless population, i.e., reduce the homeless population, not increase it.[235]

98.

| Page 65: [68] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

The local population had their homes condemned by the Israel Land Administration (ILA).[237] The ILA violently demolished occupied tents and structures in Al Araqib at least 13 times in 2012 alone[238] with no financial payment offered and no concern that the tents were occupied by innocent civilians at the time.

| Page 71: [69] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

---

[269] In 1991, Prime Minister Yitzhak Shamir promised that any funds received by Israel from America would "not be used in any manner to expand existing settlements or create new settlements in the West Bank." *See* "Baker Cites Israel for Settlements," NY Times, May 23, 1991 http://www.nytimes.com/1991/05/23/world/baker-cites-israel-for-settlements.html *and* "Tax-Exempt Funds Aid West Bank Settlements," NY Times July 5, 2010. *See also* Arms Export Control Act of 1976 (AECA), 22 U.S.C. §2754 (aid must be solely for "internal security" and "legitimate self defense"). *See also* Letter from Rep. Kucinich to Condoleezza Rice, Secretary of State, Jan. 5, 2009 (Citing the AECA, stating that Israel's most recent attacks neither further internal security nor do they constitute "legitimate" acts of self-defense).

Section Break (Next Page)

111.

| Page 71: [70] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

been violated are listed in Exhibit A—Customary International Law.

**c)**

| Page 71: [71] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

**i.**

| Page 72: [72] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

112.

| Page 81: [73] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 109: [74] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

world, and it is

estimated that 50 percent of those, at least,

| Page 109: [75] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

---

[326] http://www.tabletmag.com/jewish-news-and-politics/197244/shoot-the-messenger.
[327] http://www.ginaplus.org/kshomron.htm, "Security for the Community" link.
[328] *See* http://www.maannews.com/Content.aspx?id=769295.

Section Break (Next Page)

| Page 110: [76] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

who join this suit.

---

[329] For example, it is conceded that 100% of the property Ariel is located on is private Palestinian property, and 30% of Nokdim's property, perhaps more, is private. *See also* Palestine Inside Out p.18. A 2006 Peace Now report found that as of November 2006, privately held Palestinian land—not state land—accounted for some 40% of the land used for Jewish settlements in the West Bank. As referenced in Israel Lobby, p. 91, "this seizure of Palestinian property violates not only Israeli law, but also a fundamental principle of democracy—the protection of private property." *See also* "West Bank Sites on Private Land, Data Shows," Steven Erlanger, NY Times Mar. 14, 2007 *and* "Legitimization of Land Theft," http://www.haaretz.com/legitimization-of-land-theft-1.214201.

116

Section Break (Next Page)

Plaintiffs also request

| Page 118: [77] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

*ethnical, racial or religious group*, as such:[358]

| Page 118: [78] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

226

| Page 118: [79] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

---

[358] Based on vicious racially-motivated comments made by Israeli government officials and military leaders, the acts described herein were certainly engaged in with the intent to destroy the Palestinian population. For example: "The Palestinian threat harbors cancer-like attributes"—current Minister of Defense Yaalon; "Palestinians should go, as should the physical homes in which they raise the snakes"—current Justice Minister Shaked (encouraging "destruction of Palestine's elderly, women, cities, villages, property, and infrastructure"); "Palestinians are beasts…they are not human"—current Deputy Defense Minister Ben-Dahan; and "Preventing the spread of Palestinian citizens is a national duty"—Former Housing Minister Atias. http://imeu.org/article/extremism-incitement-to-racial-hatred-senior-israeli-officials-in-their-own, http://www.haaretz.com/news/housing-minister-spread-of-arab-population-must-be-stopped-1.279277.

[359] Palestine Inside Out p. 183 (IDF use of Palestinians as human shields, torturing prisoners, blocking ambulances, wanton destruction of property meet definition of crimes against humanity). *See also* Chris Hedges, "A Gaza Diary," http://www.bintjbeil.com/articles/en/011001_hedges.html, *and* http://www.amnestyusa.org/research/reports/annual-report-palestinian-authority-2011?page=2.

[360] http://www.seruv.org.il/english/article.asp?msgid=55&type=news.

125

———————— Section Break (Next Page)————————

| Page 137: [80] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 140: [81] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

| Page 141: [82] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

146
————————————— Section Break (Next Page) —————————————

240.

| Page 141: [83] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

(a)

| Page 152: [84] Deleted | Tina Dukandar | 8/4/16 12:22 PM |

---

[430] There are a number of factors utilized to calculate the reasons why the figure is that high: (1) in certain cases, the trespass activity complained of herein has been going on for 30-40 years; (2) At least 48,000 Palestinians have registered complaints with the UN re various aspects of the occupation land seizures; and (3) in the case of Gaza alone, estimates are that reconstruction would take $8-10 billion. Since 49,000 homes have been either confiscated or demolished, to restore these Palestinian homeowners to a similar housing accommodation (assuming such accommodations would be feasible at the low estimate of $100,000 per home), the total would be $4.9 billion. And based solely on the sale of 26,000 settler homes, BL, RE/MAX, and the construction firms grossed $9.45 billion from the occupation and subjugation of the population.

159

Section Break (Next Page)

| Page 152: [85] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

in the sum of $24.5 billion.

| Page 152: [86] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION UNDER 18 U.S.C. § 1962(c) AGAINST ALL DEFENDANTS EXCLUDING AHAVA, NORDSTROM, AND ICL

260.    This Count incorporates and is meant to be read in conjunction with the other allegations in this Complaint, including the allegations recited in the introduction, parties and the common allegations sections.

261.    Plaintiffs include this Count in their Complaint based on Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which confers a private right of action on any person injured in his or her business or property by reason of a violation of § 1962 of RICO.

262.    The RICO violation itself is the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The pattern of racketeering activity in this instance was comprised of: (a) money laundering by means of the intentional international transfer of funds for the purpose of committing various specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2); (b) mail fraud by using the mails to defraud the U.S. government of tax revenue by making false statements on applications for tax-exempt status, and filing fraudulent 990 and 1040 tax forms in violation of 18 U.S.C § 1341; (c) wire fraud by using the

Section Break (Next Page)

wires to defraud the U.S. government of tax revenue by making false statements on applications for tax-exempt status, and filing fraudulent 990 and 1040 tax forms in violation of 18 U.S.C. § 1343; and (d) murder, arson, arms trafficking, interference with commerce, theft and malicious destruction of property, and monetary transactions in property derived from specified unlawful activity, use of interstate commerce to commit murder-for-hire, mayhem, and the intentional infliction of physical violence in violation of 18 U.S.C. § 1961(1).

263.    The RICO enterprise was an association-in-fact comprised of all Defendants named herein, including all donors.

(a)    Common purpose: The Defendants named herein all fully expected that the results of rendering financial assistance ($1 billion every year) to OPT settlements and to the IDF would result in (1) violent activities directed at the Palestinian population to convince them to abandon their homes[431] and their olive groves; and (2) generate substantial revenues for all conspirators named herein. **U.S. Donors named herein** anticipated taking huge illegal tax write-offs to minimize their tax burden, and knew they could have the U.S. taxpayer in effect underwrite their political agenda. **Abrams**, for example, anticipated receiving additional speaking fees, more book royalties, free trips to Israel, and payment for the numerous congressional appearances and articles he published and the numerous speeches he delivered condemning Palestinian violence, claiming that settlements were not really expanding and that Palestinian farmers are the root cause of violence in the Middle East.

The **construction/support firms** anticipated profiting from this criminal activity because they would receive additional lucrative construction contracts. As only one example thereof, based solely on the construction of 26,000 new homes in the OPT, the construction/support firms grossed $9.4 billion dollars along with RE/MAX and BL/BH. **BL/BH** officials knew that they would earn substantial banking fees because of a continuous stream of U.S.-Israel wire transfers, the arrival of new settlers and additional retail banking business activity, including home mortgages, checking accounts, ATMs, and construction loans.

| Page 152: [87] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
| --- | --- | --- |

---

[431] One of the many reasons why RICO was enacted was the fact that the identical pattern of violence alleged in this lawsuit was engaged in by mob bosses in New Jersey. For example, the president of a private cartage company in Hoboken, NJ would wake one morning up to learn that an overnight explosion had mysteriously destroyed his entire fleet of garbage trucks and his processing plant. That violence was quite successful in terms of driving private cartage businesses out of Hoboken, and in some cases tripling the rate charge to retail shop owners for wholesale garbage removal. And as already noted, such rampant criminal activity led to the enactment of the RICO statute. The legislative history reveals that Congress wanted to prevent individuals or entities from threatening or committing violence in the hope that they would be able to convince legitimate retail shop owners and private business firms to abandon their profitable activities. The mafia wanted to move into different thriving business communities, terrorize the existing business establishment, and reap significant profits as a result.

