## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**BASSEM AL-TAMIMI, et al.,** )
 )
 )
**Plaintiffs,** )    No. 1:16-cv-00445
 )
**v.** )
 )
**SHELDON ADELSON, et al.,** )
 )
**Defendants.** )
_____ )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

COME NOW the Plaintiffs herein, and hereby respond to the Motion to dismiss filed by individuals and private entities named as Defendants herein. Defendants argue that this Court lacks subject matter jurisdiction based on the political question doctrine and the act of state doctrine. The Motion should be denied for a number of reasons. First, local District Court Judge Rosemary Collyer has rejected the invocation of the political question doctrine or the act of state doctrine in very similar circumstances. *See Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1 (D.D.C. 2005). Second, the D.C. Circuit has recently in affirmed in *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. 2016) that alien Plaintiffs can rely on the Alien Tort Statute, 18 U.S.C. § 1350, hereinafter ATS, to pursue claims based on the illegal confiscation of private property located abroad. Plaintiffs have alleged herein that belligerent settlers and rogue army personnel have stolen tens of thousands of acres or private Palestinian property. The D.C. Circuit concluded that private property confiscation in violation of international law is a war crime akin to genocide, especially if it involves the destruction of homes. As alleged in the complaint (Introduction), 49,000 Palestinian homes have been

demolished or confiscated by belligerent settlers and rogue Israeli army personnel. They receive $2 billion every year from U.S. based pro-occupation tax-exempt entities like Defendants Friends of Ariel [Defendant Adelson's favorite settlement], and Friends of the Israeli Army. In 2014 the Israeli Army received $104 million from Friends of the Israeli Army to maim and murder Palestinian landowners.

The third reason why the motion should be denied is that, as recognized by District Judge Royce Lamberth in *Doe v. Exxon Mobil*, ATS claims like the ones asserted herein have been recognized by federal district courts for at least 40 years. *Doe v. Exxon Mobil Corporation*, 69 F. Supp. 3d 75 (D.D.C. 2014). In that case, Judge Lamberth analyzed the "touch and concern test" at great length. Based on allegations contained in the introduction and venue sections, re: the extensive criminal conduct engaged in by the Defendants on U.S. soil, (money laundering, income tax fraud, and arms trafficking), the Plaintiffs have satisfied this *touch and concern* test based upon Judge Lamberth's analysis. The fourth reason the motion should be denied is that various courts have agreed with Justices Collyer and Lamberth's analysis regarding virtually the identical claims made herein. Other District Court judges, for example Judge Nina Gershon of the Eastern District of New York, have thoroughly analyzed the political question doctrine as it applies in the context of ATS and ATA claims. That decision alone affords this Court a valid basis to deny the motion to dismiss premised on a lack of subject matter jurisdiction.

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES..................................................................................................4

ARGUMENT........................................................................................................................6

    I.    This District Has Rejected Application of the Political Question Doctrine as a Bar to

Hearing Similar Claims......................................................................................................6

    II.   The D.C. Circuit has Affirmed that Aliens Can Sue for Illegal Property Confiscations....11

    III.   Alien Torts Statute Claims Have Been Entertained by Federal Courts for over 40 Years

15

    IV.   Other Federal Courts Have Also Found That Claims Based on the ATA or the ATS Do

Not Bar a Federal Judge From Hearing Such Claims................................................................18

CONCLUSION....................................................................................................................23

# INDEX OF AUTHORITIES[1]

**CASES:**

Abdullahi v. Pfizer, Inc.,
    562 F.3d 163 (2d Cir. 2009)................................................................16

Almog v. Arab Bank, PLC,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007)..................................................19

*Alperin v. Vatican Bank*,
    410 F.3d 532 (9th Cir. 2005) ...............................................................20

*Baker v. Carr,
    369 U.S. 186 (1962) ..........................................................10,17,19,20,21

*Biton v. Palestinian Interim Self-Government Authority,
    412 F. Supp. 2d 1 (D.D.C. 2005) ("Biton II").............................1,9,10,15

Caddick v. Karadzic,
    70 F.3d 232 (2d Cir. 1995)....................................................................18

*Doe v. Exxon Mobil Corporation,
    69 F. Supp. 3d 75 (D.D.C. 2014)..................................................1,12,13,14

Doe v. State of Israel,
    400 F. Supp. 2d 86 (D.D.C. 2005)..............................................6,7,10,11

Estate of Klieman v. Palestinian Auth.,
    424 F. Supp. 2d 153 (D.D.C. 2006)........................................................10

