**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **BASSEM AL-TAMIMI, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | No. 1:16-cv-00445 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SHELDON ADELSON, et al.,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____ )

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO UNITED STATES' MOTION TO DISMISS COUNTS I THROUGH III OF PLAINTIFFS' AMENDED COMPLAINT**

COME NOW the Plaintiffs herein, and hereby respond to the Motion to Dismiss which has been

filed by the United States government on behalf of Defendant Elliot Abrams under the Westfall

Act. Defendant's motion is premised on three arguments: 1) Sovereign immunity has not been

waived and bars the suit; 2) the suit raises a political question that bars the Court from

considering it; and lastly 3) an argument that the statutes utilized by Plaintiffs (ATA/ATS) do not

provide jurisdiction over the Plaintiffs' claims in this Court. As explained herein, Defendant's

arguments do not support granting the motion. For ease of reference for the Court, all of the

allegations made against Defendant Abrams can be found in Exhibit A (copy attached) to this

memorandum in opposition. The allegations are contained in the Introduction, in the Venue

section, the Parties section, and the Common Allegations section. Plaintiffs also incorporate by

reference the other Memorandum in Opposition to the other Defendants' Motion to Dismiss the

Amended Complaint, making basically the same arguments herein as if fully recited.

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................................................................3

ARGUMENT...................................................................................................................................5

Allegations Made in Counts I, II, and III..................................................................................5

   i.   Sovereign Immunity Does Not Bar Plaintiffs' Claims.......................................................6

   ii.  Defendant Abrams is mistaken when he claims that The Political Question Doctrine

   Bars this Lawsuit...........................................................................................................10

CONCLUSION..............................................................................................................................22

## INDEX OF AUTHORITIES[1]

**CASES:**

Abdullahi v. Pfizer, Inc.,
    562 F.3d 163 (2d Cir. 2009).......................................................................20

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)............................................................................12

Almog v. Arab Bank, PLC,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007)....................................................12,16

Al Shimari v. CACI Premier Tech., Inc.,
    758 F. 3d 516 (4th Cir. 2014) ...............................................................16

*In re: South African Apartheid Litigation,
    617 F. Supp. 2d 228 (S.D.N.Y. 2009)................................................8,10,17

*Baker v. Carr,
    369 U.S. 186 (1962) ...................................................................11,14,15,16,23

*Biton v. Palestinian Interim Self-Government Authority,
    412 F. Supp. 2d 1 (D.D.C. 2005) ("Biton II").......................................10,13,14,15,24

Caddick v. Karadzic,
    70 F.3d 232 (2d Cir. 1995)...................................................................20

*Doe v. Exxon Mobil Corporation,
    69 F. Supp. 3d 75 (D.D.C. 2014)..................................................10,17,18,19

Doe v. State of Israel,
    400 F. Supp. 2d 86 (D.D.C. 2005).........................................................15

Estate of Klieman v. Palestinian Auth.,
    424 F. Supp. 2d 153 (D.D.C. 2006)........................................................13,15

Estates of Ungar v. Palestinian Authority,
    325 F. Supp. 2d 15 (D.R.I. 2004)..........................................................11,13,14

Filartiga v. Pena-Irala,
    630 F. 2d 876 (2d Cir. 1980)...............................................................17,19,20

In Re Marcos,
    978 F. 2d 493 (9th Cir. 1992)..............................................................19,20

---

[1] Asterisks identify those authorities on which Plaintiffs chiefly rely.

Kiobel v. Royal Dutch Petroleum Co.,
    133 S. Ct. 1659 (2013) ...................................................................................17
Klinghoffer v. S.N.C. Achille Lauro,
    937 F.2d 44 (2d Cir. 1991)..........................................................................11,13

*Linde v. Arab Bank
    384 F. Supp. 2d 571 (E.D.N.Y. 2005)..................................................13,15,16

Sexual Minorities Uganda v. Lively,
    960 F. Supp. 2d 304 (D. Mass. 2013).........................................................18

*Simon v. Republic of Hungary,
    812 F.3d 127 (D.C. 2016)..........................................................................20

*Sokolow v. Palestine Liberation Organization,
    583 F. Supp. 2d 451 (S.D.N.Y. 2008).............................................10,11,13,24

Strauss v. Credit Lyonnais, S.A.
    925 F. Supp. 2d 414 (E.D.N.Y. 2013)......................................................22

Whiteman v. Dorotheum GmbH & Co. KG,
    431 F.3d 57 (2d Cir. 2005) ........................................................................8

**STATUTES AND RULES:**

18 U.S.C. § 1956(a)(2))...........................................................................7

28 U.S.C. §§ 1330.....................................................................................7

28 U.S.C. § 1350.......................................................................................17

28 U.S.C. §§ 1602-1611............................................................................7

28 U.S.C. §2680........................................................................................7

## ARGUMENT
## Allegations Made in Counts I, II, and III

It is helpful at the outset that the Plaintiffs remind the Court about the nature of their case. Based on his memorandum, Defendant Abrams apparently thinks it is all about the Westfall Act and the issue of whether he was acting outside the scope of employment when he was employed at the white house for four years This case is not about the Westfall Act [the Federal Torts Claims' Act] but about U.S. individuals and tax-exempt entities intent on taking criminal advantage of the U.S. tax code by taking significant illegal tax deductions. And in the case of the U.S. Pro-Occupation tax-exempt entities named herein, not reporting billions of dollars as income received from their donors. During the last thirty years, all defendants, including Abrams, have encouraged and funded arms trafficking abroad, theft of private property, wholesale violence including two recognized war crimes like genocide and ethnic cleansing.

