# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BASSEM AL-TAMIMI, et al., | |
| Plaintiffs, | |
| v. | No. 1:16-cv-00445-TSC |
| SHELDON ADELSON, et al., | |
| Defendants. | |

## DEFENDANT ELLIOTT ABRAMS'S MOTION TO DISMISS
## COUNTS I THROUGH III OF PLAINTIFFS' AMENDED COMPLAINT

Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Elliott Abrams moves to dismiss Counts I through III of Plaintiffs' amended complaint. The Court lacks subject-matter jurisdiction over Counts II and III, and all three counts fail to state a claim upon which relief may be granted. The grounds for this motion are set forth in the accompanying memorandum of supporting points and authorities. A proposed order is attached.

Dated: July 2, 2020                                Respectfully submitted,

                                                      JOSEPH H. HUNT
Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, Jr.
Acting Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel

   /s/  *Paul E. Werner*
PAUL E. WERNER
(Md. Bar, under LCvR 83.2(e))
Senior Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C.  20044
(202) 616-4152 (phone)
(202) 616-4314 (fax)
E-mail: Paul.Werner@usdoj.gov

Attorneys for Defendant Elliott Abrams

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BASSEM AL-TAMIMI, et al.,

                Plaintiffs,

    v.                                 No. 1:16-cv-00445-TSC

SHELDON ADELSON, et al.,

                Defendants.

**MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES**

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, Jr.
Acting Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel

PAUL E. WERNER
(Md. Bar, under LCvR 83.2(e))
Senior Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C.  20044

Attorneys for Defendant Elliott Abrams

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

PROCEDURAL HISTORY ................................................................................................ 3

STANDARD OF REVIEW ................................................................................................. 4

ARGUMENT ...................................................................................................................... 6

I.   Plaintiffs' Claims for Alleged War Crimes and Genocide Fail. ........................................ 6

   a.   The ATS does not provide jurisdiction for Plaintiffs' claims because they do not touch and concern the United States with sufficient force. ........................................ 6

      i.   Plaintiffs' ATS claims against Mr. Abrams do not rebut the presumption against extraterritoriality and must be dismissed............................................6

      ii.   Even without claims directly against Israeli officials, Plaintiffs' ATS claims raise foreign policy implications, further cautioning against extending the ATS's extraterritorial reach ...................................11

   b.   The Torture Victim Protection Act does not provide relief here............................... 16

II.   Under D.C. Law, Civil Conspiracy, Count I, Is Not an Independent Cause of Action. ..... 16

III.   Plaintiffs Have Not Alleged Any Plausible Claims Against Mr. Abrams. ........................ 17

IV.   The First Amendment Protects All of Mr. Abrams's Activities for Which Substitution Has Not Already Been Granted. ....................................................................................... 21

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*A Society Without a Name v. Commonwealth of Va.*,
   655 F.3d 342 (4th Cir. 2011) ................................................................. 20

*Acosta Orellana v. Croplife Intern.*,
   711 F. Supp. 2d 81 (D.D.C. 2010) ................................................... 20, 21

*Al Shimari v. CACI Premier Tech., Inc.*,
   758 F.3d 516 (4th Cir. 2014) ................................................................. 7

*Al-Aulaqi v. Obama*,
   727 F. Supp. 2d 1 (D.D.C. 2010) ......................................................... 4

*Al-Tamimi v. Adelson*,
   264 F. Supp. 3d 69 (D.D.C. 2017) ............................................... 3, 6, 16

*Al-Tamimi v. Adelson*,
   916 F.3d 1 (D.C. Cir. 2019) .......................................................... 4, 13, 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................ 5, 19

*Banneker Ventures, LLC v. Graham*,
   798 F.3d 1119 (D.C. Cir. 2015) ............................................................ 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................ 5, 20

*Brady v. Livingood*,
   360 F. Supp. 2d 94 (D.D.C. 2004) ....................................................... 20

*Bush v. Butler*,
   521 F. Supp. 2d 63 (D.D.C. 2007) ................................................... 20, 21

*Calif. Motor Transport Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) ............................................................................ 23

*Connick v. Myers*,
   461 U.S. 138 (1983) ............................................................................ 22

*Cooney v. Rossiter*,
   583 F.3d 967 (7th Cir. 2009) ............................................................... 20

*Doe I v. State of Israel*,
  400 F. Supp. 2d 86 (D.D.C. 2005) ................................................................. 3

*Doe v. Drummond Co., Inc.*,
  782 F.3d 576 (11th Cir. 2015) ................................................................. 7, 9

*Doe v. Exxon Mobil Corp.*,
  69 F. Supp. 3d 75 (D.D.C. 2014) ................................................................. 7

*Doe v. Exxon Mobil Corp.*,
  391 F. Supp. 3d 76 (D.D.C. 2019) ....................................................... 14, 15

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ................................................................................ 23

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) ................................................................................. 9

*Planned Parenthood v. Am. Coalition of Life*,
  224 F.3d 1007 (9th Cir. 2001) ................................................................. 22

*Graves v. United States*,
  961 F. Supp. 314 (D.D.C. 1997) ............................................................. 20

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................................. 20

*Hall v. Clinton*,
  285 F.3d 74 (D.C. Cir. 2002) ................................................................... 17

*Herbert v. Nat'l Acad. of Sciences*,
  974 F.2d 192 (D.C. Cir. 1992) ............................................................. 5, 18

*Int'l Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*,
  196 F.3d 818 (7th Cir. 1999) ................................................................... 23

*Jaffe v. Pallotta Teamsworks*,
  374 F.3d 1223 (D.C. Cir. 2004) ................................................................. 9

*Jerez v. Republic of Cuba*,
  777 F. Supp. 2d 6 (D.D.C. 2011) ............................................................. 16

* *Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ................................................... 11, 12, 13, 15

iv

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) .................................................................................. 18

*Kaplan v. Central Bank of the Islamic Rep. of Iran*,
    896 F.3d 501 (D.C. Cir. 2019) .................................................................................. 6

* *Kiobel v. Royal Dutch Petroleum Co.*,
    133 S. Ct. 1659 (2013) ............................................................................. 6, 7, 9, 14

*Marina Point Dev. Ass'n v. United States*,
    364 F. Supp. 2d 1144 (C.D. Cal. 2005) .................................................................. 23

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014) ................................................................................. 7, 8

*Matter of Ondova Ltd. Co.*,
    914 F.3d 990 (5th Cir. 2019) ................................................................................... 4

