# Appendix A

## TABLE OF CONTENTS

Page

I. FURTHER GROUNDS FOR DISMISSAL FOR DEFENDANT HEWLETT PACKARD ENTERPRISE CO. ....1

A. Plaintiffs' Allegations Do Not Support Standing To Sue HPE. ....1

B. Plaintiffs' Claims Against HPE Are Impermissibly Extraterritorial. ....3

C. Plaintiffs Fail To Plead Complicity In International Law Violations By HPE. ....4

D. Plaintiffs' Claims Concerning The Basel System, If Not Deemed Waived, Present A Nonjusticiable Political Question. ....5

II. LIMITED EXTENT OF CLAIMS SPECIFICALLY AGAINST NORMAN BRAMAN IN THE COMPLAINT. ....7

## I. FURTHER GROUNDS FOR DISMISSAL FOR DEFENDANT HEWLETT PACKARD ENTERPRISE CO.

Defendant Hewlett Packard Enterprise Co. ("HPE") views respect for human rights as a core value that is embedded in the way it does business. HPE further supports all efforts to reach a peaceful, just, and durable resolution to the complex conflict in the Middle East – a conflict as to which HPE takes no position. Plaintiffs' assertion that HPE is responsible for violations of international law in the course of that conflict is deeply flawed. The Complaint's allegations against HPE are generally confusing, conclusory, and unsupported, but even accepting the allegations at face value,[1] the Complaint must be dismissed for the reasons presented above and the further reasons discussed here.

### A. Plaintiffs' Allegations Do Not Support Standing To Sue HPE.

Even if Plaintiffs have pled injuries-in-fact that are fairly traceable to someone, *but see* Omnibus Mem. in Supp. of Mot. to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ("12(b)(1) and 12(b)(6) Omnibus Mem."), Section III.B, they certainly are not fairly traceable to HPE.

First, Plaintiffs allege that HPE's "subsidiary" contracted with the Israeli Ministry of Defense as "the prime contractor of the Basel System," which they describe as "an automated biometric access control system" used "in checkpoints throughout the OPT." AC ¶ 70.[2] That

---

[1] Plaintiffs' sparse allegations concerning HPE repeatedly cite a website called "Who Profits." *See, e.g.*, AC ¶¶ 69-71 & nn.157, 160. The specific page they cite has been taken down, but an archived version from the time of the filing of the Amended Complaint is available here: https://web.archive.org/web/20160826193113/http://www.whoprofits.org/company/hewlett-packard-hp (hereinafter "Who Profits – Hewlett-Packard"). Notably, the central allegation against HPE that survives Plaintiffs' waivers on appeal – that HPE sold surveillance devices to settlements – is not even supported by the advocacy materials on which Plaintiffs purport to base their Complaint.

[2] The Complaint describes HPE's subsidiary as the "prime contractor." The website that the Complaint incorporates by reference identifies the counterparty as "the Israeli ministry of

claim has been waived. *See* 12(b)(1) and 12(b)(6) Omnibus Mem., Section I. It is also based on the alleged conduct of a subsidiary that Plaintiffs have voluntarily dismissed, and as a general matter "a parent corporation is not liable for the acts of its subsidiaries." *Doe v. Bank of Am. Corp.*, 273 F. Supp. 3d 203, 209 (D.D.C. 2017) (cleaned up) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). In any event, no Plaintiff alleges any personal injury that he or she claims is attributable to the Basel System, so there is no basis for standing on those claims.

Second, the Complaint alleges that HPE "provid[ed] services and technology to the IDF" (without identifying what those "services and technology" were). AC ¶ 168. In Exhibit C, most of the Plaintiffs who list HPE as a so-called "eventuating perpetrator[]" allege that they were injured by the Israeli military. *See, e.g.*, AC, Ex. C at 5 (claiming "series of Israeli bombardments by IAF [Israel Air Force] bombardments" that relied on "HP/Motorola tracking devices"). These claims are waived as well, *see* 12(b)(1) and 12(b)(6) Omnibus Mem., Section I, so they cannot support standing.