Section Break (Next Page)

officials also looked forward to financing infrastructure improvement s (network of highways linking the settlements), which BL boasts of on its own website. **HP/Motorola** officials similarly anticipated earning huge returns on the sale of surveillance devices and thermal imaging systems. Given the large customer base that HP/Motorola officials serviced in the OPT, i.e., the settlements, security coordinators, IDF/G4S officials, retail establishments, and local police departments, HP/Motorola officials anticipated receiving substantial profits by continuing to participate in and advance the settlement enterprise. In fact, Motorola has boasted that its Israel investment has been the most profitable of all the overseas investments that the company has. And that is why HP has a $6 billion portfolio of various investments in the OPT.

    **RE/MAX** officials expected to earn substantial sales commissions in connection with the marketing of 56,000 new homes and apartments[432] which have been built in the OPT by the construction/support firms and financed by BL/BH. The **settlement** officials knew that more settlers would mean more funds coming from U.S.-based tax-exempt entities, which would result in their annual budgets being substantially increased so that they could afford expensive HP/Motorola surveillance devices and thermal imaging systems and G4S protection services and, with funds left over, construct universities, hospitals, and other residential improvements. The U.S. tax-exempt entities would have significant operating expenses paid for, which would allow them to hold more fundraising events. These events occur quite frequently all over America, and are well-attended by the conspirators named herein, e.g., one occurred in Fort Lauderdale in 2007 hosted by AFA. Defendant Moskowitz and Morton Klein, Zionist Organization of America president, along with Defendant Braman were in attendance. That event was preceded by a visit from Ariel's mayor, who visited America in 2006 to personally thank Defendants Braman and Moskowitz for their generous contributions. That is only one example of how the conspiracy as alleged in Count I worked in America to promote settlement expansion, wholesale violence, ethnic cleansing, and arms trafficking overseas.

(b) <u>Relationships among the members</u>: All Defendants named herein have an ideological as well as a substantial financial interest in promoting a greater Zionist state,[433] which necessarily means annexing private Palestinian property and engaging in ethnic cleansing. With this common goal in mind (achieving substantial profits as a result of settlement expansion, ethnic cleansing and malicious property destruction), they have communicated with each other by telephone, fax, email, and texting. In America, they all host and/or attend fundraising events such as the one held by FFF in NYC in December 2014 where $27 million was raised in one night for the Israeli army. A similar event was held in Hollywood. All the stars came out, and an additional $33 million was raised in one night for the Israeli army. At all relevant times they each knew what particular settlements (the Silwan area, EJ) and what type of particular illegal activity, e.g., arms trafficking and theft of private property, each individual or entity has the intention of funding.

---

[432] http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.

[433] *See, e.g.*, http://english.leumi.co.il/static-files/10/LeumiEnglish/Financial_Statements/LeumiProfile2013_1.pdf?lang=en, p. 12.

Section Break (Next Page)

For example, Moskowitz concentrates on funding EJ, the FFF supports the IDF, Adelson focuses on ethnic cleansing in EJ, and established a medical center in Ariel. Hagee focuses on both Ariel and EJ. In Israel, the same pattern holds true with the different settlements having their officials discuss common interests, e.g., expulsion of the Palestinian population, annexation of more Palestinian homes, funding for that activity, expansion of settlements, construction of housing developments by the construction/support firms, securing protection services from G4S, and sophisticated tracking devices and surveillance equipment from HP/Motorola, and the arming of the settlers including training in the use of automatic weapons and sniper scopes to ensure continued confiscation of private Palestinian property.

These are activities all paid for with laundered funds coming from U.S. tax-exempt entities. The officials of the Israel-based entities also correspond with their affiliated U.S. entities and host goodwill trips for wealthy donors and U.S. politicians.[434] The U.S. entities likewise correspond with their affiliated Israeli entities and inform them of pending wire transfers and the wishes of particular donors in terms of what illegal activities they want to fund. For example, Moskowitz has been very interested in establishing a permanent "Jewish-only" enclave in EJ (the Silwan neighborhood), and his funding has accomplished that in the short span of ten years. Just recently, utilizing the services of Swedish attorney Gustaf Cardellus, he engaged in a straw purchase transaction whereby he took ownership of a Christian church (Beit Al-Baraka) in the OPT. That illegal transaction had profound consequences for the parishioners who used to attend the church. They now can no longer do so because their church has been sold and converted illegally into an IDF military barracks compound and housing accommodations for Jewish-only settlers.[435] Consistent with his ethnic-cleansing efforts, Moskowitz also evicted the Palestinian Christian caretaker of the church. Moskowitz and attorney Cardellus both knew that that church was protected by a recorded restrictive use covenant which they intended to violate after closing. The covenant required any new purchaser to continue to use the property for Christian church services.

(c)  Longevity: These Defendants, for close to 30 years, have violated at least eight federal criminal statutes (see para. 112-126), including money laundering, and any number of applicable Treasury regulations governing tax-exempt entities.[436] The

---

[434] For example, Norman Braman, one of Senator Rubio's more prominent donors to his presidential campaign, gave $311 million to AFA. Defendant Braman took Rubio to Israel on an all-expenses-paid trip (which was actually funded by the U.S. taxpayer) with Defendant Moskowitz and Eliyahu Shaviro, Mayor of Ariel, in attendance. Braman also co-hosted an AFA gala in 2007.

[435] http://mondoweiss.net/2015/05/settlement-clandestine-international/.

[436] These include, but are not limited to, regulations requiring that the entities: (a) engage in charitable activities that relieve the government of a financial obligation; (b) disclose to potential donors the specific overseas "charitable" causes that their donations will support; (c) disclose any instances where they deviated from the specific "educational" and "charitable" activities that they described in their application for 501(c)(3) status; (d) determine that foreign entities receiving their funds would themselves qualify as legitimate tax-exempt entities under Treasury standards. See Rev. Rul. 63-252, 1963-2 C.B. 101; and (e) maintain strict control over funds transferred overseas, with detailed record keeping. See Rev. Rul. 68-489, 1968-2 C.B. Furthermore, the entities

Section Break (Next Page)

tax-exempt entities purposely funded criminal activity overseas, i.e., the purchase of military hardware for the settlers (arms trafficking) and training sessions re the use of automatic weapons and sniper scopes, and also funded theft and malicious destruction of private property. The entities and their donors, therefore, have repeatedly and routinely abused these regulations, and thus Treasury can revoke their tax-exempt status. Besides engaging in money laundering, the entities have conspired with their donors for 30 years to defraud the IRS, see 18 USC 371, by encouraging their donors to take illegal tax write-offs, i.e., expenses incurred in setting up sniper schools, buying and distributing military hardware (arms trafficking), and illegal private property acquisition for the settlers.

264.    The Defendants are individuals or entities capable of holding a legal or beneficial interest in property, and as such, they all constitute "persons" within the meaning of 18 U.S.C. § 1961(3).

265.    This association-in-fact is today and has at all relevant times been a corrupt organization that, since the 1980s, has participated in a pattern of racketeering activity by knowingly engaging in international money laundering, violating seven other federal statutes, Israel's Declaration and BLHDL, U.S./Israeli tax laws, Israel's money-laundering statute, and Treasury regulations governing tax-exempt entities. All of the Defendants named herein participated in the conduct of the affairs of this enterprise.

266.    The predicate criminal activity required by RICO initially started approximately 30 years ago when some of the Defendants like Moskowitz, Adelson, and FFF started to donate funds to various tax-exempt entities or their foundations to grow the settlements, knowing that such financial support would result in massive ethnic cleansing, arms trafficking, and further confiscation of private Palestinian property.[437] In the case of Moskowitz and Adelson, they directly funded AFA, and Adelson and FFF have both funded FIDF, with the intent that

---

cannot: (f) finance or promote racially or religiously discriminatory practices; (g) violate federal statutes in the process of raising the funds; (h) fund overseas activities which violate the law of the host country.

[437] *See* "Funders: Foundations That Support Non-Profits That in-turn Support Illegal Settlements" and "Spenders: American 501(c)(3) Foundations That Directly Support Illegal Settlements", available at http://lajewsforpeace.org/SettlementsinPalestine.html). This database is not an exhaustive record of all the donations and transfers that took place over the past 30 years, but it serves as a small sampling of such transfers. Discovery herein will show the extensive nature of the money-laundering activity.

donated funds will support and promote the violent expulsion of the local Palestinian population (ethnic cleansing) and other criminal activity, including the annexation of private Palestinian property and trespass thereon, and the attendant violence that inevitably ensues (poisoning livestock and water wells). In the case of FFF, the goal of its tax-exempt entity (FIDF) is to support IDF soldiers and reward them for their services. As detailed in Count II, those services included the demolition of Palestinian homes (sometimes with family members inside) and the promotion of wholesale violence. As detailed in Count II, IDF soldiers were ordered to "fill Palestinian bodies with bullets", "aim for the eyes to take out an eye", and protect rampaging settlers who were in the process of terrorizing local Palestinian homeowners to convince them to abandon their private property. That, of course, is the goal of the civil conspiracy described in Count I.