Estates of Ungar v. Palestinian Authority,
    315 F. Supp. 2d 15 (D.R.I. 2004)...........................................................15

Filartiga v. Pena-Irala,
    630 F. 2d 876 (2d Cir. 1980)............................................................16,18

In re Marcos,
    978 F. 2d 493 (9th Cir. 1992)................................................................19

Israel v. Eichmann (1962)(Israel Sup. Ct. 1962),
    Int'l L. Rep., col. 36, p. 277..................................................................21

Japan Whaling Ass'n v. American Cetacean Society,
    478 U.S. 221 (1986).................................................................................21

Kiobel v. Royal Dutch Petroleum Co.,

---

1 Asterisks identify those authorities on which Plaintiffs chiefly rely.

133 S. Ct. 1659 (2013) ...................................................................................12

Klinghoffer v. S.N.C. Achille Lauro,
937 F.2d 44 (2d Cir. 1991).........................................................................15

*Linde v. Arab Bank
384 F. Supp. 2d 571 (E.D.N.Y. 2005)....................................................17,18

Mamani v. Berzain,
654 F. 2d 1148 (11th Cir. 2011)..................................................................19

*Simon v. Republic of Hungary,
812 F.3d 127 (D.C. 2016)........................................................................14,15

*Sokolow v. Palestine Liberation Organization,
583 F. Supp. 2d 451 (S.D.N.Y. 2008).........................................................18

Strauss v. Credit Lyonnais S.A.,
925 F. Supp. 2d 414 (E.D.N.Y. 2013).........................................................16

Whiteman v. Dorotheum GmbH & Co. KG,
431 F.3d 57 (2d Cir. 2005).....................................................................20,21

**STATUTES AND RULES:**

U.S. Const. art. I, § 8, cl. 10.......................................................................12

Pub. L. No.114-222.........................................................................................7

18 U.S.C. § 960..............................................................................................8

18 U.S.C. § 1350.............................................................................................1

18 U.S.C. § 1956(a)(2))..................................................................................8

18 U.S.C. § 2339C..........................................................................................8

18 U.S.C. § 371..............................................................................................8

# ARGUMENT

## I.   This District Has Rejected Application of the Political Question Doctrine as a Bar to Hearing Similar Claims

As a fair reading of Defendant's memorandum in support of their motion to dismiss, the overriding theme is that the political question doctrine bars claims made by the Plaintiffs herein because somehow they have the potential to undermine the separation of powers doctrine designed by our founding fathers. (See Defendant's Memorandum at 13). While the Defendants' memorandum is premised on the invocation of the political question doctrine, it does not address relevant political question authorities from this District for an obvious reason. Those decisions support the proposition that the political question doctrine has no application on our facts.

Based on Defendants' memorandum, the motion to dismiss essentially relies on a single case in this jurisdiction, i.e. Judge Bates' opinion in *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005). While the Defendants argue that this Court should dismiss the complaint based upon the *Doe* opinion, nothing therein compels dismissal. First, the *Doe* Plaintiffs inexplicably requested an award of declaratory relief that necessarily implicated the political question doctrine, i.e. they sought a ruling from Judge Bates that "Israel was a terrorist state." That is something for the State Department or the Executive Department to decide. Plaintiffs of course have made no such request.

They are instead requesting entry of a monetary judgment against the financiers [donors, tax exempt entities], and profiteers [corporations and bank entities named herein], of settlement expansion, which necessarily entails ethnic cleansing and genocide. They allege in the suit, for at least 30 years, the Defendants have aided and abetted and financed the illegal appropriation of private property, wholesale violence, and perpetration of war crimes. And they are not requesting

that this Court opine that settlements are illegal, even though, based on the discussion *infra*, it appears that they are.

Moreover, the *Doe* plaintiffs never alleged that the Defendants have violated: a) nine separate criminal statutes; b) a number of Treasury tax-exempt regulations; c) President Clinton's 1995 Executive Order; and d) the newly enacted legislation called JASTA (Pub. L. No.114-222). Both JASTA and that Presidential executive order prohibit U.S. citizens from participating in or financing violence in the Middle East. U.S. Defendants here have been financing violence in the Middle East for at least 30 years. In fact, even today they send approximately $2 billion in charitable donations every year overseas to fund settlement expansion, the purchase of Kalashnikovs, M16s, sniper scopes, body armor, and the murder and maiming of innocent Palestinian Civilians. (*See* Introduction).[2] The Defendants' goal is to force all non-Jews in the OPT to abandon their 200-year-old homes and olive groves. That is classic ethnic cleansing.