The agenda that they have been pursuing for thirty years is the eradication of the Palestinian population living in the Occupied Territories (hereinafter "OPT"). They have been successful – 400,000 Muslim and Christian Palestinians no longer live in the OPT. How did that happen? As alleged in this lawsuit, Defendant Abrams encouraged wealthy Jewish Americans and evangelical Christians to take criminal advantage of the U.S. tax code in order to provide belligerent settlers and the Israeli army with billions of laundered dollars every year. *See* Compl. Introduction and ¶ 17. They literally write off expenses on their tax returns based on "charitable deductions" taken for expenses incurred in purchasing Kalashnikovs, M16s, sniper scopes, and body armor for the militia units located in hundreds of settlements in the OPT.[2]

---

2 Even former U.S. Ambassador Marc Ginsberg, in a Huffington Post piece, noted that one Pro-Occupation tax-exempt entity raises money through two Brooklyn non-profits "to train and equip guard units for settlements. Its website encourages donors to 'send a tax-deductible check for night-vision binoculars, bulletproof vehicles and guard dogs'". Marc Ginsberg, *It's Really the Settlements, Stupid!*, The Huffington Post, Oct. 15, 2014, http://www.huffingtonpost.com/author/ambmcg-507.

Defendant Abrams has funded and encouraged the commission of this criminal conduct because he is a paid zealot who has consistently advocated settlement expansion and therefore more ethnic cleansing. While he explains that he has never personally advocated violence against Palestinians, he has advocated and financed settlement expansion—which necessarily means the illegal taking of private property, ethnic cleansing and genocide. Defendant Abrams has engaged in a $2 billion money laundering scheme which funded the criminal activity.[3] Compl. ¶ 107.

Defendant Abrams has encouraged and funded gruesome criminal activities which have been detailed in the book "Our Harsh Logic." That book is cited a number of times in the Complaint because it contains the sworn statements of 700 Israeli army soldiers who actually served in the OPT for ten years during the Netanyahu regime. They have vividly described recent and horrific war crimes that they have committed as well as belligerent settlers. The war crimes include "trying to take out an eye," "fill Palestinian bodies with bullets," and telling young recruits that promotion was contingent on the number of Palestinians that they murdered. As a result of the funding coming from America, belligerent settlers and rogue army personnel have almost de-nationalized or exterminated all Palestinians in the OPT.

i.    **Sovereign Immunity Does Not Bar Plaintiffs' Claims**

It is undisputed that Defendant Abrams worked in the White House under President Bush, and because he was a Federal employee at the time, the Westfall Act would have applicability to the activity he engaged in during those four years. As for the other 26 years, both the Westfall Act and the discretionary function defense are irrelevant, as Defendant Abrams was a private individual who encouraged and financed the war crimes detailed herein even when he was working in the White House. As a result, he can be deemed to have collaborated with war

_____

3 See "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

criminals (i.e. belligerent settlers and rogue Israeli soldiers). *See* count II. The Westfall Act has nothing to do with war crimes as Justice of Department officials know only too well.

The Westfall Act pertains solely to negligence claims filed against federal employees acting in the scope of their employment. It is Plaintiffs' position that Abrams was not acting within the scope of his employment. That is a condition for application of the Federal Tort Claims Act. At all relevant times, whether in the White House or working as a private citizen, Defendant Abrams was encouraging: a) U.S. pro-Occupation donors and tax-exempt entities to raise and transfer to Israel substantial funds in order to finance war crimes; and b) settlement leaders and rogue Israeli army personnel intent on the illegal confiscation of private Palestinian property. Abrams assured settlement and government leaders that they would keep all of the Palestinian property that they stole once final borders were set. In any case, sending clean funds overseas to promote criminal activity is classic money laundering,[4] and thus well outside the scope of an official's discretionary funding function under 28 U.S.C. 2680(a).

Because Defendant Abrams has encouraged, for the last thirty years, wealthy individuals like Adelson, Bramon, Ellison, Gilbert, Hagee, and Moskowitz to fund settlement expansion, ethnic cleaning, and genocide in the OPT, he is very much a player in terms of the $2 billion money laundering scheme described herein. That of course is classic ethnic cleansing and was made possible by the financing supplied by the U.S. donors like Abrams and tax exempt-entities named herein. Settlement leaders needed approximately $200,000 a year just to equip and maintain the militia unit. They also needed millions of dollars to build road, tunnels, water purification plants, electric grids, water and electric hookups. Without that funding, the settlements would be abandoned.

---

4 *See* 18 U.S.C. § 1956.

Defendant Abrams has not addressed the requirements that an alien has to satisfy to proceed with claims against him under the Alien Tort Statute. Numerous relevant authorities have held that the ATS (also referred to as the ATCA): "confers federal subject matter jurisdiction when the following 3 conditions are satisfied: (1) an alien sues; (2) for a tort; (3) committed in violation of the law of nations. *See Kadic v. Karadzic*, 70 F. Supp. 3d 232, 238 (2d Cir. 1995); *See also Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d Cir.2005).