*McCreary v. Heath*,
    No. 04-cv-623, 2005 WL 3276257 (D.D.C. Sept. 26, 2005) .................................... 20

*McDonald v. Salazar*,
    831 F. Supp. 2d 313 (D.D.C. 2011) ....................................................................... 18

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................................ 7

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) .............................................................................................. 22

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016) ............................................................................................ 9

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009) ................................................................................... 16

* *Sexual Minorities Uganda v. Lively*,
    254 F. Supp. 3d 262 (D. Mass. 2017) ............................................................... 10, 14

*Snyder v. Phelps*,
    562 U.S. 443 (2011) .............................................................................................. 22

* *Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ..................................................................................... 6, 9, 11, 12

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
   231 F.3d 20 (D.C. Cir. 2000) ..................................................................... 4

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ................................................................ 23

*Valore v. Islamic Rep. of Iran*,
   478 F. Supp. 2d 101 (D.D.C. 2007) .......................................................... 20

*Whelan v. Abell*,
   48 F.3d 1247 (D.C. Cir. 1995) ................................................................. 23

*Wood v. Moss*,
   134 S. Ct. 2056 (2014) .............................................................................. 5

*Young v. District of Columbia*,
   107 F. Supp. 3d 69 (D.D.C. 2015) ............................................................. 5

## Statutes

28 U.S.C. § 1350 .................................................................................... 2, 12

28 U.S.C. § 2679 ......................................................................................... 3

Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) ................... 2

## Rules

Fed. R. App. P. 28(a)(6) ............................................................................... 4

Fed. R. Civ. P. 12(b)(1) ............................................................................... 4

Fed. R. Civ. P. 12(b)(6) ........................................................................... 4, 5

## Other Authorities

President Donald J. Trump's Vision for Peace, Prosperity, and a Brighter Future for Israel and
   the Palestinian People, Jan. 28, 2020 ....................................................... 14

Secretary Michael R. Pompeo Remarks to the Press, Press Briefing Room, Washington, D.C.,
   Nov. 18, 2019 ........................................................................................ 15

Remarks on Signing a Proclamation on Recognizing Jerusalem as the Capital of the State of
    Israel and Relocating the United States Embassy to Israel to Jerusalem, 2017 Daily Comp.
    Pres. Doc. 1 (Dec. 6, 2017) ................................................................................................... 15

## INTRODUCTION

This case involves tort claims brought by Palestinians, some of whom are United States citizens, and Palestinian villages against a large group of corporations, organizations, and individuals regarding alleged genocide and war crimes in East Jerusalem, the West Bank, and the Gaza Strip. It is back before this Court after the D.C. Circuit affirmed this Court's dismissal on political question grounds of Plaintiffs' claims regarding the sovereignty over those areas, but reversed with respect to claims that the Defendants somehow enabled Israeli settlers to commit genocide and war crimes in those locations. In the course of that appeal, Plaintiffs conceded their claims are not based on the actions of the Israeli military. Thus, the sole remaining issue before this Court is whether Plaintiffs' claims for alleged genocide and war crimes, aiding and abetting, and civil conspiracy to expel Palestinians from East Jerusalem, the West Bank, and the Gaza Strip through the purported actions of Israeli settlers can proceed.

They cannot. The statutes and laws Plaintiffs invoke do not provide relief for their extraordinary claims. Furthermore, their complaint is wholly lacking factual allegations sufficient to allege that the defendant herein, Elliott Abrams, engaged in any of the alleged torts. Lastly, their claims, which target Mr. Abrams's core First Amendment activities, are simply implausible and are more the stuff of conspiracy fantasies than of recognized and well-founded bases for liability in federal court.

## BACKGROUND

Plaintiffs are ninety-six individuals comprised mostly of Palestinians from East Jerusalem, the West Bank, and the Gaza Strip, some of whom are United States citizens, and five village councils of villages presumably located within those areas. Am. Compl. p. 1, ¶ 29. According to Plaintiffs' 200-page amended complaint, "[t]hey themselves or their relatives have

been injured, tortured, incarcerated, had their homes and olive groves demolished or confiscated to promote [Israeli] settlement expansion, witnessed their children being physically attacked and traumatized by armed [Israeli] settlers." *Id.* ¶ 29. Plaintiffs allege that these harms resulted from a wide-ranging conspiracy involving thirty-one defendants, including multinational corporations such as RE/MAX, Motorola, and Hewlett-Packard, and Defendant Elliott Abrams. *Id.* at pp. 1-3, ¶ 42.[1] According to their amended complaint, Mr. Abrams has given speeches at lobbying events, testified before Congress, and written articles "claiming that Palestinians are the root cause of Mideast violence" and that Israeli settlements "are not actually expanding." Am. Compl. ¶ 125.

Based on these allegations, Plaintiffs bring three claims against Mr. Abrams: (1) war crimes, crimes against humanity, and genocide in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350 (ATS), and the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (TVPA) (Count II); (2) aiding and abetting the commission of war crimes (Count III); and (3) civil conspiracy to expel all non-Jews from East Jerusalem, the West Bank, and the Gaza Strip (Count I). They seek $1 billion in damages. *See* Am. Compl. ¶ 180. For the reasons explained below, as a matter of law, none of these claims may be maintained against Mr. Abrams.

---

[1] Mr. Abrams served as a federal official in various capacities on the National Security Council, including as Deputy National Security Advisor, from 2001-09. *See* ECF No. 72, Opp'n to Mot. to Disqualify, at 5. As explained below, this Court has dismissed the claims against Mr. Abrams regarding his tenure at the White House. Plaintiffs included that tenure, however, as part of their complaint against him.

## PROCEDURAL HISTORY

In December 2016, the Court ordered the Defendants to file motions to dismiss raising defenses under Rule 12(b)(1) only. ECF No. 97, Dec. 15, 2016 Order, at 1. The Court reserved briefing on other defenses for a later stage of litigation, if necessary. *Id.* In January 2017, the United States substituted itself for Mr. Abrams as the sole defendant on Counts I through III under the Westfall Act, Pub. L. No. 100-694, 102 Stat. 4563 (codified as amended in relevant part at 28 U.S.C. § 2679), because those claims were based on his alleged negligent or wrongful acts or omissions as former Deputy National Security Advisor and thus fell within the provisions of the Westfall Act. *See* ECF No. 103, United States' Notice of Sub., at 1-2. The United States subsequently moved to dismiss those claims. *See* ECF No. 104, United States' Mot. to Dismiss Counts I though III of Plaintiffs' Amended Complaint.