Third, the sole claim that is left against HPE is that it "provided essential information and computer technology," including "surveillance devices," to "settlements in the OPT." AC ¶ 69. Without any coherent explanation, Plaintiffs speculate that this technology enabled Israeli settlers "to maliciously wound any and all Palestinian farmers trying to access their olive groves," including by engaging in "live target practice." *Id.* ¶¶ 69, 71. In a few difficult-to-follow entries in their "Initial Damages Database," Plaintiffs refer to "HP/Motorola security devices and system" protecting settlers' property, and assert that settlers in possession of such

---

defense." Who Profits – Hewlett-Packard; *see also Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (documents "incorporated by reference in the complaint" may be considered on a motion to dismiss).

technology "us[e] Palestinian farmers as live targets." *E.g.*, AC, Ex. C at 13-14.[3] But no individual Plaintiff appears to allege that he or she is the victim of such an attack. For example, Plaintiff Deik alleges such targeting in general, but claims only property loss. *See id.* (claiming family property was "illegally confiscated" and seeking $2 million in damages "based on current RE/MAX property values").

Indeed, Exhibit C's confusing references to "HP/Motorola" technology is inconsistent with the Complaint itself. The Complaint alleges that HPE "[p]rovided services and technologies to two of the largest OPT settlements in the West Bank: Modi'in Illit and Ariel." AC ¶ 168. But in Exhibit C, no Plaintiff accusing "HP/Motorola" of a role in his or her injuries claims to have been attacked anywhere near those two settlements. *See, e.g.*, AC at 2, AC, Ex. C. at 16 (claim of Hashim Yousef, purporting to proceed "in his official capacity" as president of an organization, alleging the targeting of farmers in the area of the settlement Karnei Shomron). Since no Plaintiff has plausibly pled injury traceable to HPE, Plaintiffs lack standing to sue HPE.

**B. <u>Plaintiffs' Claims Against HPE Are Impermissibly Extraterritorial.</u>**

To the extent Plaintiffs allege anything about the location of HPE's alleged actions, they allege that they occurred entirely outside the United States:

- Plaintiffs claim that settlers ordered "tracking devices" from "*Israel-based* HP/Motorola dealers." AC ¶ 131 (emphasis added).
- Plaintiffs allege that HPE had an "extensive and profitable operation *in the OPT*," *id.* ¶ 72, and "host[ed] and entertain[ed] U.S. donors and tax-exempt entity officials *who visit[ed] Israel* to . . . see the results of their financial contributions," *id.* ¶ 138 (emphasis added).
- Plaintiffs highlight HPE "subsidiary officials *doing business in Israel*" as the ones who "especially" had knowledge of how the settlers would use their technology. *Id.* ¶ 70

[3] Such references to "HP/Motorola" are impermissible group pleading. *See* 12(b)(1) and 12(b)(6) Omnibus Mem. at 12-13.

(emphasis added); *see also id.* at 27; *id.* ¶ 149 (claiming that "HP/Motorola . . . knew exactly what was going on" because they "visited the settlements on a regular basis").

- Plaintiffs allege that HPE "servic[ed] [surveillance] equipment and provid[ed] employees to teach armed settlers how to use that equipment," which necessarily would have taken place at the settlements. *Id.* ¶ 69; *see also id.* ¶ 129 ("providing the settlements with skilled staff").

By contrast, the only purported U.S. nexus Plaintiffs allege is that HPE engaged in "lobbying activities in support of its international business ventures, including those in the OPT." *Id.* ¶ 69. That generic allegation plainly does not constitute "substantial and specific U.S.-based conduct relevant to the ATS claims," such as "U.S.-based decision making" related to international law violations. *Doe v. Exxon Mobil Corp.*, 2015 WL 5042118, at *8 (D.D.C. July 6, 2015). As explained above, that is the bare minimum under any view of *Kiobel*, and Plaintiffs cannot meet that standard.

**C. Plaintiffs Fail To Plead Complicity In International Law Violations By HPE.**

Notably, Plaintiffs do not plead Count III (aiding and abetting war crimes) against HPE; the only ATS claim pled against HPE is for directly perpetrating war crimes, crimes against humanity, and genocide. AC at 145, 180. But Plaintiffs admit that "HP officials, employees and agents did not actually" harm anyone; rather, according to Plaintiffs, they sold "surveillance devices" that "protected the vandals and criminals who committed such activity." AC ¶ 71. At best, this is an indirect, not a direct, claim that HPE committed genocide, crimes against humanity, or genocide—yet a direct claim is the only one asserted.