267.    All of the Defendants named herein did encourage, finance, and engage in the aforementioned criminal activities knowing that the tax-exempt entities and Israel-based recipients of this funding would use that money to expand all West Bank settlements, each one of which is now sitting on parcels of valuable Palestinian property. The Defendants knew: (a) that the explosive growth of these settlements depended on continued massive financial aid, ethnic cleansing, arms trafficking, and illegal confiscation of private Palestinian property; and (b) that settlement officials, in illegally confiscating Palestinian property and contracting with construction/support firms to build residential improvements thereon, did not comply with local building and zoning codes. They also and gave false affidavits to secure illicit construction permits and convince area military commanders to authorize additional seizures of private property owned by Palestinians named herein.

268.    The fact that settlement officials were violating local building and zoning codes and Israeli law by stealing private property is based upon Comptroller Goldberg's 2003 report,

Special Prosecutor Sasson's 2005 report, and a comprehensive database disclosed by the Israeli government in 2009. Based on those reports, and others authored by Israel-based NGOs like Yesh Din, U.S. Defendants knew at all relevant times that they were achieving the expansion of settlements by means of illegal construction permits, false affidavits, and violent confrontations between armed settlers and the local Palestinian population. By doing so, they were knowingly contravening clearly-defined U.S. and anti-settlement public policies, Israel's Declaration, Israel's 1993 ban on settlements, BLHDL other Israeli government pronouncements, and numerous HCJ opinions. They knew the funds coming from U.S.-based tax-exempt entities

would result in the confiscation of more private Palestinian property, but nonetheless continued to provide the financial means to do so, knowing that the "Jewish-only" settlers would trespass upon, convert, and occupy private Palestinian property without any repercussions, legal or otherwise. FFF, for example, financed IDF activities in the OPT, including the illegal demolition and confiscation of 49,000 Palestinian homes. The tax-exempt entities and their donors knew that IDF/G4S personnel would routinely look the other way and allow armed settlers to inflict violent attacks on their Palestinian neighbors, and in some cases commit murder and arson. The donors/entities also knew that IDF/G4S personnel would protect rampaging settlers and refuse to enforce HCJ rulings regarding the removal of illegal outposts, unauthorized checkpoints, and unauthorized Readymix/Heidelberg concrete security barriers placed all over the OPT. These impediments illegally restricted the physical movement of the local Palestinian population, a violation of Israel's public policy, Israel's Declaration, fundamental UN principles, and basic international humanitarian rights (see Exhibit A). The security barriers referred to above prevented Palestinians from visiting relative in other villages, taking kids school, securing vital medical care, and harvesting their olive groves.

269.    Defendant donors knew and expected that their donations would be used to arm and

encourage settlers to seize more private Palestinian property, which would lead to further conversion of Palestinian property, more violent clashes with local unarmed Palestinian farmers and homeowners, and the dispatching of additional IDF/G4S forces to "protect" the converted property, new houses, retail shops, local transportation facilities, places of worship, and the settlers and their families. This financial support needlessly increased neighborhood tension (live target practice and malicious wounding of Palestinian farmers) and resulted in the inevitable injury and death of more Palestinian citizens and the confiscation of more private Palestinian property. For example, in Hebron, armed settlers roam the streets with binoculars looking for Palestinians to shoot at for breaking a 5 pm curfew, trying to access their olive orchards, or simply in order to terrify them. When Palestinian mothers are attempting to accompany their children to school, they and their children are routinely pelted with stones. This is a first degree criminal assault and battery crime under Israeli law, and requires the imposition of a ten-year prison sentence. They terrorize the children on a daily basis, activities all subsidized by the U.S. taxpayer. As described in the Avaaz petition filed with Treasury in 2015, they think nothing of dousing Muslim women with alcoholic beverages, beverages which are prohibited under Islamic law, an act which constitutes a defilement.

270.    Every similar instance of donations thereafter engaged in (after the original donations in the 1970s) by the association-in-fact was a transaction making up a 30-year pattern of racketeering activity up through the present. Every member of the association-in-fact engaged in the aforementioned racketeering activity by participating in one or more of the following activities: (a) raising and soliciting funds (tax-exempt entities) to arm the settler population; (b) encouraging violent clashes (donors, tax-exempt entities, corporate officials) between armed settlers, IDF/G4S personnel, and local Palestinian farmers; (c) using some of the funds received from U.S. donors/entities (settlement officials, security coordinators) to cover various expenses

167

including arms trafficking, setting up sniper schools, and training settlers in military tactics. Some of these funds enabled settlement officials to attend various galas in New York and Hollywood to raise additional funds for their settlements and for the IDF; and (d) transmitting the rest of the funds to recipients based in Israel who they knew would similarly promote wholesale violence and ethnic cleansing, directly or indirectly. For example, HP/Motorola officials knew that continuing to provide sophisticated tracking devices and thermal imaging systems to settlement officials would result in wholesale violence being directed at the local Palestinian population. That wholesale violence included malicious wounding of Palestinian farmers who are left to bleed out on settlement soil.

271.    In the case of the construction/support firms, they encouraged the armed settlers to engage in more ethnic cleansing activity to ensure that they would have more private property to develop, i.e., they needed vacant construction sites with no Palestinian citizens living there so that Readymix/Heidelberg workers could commence the pouring of concrete structural footings. And, of course, RE/MAX officials were motivated in the same manner because they could market the individual units in the new housing developments built by the construction/support firms and funded by BL/BH. As already noted, besides shopping malls and hotels, they built approximately 56,000 new homes and apartments in the OPT, which generated enormous revenue for RE/MAX and all of its partners in the settlement enterprise. New home activity alone resulted in gross profits of $9.45 billion.

272.    Defendants Moskowitz, FFF, Hagee, and Adelson engaged in a pattern of racketeering activity, *inter alia,* by donating hundreds of millions of dollars to FFF, FIDF, AFA, GEF, AFHH, and the Hebron Fund, and the other Defendant entities and other tax-exempt entities for the purpose of: (a) financing the violent expulsion of the local Palestinian population; (b) promoting wholesale violence (live target practice and malicious wounding) directed at the local

Palestinian population in order to confiscate more private property; (c) encouraging and funding settlement expansion; and (d) building first-rate residential and infrastructure improvements. All of these defendants knew and intended the consequences thereof—armed settlers, in the course of convincing Palestinians to abandon their homes and olive groves, would murder and maim their Palestinian neighbors, destroy thousands of acres of valuable olive orchards, and poison their livestock and water wells. At 2:00 am in the morning, settlers would distribute and hide under rocks barley seeds which had been doused with rat poison, which the livestock would eagerly consume.

273.    The tax-exempt entities' role in the racketeering activities was to receive funds from donors earmarked for criminal activities overseas and then distribute the funds to Ariel's mayor Eliyahu Shaviro and other settlement officials, including entities that distribute funds directly to settlers and the Israeli army. They knew that IDF soldiers would enthusiastically engage in: (a) systematic destruction of Palestinian homes, hospitals and schools; (b) destruction of Palestinian infrastructure systems; (c) appropriation of Palestinian lands and olive orchards; and (d) the illegal restriction of Palestinians' freedom of movement and daily activities. The need to destroy the Palestinian infrastructure systems was voiced recently by Justice Minister Ayelet Shaked, who declared that the "the entire Palestinian people is the enemy," thus justifying its destruction, "including its elderly and its women, its cities and its villages, its property *and its infrastructure.*"[438]

274.    The victims of the racketeering activity engaged in by the association-in-fact were the Plaintiffs and/or their relatives who lived in the environs of the segregated settlements of Ariel, Beit HaArava (family Husseini), Bet El (Emad Shujaia), Efrat (Ibrahim Sabih), Halamish (Bassem Al-Tamimi), Har Homa (Ra'fat Ishaq, Qais Ishaq, Mina Ishaq, Khulude Isaac, Jihan Andoni), Kiryat

---

[438] https://electronicintifada.net/blogs/ali-abunimah/israeli-lawmakers-call-genocide-palestinians-gets-thousands-facebook-likes.

169

Arba (Village Council of Abu-Asja' etc.), Karnei Shomron (Hashim Yousef), Nokdim, and Ofra

(Ahmed Al-Zeer), all of whom have suffered business damages as detailed in para. 277.

275.    At all relevant times, the Defendants named in this Count knew that the donations

received from U.S. donors/entities and the subsequent transfer of funds to various settlements

was for the specific purpose of expanding segregated settlements and the attendant violence

such activities would promote, i.e., the forcible expulsion of the local Palestinian population and

the destruction of 49,000 Palestinian homes. The wealthy Americans and the tax-exempt

entities named herein sought to and did promote the violent expulsion of all non-Jews from the

OPT so that new "Jewish-only" settlers had suitable housing accommodations. The problem as

admitted by former Prime Minister Sharon and settlement leaders was an obvious one—

millions of Palestinians still owned and occupied the territory surrounding the various

settlements, and had a right to continue to do so based on Israel's 1948 Declaration (which

preceded the occupation), UN conventions, and various international principles and conventions

(see Exhibit A).