That conduct not only violates 50 years of America's anti-settlement public policy, but also 35 years of Israel anti-settlement public policy. *See* Compl. Introduction; ¶¶ 97, 146, 158). That is only one of many reasons why the Plaintiffs allege that the Defendants have violated numerous Treasury Department tax-exempt regulations. Those regulations prohibit U.S. tax-exempt entities from using charitable donations to fund criminal conduct in the U.S. or abroad, or finance activities which violate the recipient country's public policy or its criminal statutes. Israel's public policy is definitely anti-settlement. The nine federal criminal statutes which have been violated by all the U.S. Defendants are: money laundering, arms trafficking, wire and mail fraud, financing a foreign militia unit, conspiring to defraud a U.S. government agency, income

---

2 Even former U.S. Ambassador Marc Ginsberg, in a Huffington Post piece, noted that one Pro-Occupation tax-exempt entity raises money through two Brooklyn non-profits "to train and equip guard units for settlements. Its website encourages donors to 'send a tax-deductible check for night-vision binoculars, bulletproof vehicles and guard dogs'".

tax fraud, engaging in interstate or foreign travel to solicit funds to promote criminal activity abroad, and perjury. (*See* for example, 18 U.S.C. § 2339C [financing international acts of terrorism]; 18 U.S.C. § 960 [funding a foreign army]; and 18 U.S.C. § 1956(a)(2) [money-laundering], 18 U.S.C.§ 371 [conspiracy to defraud]).

As for the question as to whether or not the settlements are illegal, Secretary of State Cyrus Vance answered that question emphatically 40 years ago: "'United States Policy regarding settlements is unequivocal and has been a matter of longstanding record…*settlements are illegal, and Article 49 paragraph 6 of GCIV is applicable*,' i.e., 'all occupiers [like Israel] are bound to preserve private properties for the rightful owners.'" ¶ 97. Moreover, numerous Secretaries of State and U.S. Presidents, including Johnson, Nixon, Ford, Carter, and Obama have all publicly concluded that they are illegal (*See* U.S. Anti-Settlement Public Policy section herein). That conclusion is consistent with senior Israeli Attorney Theodore Meron's opinion. He opined, just like Secretary of State Vance, that "civilian settlements in the administered territories contravene the explicit provisions of the Geneva Convention."[3]

Whether or not settlements are legal, the bottom line question remains—how does the outrageous criminal conduct financed by these Defendants to intimidate a civilian population, i.e. genocide and ethnic cleansing, impede the ability of our President to conduct foreign affairs? And, how does suing American citizens who abuse the U.S. tax code, or engage in money laundering or fund a foreign army and conspire on U.S. soil to injure civilians located overseas impede our President's ability to conduct foreign affairs? The reason why money-laundering is a serious issue is because it: a) promotes other criminal conduct; and b) because it damages the American economy by forcing other citizens to shoulder an additional burden in terms of income taxes. Arms trafficking not only provokes tension in the OPT, it also results in hundreds of

---

3 *See* https://www.soas.ac.uk/lawpeacemideast/resources/file48485.pdf

needless civilian deaths.

As already referenced earlier, Defendants have ignored a number of relevant opinions issued in this District that can serve as a basis for denying their motion to dismiss. In *Biton I* and *Biton II,* Judge Collyer opined that the Court was competent to rule on similar claims made herein. 412 F.Supp.2d 1 (D.D.C. 2005). Judge Collyer analyzed both the political question doctrine and act of state doctrine at length, and rejected the Defendant's argument that having the case go forward would violate those doctrines. Citations from her opinions significantly bear on the issue before the Court, i.e. disposition of the Defendants' motion to dismiss for lack of subject matter jurisdiction.

As Judge Collyer pointed out in *Biton II*: "Defendants argue that the Court would be required 'to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza.'" *Id*. She rejected that argument because, "Defendants misperceive the status of the case. Plaintiffs complain that Defendants' actions caused them injury; while the ATA provides jurisdiction for the suit in federal court, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*". *Id*. at 5-6. (emphasis added). In rejecting the identical argument advanced in the Defendants' memorandum, Judge Collyer also explained in *Biton II*:

> "'This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism.' There is no flaw in this Court's ability to address Plaintiff's claims: *Congress explicitly committed these issues to the federal courts* under the ATA. Similarly, the Court has access to 'judicially manageable standards for resolving the issues before it,' *id*., from both existing ATA caselaw and traditional tort caselaw.
>
> The 'initial policy determination' involved here has already been made by the U.S. Congress: Americans injured by terrorist acts can sue their attackers in U.S. courts and the Court can manage this case to resolution of Defendants' alleged liability without 'expressing lack of the respect due coordinate branches of government.' *Baker*, 369 U.S. at 217. The Fifth and Sixth factors from *Baker v. Carr* do not apply because a decision in

this individual case will have no consequences concerning 'political decisions already made' and will raise only the question of Defendants' alleged liability regarding this single bombing of a bus. Thus, nothing in *Baker v. Carr* counsels against having this case proceed." *Biton II*, 412 F. Supp. 2d at 6.