As recited in *In re South African Apartheid Litigation*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009), the District courts have original jurisdiction over claims made by an alien for a tort committed in violation of the law of nations or a treaty of the United States. As also recited in that case, the ATCA confers jurisdiction over civil claims arising out of violations of universally accepted norms of international covenants regardless of the nationality of the parties. *Id*.

It is difficult to conceive how defendant Abrams can challenge the application of the ATCA based upon the criminal activity he has financed for thirty years. In violation of the Geneva Convention, the Plaintiffs allege that he has been instrumental in encouraging belligerent settlers and Israeli army soldiers to commit acts of international terrorism, ethnic cleansing, and genocide. ¶ 18.

Abrams knows that every court in the world accepts the fact that genocide and ethnic cleansing are acts committed in violation of the law of nations, and the United Nations Convention on Genocide. Both Israel and the U.S. have adopted that Convention on Genocide. It does not appear that Defendant Abrams is arguing that the criminal activity alleged herein did not violate the law of nations or the U.N. Convention on Genocide. Since that is the case, it is clear that the ATCA has application to the claims detailed in this complaint.

Defendant Abrams appears to argue, however, that the ATCA does not provide this Court with jurisdiction to address torts based upon extra territorial tortious conduct. He makes this argument even though the vast majority of acts described in the amended complaint did not occur outside the U.S. For example, the $2 billion money laundering scheme occurred on U.S. soil, and the Defendants solicited funds for settlement expansion and ethnic cleansing on U.S. soil. Likewise, the international transfer of funds [money laundering] was initiated on U.S. soil when pro-Occupation donors and tax-exempt entities executed wire transfers at banks Leumi and Hapoalim. What occurred overseas, of course, is what was done with those funds, i.e. settlement leaders purchased Kalashnikovs, M16s, body armor, night vision goggles, and percussion grenades to maim and murder innocent civilians. As recited in the Complaint, U.S. tax-exempt entity officials and pro-Occupation donors in the US intended that those funds would be used that way. They were intent on financing the permanent occupation of the OPT by belligerent settlers, which, of course, required the ethnic cleansing of all Palestinians.

One of the objectives of this lawsuit is to bring to justice the financiers of settlement expansion and the extermination of all Palestinians in the OPT, for example, Defendant Abrams. Without the $2 billion sent overseas to fund the Israeli army, senior Israeli intelligence officials would not have the necessary funds to set up and operate black sites in either Israel and Palestine where they could torture Palestinian civilians Plaintiff like Al-Tamimi with impunity. As also recited in *South African Apartheid Litigation*, "it is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." *Id.* at 236. Therefore, the Plaintiffs have satisfied the elements contained in the ATCA statute, and therefore, Defendant Abrams's motion, premised as it is on the inapplicability of the ATCA, should be denied.

ii.    **Defendant Abrams is mistaken when he claims that The Political Question Doctrine Bars this Lawsuit**

As this section of the lawsuit contains essentially the same arguments raised by the other Defendants in their own motion to dismiss, Plaintiffs incorporate by reference, as if fully recited herein, the same sections in their Memorandum in Opposition to Motion to Dismiss. As argued by the plaintiffs in that brief, this District on a number of occasions has rejected the application of the political question doctrine as a bar to similar claims. *See Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005); and *Doe v. Exxon Mobil Corporation*, 69 F. Supp. 3d 75 (D.D.C. 2014).

A case identical on its facts to the case *sub judici*, is *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d. 451 (S.D.N.Y. 2008). The Plaintiffs alleged therein that the defendants, much like what is alleged in this lawsuit, have encouraged, carried out and financed brutal physical attacks on the innocent Israeli civilian population in order to terrorize and intimidate them. Here, the Defendants' goal was to intimidate and convince Palestinian landowners, by force if necessary, to abandon their 200 year-old home and ancient olive groves. In this case, the Israeli army and belligerent settlers financed in part by Defendant Abrams fundraising efforts, coerced 400,000 Palestinians to leave the OPT and abandon homes that have been in their families for 200 years.

With respect to the argument that Defendant Abrams mainly relies on, (that the case involves non-justiciable issues), it appears that he has ignored relevant local federal case law which rejects that argument. Defendant Abrams warns that judicial determinations made in this litigation will somehow adversely affect the goals of the executive branch in terms of resolving the Palestinian Israeli conflict. A number of Courts have pointed out that the non- justiciability doctrine is one of political questions, and not political cases. *See* estates of *Ungar v. Palestinian*

*Authority* 325 F. Supp. 2d 15 (D.R.I 2004). As quoted in *Sokolow*, supra, "an action does not lie beyond judicial cognizance solely because it raises questions touching upon foreign relations" citing *Baker v Carr,* 369 U.S. 186, 211 (1962). As noted in *Sokolow*, "the fact that the issues before the court arise in a politically charged context [Israeli-Palestinian conflict] does not convert what is essentially an ordinary tort suit into a non-justiciable political question." *Sokolow* at 456 (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F. 2d. 44 (2d Cir. 1991)).