This Court granted the United States' substitution with respect to "claims against Abrams arising out of his eight years at the White House," but denied that substitution as to other allegations against him. *See Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 82-83 (D.D.C. 2017). The Court then dismissed all Plaintiffs' claims because they raised non-justiciable political questions. *Id.* at 79 ("It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli–Palestinian conflict, which has raged on the world stage with devastation on both sides for decades." (quoting *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 111–12 (D.D.C. 2005))); *id.* at 81. Alternatively, the Court dismissed the claims against the United States because of jurisdictional bars the Federal Tort Claims Act (FTCA) presented. *Id.* at 83-86.

Plaintiffs appealed this Court's ruling on the political question issue. ECF No. 122, Notice of Appeal. On appeal, the D.C. Circuit affirmed that the political question doctrine barred

Plaintiffs' claims to the extent they asked the court to determine who had sovereignty over East Jerusalem, the West Bank, and the Gaza Strip. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 11 (D.C. Cir. 2019).[2] The court did not decide whether allegations that Israeli officials committed war crimes presented a political question because, as the court noted, Plaintiffs waived any claim based on the alleged actions of such officials. *See id.* at 9 & n.5. Lastly, the court held that Plaintiffs' claims that Israeli *settlers* committed war crimes could potentially be extricated from the other political questions that Plaintiffs' amended complaint, on its face, presented. *Id.* at 13-14. The D.C. Circuit remanded to this Court for "further proceedings consistent with this opinion." *Id.* at 14. Pursuant to this Court's December 2016 Order, Mr. Abrams now moves under Rules 12(b)(1) and 12(b)(6) to dismiss the remaining claims against him.

## STANDARD OF REVIEW

When faced with a motion to dismiss under Rule 12(b)(1), the party invoking the jurisdiction of the court bears the burden of establishing the court's jurisdiction. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). Courts considering a motion to dismiss under that rule accept the well-pled factual allegations of the complaint as true and construe them in favor of the plaintiff. *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 13 (D.D.C. 2010). Those factual allegations, however, "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* at 13-14

---

[2] No party appealed the Court's ruling on the substitution of the United States, and Plaintiffs did not appeal the Court's dismissal of the claims against the United States based on the FTCA's jurisdictional bars. *See Al-Tamimi*, 916 F.3d at 6 n.3. Plaintiffs have therefore waived any challenge to the dismissal of the claims against the United States. *See* Fed. R. App. P. 28(a)(6); *see also Matter of Ondova Ltd. Co.*, 914 F.3d 990, 994 (5th Cir. 2019) ("It is a well worn principle that the failure to raise an issue on appeal constitutes waiver of that argument."). Thus, the United States is no longer a party in this suit. Although their parameters are not entirely clear, the only claims that remain as to Mr. Abrams arise from any alleged actions he took outside of his White House tenure.

(citation and quotation omitted). Accordingly, a court may consider material outside of the complaint in determining whether it has jurisdiction over the claims. *See Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

"To survive a motion to dismiss under Rule 12(b)(6), the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Young v. District of Columbia*, 107 F. Supp. 3d 69, 73 (D.D.C. 2015) (quoting *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014)). The plausibility requirement demands that a plaintiff plead factual content "that is more than 'merely consistent with a defendant's liability,'" but instead "'allows the court to draw the reasonable inference that the defendant is liable.'" *Young*, 107 F. Supp. 3d at 73-74 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). As the Supreme Court has made clear, in evaluating a complaint facing a motion to dismiss, the court ignores non-factual content, such as "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." 556 U.S. at 678. *Accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (rejecting the "no set of facts" standard). The court then assumes the truth of well-pled factual allegations only, *id.*, and determines whether those factual allegations lift the claim across the line of possibility to plausibility—in other words, are those factual allegations more likely explained by unlawful behavior than by lawful behavior. *See Iqbal*, 556 U.S. at 679-80. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Although the "plausibility standard is not akin to a 'probability requirement,'" *id.*, an inference of misconduct may be rendered implausible when the allegations of misconduct are more likely explained by lawful behavior than by unlawful behavior. *See id.* at 679-80; *see also Twombly*, 550 U.S. at 567.

## ARGUMENT

**I.     Plaintiffs' Claims for Alleged War Crimes and Genocide Fail.**

This Court should dismiss Plaintiffs' war crimes and genocide and related aiding-and-abetting claims, Counts II and III, because, given their allegations, the statutes Plaintiffs invoke do not provide remedies for their claims in the context pled.

### a.   The ATS does not provide jurisdiction for Plaintiffs' claims because they do not touch and concern the United States with sufficient force.

The ATS, a statute originally intended to prevent diplomatic strife, does not provide jurisdiction for a claim here. Plaintiffs' war crimes and genocide claim, and their aiding-and-abetting claim, involve alleged events occurring abroad that do not "touch and concern" the territory of the United States "with sufficient force to displace the presumption against extraterritorial application" of the ATS. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013). Moreover, given the potential foreign policy implications of Plaintiffs' lawsuit, this Court should not allow their claims to proceed under the ATS.[3]

#### i.     Plaintiffs' ATS claims against Mr. Abrams do not rebut the presumption against extraterritoriality and must be dismissed.

In *Kiobel*, the Supreme Court held that the presumption against the extraterritorial application of federal statutes applies to the ATS. *Id.* The ATS—which itself is "strictly jurisdictional," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004)—therefore does not provide

---

[3] The United States raised a similar argument under Rule 12(b)(1) in its motion to dismiss after substituting itself for Mr. Abrams. *See* ECF No. 104, U.S. Mot. to Dismiss, at 19-24. *See also Kaplan v. Central Bank of the Islamic Rep. of Iran*, 896 F.3d 501, 516 (D.C. Cir. 2019) (indicating that question of extraterritorial application of ATS is a jurisdictional question). The Court did not rule on that basis for dismissal. *See Al-Tamimi*, 264 F. Supp. 3d at 83 n.10. Even as to claims against Mr. Abrams relating to alleged acts outside his tenure at the White House, however, the same basis for dismissal applies. If anything, the connection of these claims to the United States is even more remote when it does not involve Mr. Abrams's official conduct while in office.

jurisdiction for claims brought under that statute in which "all the relevant conduct" underlying the claims occurs outside of the United States. *Kiobel*, 133 S. Ct. at 1669. The *Kiobel* Court added that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.*

Since *Kiobel*, several circuit courts have struggled with developing a legal framework to determine precisely when claims "touch and concern" United States territory "with sufficient force to displace the presumption." *See, e.g.*, *Doe v. Drummond Co., Inc.*, 782 F.3d 576, 586-93 (11th Cir. 2015) (surveying approaches of other circuits and adopting its own framework); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 181-94 (2d Cir. 2014) (adopting framework based on the Supreme Court's decision in *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)); *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 528 (4th Cir. 2014) (adopting a framework based on a fact-based inquiry).[4] The debate in that regard, however, is irrelevant here. Under any of the legal frameworks circuit courts have offered, Plaintiffs' claims against Mr. Abrams for any activities while he was not a federal official do not "touch and concern" the territory of the United States with "sufficient force."