Even if the Complaint had asserted an aiding-and-abetting claim against HPE, it would fail. Plaintiffs allege that HPE sold devices that were used to "protect . . . settlements." AC ¶ 69; *see id.* ¶ 129 (alleging that the "reason" for surveillance systems was so "disgruntled Palestinians would not be able to threaten settlers"); *id.* (surveillance devices allegedly convinced homebuyers that "the settlements they were looking at were safe and secure"). Courts

have rejected ATS claims where the defendant supplied a product that "can be used for many crime-control purposes . . . without permitting torture or other human rights abuses." *Doe v. Cisco Sys., Inc.*, 66 F. Supp. 3d 1239, 1248 (N.D. Cal. 2014).

Despite recognizing that security systems are defensive in nature, the Complaint asserts that settlers bought this technology to facilitate "live target practice" against Palestinian civilians. *Id.* ¶ 71. Plaintiffs do not explain how a security system has any bearing on the ability of individual settlers to target and shoot their neighbors. Nor do Plaintiffs offer any well-pled factual allegations to support their conclusory assertion that HPE "knew" of this practice. AC ¶ 69. It is implausible to infer that by merely "visiting the settlements" and allegedly learning that settlers "coveted their Palestinian neighbors' property," AC ¶¶ 149, 190, HPE officials should have expected security systems to be used to commit murder. *See Mastafa*, 770 F.3d at 194 (rejecting allegations of *mens rea* in "conclusory terms" that "fail[] to establish even a baseline degree of plausibility"). Moreover, Plaintiffs allege that knowledge was "especially" present for HPE's "subsidiary officials doing business in Israel," AC ¶ 70, but that distinct corporate entity is no longer in the case. The allegations against HPE do not, and cannot, support an ATS claim.

### D. Plaintiffs' Claims Concerning The Basel System, If Not Deemed Waived, Present A Nonjusticiable Political Question.

The D.C. Circuit recognized that Plaintiffs avoided dismissal under the political question doctrine only by affirmatively waiving any claims related to the conduct of the Israeli military. In so holding, the Court of Appeals noted that it owed "deference" to the U.S. Government's view that "given the level of political and military support provided Israel by the American government, a judicial finding that the Israeli armed forces had committed the alleged offenses would implicitly condemn American foreign policy by suggesting that the government's support of Israel is wrongful." *Al-Tamimi*, 916 F.3d at 13. Accordingly, to the extent Plaintiffs attempt

to continue asserting claims against HPE that depend upon a judicial finding that would condemn U.S. foreign policy toward Israel, they are barred by the political question doctrine.

Most of Plaintiffs' claims against HPE allege dealings with the Israeli military and so do just that. In fact, Plaintiffs' allegations concerning the Basel System do more than just condemn the United States' provision of military support to Israel. According to the source on which Plaintiffs base their Complaint and incorporate by reference, the Basel System was "financed by the US government."[4] A judicial finding that this system violates international law would inescapably condemn U.S. Government support for it. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 977-78, 983 (9th Cir. 2007) (claim that supplying bulldozers to the Israeli military presented political question because it was "financed by the executive branch").

---

[4] Who Profits – Hewlett Packard.

## II. LIMITED EXTENT OF CLAIMS SPECIFICALLY AGAINST NORMAN BRAMAN IN THE COMPLAINT.

Throughout the 200 pages of the Complaint,[5] Plaintiffs specifically name Mr. Braman only four times. Other than the introductory remarks about Mr. Braman and conclusory statements of alleged activities (AC at 12 at n. 5, 26 at n. 37, 31, 32), Plaintiffs refer to Mr. Braman's alleged conduct in three other excerpts and only named him as a defendant in Counts II and III (AC ¶ 34):

- "**Defendant Norman Braman** … has openly advocated for the FIDF and settlement expansion and the attendant malicious property destruction, wholesale violence, and ethnic cleansing. He and his various friendly 501(c)(3)s have transferred at least $10 million to Defendants FIDF, AFA, CFOIC, and other U.S. tax-exempt entities which have, for at least 20 years, laundered funds in support of the aforementioned criminal activities." (AC ¶ 34 (emphasis added)).