276.    At all relevant times herein, the Defendants named in this Count knew that this pattern

of racketeering activity would result in the injury and death of Palestinian citizens engaged in

various income-producing endeavors (like tourist/hotel businesses, the sale of olive crops and

vegetable markets), the destruction of valuable private business property, and the expropriation

of Palestinian agricultural property and greenhouses, which provided the sole livelihood of

many of the victims, including the Plaintiffs named in this lawsuit. The acts undertaken by

Defendants named herein served to further the pattern of racketeering activity already described

herein.

277.    The Plaintiffs herein have suffered the requisite business damages required under RICO

and defined in 18 U.S.C. § 1962(c) in that they lost their retail shops, valuable livestock, olive

orchards, greenhouses, factories, restaurants, hotels, and open-air vegetable markets, which was their main source of business income. Palestinian tour operators have also seen their annual gross revenues greatly diminished because of the numerous checkpoints the tourists must pass through, and the time it takes to accomplish that task. The separation wall itself has literally shut off Jerusalem and other communities like Bethlehem, which was once a vibrant international tourist attraction. The IDF forces even intentionally destroyed the only flour mill facility known as al-Badr during the Third Gaza Invasion (2014).[439] By destroying that one remaining flour mill, the IDF eliminated one of the only remaining food sources available to Gazans. The purpose in doing so was to send the identical message which had been repeatedly sent to Palestinian farmers in the OPT, i.e., leave "or else." That is the classic threat which has been repeatedly made by U.S. mafia musclemen trying to take over area businesses.

278.    But for the Defendants' participation in the aforementioned illegal activities, including the racketeering activity of money laundering in violation of 18 U.S.C. §1962(c), Plaintiffs would not have suffered the aforementioned business damages. They incurred the aforementioned business damages because of the massive funding provided by U.S. donors/entities, which enabled the Defendants to promote and engage in all of the criminal activity described herein. All of the original six-tent encampments would have been abandoned 30 or 40 years ago but for that massive funding made possible by U.S. donors and entities intent on abusing the U.S. tax code and forcibly expelling all non-Jews from the OPT.

279.    The injuries suffered by the Plaintiffs were reasonably foreseeable and/or anticipated by the Defendants as a natural consequence of their criminal acts as fully described herein.

280.    The Plaintiffs named herein have sustained the requisite business damages in the sum of at least $10 billion.

---

[439] https://www.hrw.org/news/2010/02/07/israel-military-investigations-fail-gaza-war-victims.

171

Section Break (Next Page)

, the Plaintiffs demand judgment against the Defendants named in this Count, jointly and severally, for $10 billion in business damages based on the extensive tortious and illegal activity detailed herein arising out of the expansion of settlements and the violent expulsion of the local Palestinian population. This sum includes damages arising out of the demolition or forced closure of retail shops, open-air vegetable markets and souks, restaurants, hotels, 900,000 olive trees, and thousands of acres of fertile agricultural property. This activity resulted in a drastic reduction in the annual income which had been previously earned by Palestinian taxi-cab drivers, tour operators and hotel owners. This figure is largely dependent on the number of Plaintiffs who have sustained business damages and who ultimately join this suit. Plaintiffs also request treble damages pursuant to 18 U.S.C. §1964, punitive damages, pre and post-judgment interest, costs of this action, attorney's fees and such other and further relief as the Court may deem appropriate under the circumstances, i.e., these defendants have consistently, over a period of 30 years, violated fundamental principles of Customary International Law as detailed in Exhibit A.

### COUNT V:
### THE WAR CRIME OF PILLAGE, ENGAGED IN BY DEFENDANTS NESHER, HEIDELBERG, READYMIX, AHAVA, NORDSTROM AND ICL BASED ON EXTRACTING VALUABLE NATURAL RESOURCES LOCATED ON PRIVATE PALESTINIAN PROPERTY

281.    This Count incorporates and is meant to be read in conjunction with the other allegations in this Complaint, including the allegations recited in the introduction, parties and the common allegations sections. This Count lays out: (a) the elements of pillage; (b) the Defendants who have engaged in such activity; (c) the nature of their operations in the OPT; (d) how international profit-sharing agreements concerning exploitation of natural resources in an occupied territory are structured and operate for the benefit of the occupied people; and (e) international legal principles governing that issue.

282.    Pillage is recognized as a war crime by both the 1907 Hague Convention and by the

1949 Geneva Convention, conventions which have been adopted by both Israel and America. The term basically is defined as theft during a period of armed conflict. The elements are: (a) the perpetrator appropriates private property; (b) which he intends to appropriate for his private use (conversion); (c) the property owner never consented to the appropriation; and (d) it occurred during a time of armed conflict or belligerent occupation. As HCJ members have repeatedly observed—the Israeli army "holds the OPT in belligerent occupation."[440]

283.    The Defendants named herein which have engaged in the war crime of pillage are: Ahava, ICL, Readymix, Heidelberg, Hanson, and Nesher. Nesher's parent companies are Access Industries (based in New York) and CRH (based in Dublin).[441]

284.    All of these Defendants have intended to and have extracted, for at least thirty years (in the case of ICL, 40 years), valuable mineral deposits which they knew were located on property owned by Palestinians listed herein as Plaintiffs.[442] Those minerals are potash, bromine, magnesium, various salts, and other valuable compounds. The Defendants have exploited these privately-owned natural resources by extracting those products from land in the OPT and transferring them to Israel-based suppliers for worldwide distribution. It is a very profitable endeavor—Defendant Heidelberg alone grosses $5-6 million per year and pays $585,000 a year in income taxes or royalties to the Judea Samaria regional council.[443] Instead of retaining the $6 million gross profits in their corporate bank

---

[440] *See, e.g. Yesh Din v. Commander of IDF Forces in the West Bank*, HCJ 2164, Dec. 2011.

[441] Plaintiffs have not named the CEOs of the corporate Defendants named herein as separate defendants in this complaint because their corporations are responsible for their actions under a *respondeat superior* theory, and ample precedent exists for pursuing Alien Tort Statute (ATS) remedies against corporations. *See, e.g., John Doe I v. Nestle, USA*, No. 10-56739 (9th Cir. 2013) (holding corporations can face liability for claims brought under the ATS, cert. denied). In the event that this Court should nonetheless determine that remedies cannot be pursued against the corporate Defendants under the ATS, Plaintiffs respectfully request permission to amend their complaint so as to join as Defendants all of the CEOs listed in Exhibit C.

[442] Exploitation and pillage is a very profitable endeavor, i.e., a World Bank report issued in October 2013 found that "a conservative estimate excluding stone aggregates is that restrictions imposed by area military commanders on Palestinian quarry operators costs the Palestinian economy $241 million per year." http://www-wds.worldbank.org/external/default/WDSContentServer/WDSP/IB/2014/01/23/000442464_20140123122135/Rendered/PDF/AUS29220REPLAC0EVISION0January02014.pdf.

[443] https://www.hrw.org/news/2016/01/20/dispatches-corporations-perpetuate-injustices-settlements.

Section Break (Next Page)

account (which practice violates bedrock international legal principles) and paying those royalties to the Judea and Samaria Council, Heidelberg officials should have been escrowing and eventually distributing those profits to the actual owners of the properties exploited, i.e., the Palestinian Plaintiffs named herein.

285.    ICL has similarly exploited natural resources it did not own by extracting them from property owned by Palestinians, as explained *infra*. For at least 40 years, ICL officials have been using and exploiting Dead Sea waters to secure and extract potash and other valuable minerals owned by Palestinians and then exporting them worldwide for use in fertilizers, cosmetics, cars, and laptops. Ahava has been similarly using and exploiting Dead Sea minerals in order to manufacture and sell expensive cosmetic products on a worldwide basis which are sold in upscale retail shops in the U.S. like Nordstrom.

286.    ICL has cleverly concealed its 40-year scheme of exploiting Palestinian property. It is undisputed that all Israeli Dead Sea minerals come from ICL's Dead Sea Works factory, on the southwest corner of the Dead Sea's southern basin.[444] However, while the Dead Sea Works factory is indeed located on the Israeli side of the 1967 borders, ICL has purposefully diverted water to, and then taken water from the southern basin, in order to extract valuable minerals owned by Palestinians. ICL's corporate strategy has been remarkably successful, i.e., divert water to the southern basin by illegally digging and dredging a 10-mile canal from the Dead Sea's original northern basin, located primarily in the OPT.[445] It then extracts the valuable minerals in the southern basin (on the Israeli side of the 1967 line) using a complex system of evaporation pools and processing plants, and then returns the unwanted valueless residue to the northern basin (majority in

---

[444] https://corporateoccupation.wordpress.com/2010/08/23/israel-opportunity-2010-a-chance-to-invest-in-apartheid/.

[445] http://www.huffingtonpost.com/2011/06/13/dead-sea-shrinking-flooding_n_875784.html?. Notably, ICL uses *three times* as much Dead Sea water in its Dead Sea Works facility than the drinking water available for the *entire population* of the OPT. http://repo.icl-group.com/Lists/ReportsManagement/other/2013%20Corporate%20Responsibility%20Report.pdf, p. 90.