Similar to the holding in *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006), the tortfeasors named herein "have made no attempt to distinguish any of these prior decisions in their moving papers." Just as in *Biton II*, a decision on Plaintiffs' claims alleged herein can be resolved by this Court by deciding the liability of the Defendant tortfeasors, thus it would have no consequences concerning "political decisions already made." *Biton II* at 6. The Plaintiffs respectfully submit that the Motion to Dismiss can be denied based solely on the holdings in *Biton I* and *Biton II*. The bottom line is that it would be judicial error for this Court to grant the motion to dismiss based on Judge Bates' holding.

They are two entirely different cases, e.g. the *Doe* Plaintiffs never alleged that the Defendant tortfeasors were engaging in a $2 billion money laundering scheme on U.S. soil designed to rid the West Bank of all non-Jews. All Defendants know that the fulfillment of that goal—ridding the West Bank of all non-Jews—necessarily entailed ethnic cleansing and genocide. Thus, they were financing war crimes. Without the funding provided by the U.S. based tax-exempt entities and donors, belligerent settlers would never have had the financial resources to accomplish that job. Evidence thereof is the fact that equipping a fifty-member militia unit with body armor or Kalashnikovs or M-16s could run as much as $200,000. None of the settlements have that amount of money lying around to purchase military hardware. The solution —have pro occupation tax-exempt entities' and donors' financial backing.

## II.    The D.C. Circuit has Affirmed that Aliens Can Sue for Illegal Property Confiscations

Defendants have also ignored the recent D.C. Circuit opinion in *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. 2016). The Plaintiffs therein complained that their homes and

private property had been illegally confiscated by the Hungarian government and a Hungarian

state-owned railway. Just like the Plaintiffs herein, the Plaintiffs in that case alleged that

destroying or confiscating their homes constituted a grave war crime, i.e. genocide. The D.C.

Circuit allowed the case to go forward against the state-owned railroad and overruled the District

Court for failing to recognize claims based on expropriation of private property in violation of

international law. The identical claims are made herein.

Contrary to Judge Bates' *Doe v. Israel* opinion cited repeatedly in Defendants' motion to

dismiss, the D.C. Circuit concluded that a Federal District Court judge could competently hear

and determine claims that are virtually identical to the ones alleged herein. *See* Simon v.

Republic of Hungary, 812 F.3d 127 (D.C. 2016). Plaintiffs Ali, Abulhawa, and Kateeb, who are

U.S. citizens, have specifically alleged that they have lost their private property as a result of

funding coming from U.S. Defendants tax-exempt entities and their donors who sent $104

million to the Israeli army in 2014. The theft of private property included two steps: a) settlers,

armed with Kalashnikovs and body armor threaten to kill Palestinian land owners who are forced

to evacuate the area fearing family members will be murdered; b) After the settlers move in,

rogue Israeli soldiers, financed by the American taxpayer, encircle their homes and refuse

Palestinian homeowners reentry.

Contrary to Defendants' argument, individuals who do not actually terrorize a civilian

population or maim and murder them, but provide the necessary financing to do so can be

deemed to be collaborators in the commission of war crimes. *See* re: Count II – War Crimes).

District Court Judge Lamberth, in a similar setting, has also held that claims against a defendant

for injuries caused by Indonesian soldiers employed overseas by the defendant therein did not

violate the act of state doctrine, nor warrant dismissal under the political question doctrine. *See*

*Doe v. Exxon Mobil Corporation*, 69 F. Supp. 3d 75 (D.D.C. 2014). In that case, Judge Lamberth found that federal courts may recognize private claims under the ATS as a manner of federal common law if those claims sufficiently 'state a violation of law of nations with the requisite definite content and acceptance among civilized nations.'" *Id*. at 94 (quoting *Kiobel*, 133 S. Ct. at 1663). The entire world recognizes that ethnic cleansing and genocide violate the law of nations. Our founding fathers thought so much of the law of nations concept that a law of nations clause is enshrined in our Constitution. U.S. Const. art. I, § 8, cl. 10. Judge Lamberth further recognized that "authorities and sources confirm aiding and abetting liability is clearly established in the law of nations and consequently such liability is available under the ATS." *Id*. (quoting *Doe VIII*, 654 F.3d at 32). Defendants of course do not address this issue in their memorandum.