Defendant Abrams also claims that this case should be litigated in Israel. In the Jurisdiction and Venue sections, the Plaintiffs address that argument in detail. (*See* Amended Complaint). One of the problems is that Palestinians don't have access to civil courts in Israel. Therefore they would have to bring their claims based on war crimes in an Israeli military court, a court of limited jurisdiction dealing with issues like dishonorable discharge and going AWOL. *Id.* Moreover, Plaintiffs in Israel who are not Jewish citizens cannot bring any claims based upon the Israeli War Crimes statute. They therefore could not sue in an Israeli Court based on injuries sustained as a result of genocide and ethnic cleansing, one of the principal allegations made herein. A similar argument of *forum non conveniens*, raised in Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), was rejected because: a) Defendants failed to overcome the deference accorded to plaintiffs' choice of forum; b) failed to establish that the other country provides an adequate alternative forum (Plaintiffs have demonstrated in their Complaint that Israel doesn't) ; and c) failed to establish that private and public interests favor trial of these issues abroad, *which seek to vindicate important human rights under both domestic and international law. Id* at 295.

As explained herein, U.S. courts and administrative agencies would be understandably concerned that U.S. citizens have engaged in substantial activity on U.S. soil [arms trafficking]

in order to finance war crimes overseas. They have solicited funds every day here on U.S. soil, and they have all participated on U.S. soil in the aforementioned $2 billion money laundering scheme. It is difficult, therefore, to conceive why: a) Treasury Department officials would not be concerned with the loss of $2 billion every year in tax revenues, and b) State Department officials would not be concerned about U.S. citizens financing and encouraging war crimes abroad and a foreign militia unit.

Moreover, the allegations pled herein satisfy the *Iqbal* test because Plaintiffs repeatedly claim in the suit that all Defendants acted with the purpose of causing the Plaintiffs the severe injuries alleged herein. All Defendants knew what the inevitable consequences would be of arming belligerent settlers, i.e. theft of Palestinian private property and more ethnic cleansing and genocide. Judge Gershon of the E.D.N.Y. held that the Defendants in a similar case offered no sound support for its argument that the complaint should be dismissed under the political question Doctrine. *Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005).

Judge Collyer in this jurisdiction decided two cases which are referred to as *Biton I* and *Biton II. See Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1 (D.D.C. 2005). Judge Collyer made the same observation noted by Judge Gershon in *Sokolow* and *Klinghoffer* I.e. that an action doesn't lie beyond judicial cognizance solely because it raises questions touching upon foreign relations. *Id*. She specifically referenced the Palestinian Israeli conflict, noting in the context of the Anti-Terrorism Act that "the ATA provides jurisdiction for suits in federal courts, *the basic elements of the claim lies in tort, not in the relations between Palestine and Israel*." *Id* at 6. As such, "the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602-1611 ("FSIA"), as well as traditional common law tort principles provide the Court

with judicially discoverable and manageable standards necessary to resolve the legal issues applicable to this lawsuit." *Sokolow* at 456.[5]

In *Biton I* and *Biton II,* Judge Collyer opined that the Court was competent to entertain and rule on similar claims based on violations of international conventions like the Geneva Convention and the UN Convention on Genocide. Judge Collyer analyzed both the political question doctrine and act of state doctrine at length, and rejected the Defendant's argument that having the case go forward would violate those doctrines. Citations from her opinions significantly bear on the issue before the Court, i.e. disposition of the Defendants' motion to dismiss for lack of subject matter jurisdiction.

As Judge Collyer pointed out in *Biton II*: "Defendants argue that the Court would be required 'to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza.'" She rejected that argument because, "Defendants misperceive the status of the case. Plaintiffs complain that Defendants' actions caused them injury; while the ATA provides jurisdiction for the suit in federal court, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*." *Biton* at 5-6 (2005) (emphasis added). In rejecting the identical argument advanced in the Defendants' memorandum, Judge Collyer also explained in *Biton II*:

> "'This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism.' *Ungar*, 402 F.3d at 280. There is no flaw in this Court's ability to address Plaintiff's claims: *Congress explicitly committed these issues to the federal courts under the ATA.* Similarly, the Court has access to 'judicially manageable standards for resolving the issues before it,' *id*., from both existing ATA caselaw and traditional tort caselaw.

---

5 *See also Ungar, IV*, 402 F.3d at 281; *Klinghoffer*, 937 F.2d at 49; *Ungar III*, 315 F. Supp. 2d at 174; *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 184 (D.D.C. 2004) ("*Biton* I"); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153 (D.D.C. 2006) (*"Klieman I"*); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F.Supp.2d 96, 100 (D.D.C. 2006).

*The 'initial policy determination' involved here has already been made by the U.S. Congress*: Americans injured by terrorist acts can sue their attackers in U.S. courts and the Court can manage this case to resolution of Defendants' alleged liability without 'expressing lack of the respect due coordinate branches of government.' *Baker*, 369 U.S. at 217. The Fifth and Sixth factors from *Baker v. Carr* do not apply because a decision in this individual case will have no consequences concerning 'political decisions already made' and will raise only the question of Defendants' alleged liability regarding this single bombing of a bus. Thus, nothing in *Baker v. Carr* counsels against having this case proceed." *Biton II*, 412 F. Supp. 2d at 6.