At the outset, the vast majority of Plaintiffs' allegations against Mr. Abrams are either conclusory (and thus, for pleading purposes, not entitled to the presumption of truth under *Iqbal*) or are immaterial to their claim for purported war crimes and genocide. *See, e.g.*, Am. Compl. 19 (conclusory allegation that Abrams "encouraged . . . wholesale violence"); 27 (conclusory allegation that Abrams "encouraged and justified" settlement expansions and ethnic cleansing); ¶ 1 (conclusory allegation that Abrams "formulated" his plan to conspire while in the United

---

[4] The D.C. Circuit has not weighed in on the appropriate legal framework to apply. *See Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 94-97 (D.D.C. 2014) (basing analysis on opinions of the Second, Fourth, and Eleventh Circuits).

States); ¶ 17 (allegation that Abrams has been a featured speaker at AIPAC conferences, which has no bearing on claim); ¶ 41 (conclusory claim that Abrams has been an unofficial paid spokesman of settlements); ¶ 86 (conclusory allegation that Abrams "encouraged" illegal land seizures by Israeli settlers); ¶ 116 (conclusory allegation that Abrams travels to Israel "three or four times a year" to "review settlement expansion progress, and meet with government officials"); ¶ 186 (conclusory allegation that Abrams "encouraged" war crimes). Such conclusory or irrelevant allegations are devoid of factual enhancement and cannot displace the presumption against extraterritorial application of the ATS. *See Mastafa*, 770 F.3d at 190 ("[O]ur jurisdictional analysis need not take into account allegations that, on their face, do not satisfy basic pleading requirements."). And now that any claims against Mr. Abrams regarding his time as a federal official are no longer part of this litigation, any connection to the United States is even more remote.

Moreover, the gravamen of Plaintiffs' complaint is that Palestinians suffered various injuries abroad at the hands of Israeli citizens acting abroad purportedly "encouraged" by speeches, testimony, and newspaper articles of Mr. Abrams. *See, e.g.*, Am. Compl. 19, 27, 30-31. On its face, such allegations do not displace the presumption against extraterritorial application. The locus of the torts Plaintiffs allege was clearly abroad. At bottom, their genocide and war crimes claim alleges that foreign citizens acting abroad harmed other foreign (and some United States) citizens abroad.[5] Under basic tort principles, those alleged torts occurred abroad and their focus—in terms of both the location of the alleged tortfeasors and of the injuries, and the jurisdiction with the more substantial interest in the resolution of this litigation—is abroad. *Cf.*

---

[5] Because the ATS is limited to claims "by an alien," to the extent any of the Plaintiffs are United States citizens, they cannot bring claims under the ATS.

*Sosa*, 542 U.S. at 711 (holding that for purposes of 28 U.S.C. § 2680(k), a tort "aris[es]" where the injury occurs); *Drummond Co.*, 782 F.3d at 598 (holding that allegations regarding decision-making, funding, and policy choices occurring in the United States insufficient to displace presumption where agreement, planning, and execution of purported crimes occurred abroad); *Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (noting that in tort cases, D.C. courts apply "the law of the jurisdiction with the more substantial interest in the resolution of the issue," which considers "the place where the injury occurred," and "the place where the conduct causing the injury occurred," among other factors). As the locus of the alleged torts—including the purported injuries and the commission of tortious acts—occurred abroad, acceptance of Plaintiffs' theory of liability risks rendering the Supreme Court's holding in *Kiobel* academic, at least at the pleadings stage.[6] In short, both the limited factual allegations Plaintiffs make against Mr. Abrams and the overarching context of the injuries pled fall well short of the "force" necessary to rebut the presumption against extraterritoriality.[7]

Indeed, another court considering an ATS claim with similar speech-based roots dismissed the claim, finding that the presumption against extraterritoriality was not sufficiently

---

[6] In this respect, Plaintiffs' "aiding and abetting" claim, *see* Am. Compl. at p. 180, is legally indistinguishable from their war crimes claim. The same analysis applies to both claims. Indeed, *Kiobel* involved a claim for aiding and abetting war crimes. *See Kiobel*, 133 S. Ct. at 1663.

[7] In some non-ATS contexts, the solicitation of funds for unlawful foreign activities might support an application of U.S. law that is not explicitly extraterritorial. Compared to private plaintiffs, the U.S. Government traditionally exercises self-restraint and considers foreign governmental sensibilities before acting. *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 171 (2004) (citation omitted). Accordingly, Congress may be presumed to require a less substantial domestic nexus in a statute enforced by the government—which can weigh the impact on foreign relations in deciding whether to prosecute an action—than for a statute enforced through private civil actions. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2110 (2016). Thus, in the context of the ATS, attenuated, vague, and conclusory allegations involving fundraising efforts—like the ones involving Mr. Abrams—do not constitute a sufficient domestic nexus to displace the presumption of extraterritoriality.

rebutted. In *Sexual Minorities Uganda v. Lively*, 254 F. Supp. 3d 262 (D. Mass. 2017), plaintiffs alleged that the defendant, a United States citizen, aided and abetted Ugandan officials in committing crimes against humanity by conducting a campaign against LGBTI individuals in Uganda through speeches, articles, attending a seminar in Uganda, and assisting Ugandan officials in both drafting and advocating for legislation discriminating against such individuals. *See id.* at 265-66. The defendant's contacts with the United States that related to the claim included travelling from the United States to Uganda on three occasions, sending his writings and other advocacy materials to Uganda, and communicating by email with Ugandan officials regarding the draft legislation. *Id.* Faced with these facts, the court concluded that the "clear import of *Kiobel* is that the level of contact presented in this case is not enough." *Id.* at 269. It simply did not "rise to the level of 'force' sufficient to displace the presumption against extraterritorial application." *Id.* at 270.