- "Because of the tax-exempt financial assistance and the settlers stealing more private Palestinian property, Ariel went from six tents and two outhouses to 25,000 permanent settlers today with first-class housing developments, a major university complex, a concert hall, and a state-of-the-art medical facility (funded by **Defendants Adelson and Braman**.)"; "**Norman Braman** is a big Ariel supporter, i.e. he gave $311,000 to Ariel from 2004-2008 and hosted a "Peace with Security" fundraiser dinner in Fort Lauderdale, Florida in 2007. (…) Ariel's mayor visited the U.S. specifically to commend donors including Mr. Braman." (AC ¶ 122 & n. 253 (emphasis added)).

- "… The tax-exempt entities and other pro-settlement organizations like ZOA held numerous fundraising events all over America: (a) extolling the virtues of brave settlers and their annexation of private property; (b) encouraging the further expulsion of all non-Jews from the OPT; and (c) honoring settlement advocates like Defendant Abrams and donors like Defendants Hagee, Adelson, **Braman**, Saban, and Gilbert for their significant financial contributions ($500 million) to expand the settlements and subsidize Israeli army activities in the OPT ($104 million in 2014)." (AC ¶ 132 (emphasis added)).

[5] Excluding references to Mr. Braman on Exhibit C, which, as described in the Omnibus Brief, purports to describe Plaintiffs' individual injuries, but does not contain any non-conclusory allegations against the Donor Defendants. *See* 12(b)(1) and 12(b)(6) Omnibus Mem., Background Section III.A.

As explained in the Omnibus Brief, Mr. Braman is defined as a "Donor Defendant" in the Complaint. 12(b)(1) and 12(b)(6) Omnibus Mem., Background, Section III.A; AC at 12 n. 5. And as the Brief further notes, all allegations against the Donor Defendants—including the allegations quoted above—are entirely conclusory, without any specificity as to a particular donation or its transmission to an identifiable recipient "that caused any alleged injury to any Plaintiff." Omnibus Brief, *id*.

Aside from the vague allegations listed in the excerpts above, Plaintiffs' claims against Mr. Braman within Counts II and III are limited to conclusory smears and unfounded allegations of financial support and advocacy activities which allegedly rise to the level of "war crimes" against the Palestinians.

Under Count II, the Omnibus Brief demonstrates that Plaintiffs have failed to state a claim for Primary Violations of International Law against the Donor Defendants. What is more, even in the sections of the Complaint where Plaintiffs unsuccessfully attempt to establish a chain of causation between the activities of certain Donor Defendants and the commission of violations of international law—alleging advocacy for the expansion of settlements (AC ¶¶ 28, 33) and "encouragement" to the expulsion of non-Jews from the OPT (*id*. ¶ 105)—Mr. Braman is not named.[6]

As to Count III (aiding and abetting the commission of war crimes), the Complaint attempts to establish secondary liability for the same violations of Count II. As the Omnibus Brief details, such allegations cannot survive the Complaint's failure to establish this Court's

[6] According to the Complaint, allegations that certain Donor Defendants advocated for the expansion of settlements are attributed to Adelson and "the conspirators named on Count I" (AC ¶¶ 28, 33) while Moskowitz, Adelson, and Hagee are accused of "publicly encouraging" the expulsion of non-Jews from the OPT (*id*. ¶ 105).

jurisdiction over the underlying ATS claims. Notably, Plaintiffs have failed to established the necessary *actus reus* requirement for aiding and abetting liability under international law. In the case of Mr. Braman, vague allegations that he has purportedly made "significant financial contributions" to the expansion of settlements in the OPT (AC ¶132) or that his alleged support to Ariel (AC ¶122) indirectly causes international law violations is not enough to meet the *actus reus* requirement. As the Omnibus Brief explains, aiding and abetting claims cannot survive on their own—as Plaintiffs have failed to establish this Court's jurisdiction over the underlying ATS claims, allegations under Count III necessarily fail as well. 12(b)(1) and 12(b)(6) Omnibus Mem., Section III.D.

For all the enumerated reasons in the Omnibus Brief,[7] and specifically in light of the limited extent of the conclusory allegations against Mr. Braman as a "Donor Defendant" in the Complaint, Mr. Braman joins the other Defendants and moves to dismiss the Complaint in its entirety, with prejudice, pursuant to the Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

---

[7] Mr. Braman fully joins the motion to dismiss. As a Donor Defendant only named in Counts II and III, Mr. Braman specifically joins all arguments raised in the sections of the Omnibus Brief as applied to him, namely: I; II.A; II.C; II.D; II.E; III.A; III.B; IV.B, IV.C; IV.D; and VI.