Section Break (Next Page)

the OPT). ICL has admitted that at least 95% of those minerals go not to benefit the Palestinian people who own the property in the northern basin, but rather are sold abroad (including to the U.S.[446]), generating substantial profits for the exploiters.

287.     In direct violation of bedrock international legal principles, substantial royalties are then sent to the Tamar Regional Council (an Israeli government body),[447] not to a regional Palestinian authority. That authority would, based on recognized international law principles, distribute profits to the Palestinian property owners listed herein whose minerals have been illegally exploited. An apt illustration of how such a profit-sharing agreement works in an occupied territory like Palestine concerns Iraqi-owned natural resources, i.e., oil fields. The occupying coalition authority in Iraq administers the Development Fund for Iraq, which was established in 2003, early on during the invasion and occupation of Iraq. Iraqi and American officials administer that fund and act as trustees in discharging their fiduciary duty to the local Iraqi population.

288.     They have, for the last 12 years, collected and distributed all profits derived from Iraqi natural resources (oil fields) to be used for the benefit of the Iraqi population, not for Americans, oil companies, or other foreign entities involved in oil exploration.[448] Hence, based on recognized international law principles, all Defendants named herein who were plundering or exploiting the natural resources owned by Palestinians should have been instead acting as trustees and collecting profits that they generated and escrowing them in a special bank account on behalf of a similar Palestine Development Fund ("PDF"). After being instructed by the local Palestinian authority, PDF officials would then distribute those profits, with interest, to the Palestinians who own the exploited properties like the Plaintiffs named herein.

---

[446] http://repo.icl-group.com/Lists/ReportsManagement/other/2013%20Corporate%20Responsibility%20Report.pdf, p. 128.
[447] http://repo.icl-group.com/Lists/ReportsManagement/other/2013%20Corporate%20Responsibility%20Report.pdf.
[448] Id. That principle had been recognized in a 1977 State Department memorandum finding Israel's oil fields off the coast of Sinai contravened international law.

Section Break (Next Page)

289.     To protect ICL's world market share and its illegal monopoly, area military commanders

have repeatedly rejected all applications filed for permits by Palestinian OPT businessmen to extract

those minerals themselves, despite the fact that the northern basin is part of the OPT. The result—

property owners like the Plaintiffs named herein lose at least $241 million per year, and perhaps as

much as $2.2 billion.[449] Protected by its illegal monopoly as enforced by area military commanders,

ICL continues to extract valuable minerals owned by the Plaintiffs listed herein. It has thus engaged

in the war crime of plunder, and thus must disgorge all profits from such activity to the Palestinian

people, and specifically the property owners identified herein. That total profit number is huge,

probably in the billions, because ICL has been exploiting Palestinian resources for at least 40 years.

290.     As confirmed in a World Bank report, some 73% of global bromine production comes from

the Dead Sea, which is a nearly inexhaustible source of that mineral. ICL senior officials knew at least

40 years ago that the Dead Sea would always serve as a major source of bromine and other minerals,

which their company, therefore, had to access and exploit somehow. So on or about 1968, ICL

officials hired a dredging company to purposely divert Dead Sea water from the northern Palestinian

basin in order to surreptitiously secure natural resources like Bromine which would then be extracted

from property owned by Palestinians.[450] The reason that is significant and has

enormous and long-term consequences for the Plaintiffs herein is that the Dead Sea quarries'

principal competitors in bromides and potash are based in China. Experts estimate, however, that

the Chinese mines will be depleted in approximately five years, leaving trespassing war criminals like

---

[449] http://www-
wds.worldbank.org/external/default/WDSContentServer/WDSP/IB/2014/01/23/000442464_20140123122135/Re
ndered/PDF/AUS29220REPLAC0EVISION0January02014.pdf.
[450] Id p. 11-12. *See also* http://www.huffingtonpost.com/2011/06/13/dead-sea-shrinking-
flooding_n_875784.html?.

ICL with a virtual world monopoly.[451] That is only one reason why the profiteering corporations named herein will never end their participation in the settlement enterprise. It is simply one of the best and most secure investments available on a worldwide basis.

291.    OPT stone-crushing companies like Nesher, Heidelberg, and Readymix[452] with exclusive licensing agreements issued by area military commanders have similarly exploited Palestinian-owned natural resources. For example, they all produce stone aggregates (mainly gravel) for the production of concrete, asphalt, and the sub-surface layers of roads.[453] Thousands of miles of paved roads with subsurface layers of gravel supplied by those firms have been built by the construction/support firms named herein all over the OPT. Those segregated roads (i.e., "Jewish-only") today link up all the settlements and allow access to major medical centers and universities located in Ariel. Thus, all highways, tunnels, access ramps, and paved roads linking up the settlements in the OPT were all built with Palestinian natural resources. However, Palestinian car owners, truck drivers, and taxi cab operators, even Palestinian emergency vehicles and ambulances, are not allowed to use these vital transportation links.

292.    As a result of the aforementioned conduct, all Defendants named herein have engaged in and committed the war crime of pillage in violation of the Hague Regulations of 1907, specifically Article 47, which states that "pillage is formally prohibited....including plunder of public or private

---

[451] http://www-wds.worldbank.org/external/default/WDSContentServer/WDSP/IB/2014/01/23/000442464_20140123122135/Rendered/PDF/AUS29220REPLAC0EVISION0January02014.pdf at 11-12.

[452] Any authority or licenses that those entities rely on because they were granted by an area military commander "will not protect companies against liability for pillage because these concessions have neither a greater claim to legal justification in international law, nor go further in obtaining adequate consent in accordance with applicable state legislation." In one IMT Nuremberg case, IG Farben officials were convicted of pillaging Strasbourg-Schiltighiem oxygen and acetylene plants in Alsace-Lorraine. Their reliance on the German civil administration's decree confiscating the plants was "without any legal justification under international law." They were found criminally liable for pillage because "they had acquired (just like Defendants named herein) these plants from the German (Israeli) government without payment to or consent of the French (Palestinian) owners." https://www.opensocietyfoundations.org/sites/default/files/pillage-manual-2nd-edition-2011.pdf at 63-64.

[453] http://www-wds.worldbank.org/external/default/WDSContentServer/WDSP/IB/2014/01/23/000442464_20140123122135/Rendered/PDF/AUS29220REPLAC0EVISION0January02014.pdf at 14.

Section Break (Next Page)

property." Article 53 thereof specifically provides that an army of occupation, here the IDF, should only *take possession of movable property of the state which may be used for military operations*. As is clear, the quarries located in the OPT have not been operated for, and excavated potash and other minerals have never been used for Israeli military operations in the OPT. To state the obvious, military operations in the OPT require production of stun grenades, armored vehicles, and sophisticated military hardware.

293.     As conceded by ICL and Heidelberg, quarry end products and other Palestinian natural resources, including potash, are instead shipped out of Palestine to Israel-based suppliers. Courtesy of their relationship with the occupier and the area military commander, these suppliers have made extraordinary profits for at least 30 years because they have sold valuable natural resources which have been extracted from property not owned by them. As a result, these suppliers derive windfall profits from this business activity because they do not pay any royalties or rents to the legitimate property owners like the Plaintiffs named herein. Thus, they in effect exploit these valuable mineral resources for free.

294.     Article 55 of the 1907 Hague Regulations specifies that the occupying power (and its agents), with respect to public buildings, real estate, forest, and agricultural works belonging to residents of the occupied property situated in the occupied country, have an ongoing fiduciary obligation to protect the capital of these properties. As the occupier's agents or licensees, they must administer those properties as trustees, and based on the rules of usufruct.[454] "private property must be respected" Hague 1907 Art 46(1). "private property cannot be confiscated" Hague 1907 Art 46(2). The State Department in 1977 opined that "[r]esources such as oil deposits, which are irreplaceable and have value only as they are consumed, cannot be used without impairing the capital of the oil

---

[454] Usufruct is defined as "the right to enjoy the use and advantages of another's property *short of the destruction or waste of its substance.*" http://www.oxforddictionaries.com/us/definition/american_english/usufruct. A simple analogy is that of an apple tree—the usufructory may take the apples for his own use and profit, but may not do anything to harm the tree.

Section Break (Next Page)

bearing land.[455] Usufruct "logically prohibits any exploitation of minerals."[456] Thus, based on

international legal principles recognized by Israel and the world community, occupier agents and

licensees like the Defendants named herein have a fiduciary duty and are supposed to act as trustees

to protect both private and state property while the military occupation continues.

295.     There are a number of plundering cases which were decided by the International Military

Tribunal in Nuremberg which bear on this issue. In one case, the tribunal found that "machinery

and raw materials" hurriedly removed by corporate representatives from a state-owned factory in

Ukraine constituted "pillage."[457] Furthermore, the United Nations Declaration on the Rights of

Indigenous Peoples states that indigenous peoples have the right "to lands, territories, and resources

which they have traditionally owned or acquired."[458] The original pillagers and plunderers named

herein do not have recorded deeds or licensing agreements executed by the owners of the

Palestinian property they are exploiting. They claim, in the alternative, that the military area

commander in charge of the OPT has afforded them permission to engage in operation of a quarry

or extract potash and other minerals from Palestinian property free of charge.