The U.S. Supreme Court, as reiterated by the Judge Lamberth in *Doe v. Exxon Mobil*, "noted that in certain situations, claims arising under the ATS might 'touch and concern the territory of the United States' with 'sufficient force to displace the presumption against extraterritorial application.'" *Id*. (quoting *Kiobel* at 1669). In ultimately concluding that the Plaintiffs' claims in *Doe v. Exxon Mobil* sufficiently touched and concerned the United States to allow the ATS claims to go forward, the Court specifically referenced the 4th Circuit opinion of *Al Shimari v. CACI Premier Tech., Inc.*, 758 F. 3d 516 (4th Cir. 2014), noting "the ATS was properly applied [there] because, among other reasons, plaintiffs alleged relevant U.S. based conduct indicating knowledge and encouragement of international law violations abroad." *Id*. at 95.

The Plaintiffs have repeatedly alleged, and have detailed the U.S. based criminal activity engaged in by both pro-occupation U.S. donors and U.S. tax-exempt entities. The donors and the entities solicit charitable donations on U.S. soil to send millions of dollars overseas which

provides assistance to tortfeasors based overseas like rogue Israeli Army personnel and belligerent settlers to finance theft of private property, settlement expansion, arms trafficking, and ethnic cleansing and genocide. They also alleged that all Defendants knew that their charitable donations would be used to maim and murder Palestinians and forcibly remove thousands of Palestinian families from the OPT. Their funding made that criminal activity possible and resulted in 400,000 Palestinian civilians being deported from the OPT in violation of the Geneva Convention.[4] Compl. ¶ 107.

In any event, Defendants' argument can and should be rejected for the same reasons that Judge Lamberth relied on in *Doe v. Exxon Mobil*. He rejected the argument that adjudicating the plaintiffs' claims "would require the Court to declare invalid an official act of the [State]." *Id*. at 87. As explained by the Court, "[t]he act of state doctrine requires American courts *to presume the validity of an official act of a foreign sovereign performed within its own territory*." *Id*. He denied the defendants' motion to dismiss because "[Defendant] has made no showing that plaintiffs were injured pursuant to official military orders as required by the act of state doctrine." *Id*.

Plaintiffs allege armed belligerent settlers are "out of control" according to 700 Israeli army veterans. As sworn to in their book "Our Harsh Logic", their mission in the OPT was not to protect Israel, but to protect belligerent settlers when they went on violent rampages against Palestinian farmers, almost a daily occurrence. In their memorandum, the Defendants have not claimed that any of this criminal activity that they financed was engaged in based on official military or government orders, nor could they. Not a single civilized nation has ever issued official government orders that compel murdering and maiming civilians, burning down their homes and places of worship, buying military hardware to intimidate landowners, stealing

---

4 See "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

private property, or engaging in war crimes like ethnic cleansing and genocide. Therefore, the Act of State doctrine cannot be invoked herein as a basis for granting the instant motion to dismiss.

Judge Lamberth ultimately concluded in *Doe v. Exxon Mobil* that because the Defendant "provided material support to its security personnel by, for example, constructing facilities, *providing funding for weapons*, providing supplies and equipment, and *paying for the services of consultants in training and equipping the personnel*" that the claims were actionable under the ATS. *Id*. at 96 (emphasis added). As alleged in the Complaint, the Plaintiffs make the identical claims as the Plaintiffs did in *Doe v. Exxon Mobil*. They allege that Defendants have provided the funding for the purchase of body armor, sniper scopes and automatic weapons [arms trafficking], building military barracks, providing supplies [ammunition], and providing the necessary training to ensure that settlement militia members knew how to use sniper scopes so they could murder Palestinian farmers trying to harvest their olive groves. The result - 400,000 Palestinians no longer live in the West Bank, forced out by belligerent settlers. That is classic ethnic cleansing.

**III.    Alien Torts Statute Claims Have Been Entertained by Federal Courts for over 40 Years**

A case remarkable on its facts to the case *sub judici*, is *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008). The *Sokolow* plaintiffs alleged that the Defendants, much like what is alleged in this lawsuit, have carried out and utilized violent physical attacks on an innocent civilian population in order to terrorize and intimidate them. Here, Palestinian nationals alleged that they have been intimidated and coerced into abandoning their homes and olive groves as a result of armed violent settlers threatening to murder them. The court in *Sokolow*, quoting *Estates of Ungar v. Palestinian Authority*, 315 F. Supp. 2d 15 (D.R.I.