Similar to the holding in Estate of *Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153 (D.D.C. 2006), the tortfeasors named herein "have made no attempt to distinguish any of these prior decisions in their moving papers." Just as in *Biton II*, a decision on Plaintiffs' claims alleged herein can be resolved by this Court by deciding the liability of the Defendant tortfeasors, thus it would have no consequences concerning "political decisions already made." *Biton II* at 6. The Plaintiffs respectfully submit that the Motion to Dismiss can be denied based solely on the holdings in *Biton I* and *Biton II*.

The bottom line is that it would be judicial error for this Court to grant the motion to dismiss based on Judge Bates' holding. They are two entirely different cases. The *Doe* Plaintiffs requested that the Court declare Israel to be a terrorist state, a decision to be made by the executive branch or the State Department; and they never alleged that the Defendant tortfeasors were engaging in a $2 billion money laundering scheme on U.S. soil designed to rid the West Bank of all non-Jews. Query: Where else but in America could belligerent settlers receive $2 billion a year in laundered funds to expand the 100+ settlements in the OPT and eradicate the Palestinian population?

In *Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005), just like the Defendant herein, the Defendant Bank had, through the provision of financial services to groups that engaged in terrorist activity, knowingly and intentionally aided and abetted violent criminal

attacks on civilians in Israel in violation of international law. The only difference between those allegations and the allegations pled herein is that the injured Plaintiffs were innocent Israeli citizens, not Palestinians. The Plaintiffs herein, just like the Plaintiffs in *Linde*, have alleged that they have been injured by the criminal activity engaged in by U.S. defendants on U.S. soil. Defendants like Abrams raise and send overseas substantial financial assistance to promote war crimes abroad. The Israeli recipients [sister NGOs], courtesy of that funding, knowingly finance and aid and abet attacks on Palestinian civilians in violation of international law, designed to ethnically cleanse the West Bank of all non-Jews. They have done an excellent job armed with Kalashnikovs, M16s, and percussion grenades paid for by the American taxpayer.

Defendants also rely significantly on the *Baker v. Carr* holding to justify dismissing the lawsuit based on non-justiciable political questions. Much like the Defendants herein, the Defendant in *Linde v. Arab Bank* laid out the elements that identify a non-justiciable political question. Judge Gershon then concluded, however, that "these elements do not exist in this case, in particular no action by a coordinate branch of the U.S. government is involved here." She also pointed out that "*it ignores government concerns that charitable donations purportedly for humanitarian services are being funneled to terrorist entities*." Plaintiffs allege herein that the Defendants have used charitable donations [$2 billion a year] in order to accomplish theft of private property necessary for settlement expansion, arm belligerent settlers, purchase sophisticated military hardware, and commit ethnic cleansing and genocide.

Judge Gershon went on to point out that as set forth in *Almog*, the three theories of international law violations asserted in the case were all based upon principles to which the United States has expressed strong adherence. *Id*. at 318. Here, senior State Department officials

have repeatedly condemned arms trafficking, extra- judicial killings, settlement expansion and the violence it promotes.

> ## I. Other Federal Courts Have Also Found That Neither ATA nor ATS Claims bar a Federal Judge From Hearing Claims Based on Genocide, Denationalization, and Ethnic Cleansing

Plaintiffs claim jurisdiction here under the Alien Tort Claims Act, 28 U.S.C. §1350. Just as in *In re South African Apartheid Litigation*, Plaintiffs' claims here are "based on torts committed in violation of customary international law." *Apartheid* at 244. The ATCA [also referred to as the ATS] states that "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Numerous Federal courts have concluded that "the ATCA conveys jurisdiction for civil claims concerning violations of 'universally accepted norms of the international law of human rights, regardless of the nationality of the parties.'" *Id*., (Quoting *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). The Supreme Court upheld the core of *Filartiga* in *Sosa v. Alvarez-Machain*, (2004).

The U.S. Supreme Court, as reiterated by the Judge Lamberth in *Doe v. Exxon Mobil*, "noted that in certain situations, claims arising under the ATS might 'touch and concern the territory of the United States' with 'sufficient force to displace the presumption against extraterritorial application.'" *Id*. (quoting *Kiobel* at 1669). In ultimately concluding that the Plaintiffs' claims in *Doe v. Exxon Mobil* sufficiently touched and concerned the United States to allow the ATS claims to go forward, the Court specifically referenced the 4th Circuit opinion of *Al Shimari v. CACI Premier Tech., Inc.*, 758 F. 3d 516 (4th Cir. 2014), noting "the ATS was properly applied [there] because, among other reasons, plaintiffs alleged relevant U.S. based conduct indicating knowledge and encouragement of international law violations abroad." *Id*. at

95. *See also Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 323 (D. Mass. 2013) (for example evaluating a claim for aiding and abetting international law violations committed abroad and holding that the claims sufficiently "touched and concerned" the United States because the 'Amended Complaint adequately sets out actionable conduct undertaken by Defendant in the United States to provide assistance to the primary tortfeasors)." *Id* at 95-96.

In any event, Defendants' argument can and should be rejected for the same reasons that Judge Lamberth relied on in *Doe v. Exxon Mobil*. He flat out rejected the argument that adjudicating the plaintiffs' claims "would require the Court to declare invalid an official act of the [State]." *Id*. at 87. As explained by the Court, "[t]he act of state doctrine requires American courts *to presume the validity of an official act of a foreign sovereign performed within its own territory*." *Id*. He denied the defendants' motion to dismiss because " [Defendant] has made no showing that plaintiffs were injured pursuant to official military orders as required by the act of state doctrine." *Id*.