A similar analysis applies here. The limited factual allegations against Mr. Abrams that involve domestic conduct, such as writing articles and testifying before Congress, simply "do not rise to the level of 'force'" required to rebut the presumption against extraterritoriality. In fact, the few factual allegations regarding the former Deputy National Security Advisor are considerably less significant than those found wanting in *Sexual Minorities Uganda*.

In sum, regardless of the precise legal framework that applies to determining when claims under the ATS "touch and concern" the United States with sufficient force to rebut the presumption against extraterritoriality, Plaintiffs' claims against Mr. Abrams certainly do not. The only relevant allegations regarding his conduct either occurred abroad or are insufficient to displace the presumption against extraterritoriality. Accordingly, Plaintiffs' claim against Mr.

Abrams for genocide and war crimes and the related aiding-and-abetting claim should be dismissed.[8]

      **ii.**    **Even without claims directly against Israeli officials, Plaintiffs' ATS claims raise foreign policy implications, further cautioning against extending the ATS's extraterritorial reach.**

Buttressing the above showing with respect to the conduct challenged, the injuries alleged, and the purported actions of Mr. Abrams are the foreign policy concerns Plaintiffs' claims raise. The ATS is a statute that provides jurisdiction for only a limited universe of claims in limited circumstances, and under which courts should exercise caution before recognizing any claim. Congress enacted the ATS in 1789 "to avoid foreign entanglements" by providing jurisdiction in a federal forum for claims based on violations of international law "where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018). Several years before Congress passed the ATS, two incidents occurred on United States territory involving alleged violations of international law perpetrated against foreigners, for which the nascent United States provided no national forum to consider. *See id.* (discussing an assault in 1784 by a "French adventurer" against a French official in Philadelphia and a later arrest by a New York constable of a servant on the premises of the Dutch Ambassador's residence). "The Framers addressed these matters" by extending the federal judicial power to "all cases affecting ambassadors, other ministers and consuls," as well as disputes between "a state, or the citizens

---

[8] Plaintiffs also refer to "crimes against humanity." Am. Compl. at 145. Because the precise contours of what conduct constitutes "crimes against humanity" is unsettled, the ATS does not provide jurisdiction for claims based on any additional conduct Plaintiffs complain of that does not otherwise violate the accepted international norms relating to war crimes and genocide. *See Sosa*, 542 U.S. at 732. Moreover, regardless of the content of "crimes against humanity," the above explanation for why Plaintiffs' war crimes and genocide claim does not sufficiently touch and concern the United States applies equally to any claim for "crimes against humanity."

thereof, and foreign states, citizens, or subjects." *Id.* (quoting Article III). It is against this backdrop that Congress, in the Judiciary Act of 1789, included the ATS, which gives district courts "jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations . . . ." 28 U.S.C. § 1350.

Although the ATS remained largely dormant for nearly two centuries, in the 1980s, courts began to consider an increasing number of claims brought under that statute. *See Jesner*, 138 S. Ct. at 1397-98 (recounting history). Given the nature and scope of such litigation, the Court noted that "ATS litigation implicates serious separation-of-powers and foreign-relations concerns." *Id.* at 1398 (citing *Sosa*, 542 U.S. at 727-28). Accordingly, the Court explained, "ATS claims must be 'subject to vigilant doorkeeping.'" *Jesner*, 138 S. Ct. at 1398 (quoting *Sosa*, 542 U.S. at 729). As part of that "vigilant doorkeeping," the Supreme Court in *Sosa* developed a two-part test for determining whether a court should exercise jurisdiction over a common-law tort claim brought under the ATS. First, a plaintiff must demonstrate that the alleged violation is "of a norm that is specific, universal, and obligatory." *Jesner*, 138 S. Ct. at 1399 (quoting *Sosa*, 542 U.S. at 732).

Second, even assuming a violation meets those criteria, a court must determine whether allowing the case to proceed "is a proper exercise of judicial discretion," *Jesner*, 138 S. Ct. at 1399, or whether instead the litigation calls for "case-specific deference to the political branches." *Sosa*, 542 U.S. at 733 n.21. "In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.* This caution "guards against" courts "triggering . . . serious foreign policy consequences" in certain litigation. *Jesner*, 138 S. Ct. at 1407. Such an outcome would be the

12

opposite of Congress's intent in the ATS, which, as mentioned at the outset, was "to promote harmony in international relations." *Id.* at 1406.[9]

Here, Plaintiffs' claims would likely have that very outcome: they have unmistakable foreign policy implications and could trigger "serious foreign policy consequences." Those claims therefore are not the sort of claims for which Congress intended courts to provide remedy through the ATS. Plaintiffs contend that Mr. Abrams has "encouraged" Israeli settlers in committing genocide and war crimes. According to Plaintiffs' complaint, through his testimony and advocacy before, (during) and after government service, a prominent American figure has enabled and encouraged Israeli settlers to commit such acts against Palestinians in East Jerusalem, the West Bank, and the Gaza Strip. To consider whether such a person has been engaged in such acts, including through testifying before Congress and while acting as a policymaker shaping United States policy in the Middle East, would clearly have substantial ramifications in the realm of foreign affairs. Moreover, sensitive questions of what legal rights and remedies both Palestinians and Israeli settlers may or may not have abound in this litigation, whether or not the direct conduct of Israeli officials is challenged. If this Court were to permit those claims to proceed, they would undoubtedly have significant foreign policy ramifications, regardless of the ultimate outcome in this litigation. This alone counsels the "need for judicial

---

[9] The D.C. Circuit's discussion in *Al-Tamimi* regarding whether the foreign policy implications of the remaining claims warrant application of the political question doctrine does not govern this Court's analysis of whether to permit those claims to proceed under the ATS.  In fact, the standard of judicial discretion regarding whether to permit a claim to proceed under the ATS is in some ways the *inverse* of the standard in determining whether the political question doctrine bars a claim. Claims under the ATS are "subject to vigilant doorkeeping," *Jesner*, 138 S. Ct. at 1398, whereas "the political question doctrine is a limited and narrow exception to federal court jurisdiction." *Al-Tamimi*, 916 F.3d at 8 (citation omitted). The latter considers whether to *bar* jurisdiction that is presumed to exist, whereas the former considers whether to *exercise* jurisdiction in the first place against the backdrop of a statute designed to *avoid* foreign entanglements.

caution." *Kiobel*, 133 S. Ct. at 1664. *See Lively*, 254 F. Supp. 3d at 270 (after concluding that claims did not rebut presumption against extraterritoriality, noting that "the record reveals that in this case serious potential 'foreign policy concerns' exist—a problem explicitly identified in *Kiobel*" (citation omitted)); *see also Doe v. Exxon Mobil Corp.*, 391 F. Supp. 3d 76, 85-87 (D.D.C. 2019) (declining to exercise jurisdiction over claims where "executive branch has repeatedly explained that adjudication of plaintiffs' ATS claims" would "harm U.S. foreign policy interests," and noting that "the ATS's purpose was to avoid diplomatic tensions," whereas "these ATS claims . . . have provoked diplomatic strife").