296.     However, that claim has been specifically heard and rejected before by the International

Nuremberg Tribunal: "acts adjudged criminal when done by an officer of the government (i.e., area

military commander) are criminal also when done by a private individual (ICL and Heidelberg

CEOs). The guilt differs only in magnitude, not in quality. The offender, in either case is charged

with a serious personal wrong and punishment falls on the offender *in propria persona. The application of*

---

[455] Department of State Memorandum of Law on Israel's Right to Develop New Oil Fields in Sinai and the Gulf of Suez, 16 Int'l Legal Materials 733, 740 (1977).

[456] Brice M. Clagett and O. Thomas Johnson, "May Israel as a Belligerent Occupant Lawfully Exploit Previously Unexploited Oil Resources of the Gulf of Suez?" 72 *The American Journal of International Law*, 558–585, 558, 568 (1978) [hereafter Clagett and Johnson].

[457] https://www.opensocietyfoundations.org/sites/default/files/pillage-manual-2nd-edition-2011.pdf at 55.

[458] Id. at 45.

179

Section Break (Next Page)

*international law to individuals is no novelty.*"[459] Hence, OPT military commanders have been and are subject today to the application of bedrock international legal principles, all of which have been recognized by Israel. They therefore cannot claim that they have been legally and properly vested with authority to assign or transfer to the Defendants named herein private mineral rights owned by the Plaintiffs herein.[460]

297.    Article 55 of the Hague Regulations states that "the occupying power (Israel) can only dispose of the resources (potash, bromides, concrete, minerals) of the occupied territory to *the extent necessary for the current administration of the territory and to meet the essential needs of the occupied population* (Palestinians). According to the distinguished Israeli legal scholar Yigal Benvenisti, "there is little doubt today that this condition (essential needs of Palestinians) limiting the occupying power in terms of what it can dispose of in the territory…is binding on all uses of immovable public property."[461]

298.    It is generally accepted under well-known international principles that an occupier (in this case, Israel or its agents and licensees) may not use the natural resources located in the occupied territory for its own domestic purposes."[462] However, all Defendants named herein have been doing exactly that for at least 30 years (ICL 40 years) by shipping natural resources owned by the indigenous population into the occupier's territory for sale and distribution on a worldwide basis.

299.    In the 1863 Lieber Code,[463] which established the law of war for Union forces in the

---

[459] *U.S. v. Flick* transcript p. 109-81. A similar view was expressed in *U.S. v. Ohlendorf*, transcript pp 6714-16. Both Flick and Ohlendorf are part of a huge compendium of Nuremberg Trial transcripts.
[460] *See* FN 452.
[461] Benvenisti, "International Law of Occupation" p. 82.
[462] *See* Institut de Droit International, Bruges Principles, *and* Yigal Benvenisti's "International Law of Occupation" p. 82, *and* James Stewart, "Corporate War Crimes" p. 60.
[463] The U.S. War Crimes Act exemplifies
a trend amongst several domestic lawmakers toward criminalizing pillage by simply
cross-referencing pertinent treaty provisions within a criminal statute. Section 2441(c)(2)

Section Break (Next Page)

American Civil War, "all pillage or sacking, even after taking place by main force [...were]

prohibited under the penalty of death, or such other severe punishment as may seem adequate for

the gravity of the offense." The Hague Regulations of 1907 contain two provisions which

categorically track the language in the Lieber Code: "the pillage of a town or place, even when taken

by assault, is prohibited," and that "pillage is formally forbidden."[464] In fact, the United States

Uniform Code for Military Justice provides for the criminal prosecution of persons engaged in

"looting or pillage,"[465] and basically reiterates the principles contained in the 1863 Lieber Code.

300.     U.S. public policy is quite clear on this subject. The U.S. War Crimes Act of 1996, for

example, includes specific provisions that confer criminal jurisdiction on U.S. federal courts over

pillage perpetrated by "a national of the United States," regardless of whether the offense

occurred "inside or outside the United States."[466] The act thus furnishes U.S. federal courts with

jurisdiction over American companies, its citizens, and their foreign affiliates which have been

alleged to have benefited econically from the perpetration of pillage in foreign conflicts.[467]

301.     The United Nations War Crimes Commission concluded that "[i]f wrongful interference

with property rights has been shown, it is not necessary to prove that the alleged wrongdoer

(ICL and Heidelberg CEOs) was involved in the original wrongful appropriation."[468] As a

result, the purchase and/or use by commercial actors of "appropriated" natural resources,

which do not belong to them, falls within the meaning of pillage, irrespective of whether the

---

of the U.S. War Crimes Act 1996 defines war crimes as including any conduct "prohibited
by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the
Laws and Customs of War on Land, signed October 18, 1907." Article 28 of the Hague
Regulation, to which the provision refers, states that "[t]he pillage of a town or place,
even when taken by assault, is prohibited." In this sense, U.S. federal courts have
jurisdiction over an offense that also features within the Statute of the International
Criminal Court.

[464] http://www.osisa.org/law/blog/corporate-pillage-war-crime.
[465] https://www.opensocietyfoundations.org/sites/default/files/pillage-manual-2nd-edition-2011.pdf p. 17.
[466] Id. p. 310.
[467] Id. p. 85.
[468] Id. p. 104.

Section Break (Next Page)

commercial actors were involved in the initial extraction of the resources. Thus all commercial actors, including the Defendants named herein as well as U.S. companies like Nordstrom and other upscale retail establishments which are involved in the purchase and marketing of pillaged Palestinian natural resources commit pillage on a daily basis as principal perpetrators even though they were not obviously involved in the initial misappropriation. [469]

302.    The Nuremberg prosecutors found that Control Council Law number 10 was binding on the international military tribunal and the Defendants who were being criminally prosecuted thereunder with regards to plunder and exploitation. That provides in Article 2(1)(b) that each of the following acts are recognized as a crime:

> (b) war crimes: Atrocities or offenses against persons or property constituting violation of the laws or customs of war, including but not limited to murder, ill treatment, or deportation to slave labor or for any other purpose of a civilian population from occupied territory…plunder of public or private property, wanton destruction of cities, towns, or villages or devastation not justified by military necessity.

303.    This quoted provision corresponds to Article VI(b) of the IMT Charter concerning which that tribunal held that the criminal offenses so defined were recognized as war crimes under international law even prior to the IMT charter…the offense of plunder of private and public property must be a well-recognized crime under international law. It goes on to recite that "any defendant participating therein with the degree of criminal connection specified in the control council law must be held guilty under this charge of the indictment." All Defendants named herein have a specific and well-documented history of criminal connection to the exploitation activities that their officials either authorized or knowingly engaged in in terms of exploiting Palestinian natural resources.

304.    Article 52 also provides that with respect to private property and/or locally-owned natural resources confiscated for legitimate security or military needs, they have to be restored

---

[469] Id. p. 37.

Section Break (Next Page)

at the conclusion of peace, and indemnities (market-value rental sum) paid for them. Article 55 sums up the situation by declaring that the occupying state shall be regarded "only as administrator and usufructory of the public buildings, real estate (private Palestinian property confiscated as a result of the construction of the separation wall), forests (acres of forests destroyed near Bethlehem by IDF personnel), and agricultural works (olive groves and greenhouses) belonging to the hostile state (or its inhabitants)."

305.    Article 52 goes on to recite that the occupying army "must protect the capital of these properties and administer those properties according to the rules of usufruct." As the IG Farben Nuremberg Tribunal recited, "the foregoing provisions of the Hague regulations are broadly aimed at preserving the inviolability of property rights of both public and private property during military occupancy." Extracting natural resources from property owned by the inhabitants of an occupied territory and then transferring those resources back to the occupier's regime for its use and enjoyment does not "protect the capital" of these properties.

306.    It was also stated in the IG Farben Nuremberg judgment of July 30, 1949 "where private individuals, including juristic persons, proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action, not being expressly justified by any applicable provision of the Hague Regulations, is in violation of international law…similarly, where a private individual or juristic person (like HCJ judges who issued the *Yesh Din* opinion) becomes a party to unlawful confiscation of public or private property by planning and executing a well-defined design to acquire such property permanently, acquisition under such circumstances subsequent to the confiscation constitutes conduct in violation of the Hague Regulations." As is obvious, senior officials of all of the Defendants named herein, including their CEOs, have been parties to repeated unlawful confiscations of private property owned by Palestinian plaintiffs, and in the case of ICL, this illegal practice of

183

exploitation and pillage has been going on for at least 40 years.