2004), noted that "[t]he [Defendants] PA and PLO repeatedly fail to realize that the non-justiciability doctrine is one of political questions and not political cases." *Id*. at 456.

The Defendants raise many of the same foreign policy concerns as the PLO did in *Sokolow* and *Klinghoffer,* with the Second Circuit observing that "[*t]he fact that the issues before [the court] arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question.*" *Id.* (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)). *See also Biton* at 6, noting that "the ATA provides jurisdiction for suits in federal courts, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*."

In addition, federal courts, such as the Second and Ninth Circuits have recognized tort liability for torture, genocide, and war crimes committed by both state and non-state actors. *Apartheid Litig.* At 248-49. The Ninth Circuit has also held "that a court's jurisdiction to hear claims under the ATCA is not limited by 'the focus of the injury'." *Id*. at 247 (quoting *In re Marcos*, 978 F. 2d 493, 500 (9th Cir. 1992). A tort that violates customary international law will be recognized under the ATS if "the norm alleged (1) is defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*. (2) is based upon a norm of international character accepted by the civilized world, and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Apartheid Litig.* At 248 (quoting *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009). As this Court knows, genocide and ethnic cleansing are war crimes, and violate norms of international character accepted by the civilized world.

Plaintiffs also allege the international crime of denationalization, which has been recognized as an actionable tort basis for jurisdiction under the ATCA. *See Apartheid Litig.* at 252 ("A state actor commits arbitrary denationalization if it terminates the nationality of a citizen

either arbitrarily or on the basis of race, religion, ethnicity, gender, or political beliefs"); *see also* the 1907 Hague Convention Respecting the Laws and Customs of War on Land (individuals have a right to retain their citizenship, even in the fact of a hostile invasion). The Plaintiffs have alleged herein that state actors like out of control Israeli soldiers and belligerent settlers have committed arbitrary denationalization based on race, religion, ethnicity, and political beliefs.

Defendants here make essentially the same arguments as the Defendants did in *Apartheid Litigation*, re: that the Court does not have jurisdiction to address tort claims based on extraterritorial events. Although the physical injuries complained of herein, i.e. maiming and murdering Palestinian civilians, occurred outside the U.S., this is no bar to jurisdiction. *See Apartheid Litig.* at 246. As detailed in the venue section, pro-occupation U.S. donors and 501(c)(3) officials have conspired on U.S. soil for approximately 30 years to finance horrific criminal activity—maim and murder Palestinians, steal their property, engage in ethnic cleansing and genocide. "It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." *Filartiga*, 630 F.2d at 885.

The Defendants have also suggested that there should be a requirement imposed on the Plaintiffs to trace specific wire dollar transfers to specific physical attacks on innocent Palestinian civilians. That requirement has been repeatedly rejected by our federal courts. *See Strauss v. Credit Lyonnais S.A*, 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013). ("Plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter.") It would be impossible to trace specific dollars to specific attacks on our facts because the named Defendants have been executing wire transfers for approximately thirty years.

Based on the allegations made herein, a reasonable juror could conclude that the significant amount of money sent by U.S. Defendants overseas [$2 billion a year] was a substantial reason why sister Israeli based NGOs intent on ridding the West Bank of all non-Jews, belligerent settlers, and rogue Israeli army soldiers were able to finance the horrific terrorist attacks described herein.

It also would be obvious to any juror hearing this case, that an annual subsidy of $2 billion is quite a staggering sum. Besides the amount of the subsidy, another reason why those funds were so crucial is that the Israeli government had prohibited charitable donations to settlements, which cut off a significant source of income. Likewise, Secretary of State Baker was assured by Prime Minister Shamir in 1992 [the Baker/Shamir Accord], that no part of American financial aid would be used to set up new settlements or finance expansion of existing settlements. Thus, except for some minimal funding coming from Prime Minister Netanyahu, ("under the table financing"), the settlers did not have any source of funding to: a) properly equip a 50-member local militia unit; and b) build vital infrastructure improvements like electric power grids and sewage hookups.