In his memorandum, Defendant Abrams has not claimed that any of this criminal activity that he and others financed was engaged in based on official Israeli military or government orders, nor could he. Not a single civilized nation has ever issued *official government orders* that compel murdering and maiming civilians, burning down their homes and places of worship, buying military hardware to intimidate civilian landowners, stealing their private property, or engaging in war crimes like ethnic cleansing and genocide. Therefore, the Act of State doctrine cannot be invoked herein as a basis for granting the instant motion to dismiss.

Judge Lamberth ultimately concluded in *Doe v. Exxon Mobil* that because the Defendant "provided material support to its security personnel by, for example, constructing facilities, *providing funding for weapons*, providing supplies and equipment, and *paying for the services of*

*consultants in training and equipping the personnel*" that the claims were actionable under the ATS. *Id*. at 96 (emphasis added). As alleged in the Complaint, the Plaintiffs make the identical claims. They allege that Defendants have provided the funding for: a) the purchase of body armor, sniper scopes, and automatic weapons [arms trafficking] and the training necessary for settlers to know how to use them; b) building military housing barracks; and c) providing supplies [ammunition].

Defendant Abrams makes essentially the same argument as the Defendants did in *Apartheid Litigation*, i.e. that the Court does not have jurisdiction to address torts claims based on extraterritorial criminal activity. Although the injuries described in the complaint occurred outside the U.S., this is no bar to jurisdiction. *See Apartheid Litig.* At 246. "It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." *Filartiga*, 630 F.2d at 885. Defendant Abrams does not appreciate that "The ATCA does not by its own terms regulate conduct; rather it applies universal norms that forbid conduct regardless of territorial demarcations or sovereign prerogatives." *Apartheid Litig.* At 246-47.

The Ninth Circuit has held "that a court's jurisdiction to hear claims under the ATCA is not limited by 'the focus of the injury.'" *Id*. at 247 (quoting *In re Marcos*, 978 F. 2d 493, 500 (9th Cir. 1992)). A tort that violates customary international law will be recognized under the ATCA if "the norm alleged (1) is defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*. (2) is based upon a norm of international character accepted by the civilized world, and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Apartheid Litig.* At 248 (quoting *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009)).

Defendant has also ignored the recent D.C. Circuit opinion in *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. 2016). The Plaintiffs therein complained that their homes and private property had been illegally confiscated by the Hungarian government and a Hungarian state-owned railway. Just like the Plaintiffs herein, the Plaintiffs in that case alleged that destroying or confiscating their homes constituted a grave war crime, i.e. genocide. The D.C. Circuit allowed the case to go forward against the state-owned railroad and overruled the District Court for failing to recognize claims based on expropriation of private property in violation of international law. The identical claims are made herein.

Other federal Courts have found that neither ATA nor ATS claims bar a federal judge from hearing claims based on genocide, denationalization, and ethnic cleansing – classic war crimes. *See Filartiga v. Pena-Irala*, 630 F. 2d 876 (2d Cir. 1980); and *Caddick v. Karadzic*, 70 F.3d 232 (2d Cir. 1995). The Second Circuit has recognized tort liability for torture, genocide, and war crimes committed by both state and non-state actors. *Apartheid Litig.* At 248-49. The Ninth Circuit has also recognized additional causes of action against state actors for summary execution and prolonged and arbitrary detention. *Id*. at 249. *See also In re Estate of Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994). The Complaint cites numerous violations of customary international law that would provide a recognized basis for jurisdiction under the ATCA as described *supra*, including violently enforced segregation of Palestinians from Israeli settlements and towns. *See* Plaintiff's other brief against all defendants – Discussion of the Apartheid Issue.

Plaintiffs also allege the international crime of denationalization which has been recognized as an actionable tort basis for jurisdiction under the ATCA. *See Apartheid Litig.* at 252 ("A state actor commits arbitrary denationalization if it terminates the nationality of a citizen either arbitrarily or on the basis of race, religion, ethnicity, gender, or political beliefs"); *see also*

the 1907 Hague Convention Respecting the Laws and Customs of War on Land (individuals have a right to retain their citizenship, even in the fact of a hostile invasion). Contrary to Defendant Abrams' assertion that there is no state interest in this case, prohibition on arbitrary denationalization reflects an international well-recognized concern regarding the existence of stateless persons. *Apartheid Litig.* At 253; *see also* Restatement (Third) of Foreign Relations Law § 211 cmt. e (1987).

In regards specifically to Defendant Abrams, "the aider or abettor may be held liable if he or she *is aware* that the assistance provided will substantially assist the commission of crimes in violation of the law of nations." *Apartheid Litig.* At 261. Plaintiffs allege that Defendant Abrams knowingly financed and aided and abetted the commission of the war crimes and torts described herein, thus providing a jurisdictional basis for the claims asserted against him. Despite Defendant Abrams' arguments to the contrary, this Court does have a jurisdictional basis on which to adjudicate these claims brought against him based on the Alien Torts Statute.