Moreover, the Executive Branch has already made its views known regarding the foreign policy implications of this suit by seeking the dismissal of these claims under the political question doctrine. *See* ECF. No 104, United States' Mot. to Dismiss, at 12-19. Additionally, Plaintiffs, like the plaintiffs in *Doe*, sue several domestic corporations for their alleged support of purported human rights abuses abroad, in a highly tense area of the world.[10]

The potential foreign policy implications of this case are compounded by the Executive Branch's ongoing efforts to address the longstanding conflict between the Israelis and the Palestinians. *See, e.g.*, President Donald J. Trump's Vision for Peace, Prosperity, and a Brighter Future for Israel and the Palestinian People, Jan. 28, 2020, *available at* https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-vision-peace-prosperity-brighter-future-israel-palestinian-people/ (offering "the most serious, realistic, and detailed plan ever presented. . . . The United States hopes this Vision will lead to direct

---

[10] As explained in the previous footnote, the D.C. Circuit's ruling on the political question doctrine does not govern this Court's analysis of whether to exercise its discretion to permit Plaintiffs' remaining claims against Mr. Abrams to proceed under the ATS.

negotiations between Israel and the Palestinians. It will be up to Israeli and Palestinian leaders to take courageous and bold actions to end the political stalemate, resume negotiations on the basis of this Vision, and make lasting peace and economic prosperity a reality."); Secretary Michael R. Pompeo Remarks to the Press, Press Briefing Room, Washington, D.C., Nov. 18, 2019, *available at* https://www.state.gov/secretary-michael-r-pompeo-remarks-to-the-press/ ("Turning now to Israel, the Trump administration is reversing the Obama administration's approach towards Israeli settlements. . . . The establishment of Israeli civilian settlements in the West Bank is not per se inconsistent with international law."); Remarks on Signing a Proclamation on Recognizing Jerusalem as the Capital of the State of Israel and Relocating the United States Embassy to Israel to Jerusalem, 2017 Daily Comp. Pres. Doc. 1 (Dec. 6, 2017) (marking "the beginning of a new approach to conflict between Israel and the Palestinians" by recognizing Jerusalem "as the capital of Israel," while not taking a position on "any final status issues, including the specific boundaries of the Israeli sovereignty in Jerusalem, or the resolution of contested borders"). The potential for this case to cause "significant diplomatic strife" and to "harm U.S. foreign policy interests" is obvious. This Court should "defer to the political branches in cases like this, rather than triggering serious foreign policy consequences." *Doe*, 391 F. Supp. 3d at 87. This Court should dismiss Plaintiffs' ATS claims against Mr. Abrams.[11]

---

[11] As part of a separate but related analysis in *Doe*, the court looked to the TVPA for guidance, as that statute "is the only cause of action under the ATS that Congress, rather than the courts, created." *Id. See also Jesner*, 138 S. Ct. at 1403 ("The TVPA reflects Congress' considered judgment of the proper structure of a right of action under the ATS. Absent a compelling justification, courts should not deviate from that model.") (Kennedy, J.). As explained in the next section, the TVPA does not provide for relief against Mr. Abrams.

### b.    The Torture Victim Protection Act does not provide relief here.

Similar to the ATS, the TVPA does not provide relief for Plaintiffs' claims against Mr. Abrams. The TVPA does not provide a cause of action for Plaintiffs' claims because even if it were somehow possible to segregate the allegations against him to his time outside the government, at no point in time was Mr. Abrams acting under the authority of a foreign nation. *See Saleh v. Titan Corp.*, 580 F.3d 1, 13 n.9 (D.C. Cir. 2009) ("In the TVPA . . . Congress exempted American government officials and private U.S. persons from the statute."); *Jerez v. Republic of Cuba*, 777 F. Supp. 2d 6, 18 (D.D.C. 2011) (explaining that a cause of action under the TVPA is available only against an individual acting "under actual or apparent authority, or color of law, of any *foreign nation*" (emphasis added)). First, Plaintiff has abandoned the claims against Israeli soldiers or officials, so the only claims remaining arise from Mr. Abrams's purported support for the actions of Israeli *settlers*, not his alleged actions under "apparent authority" or "color of law" of a "foreign nation." Second, alleged interactions Mr. Abrams had with Israeli government officials occurred during Mr. Abrams's tenure at the White House, *see* ECF No. 72, Opp'n to Mot. to Disqualify, at 4-5, and therefore those claims have already been dismissed. *See Al-Tamimi*, 264 F. Supp. 3d at 82. And third, Plaintiffs have explicitly waived as a basis for liability any allegations related to the actions of the Israeli military. *See Al-Tamimi*, 916 F.3d at 9 n.5. Because Plaintiffs' claims against Mr. Abrams are not based on his purported actions under the authority of a foreign nation, the TVPA does not apply. Plaintiffs' claim based on that statute should be dismissed.

## II.    Under D.C. Law, Civil Conspiracy, Count I, Is Not an Independent Cause of Action.

Plaintiffs' civil conspiracy claim against Mr. Abrams fails because the underlying tort alleged does not provide relief. In the District of Columbia, civil conspiracy does not provide an

independent cause of action. "Civil conspiracy, of course, is not actionable in and of itself . . . ." *Hall v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002). Instead, it serves as a vehicle to provide vicarious liability for another underlying wrong, which itself must be actionable. *Id.* It follows that "one cannot be liable for a conspiracy that does not have as its object an *actionable* wrong." *Id.* (quotation and citation omitted).

Under this standard, Plaintiffs' civil conspiracy claim must be dismissed. The "object" of Plaintiffs' conspiracy claim—the purported effort to "expel all non-Jews" from East Jerusalem, the West Bank, and the Gaza Strip—is not actionable, and therefore provides no basis for liability under a civil conspiracy theory. That "object" is the same—in substance if not in form—as Plaintiffs' war crimes and genocide claim. Because, as explained in the previous section, Plaintiffs' war crimes and genocide claim fails, the same outcome applies to their civil conspiracy claim.