307.    No doubt the Defendants herein will argue that HCJ precedent favorable to plundering

corporations should apply in this case,[470] and thus they should not be named as Defendants

herein. Such a bold assertion would be mistaken, because this war crime Count is a tort claim,

as should be obvious, which has been brought under the Alien Tort Statute. That statute

authorizes a judicial forum to adopt and rely on Customary International Law, *not the erroneous

politically-expedient decisions of a foreign domestic court*, as binding upon this Court in deciding this

claim.[471] As explained in the paragraphs directly above, U.S.-articulated public policy as well as

Customary International Law on the question of plunder has been unambiguous and universally

recognized, even by Israel, since the Nuremberg Tribunals and perhaps even back to 1863

courtesy of the Lieber Code (GCVI's predecessor).

308.    Furthermore, the fact that rotating members of the HCJ can justify, at least as of 2011,

wholesale departure from well-established, long-standing Customary International Law,

underscores the futility of any attempt by the U.S. citizen Plaintiffs herein to seek a just

outcome through pursuing remedies in Israeli courts.[472] That holding is not an isolated case. Just

recently, the HCJ ruled unanimously that the parents of Rachel Corrie, a 22-year-old U.S.

citizen, could not sue the IDF for her intentional murder even though her claims had been

timely filed. Also, the Israeli Deputy Defense Minister Eli Ben-Dahan recently announced that

the members of the Dawabshe family, being Palestinians, could not sue for damages in any

---

[470] *See, e.g. Yesh Din v. Commander of IDF Forces in the West Bank*, HCJ 2164, Dec. 2011 (justifying violating Customary International Law because 200 Palestinian employees had been hired to assist Israeli corporations in plundering quarries on Palestinian land).

[471] For a more complete description of the political pressures extant upon the Israeli judiciary, see http://www.academia.edu/12909317/Legitimising_the_Illegitimate_The_Israeli_High_Court_of_Justice_and_the_Occupied_Palestinian_Territory, and http://www.israelnationalnews.com/News/News.aspx/155551#.VtCPr_krLIU, and The Role of National Courts in Applying International Humanitarian Law, Sharon Weill, 2014, p. 91, and "Israel's High Court Is Sponsoring anti-Palestinian Discrimination," http://www.haaretz.com/opinion/1.661022.

[472] As stated in FN 37, the non-U.S. citizen Plaintiffs are under no obligation to exhaust local remedies under the Alien Tort Statute.

Section Break (Next Page)

Israeli court in connection with wrongful death claims arising out of the murder of three family members in an arson attack by extremist settlers in November 2015.[473]

309.    In any case, plundering corporations like ICL or Heidelberg cannot claim that the UN has indirectly sanctioned their pillaging. In 1948 the UN did not authorize the occupying power, i.e., Israel and therefore its agents or licensees like ICL, to exploit and exhaust the natural resources of the indigenous Palestinian population. The unanimous UN resolution authorized the establishment of a new Israeli state. However, inhabitants thereof, like the Palestinian Plaintiffs named herein, were to be specifically protected in terms of their civil liberties. For example, they were to be free from armed attacks by violent militia and to have their private property protected by IDF soldiers—occupier agents. Since all Palestinians were then, and are now, specific intended beneficiaries of the Declaration authored and signed by founding father Ben Gurion, their property rights have to be respected by the HCJ, the area military commanders, and the plundering corporations.

310.    It is obvious, however, that Palestinian property owners' rights have not been respected by the OPT military commanders or the Defendants named herein. As an example, the quarry and Dead Sea operations referenced herein have never been and are not being conducted today in the best interest of the local indigenous population, i.e., the Palestinian Plaintiffs named herein. And it is equally obvious that engaging in exploitation of natural resources located in the occupied territory does not, in any manner, promote or ensure the security of the State of Israel. That activity only goes to ensure that corporations engaging in plundering activities like Heidelberg and ICL can continue to: (a) secure windfall profits because they are extracting resources from property which they neither owned nor had licensing agreements for exploitation; and (b) hold a virtual monopoly only as a result of the discriminatory licensing

---

[473] http://www.ynetnews.com/articles/0,7340,L-4740728,00.html.

procedures employed by the occupier's agent, i.e., the area military commander, with respect to licensing new quarry operations in Area C. For years, Palestinian businessmen have tried, unsuccessfully, to secure a license to start quarry operations on their own private property. All of those applications have been denied due to the racist and discriminatory licensing practices and procedures employed by the area military commander. Given this reality, the applicants will never be issued quarry licenses in Area C, and therefore will continue losing millions of dollars on an annual basis.

311.    Since none of these Defendants had received licensing agreements from the legitimate property owners to exploit the resources owned on that property and have no recorded deeds which formally transferred ownership to them, they have committed the war crime of pillage for approximately 30 years. And, consistent with the administration and the operation of the Iraqi Development Fund as already detailed herein, they have the obligation to provide Plaintiffs with an accounting showing the amount of revenues they have grossed as a result of engaging in pillage. Once the occupation ends, they also have an obligation to vacate the private property that they have been illegally occupying for the last 30-40 years, including any executive offices and processing facilities.

WHEREFORE Plaintiffs also request an accounting and damages in an unknown amount at this time because they do not have access to the books and records of these Defendants. The best estimate for plundered resources available at this time is at least $20 billion. That figure is premised on a number of factors: (a) Heidelberg Cement alone grossed $6 million and paid $585,000 in income taxes and royalties in 2014;[474] (b) the World Bank estimates that Palestinian property owners are losing $241 million per year because they cannot set up their own quarry companies; (c) ICL has been exploiting privately-owned natural

---

[474] https://www.hrw.org/news/2016/01/20/dispatches-corporations-perpetuate-injustices-settlements.

resources for at least 40 years; (d) the other Defendants named herein have been similarly exploiting private natural resources for at least 30 years; and (e) all quarries operated by Israeli companies in the West Bank pay approximately 25 million shekels in royalties each year to the Judea and Samaria Regional Council (a settler organization). They should instead be depositing those royalties or licensing fees into a Palestine Development Fund, which entity in turn will distribute the funds to the Palestinian people who own the properties that the quarries or cement factories are sitting on. Discovery will determine what the gross revenues those royalties are based on. Once Plaintiffs secure the books and records of these Defendants and calculate a proper amount of damages, Plaintiff property owners named herein can then be fully compensated by virtue of the war crime profiteering activity engaged in by these defendants.

| Page 153: [89] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

mm@martinmcmahonlaw.com
*Counsel for Plaintiffs*

W. Jameson Fox, Esq.
D.C. Bar Admission Pending
wf@martinmcmahonlaw.com

| Page 153: [90] Deleted | Tina Dukandar | 8/4/16 12:22 PM |
|---|---|---|

187

————————————————Section Break (Next Page)————————————————

# EXHIBIT A

## CUSTOMARY INTERNATIONAL LAW VIOLATED ON A DAILY BASIS IN THE OPT

1. 1863 Instructions for the Government of Armies of the United States in the Field, General Order 100 ("Lieber Code of April 24, 1863")

2. 1899 The Hague Convention of 1899

3. 1907 The Hague Convention of 1907

4. 1945 Charter of the International Military Tribunal – Annex to the Agreement for the prosecution and punishment of the major war criminals of the European Axis ("Nuremberg Charter")

5. 1945 United Nations Charter

6. 1946 Nuremberg Principles

7. 1948 Universal Declaration of Human Rights

8. 1948 Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention")

9. 1949 Geneva Convention relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention" or "GCIV")

    a. Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol 1)

10. 1957 Standard Minimum Rules for the Treatment of Prisoners

11. 1959 Declaration of the Rights of the Child

12. 1965 International Convention on the Elimination of All Forms of Racial Discrimination

13. 1966 International Covenant on Civil and Political Rights

    a. First Optional Protocol to the International Covenant on Civil and Political Rights

14. 1966 International Covenant on Economic, Social, and Cultural Rights

15. 1984 Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

16. 1986 Comprehensive Anti-Apartheid Act of 1986

17. 1989 Convention on the Rights of the Child

18. 1998 Senate Resolution of Ratification of the International Covenant on Civil and Political Rights

19. 2000 Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflicts

20. 2004 Arab Charter on Human Rights

Section Break (Next Page)



**Exhibit B: The Cycle of Trespass, Demolition, and Conversion**

Section Break (Continuous)

**CORPORATE PROFITEERING**

RE/MAX markets "Jewish-only" housing financed by BL/BH, and all entities share the windfall profits, including international conglomerate construction/support firms.

Column Break



Ideology-driven settlers claim and seize Palestinian hilltop land for their own use and occupation, raise Israeli flags, pitch tents, and drive caravans and trailers onto private Palestinian property.

———Column Break———

**2. UTILITY HOOKUPS**

Rogue Israeli government officials

issue illegal building permits, water access authorization, and provide unauthorized utility and sanitation hookups. Construction/support firms assist settler families in doing so.

———Section Break (Continuous)———

families.



**4. INTENTIONAL CONVERSION**

Construction/support firms like Veolia, AFI, and Volvo build housing, shopping malls, highways, light rail, security barriers, sewage systems, on private Palestinian property which had been illegally seized by armed settlers and IDF personnel.

Neighboring Palestinian villagers have their homes, retail shops, and mosques condemned for alleged "structural defects" by the ILA or demolished by IDF and G4S forces, or violently confiscated by armed settlers and IDF personnel.