## IV.   Other Federal Courts Have Also Found That Claims Based on the ATA or the ATS Do Not Bar a Federal Judge From Hearing Such Claims

It is not just Judge Collyer, Judge Lamberth, and the D.C. Circuit that have decided to reject the argument that Courts lack subject matter jurisdiction to entertain claims based on violation of international norms. Other Courts have decided to reject the application of the Political Question doctrine based on similar allegations made herein. For example, in *Linde v. Arab Bank*, Judge Gershon of the Eastern District of New York rejected the invocation of the political question to bar her from hearing similar claims made herein. *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005). She analyzed the political question doctrine at length, and

rejected the Defendant's argument for dismissal premised on the fact that the ATS statute empowers courts to hear a dispute between foreign nationals concerning extra territorial conduct. *Id.* As Judge Gershon observed, this argument was unavailing to the Defendant. Foreign plaintiffs sued foreign defendants for extra territorial conduct in both *Filartiga v. Pena-Irala*, 630 F. 2d 876 (2d Cir. 1980) and *Caddick v. Karadzic*, 70 F.3d 232 (2d Cir. 1995). *Id*. And Judge Gershon remarked further that indeed "a recent 2nd Circuit case upheld the availability of aiding and abetting liability for conduct of foreign defendants in South Africa."

In *Linde*, just like the Plaintiffs herein, the Defendant Bank had, through the provision of financial services to groups that engaged in terrorist activity, knowingly and intentionally aided and abetted violent criminal attacks on civilians in Israel in violation of international law. The only difference between those allegations and the allegations pled herein is that the injured Plaintiffs therein were innocent Israeli citizens, not Palestinians. The Plaintiffs herein, just like the Plaintiffs in *Linde*, have alleged that they've been injured by the Defendants providing substantial financial assistance to promote that criminal activity.

Defendants rely significantly on the *Baker v. Carr* holding to justify dismissing the lawsuit based on non-justiciable political questions. Much like the Defendants herein, the Defendant in *Linde v. Arab Bank* laid out the elements that identify a non-justiciable political question. Judge Gershon then concluded, however, that "these elements do not exist in this case, in particular no action by a coordinate branch of the us government is involved here." *Id*. She also pointed out that "it ignores government concerns that charitable donations purportedly for humanitarian services are being funneled to terrorist entities." *Id*.

Judge Gershon went on to point out that as set forth in *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), the three theories of international law violations asserted in the

case were all based upon principles to which the United States has expressed strong adherence. *Id*. at 318. Just as the Plaintiffs alleged in *Almog*, U.S. senior officials like Senator Leahy have expressed strong adherence to international law conventions, like the Geneva Convention. Senator Leahy has, among others, specifically condemned the extra judicial killings that are alleged in this complaint. And senior State Department officials have repeatedly condemned not only extra judicial killings, but settlement expansion and the violence it promotes.

Moreover, successful prosecution of this lawsuit will, if anything, reinforce U.S. public policy concerns about settlement expansion, the frustration of U.S. foreign policy objectives, and encouraging criminal activity like money laundering, arson and arms trafficking. As this Court knows, money-laundering and arms trafficking are prosecuted on a daily basis by the Justice Department. As recited in *Mamani v. Berzain*, 654 F. 2d 1148 (11th Cir. 2011), the claims alleged therein simply required the court to evaluate the lawfulness of the conduct of the Defendants/tortfeasors named therein. For example, the claims in *Mamani*, such as extra judicial killings occurring in Bolivia by government officials, did not require the Court to decide the legitimacy of U.S. executive branch foreign policy decisions. *Mamani* at 1151 (quoting *Cf. hinder v. Portocarrero*, 963 F.2d 332, 332 (11th Cir. 1992)). Just like here, the claims asserted by the Plaintiffs [genocide, denationalization of a civilian population and ethnic cleansing] do not require this court to decide the propriety of the U.S. executive branch's foreign policy decisions as they pertain to the Middle East.

Finally, Defendants urge this Court to accept the argument that suing individuals who are financing war crimes abroad somehow impact the ability of the political branch to function. Besides being an absurd argument to embrace based on relevant case law in this District, such a decision would likely violate provisions contained in the International Covenant on Civil and

Political Rights. As this Court surely realizes, foreign plaintiffs should be able to access U.S.

court to have legitimate property and civil rights claims adjudicated, especially where they

complain about ethnic cleansing and genocide. These are classic war crimes, which violate

international norms recognized by the world. Thus, if foreign plaintiffs are denied that right, this

Court could possibly be violating relevant provisions contained in the International Covenant on

Civil and Political Rights.

Defendants further argue that having the Court decide the issues raised in the Complaint

would violate the standards set forth in *Baker* as to issues best left to the political branches of

government. The Court pointed out in *Baker*, however, that "An action does not lie beyond

judicial cognizance solely because it raises questions touching upon foreign relations." 369 U.S.