With respect to Defendant Abrams' argument that documents would have to be secured from Palestine and Israeli officials, that is not a relevant consideration. *See* Def.'s Other Motion to Dismiss at 17. Moreover, producing documents in discovery constitutes normal activity in international litigation cases. The Plaintiffs, of course, can prove, without Israeli documentation, that they once owned property in Palestine which was illegally confiscated by rogue Israeli army soldiers and belligerent settlers. They would certainly be able to identify the year that they and their family were forcibly evicted from Palestine and what their property was worth, and they certainly would not have to secure any documentation from Israel to prove that. In fact, the documents they would receive from Israeli army officials in all probability would be copies of forged deeds used to justify the illegal confiscation of their property. Finally, Defendant Abrams

overlooks the fact that the most important documentation that the plaintiffs need is available on U.S. soil – copies of wire transfers for the last thirty years. *See Introduction*.

In the event that Defendant Abrams suggests in his reply brief that Plaintiffs are obligated to link specific injuries to specific wire transfers, *See* Def.'s Motion to Dismiss at 17, there is no authority for that proposition. In fact, that requirement has been repeatedly rejected by our federal courts. *See also* Strauss v. Credit Lyonnais, S.A, 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013). ("Plaintiffs who bring an action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter.") It would be impossible to trace specific dollars to specific attacks on our facts because the named Defendants have been executing wire transfers for approximately 30 years. Given that they have been sending billions of dollars overseas every year to finance war crimes, there must be thousands of wire transfers executed in a given year by U.S. Defendants. Finally, granting the motion to dismiss *sub judici* on that basis would result in both the ATA and ATS having no legal validity, something that Congress never intended.

Based on the allegations made herein, a reasonable juror could conclude that the significant amount of money sent by U.S. Defendants, including Abrams, overseas [$2 billion a year] was a substantial reason why Israeli based NGOs intent on ridding the West Bank of all non-Jews, belligerent settlers, and rogue Israeli army soldiers were able to perpetrate the horrific terrorist attacks described herein. As just one example thereof, belligerent settlers, during military training sessions conducted by senior Israeli army commanders, rounded up Palestinian farmers to use as live targets. And a juror could similarly conclude that the increased ability of belligerent settlers and rogue Israeli army soldiers to carry out deadly attacks on the Palestinian population was a foreseeable consequence of the criminal activity [money laundering, arms

trafficking] engaged in by U.S. based tax exempt entities on U.S. soil. That conduct violates

President Clinton's 1995 Executive Order and the recently enacted JASTA Act.

As would be obvious to any juror hearing this case, an annual subsidy of $2 billion is

quite a staggering sum. Apart from the vast amount of this annual financial aid, the reason why

those funds were so important is that the Israeli government in 1992 had prohibited charitable

donations to settlements, which cut off a significant source of income. Likewise, Secretary of

State Baker was assured by Prime Minister Shamir in 1992 [the Baker/Shamir Accord], that no

part of American financial aid would be used to set up new settlements or finance expansion of

existing settlements. Thus, except for some government funding ("under the table financing"),

the settlers did not have any major source of funding to properly equip a fifty-member militia

unit or build necessary infrastructure improvements like paved roads, tunnels, water purification

plants, electric and sewage hookups.

Based on the relevant authorities cited herein and the allegations in the complaint, this

case can and should be heard by this Court based on both the ATS and ATA statutes.

## CONCLUSION

It is obvious that there is abundant case law issued by District Court judges like Judge

Collyer, Judge Lamberth, and the Second Circuit, which support dismissal of the instant motion.

The claims alleged in the suit are premised on serious violations of international law, whether the

Geneva Convention or the UN Genocide Convention, or the Law of Nations. All of these

conventions have been incorporated into U.S. jurisprudence. Therefore, based on relevant case

law from this district, it is obvious that this Court has the authority to entertain and resolve

claims premised on violations of international law or recognized norms – law of nations. In the

D.C. Circuit Court decision cited herein, Hungarian homeowners who had their properties

illegally seized by the Hungarian government could advance claims in this jurisdiction based on

violations of international law. That is the identical claim advanced herein. Unlike the *Doe* plaintiffs, the Plaintiffs are not asking this Court to issue a declaratory judgment that Israel is a terrorist state. That request almost invites dismissal of the litigation based on the political question doctrine. Since this case presents facts similar to those in *Biton I*, *Biton II*, and *Sokolow v. PLO*, Defendant Abrams' motion should be denied

Respectfully Submitted,

> */s/ Martin F. McMahon*
> Martin F. McMahon, Esq.
> D.C. Bar Number: 196642
> Martin McMahon and Associates
> 1150 Connecticut Avenue, N.W., Suite 900
> Washington, D.C. 20036
> (202) 862 - 4343
> mm@martinmcmahonlaw.com
> *Counsel for Plaintiffs*

**Exhibit A: Specific References to Defendant Abrams in the Complaint**

**Count I, ¶135, Page 89**

- Abrams' overt acts alone included: (a) meeting secretly with Israeli Prime Minister aides286 and encouraging them to keep announcing new settlements and in the process continuing to expel the local Palestinian population; (b) giving congressional testimony and speeches over the past 30 years condemning Palestinian violence and promoting the idea that Palestinians are the root cause of violence in the Middle East; (c) publishing articles to the effect that settlement expansion is a myth; and (d) discussing the need for additional funding for settlement expansion with various donors including Defendant Adelson. He is a frequent Capitol Hill visitor and regular attendee at AIPAC's annual convention, where Abrams and IDF "war heroes" are featured speakers.