### III.        Plaintiffs Have Not Alleged Any Plausible Claims Against Mr. Abrams.

Beyond the threshold shortcomings of Plaintiffs' remaining claims against Mr. Abrams discussed above, Counts I through III also fail for one basic reason. Even assuming *arguendo* that the claims were actionable as pled—as explained above they are not—Plaintiffs' complaint still fails to *plausibly* allege actual factual material sufficient to state a claim against Mr. Abrams for war crimes, genocide, aiding and abetting, or "conspiracy." In addition to the patent implausibility of Plaintiffs' assertions, the vast majority of allegations against Mr. Abrams are merely conclusory or contain legal conclusions, all of which must be ignored under *Iqbal* and therefore cannot form the basis for Plaintiffs' claims.

At the outset, Plaintiffs' claims are simply implausible. It is unremarkable that Mr. Abrams, given his professional experience, has testified at congressional hearings, spoken at

lobbying group events, and published opinion pieces in mainstream news outlets regarding the

ongoing Israeli-Palestinian conflict. But it is not only remarkable, but flatly implausible to allege

that he has done so as part of and in furtherance of a vast, encompassing conspiracy with

approximately thirty other individuals, organizations, and corporations such as RE/MAX and

Hewlett-Packard to "terrorize and violently expel" Palestinians from East Jerusalem, the West

Bank, and the Gaza Strip. Am. Compl. ¶ 127.

This is particularly so where the underlying source material Plaintiffs repeatedly refer to

in their complaint makes no reference whatsoever to such a plan, and instead suggests the exact

opposite.[12] Indeed, according to the materials Plaintiffs cite, a "meeting" between Mr. Abrams

and former Prime Minister Sharon that Plaintiffs assert related to expanding settlements involved

Sharon informing Mr. Abrams that Israel would be *removing* all of its settlements from the Gaza

Strip, as well as other settlements from the West Bank. *See* ECF No. 104-1 at 4 (page 217 of

John J. Mearsheimer & Stephen M. Walt, *The Israel Lobby and U.S. Foreign Policy*); Am.

Compl. ¶ 125 (citing Mearsheimer & Walt, *supra*, at 217, for the allegation that Abrams met

with "Israeli Prime Minister aides" and "encourag[ed] them to keep announcing new settlements

and in the process continuing to expel the local Palestinian population"). And nowhere in Mr.

Abrams's congressional testimony or articles does he "advocate" violence against Palestinians or

the expansion of Israeli settlements. *See* ECF No. 104-2 at 7-12, 35, 48, 40-42, 47-51 (opening

statement and testimony of Abrams); ECF No. 104-3 at 12 (article by Abrams regarding Israeli

---

[12] Plaintiffs' rely on these materials as the basis for many of their allegations against Mr. Abrams. *See* Am. Compl. pp. 19-20 & nn.18-20. This Court can therefore consider relevant portions of the materials in a motion to dismiss under Rule 12(b)(6). *See McDonald v. Salazar*, 831 F. Supp. 2d 313, 318 (D.D.C. 2011) (documents whose authenticity is not disputed may be considered in a motion to dismiss when "they are referred to in the complaint and are integral to [a plaintiff's] claims" (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004))).

settlements); ECF No. 104-4 (additional article by Abrams regarding settlements). Instead, he proposes *removing* from the West Bank those Israeli settlements that lie beyond Israel's security barrier, a proposal that contradicts the very premise of Plaintiffs' claim. *See* ECF No. 104-3 at 12. To suggest that such actions and positions were in furtherance of some broad "conspiracy" and constituted war crimes and genocide is to forsake any reasonable interpretation of events. The more likely explanation of Mr. Abrams's conduct, without a doubt, is not as part of some vague conspiracy, but rather as the honest, forthright opinions of someone with many years of experience in Middle East policymaking as to how best to resolve that area's challenges.

Indeed, far from a war crime, genocide, aiding and abetting, or an unlawful "conspiracy," Mr. Abrams's acts, attendance at lobbying events, testimony to Congress, and news articles, are more plausibly explained as the normal, lawful, First Amendment-protected activities of a former federal official who has dedicated a substantial portion of his career to Middle Eastern affairs. *See Iqbal*, 556 U.S. at 679-80 ("When there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.").

Moreover, what little factual allegations against Mr. Abrams remain regarding time outside his federal employment fall well short of stating a claim for war crimes, genocide, or aiding and abetting. Those allegations state that Mr. Abrams has written articles in the mainstream press and has provided testimony to Congress. Such innocuous activities—all (as explained below) protected by the First Amendment—simply do not constitute war crimes, genocide, or aiding and abetting those acts. Plaintiffs' war crimes, genocide, and aiding-and-abetting claims against Mr. Abrams should be dismissed.

19

Similarly, Plaintiffs' conspiracy claim should be dismissed because they have failed to allege the existence of a civil conspiracy. To survive a motion to dismiss, a complaint alleging a civil conspiracy must plead facts plausibly demonstrating an agreement between two or more persons to commit an unlawful act, or a lawful act by unlawful means, and an overt act carried out by one of the parties to the agreement that causes injury, where the act was undertaken pursuant to the agreement. *See Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), and *Valore v. Islamic Rep. of Iran*, 478 F. Supp. 2d 101, 108-09 (D.D.C. 2007)).

The "principle element" of a civil conspiracy claim is "an agreement." *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997). Conclusory allegations of an agreement will not survive a motion to dismiss. *See Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (citing *Graves*, 961 F. Supp. at 321). Instead, a plaintiff must plead "the existence of any events, conversations, or documents indicating there was an agreement," including "the nature of the agreement," and "what particular acts were taken to form the conspiracy." *Bush*, 521 F. Supp. 2d at 68 (citing *McCreary v. Heath*, No. 04-cv-623, 2005 WL 3276257, *5 (D.D.C. Sept. 26, 2005)). *See also Acosta Orellana v. Croplife Intern.*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010) (dismissing civil conspiracy claim where complaint failed "to provide any indication of when or how such an agreement was brokered"). Moreover, a complaint's factual allegations "must plausibly suggest agreement, rather than being merely consistent with agreement." *A Society Without a Name v. Commonwealth of Va.*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Twombly*, 550 U.S. at 557). Lastly, claims alleging "a vast, encompassing conspiracy"—as the instant claim undoubtedly does—"must meet a high standard of plausibility." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009).