**5. SECURITY PROTECTION**

G4S, Hewlett Packard, and other contractors provide manned and biometric security services to prevent disgruntled Palestinian owners from accessing their property or posing threats to settler

**EXHIBIT C: CHIEF EXECUTIVE OFFICERS OF CORPORATE DEFENDANTS**

1. Ashley Almanza ( G4S PLC 2013-present);
2. Leo Apotheker (HP 2010-2011);
3. Joshua Bakola (HP Israel 2007-2014);
4. Ytzhak Bejerano (Readymix Israel 2003-2008);
5. Len Blavatnik (Access Industries);
6. Stefan Borgas, a.k.a. Stephen Burgess (ICL 2012-present);
7. Greg Brown (Motorola 2008-present);
8. Nick Buckles (G4S PLC 2005-2013);
9. Amnon Dotan (Readymix Israel 1986-2003);
10. Shimon Dick (Motorola Israel 2010-present);
11. Ya'akov Ellis (Ahava 2003-2013);
12. Joel Feldschuh (Nesher 2004-2013);
13. Carly Fiorina (HP 1999-2005);
14. Antoine Frerot (Veolia 2009-present);
15. Christopher Galvin (Motorola 1997-2003);
16. Ronen Ginzburg (Danya Cebus Ltd. 2009-present);
17. Mark Hurd (HP 2005-2010);
18. Leif Johansson (Volvo 1997-2011);
19. Moshe Kaplinsky (Nesher 2013-present);
20. Zion Kenan (BH 2009-present);
21. David Lander (HP Israel 2014-present);
22. Myles Lee (CRH PLC 2009-2014);
23. Lev Leviev (AFI Israel chairman);
24. Dave Liniger (RE/MAX 1973-present);
25. Martin Lundstedt (Volvo 2015-present);
26. Albert Manifold (CRH PLC 2014-present);
27. Galia Maor (BL 1995-2012);
28. Micha Mixner, a.k.a. Micha Miksner, a.k.a. Michael Maixner (Merkavim);
29. Akiva Mozes (ICL 1999-2012);
30. Avraham Novogrocki (AFI Israel 2012-present);
31. Liam O'Mahony (CRH PLC 1990-2009);
32. Olof Persson (Volvo 2011-2015);
33. Eliezer Priel (Hanson);
34. Henri Proglio (Veolia 2000-2009);
35. Bernard Raskin (RE/MAX Israel 1995-present);
36. Gil Rosenfeld (HP Israel 1998-2007);
37. Rakefet Russak-Aminoach (BL 2012-present);
38. Bernd Scheifele (Heidelberg);
39. Yigal Shermister, a.k.a. Yigal Shermeister (G4S Israel);
40. Estate of Amiram Sivan (1986-2002);
41. Uri Starkman (Veolia Israel);
42. Elana Szyfer (Ahava 2013-present);
43. Margaret Whitman (HP 2011-present);
44. Elisha Yanay (Motorola Israel 1970-2010);
45. Edward Zander (Motorola 2004-2008);
46. Zvi Ziv (BH 2003-2008).

**EXHIBIT D**

# 2015 Hebron District, West Bank Special Report: Crimes committed against Palestinians by the Israeli occupation forces and Israeli settlers.

- *The area covers 375,000 acres (1.5 million dunams)*
- *The Palestinian population includes 706,000+.*
- *Many types of military occupation attacks are described*

*2014 was described as the year of settlement expansion. 2015 is the year of the settlement expansion and street executions. These were done by experienced, senior Israeli military officers. Young Palestinian men, women, and children bled to death as military officials prevented ambulances from reaching them. The reprehensible atrocities committed by the 'finest' military in the world is described below.*

## Palestinians killed: 54

### Land confiscation and dredging operations: 1181 acres (military and settlers)

| | |
|---|---|
| 1. | Uprooting or burning of trees: **7335 trees**, close to Yatta, Halhul, Dahria, Bet Ula, Shukh, and Dura |
| 2. | Preventing of field work (agriculture): 22 cases |
| 3. | Damage to agricultural crops: 6 cases,: **225 acres destroyed** |
| 4. | Construction of units & caravans: Added 115 new housing units & multiple caravans |
| 5. | The construction settler roads: **1 case** |
| 6. | Military orders **39** in the old city of Hebron, **2** in Yatta, **3** in Dahria, **2** in Tarqumia, **2** near Kiryat Arba = **976 Acres** |
| 7. | Stop building and demolition notices: **215 orders** , in Idna, Bet Ula, Yatta, Halhul, Hebron, Ramadin, Dahria, Al Kom, Bet Umer, Karma, and Dura |

### The Demolition of Homes and Bombing Attacks

| | |
|---|---|
| 1. | Demolition of houses / barracks rooms / agricultural structures / factories / caves / tents: 52 cases |
| 2. | Demolition water wells: **11 wells** |
| 3. | Stop building orders: **235 orders** |
| 4. | Evacuation orders: **34 cases covering 538 acres** primarily in Dura, Dhariya and Beit Ummar |
| 5. | Destroying / dynamiting doors of homes or shops: **178 doors** |

| | |
|---|---|
| 6. | Private homes seized for military barracks: **190 homes** |
| 7. | Closure of shops under gun threats: **17 shops** |
| **8.** | Breaking into shops and smashing contents: **70 shops** |
| 9. | Confiscation of farm machinery: **4 cases** |

**Military operations**

| | |
|---|---|
| 1. | Raids of private homes: **2598 raid attacks** throughout Hebron district |
| 2. | Shooting at homes and civilians, theft of property, stealing of gold coins, smashing contents of homes, taking computers, mobile devices, cameras, and DVD players, raiding institutional supplies, gas stations, 1067 cases |
| **3.** | Raids of schools: **15 cases** |
| 4. | Raids of institutions and factories: **75 cases** |
| **5.** | Mixing food contents so it is inedible by the family: **12 cases** |
| **6.** | Storming villages / towns / refugee camps: **1890 storming operations** |
| **7.** | Shooting at citizens: **472 cases** |
| 8. | Gas bombs used: **590 cases** |
| 9. | Stun grenades used: **382** cases *(170 decibels, hearing loss at 120 decibels)* |

**Arrest of citizens: up to 1600, many released in hours, others still in custody**

| | |
|---|---|
| **1.** | Beating of citizens: **367 citizens** |
| 2. | Chasing pedestrians in army jeeps: **3 cases, running over 4 of them** |
| **3.** | Chasing workers on the job: **54 workers** |
| 4. | Forcing citizens to undress: **123** cases |
| **5.** | Attacking on worshipers:  **On daily basis** |
| **6.** | Assault on school students, teachers, university students: **42 cases** |

| | |
|---|---|
| 7. | Attacks on farmers - **54** cases, journalists – **28** cases, foreigners –**4** cases, demonstrators – **23** cases |
| 8. | Using citizens as human shields: **15** cases |
| 9. | Kidnapping of citizens: **6 citizens** |
| | |
| 10. | Joint army attacks with settlers: **20 cases** |
| 11. | Blocking ambulance and fire crews , **45 cases** |
| 12. | Closure of roads / entrances to villages and towns: **1000 cases, some are still closed** |
| 13. | Detention of Palestinian vehicles: **590 vehicles** |
| 14. | Preventing access to the Tomb of the Patriarchs: **DAILY** |
| 15. | Declaration of closed military zones: **39 cases** |
| 16. | Storming of mosques: **2 cases** |
| 17. | Destruction of water networks and  Electricity networks : 7 cases |
| 18. | Closure of institutions: **5 cases** |
| 19. | Erecting new military Towers: **3 case** |
| 20. | Prohibiting access to farmland: **5 cases** |
| 21. | Landing military aircraft: **4 cases of operations** |

**Settler Attacks and Outpost Thugs**

| | |
|---|---|
| 1. | Attacking homes: **220 cases** |
| 2. | Smashing cars: **29** cars |
| 3. | Uprooting and stealing  trees: **800 trees** |
| 4. | Beating Palestinian citizens: **83 citizens** |
| 5. | Attacks on farmers, school students, children, shopkeepers, ambulance crews, shepherds: 177 cases |
| 6. | Sexual provocation: **80 cases** |
| 7. | Assault on graves: **1 case** |

| | |
|---|---|
| **8.** Block roads.: **16 cases** | |
| **9.** Attacks people : **38 cases** | |
| **10.** Death threats: **10 cases** | |
| 11. Smashing Solar Cells: **6 cases** | |
| 12. Storming villages and towns :**14 cases** | |
| 13. Acts of provocation and Orgy: **111 cases** | |
| 14. Running over citizens and children: **18 cases** | |

Registering of Palestinians in Hebron's Old City with numbers next to their identity (to intimidate).  This procedure initiated in Nazi Germany.

***Prepared by Abdulhadi Hantash***
*Expert on Land and Settlement*
*Land Surveyor and Cartographer for the Palestinian*
*Authority* hantasha@hotmail.com
*0599- 83 81 80*

***All rights reserved***

4