186 (1962). The Second Circuit noted that "[w]ith respect to the first *Baker* test, while foreign

policy is committed in the first instance to the Executive, tort claims against foreign countries

and individuals under the law of nations, as well as issues of sovereign immunity, *are*

*constitutionally committed to 'none other than our own Judiciary.'"* *Whiteman v. Dorotheum*

*GmbH & Co. KG*, 431 F.3d 57 (2d. Cir. 2005) (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d

Cir. 1995). *See also Alperin v. Vatican Bank*, 410 F.3d 532, 551 (9th Cir. 2005).

As for the second and third *Baker* tests, just like in *Whiteman*, they are met by applying

not only the traditional adjudication process, but also through "the universally recognized norms

of international law [invoked by the Plaintiff]." *Whiteman*. at 77. The Second Circuit noted, for

example, that the "FSIA "'provide[s] judicially … manageable standards for adjudicating suits'

and 'obviate[s] any need to make policy decisions of the kind normally reserved for non judicial

discretion.'" *Id*. (citing *Kadic*, 70 F.3d at 249). As further outlined in *Whiteman*, "[t]he fourth and

sixth tests are basically coterminous with the fifth, that they involve cases where an exercise of

jurisdiction, although not *per se* outside the judiciary's authority, would somehow contradict actions taken by the political branches; [the Court] will therefore discuss them together." *Id*.

It is important to reiterate that a ruling in this case would in no way contradict prior decisions taken by the other political branches—executive or legislative. *Id*.; *see also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221 (1986) (the Supreme Court for example unanimously declined to dismiss as non-justiciable a claim that the Secretary of Commerce had violated federal statutory law by refusing to certify that Japan's whaling practices were undermining the effectiveness of an international fishing conservation program). If anything, this case serves to reinforce fundamental principles of international law approved by 12 American Presidents and at least 10 Secretaries of State—i.e., ethnic cleansing, genocide, and denationalization of a civilian population are horrific war crimes.

Finally, the Defendants failed to address Amnesty International's principles on universal jurisdiction as recognized by the district court of Jerusalem in the case of *Israel v. Eichmann* (1962). The District Court of Jerusalem held, regarding jurisdiction, that the universal character of the crimes in question, i.e. war crimes, which are grave offenses against the law of nations itself, grants jurisdiction to *any domestic court hearing such claims*.  As repeatedly pled herein, grave war crimes, like genocide and ethnic cleansing, committed or funded by the Defendants named herein are an appropriate basis to conclude that the Court had subject matter jurisdiction herein.

Defendants' intentions regarding displacement of Palestinian landowners are well-known. For example, there are at least 200 Rav Shatz Israeli Guards in the OPT. One former Rav Shatz "patrolled outside the settlement to frighten neighboring Palestinians so they would move away,"

driving the Palestinians off the land clears the path for settlement expansion. [5] He explained further that expansion is the primary goal of Israeli West Bank Settlers. The One Israeli fund, just like the U.S. tax-exempt entities named herein, transfers sophisticated military equipment to these guards, who use that equipment to intimidate and push out Palestinians.

In the Memorandum (page 6), the Defendants claim that none of them have actually engaged in any actions causing personal injuries, nor have they taken forcefully or otherwise any property from any Plaintiff. That is a true statement, but it is totally irrelevant because the Defendants have financed these criminal acts. As detailed in the Complaint Count II, genocide is defined to mean that if you aid and abet the commission of war crimes, you can be accused of being a war crime collaborator simply because you have financed these crimes.

And it is rather disingenuous on the Defendants' part to claim that U.S. Defendants have been engaging in "normal business transactions" with settlers by financing the commission of international acts of terrorism. These are not "normal business transactions" which a U.S. tax-exempt entity can engage in. They constitute money laundering (i.e. sending funds overseas to promote criminal activity and arms trafficking). In fact, these alleged "normal business transactions" violate both President Clinton's Executive Order and the new JASTA legislation.

**CONCLUSION**

---

5 *See* Alex Kane, *Meet the U.S. Non Profit That Funds the Israeli Guards Who Terrorize Palestinians*, INTHESETIMES.COM (Feb. 15, 2017), available at Inthesetimes.com/features/one_israel_fund_settlement_guards.html

Based on the authorities cited herein from this judicial district, and the detailed allegations contained in the Complaint, this Court has ample precedent to deny the instant motion based on subject matter jurisdiction.

Respectfully submitted,

/s/  Martin F. McMahon
Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
Counsel for Plaintiffs