**Count I, ¶142-144, Page 92-93**

- On the U.S. side, the donors/entities, BL/BH officials, and Defendant Abrams have cooperated with each other, have served on similar boards and committees (Abrams' wife used to serve on the board of Emergency Committee for Israel), have coordinated their fundraising activities and their trips to Israel with each other, have coordinated their lobbying efforts with the Israel Allies Caucus and AIPAC, and consulted each other almost on a daily basis. They meet in Washington, D.C. at various AIPAC and congressional events and communicate by telephone,291 email, fax, and text, discussing among themselves and with settlement officials how to fund and continue the violent expulsion of all non-Jews in the OPT.292 The tax-exempt entities and other pro-settlement organizations like ZOA held numerous fundraising events all over America honoring donors like Defendants Hagee, Adelson, Braman, Saban, and Gilbert for their significant financial contributions ($500 million) to the settlements and Israel's army ($104 million in 2014).

- Defendant Abrams also played a crucial role as a co-conspirator by giving speeches and authoring articles claiming that Palestinians are the root cause of Mideast violence, and that the settlements are not actually expanding. His role included telling settlement leaders that when final borders are set, they will keep most of the property the settlers have unlawfully confiscated. He makes the identical point in his articles, and literally tells the U.S. Congress which specific settlements Israel will retain once final borders are set.293

- He has had discreet discussions in America, Israel, and Europe with Messrs. Dov Weissglass and Yoram Turbowitz and Shalom Turgeman, former aides to Prime Ministers Sharon and Olmert, on topics including the need for additional settlement funding and expansion, which he knew meant the continued expulsion of all non-Jews. He routinely informs government officials of his travel plans to Israel to coordinate meetings and publicity.294 These officials set up press conferences and interviews with friendly pro-settler newspapers. As America's premier pro-settlement advocate, he repeats in these interviews his standard line, i.e., settlement expansion is a myth. His latest challenge as a member of the conspiracy is to protect the settlement enterprise by working with senior AIPAC officials, Senator Schumer and Representative Lowey to kill the international Boycott Divest and Sanction ("BDS") movement and any EU support thereto.

**Count I, ¶156, Page 98**

-   As already noted, **Abrams** has repeatedly encouraged senior aides of former Prime Ministers Sharon, Barack, and Olmert and donors like Adelson to continue to engage in and fund these same criminal activities. He has consistently justified settlement expansion even though he knew it necessarily entailed the expulsion of the local Palestinian population301 and the confiscation of their homes and destruction of their olive orchards. He also knew that in 1991, Prime Minister Yitzhak Shamir had repeatedly promised senior U.S. officials that any U.S. financial assistance would "not be used in any manner to expand existing settlements or create new settlements in the West Bank."302 Thus Abrams, an experienced attorney, had to know just by reading the Sasson report or hearing about Prime Minister Shamir's commitment that by encouraging settlement officials, Prime Minister Sharon's senior aide, Dov Weissglass, to keep announcing new settlements and keep annexing private property and promoting ethnic cleansing, he was promoting violence in the Middle East. He was therefore violating President Clinton's 1995 Executive Order, Israel's 1993 settlement ban, Israel's own Declaration, the 1995 Interim Peace Treaty, and America and Israel's clearly-defined anti-settlement public policy.

**Count II, ¶232-234, Page 143-144**

-   Defendant Abrams, as already specifically described herein, for approximately 20 years has engaged in a pattern of conduct designed to intimidate, punish, and crush the spirit of the Palestinian people. He has done an excellent job in that regard, and has largely succeeded in that endeavor. Because he has consistently encouraged U.S. donors, tax-exempt entity officials, and Israeli Prime Minister Olmert's senior staff (e.g. Messrs. Turgeman and Turbowitz) to continue financing and confiscating more private Palestinian property, some 49,000 Palestinian homes were eventually destroyed or confiscated in the OPT based on his advice. He has also deprived Palestinians located in Gaza of freedom of movement. They are essentially confined to an outdoor prison.

-   In 2005, James Wolfensohn, former president of the World Bank, had personally negotiated the "Agreement on Movement and Access" to afford maximum freedom of movement to the Gazan population. But Abrams personally sabotaged this agreement406 because he knew that if the Gazan population continued to be confined to an open air prison,407 that would heighten tension in the area, and lead to more bloodshed and violence. That would promote his agenda—more violent episodes in the OPT serve to convince Congress and the American people that Palestinian farmers are terrorists, not the violence-prone settlers intent on stealing their neighbors' property. He has been very successful in promoting that agenda—he has just recently secured another congressional resolution condemning Palestinian violence.408

-   Footnote 408: For example, Abrams testified at a recent hearing held in November 2015 in the House of Representatives which resulted in a resolution condemning Palestinian violence. He always makes himself available for such hearings, and never misses an opportunity to condemn alleged Palestinian violence in his role as America's spokesperson for the settlement movement. Given the fact that he is a convicted felon for lying to Congress about the Iran-Contra Affair, it is difficult to comprehend why House leadership repeatedly invites him to give testimony under oath about an issue as important as funding and promoting Middle-East Violence, i.e., the substance of President Clinton's 1995 Executive Order 12947, written by senior Treasury officials.