20

Plaintiffs' claim fails to meet this demanding standard. The vast majority of their allegations regarding an agreement are conclusory or insufficient. The few factual allegations they plead do not plausibly suggest that Mr. Abrams entered into the "vast, encompassing conspiracy" that Plaintiffs posit. For example, Plaintiffs' allegation that Mr. Abrams and others "conspired to encourage, raise, solicit, contribute, or transfer significant sums overseas to promote settlement expansion," Am. Compl. ¶ 127, is precisely the sort of conclusory allegation that courts routinely ignore, as are Plaintiffs' allegations that unidentified "settlement leaders" realized that they "needed the services of" Mr. Abrams. *Id.* ¶ 123. Similarly, Plaintiffs' general assertion that Mr. Abrams and others "have cooperated with each other, have served on similar boards and committees . . . have coordinated their fundraising activities, . . . have coordinated their lobbying efforts . . . and consulted each other almost on a daily basis . . . meet in Washington, D.C. . . . discussing among themselves and with settlements officials how to fund and continue the violent expulsion of all non-Jews" from East Jerusalem, the West Bank, and the Gaza Strip, *id.* ¶ 132, is conclusory and fails adequately to allege the formation of an agreement. These allegations say nothing about "the nature of the agreement" or "what particular acts were taken to form the conspiracy." *Bush*, 521 F. Supp. 2d at 68. Nor do they "provide any indication of when or how such an agreement was brokered." *Acosta Orellana*, 711 F. Supp. 2d at 113. In sum, Plaintiffs' claims fail because their allegations against Mr. Abrams are flatly implausible and because they have not pled sufficient factual material to state a claim against him for any of the three counts pled.

## IV.     The First Amendment Protects All of Mr. Abrams's Activities for Which Substitution Has Not Already Been Granted.

Lastly, Plaintiffs' claims should be dismissed because they target Mr. Abrams's constitutionally protected exercise of his First Amendment rights, including his right to petition

21

his government. With respect to Plaintiffs' allegations regarding Mr. Abrams's testimony to Congress and articles in news publications, *see, e.g.*, Am. Compl. 20, ¶¶ 24, 125, 123, such testimony to Congress and authorship of opinion pieces regarding prominent issues and policies in international affairs (with respect to which he was a former United States policymaker) are core First Amendment-protected activities that did not constitute a war crime, genocide, or a civil conspiracy. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (in reversing jury verdict for tort claim based on protests, noting that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection" (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983))); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933 (1982) (emotional speech supporting civil rights boycott and threatening "discipline" to boycott violators protected by First Amendment and could not form basis for tort claim). As the Ninth Circuit explained, "speech made through the normal channels of group communication, and concerning matters of public policy, is given the maximum level of protection by the Free Speech Clause because it lies at the core of the First Amendment." *Planned Parenthood v. Am. Coalition of Life*, 224 F.3d 1007, 1019 (9th Cir. 2001). The crux of the lawsuit as to Mr. Abrams, that he could be held liable in damages for offering views garnered from years of experience working to resolve the Israeli-Palestinian conflict, would turn tort principles in United States courts on their head, leading to countless lawsuits by individuals on one side or another of this historic issue of public concern.

Furthermore, to the extent Plaintiffs' claims are based on Mr. Abrams's alleged "lobbying" of Congress, *see, e.g.*, Am. Compl. ¶¶ 16, 133, and his testimony before that branch of government, their claims are barred by the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine protects the rights of individuals and organizations to petition the United States

government through normal channels by immunizing them from statutory liability for engaging in such activities. *See Calif. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) ("We conclude it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view . . . ."); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1023 (D.C. Cir. 2009) ("[T]he *Noerr-Pennington* doctrine [is] a doctrine, rooted in the Petition Clause of the First Amendment, that protects 'an attempt to persuade the legislature or the executive to take a particular action with respect to a law . . . .'" (quoting *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961))). That doctrine forecloses claims under the ATS or TVPA based on protected petitioning activity. *Cf., e.g., Int'l Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("Although the *Noerr-Pennington* doctrine originated in antitrust, its rationale is equally applicable to RICO suits."); *Marina Point Dev. Ass'n v. United States*, 364 F. Supp. 2d 1144, 1146 (C.D. Cal. 2005) ("Because Steers engaged in protected First Amendment petitioning activities, she is immune from civil RICO liability under the *Noerr-Pennington* doctrine.").

To the extent Plaintiffs' theory of liability vis-à-vis his congressional testimony is based on common law, the D.C. Circuit has left open the question of whether the *Noerr-Pennington* doctrine applies, *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1137 n.8 (D.C. Cir. 2015). That does not change the fact that the content of his testimony remains core protected speech, and this Court should apply the *Noerr-Pennington* doctrine to Plaintiffs' claims because the First Amendment principles that undergird the doctrine apply equally to common-law torts as they do to statutory causes of action. *Cf. Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995)

("As *Noerr–Pennington* rests on the conclusion that the filing of claims in court or before administrative agencies is part of the protected right to petition, it is hard to see any reason why, as an abstract matter, the common law torts of malicious prosecution and abuse of process might not in some of their applications be found to violate the First Amendment."). Because Plaintiffs' genocide, war crimes, aiding-and-abetting, and conspiracy claims target Mr. Abrams's protected speech, including alleged speeches, newspaper articles, and petitioning of Congress, they are barred and may not be maintained consonant with the First Amendment.

## **CONCLUSION**

The statutes Plaintiffs invoke do not provide jurisdiction here, and civil conspiracy is not independently actionable. Moreover, Plaintiffs' claims are implausible. Finally, the only conduct alleged on the part of Mr. Abrams involves core First Amendment-protected speech. This Court should dismiss all claims against Mr. Abrams, with prejudice.

Dated:  July 2, 2020                              Respectfully submitted,

                                                 JOSEPH H. HUNT
                                                 Assistant Attorney General
                                                 Civil Division

                                                 C. SALVATORE D'ALESSIO, Jr.
                                                 Acting Director, Torts Branch

                                                 MARY HAMPTON MASON
                                                 Senior Trial Counsel

                                                  _/s/  *Paul E. Werner*_____
                                                 PAUL E. WERNER
                                                 (Md. Bar, under LCvR 83.2(e))
                                                 Senior Trial Attorney
                                                 United States Department of Justice
                                                 Torts Branch, Civil Division
                                                 P.O. Box 7146
                                                 Washington, D.C.  20044
                                                 (202) 616-4152 (phone)
                                                 (202) 616-4314 (fax)
                                                 E-mail: Paul.Werner@usdoj.gov

                                                 Attorneys for Defendant Elliott Abrams