IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BASSEM AL-TAMIMI, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:16-cv-00445 (TSC) |
| v. | ) ) ) | |
| SHELDON ADELSON, et al., | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT ELLIOTT ABRAMS' MOTION TO DISMISS**

COME NOW the Plaintiffs herein and hereby oppose the motion to dismiss filed by the Defendant Elliott Abrams. The motion should be denied as explained herein.[1] Some arguments don't warrant analysis in light of the District of Columbia Circuit Court Opinion in *Al-Tamimi v. Adelson* 916 F.3d 1 (D.C. Cir. 2019), e.g. Defendants' arguments concerning "foreign policy" concerns. It also appears in some instances that Defendants' counsel simply skimmed the Amended Complaint (hereinafter "AC") which resulted in Defendant's claim that the AC is replete with conclusions. They obviously overlooked the specific allegations contained in the AC supporting these conclusions.

---

[1] The Court should know initially that with respect to service of process issues raised, Plaintiffs' counsel sought a dialogue with the appropriate Defendants to narrow our differences, but coordination counsel Lars Liebler rejected that suggestion.

Many of the arguments raised in Defendant Abram's Motion to Dismiss were made in his brief filed in the D.C. Circuit Court of Appeals in 2018—and they were summarily rejected by that Court. He has once again alleged an ill-defined "foreign policy" concern which is a reiteration of the "act of state" doctrine argument. This is no doubt prompted by the fact that Defendant Abrams is once again represented by the U.S. Department of Justice whose attorneys have an obvious conflict of interest if this case would go forward. Instead of representing Defendant Abrams, they should be prosecuting him Sheldon Adelson and other Defendants for violating 501(c)(3) regulations, the U.S. money laundering statute, (18 U.S.C. § 1956), numerous income tax regulations, and for defrauding the U.S. government (*Id.* § 371). They should be treated just like President Trump's former campaign manager, Stephen Bannon, and the numerous movie stars who have been indicted for using phony charities for illicit purposes and taking fraudulent tax deductions. The movie stars were concerned about their childrens' admissions to elite colleges. (see indictments in Mass. Bannon, indicted in SDNY, was simply abusing the US tax code.)

### I.      Plaintiffs allege viable Claims for War Crimes, including Genocide

Defendant Abrams fails to recognize that ethnic cleansing and pillage are standard war crimes. They have been accepted by numerous federal courts as the basis to invoke ATS jurisdiction. Thus, contrary to Defendant Abrams' conclusion, the Plaintiffs have made viable claims for war crimes.

Without citing any authority, Defendant Abrams (page 19) states that a party opposing a Motion To Dismiss must allege a minimum number of material allegations. *Query*: if Genocide and ethnic cleansing are alleged, is there a need to add kidnapping, torture, rape and pillage? *Query*: has Abrams conceded the presence of material genuine facts in the AC by raising tis argument?

**II.     Contrary to Defendant Abrams arguments he has engaged in significant activities on US soil which "Touch and Concern" United States in significant ways.**

Defendant Abrams' argument that the AC is devoid of allegations necessary to satisfy the "touch and concern" test required to attain jurisdiction under the Alien Tort Statute (ATS) should be rejected for good cause shown.

Defendant Abrams cites *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010), which states that it is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 255 (2010) (internal quotation marks omitted) (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991)).

Defendant Abrams also cites *Kiobel*, quoting The Supreme Court stating that the ATS must be interpreted in light of the usual "presumption that United States law governs domestically but does not rule the world." *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 115 (2013) (internal quotation marks and citation omitted). This Court does not have to conclude that "America rules the world" to allow this case to go forward.

Defendant Abrams argues that the Court made clear in *Kiobel* that a Defendant's "mere corporate presence" in the United States is not enough to overcome the presumption against extraterritoriality. *Id.* at 125. And that a federal court has jurisdiction under the ATS only for claims that "touch and concern the territory of the United States . . . with sufficient force to displace the presumption

against extraterritorial application." *Id.* at 124-25 (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 264-72 (2010)).

Defendant Abrams has conveniently misstated the Court's rationale on the concept of extraterritoriality. The AC is replete with facts and details of his actions inside the United States, that go far beyond the "mere corporate presence" cited and discussed in *Kiobel*. For example, soliciting funds on U.S. soil to be sent overseas to promote violence [18 USC 1956], or setting up phony 501(c)3s as a result of fraudulent IRS filings [18 USC 371], or securing financial commitments at AIPAC functions to grow new settlement activities all constitute criminal activity which can be the subject of a criminal indictment. That activity also fits into the definition of "international terrorism." See 19 USC 2331, (see Boston and SDNY criminal indictments previously cited herein)

Plaintiffs' position is also buttressed by the language of the D.C. District Court in *United States v. Ali*, 885 F. Supp. 2d 17, 23-24 (D.D.C. 2012) which stated that the presumption against extraterritoriality does not apply to federal statutes establishing aiding and abetting and conspiratorial liability where the statute setting forth the underlying substantive offense applies outside U.S. borders. *See United States v. Yakou*, 428 F.3d 241, 252, 368 U.S. App. D.C. 162 (D.C. Cir. 2005)." The Justice Departments indicts foreign-based money launderers and individual who fund international terrorism overseas every day.

More importantly, in *Sosa* [2] the Court endorsed federal Courts' authority to hear ATS claims based on alleged violations of international law norms that are "'specific,

---

[2] *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)

Page **4** of **19**

universal, and obligatory.'" *Sosa*, 542 U.S. at 732, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (quoting *Hilao v. Marcos* (*In re Estate of Marcos*), 25 F.3d 1467, 1475 (9th Cir. 1994)). As Judge Sheindlin[3] observed in the *Apartheid* case, the war crime of apartheid and lesser offenses involved are "specific, universal, and obligatory." They include extrajudicial killing, the crimes that come under Law of Nations, genocide, ethnic cleaning wanton destruction of property, and dehumanization of a civilian population--the very crimes contemplated in *Marcos* and *Ali*.

        Plaintiffs' argument that there are more than are substantial U. S. connections pled herein is also supported by the holding in *Doe v. Exxon Mobil Corp.*, where the Court's decision was based on a finding in *Doe* of "substantial connections" between the United States and the unlawful criminal conduct occurring in Iraq. The war crimes of torture [genocide and ethnic cleansing here] was committed [financed by U.S. citizens here] employed by a U.S. corporation, a 501(c)(3), [for example Friends of Ariel]. In *Doe*, the torture was committed pursuant to a contract with a U.S. government agency at a U.S. military facility, and the CACI employees were required to obtain security clearances from the U.S. Department of Defense. *Id.* at 528-29. [Here charities have to be designated by the IRS as non-profits]. *Furthermore, the case involved domestic conduct, a point not addressed by the Justice Department*—Defendant's "managers located in the United States were aware of reports of misconduct abroad, attempted to 'cover up' the misconduct, and 'implicitly, if not expressly, encouraged' it." *Id.* at 529. *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 95 (D.D.C. 2014)

    Defendant Abrams, just like those Defendants in *Doe*, was located in the United States at all relevant times and was well aware of reports of misconduct abroad, courtesy of

---

[3] *Ntsebeza v. Daimler AG* (*In re S. African Apartheid Litig.*), 617 F. Supp. 2d 228 (S.D.N.Y. 2009)

numerous Haaretz articles, his numerous visits to the OPT, conferences with PM Netanyahu, *Amnesty International Reports and four separate Israeli government* reports citing that settlers "implicitly, if not expressly, encouraged [misconduct]." *Id.* at 529. *Id.* at 95. See admission made 50 years ago by Defense Minister Mofaz "these people [the settlers] are stealing private property." Defendant Abrams: encouraged violence in the OPT; by continuing to urge settlement official to: a) steal more Palestinian property, b) to convince US donors to fund that criminal conduct, and c) convince settlers to destroy olive groves, poison water wells and livestock, see Witness in Palestine and numerous Haaretz articles and UN reports. [4]

Abrams—and his many co-defendants--have conspired for at least 30 years with U.S. tax-exempt entity officials to forcibly remove Palestinians from the OPT by expanding Israeli settlements and engaging in arms trafficking, wholesale violence and ethnic cleansing. The Adelson family and individual Defendants have been funding arms trafficking, ethnic cleansing, wanton destruction of property and settlement expansion for at least 40 years. Just last year Mrs. Adelson and her colleagues funded the Friends of the Israeli Army with $104 million in charitable donations, in violation of 18 U.S.C. § 960 which prohibits Americans from funding a foreign militia unit. The Adelson family's favorite settlement is Ariel which has received approximately $50 million from the Adelson family in the last 40 years, despite the that fact that settlement officials have conceded that all of Ariel was built on stolen Palestinian property.

Examples of specific acts of Defendant Abrams are detailed in the AC:

Co-Conspirator Defendant Elliott Abrams, for the last 25 years, has

---

[4] U.N. General Assembly, Human Rights Council, Report of the Special Rapporteur on the situation of human rights defenders, Michel Forst, Thirty-fifth session; 26 February-23 March 2018.

encouraged and been aware of the wholesale violence that the donors and tax-exempt entities have funded,[5] while lying to Congress that settlement expansion is a myth [perjury]. In fulfilling his role as the settlements' paid self-appointed U.S. spokesperson, he has received substantial book royalties, speaking fees, paid trips to Israel and Europe, and lucrative consulting fee contracts, all engaged in to promote the settlement enterprise. He has advocated and justified continued settlement growth, which necessarily meant the theft of more private Palestinian property and extra-judicial killings. 700,000 "Jewish-only" settlers now live in the OPT. Where did all their homes come from? The UN OPT master Palestine property list has registered all of these properties.

Abrams has engaged in numerous overt acts (meetings, email exchanges, and telephone calls and faxes with donors, Israeli Prime Minister Netanyahu, his staff members like Dov Weissglas, Yoram Turbowitz, and Shalom Turgeman, and tax-exempt entity officials[6], including some in this jurisdiction (he is a featured speaker at AIPAC events and attends Israeli embassy events, has given false Congressional testimony for at least 20 years citing Palestinian conduct rather than settler violence, and has entertained Israeli Prime Ministers during visits to Washington, DC), all activities engaged in to achieve the primary goal of the conspiracy, i.e., quietly expel all non-Jews from the OPT. He has: (a) met with or spoken to aides to former Prime Ministers Sharon (e.g., Dov Weissglas), Barak, and Olmert in New York, Washington, D.C., Europe (recent Rome meetings with Sharon), and Israel; and (b) consistently condemned Palestinian violence, arguing disingenuously that the settlements have not really expanded, nor do they frustrate U.S.

---

[5] The Israel Lobby and U.S. Foreign Policy, John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 167. *See also* Elliot Abrams, Faith or Fear: How Jews Can Survive in a Christian America (New York: Simon & Schuster, 1997), 181.
[6] 18 U.S.C. § 960. Pages 217, 218, 223, 224, 228.

foreign policy objectives.[7] His goal in engaging in all of these activities is to convince the American people and Congress that Palestinian farmers armed with pitchforks are the root cause of violence in the Middle East, a complete fabrication. He has largely convinced the House of Representatives leadership that this is the case. He convinced Tom Delay to call for removal of all Palestinian inhabitants living in the OPT. (See <u>Israel Lobby</u>.)[8]

### III.     The D.C. Circuit in this case addressed and dismissed all "foreign policy" concerns raised in the lawsuit

The DC Circuit in its Opinion in this very case set aside any concerns about the impact of this case on the conduct of U.S. Foreign Policy.

The DC Circuit, in its February 2019 opinion stated:

"A legal determination that Israeli settlers commit genocide in the disputed territory would not decide the ownership of the disputed territory and thus would not directly contradict any foreign policy choice. In light of the statutory grounds of plaintiffs' claims coupled with Zivotofsky I's muteness regarding Baker's four prudential factors, we believe that whether Israeli settlers are committing genocide is not a jurisdiction-stripping political question." *Al-Tamimi v. Adelson*, 439 U.S. App. D.C. 357, 370, 916 F.3d 1, 14 (D.C. Cir. 2019)

The Court went on to discuss the extricability of the political question inherent in the case.

---

[7] The Israel Lobby and U.S. Foreign Policy, John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 167. *See also* Elliot Abrams, Faith or Fear: How Jews Can Survive in a Christian America (New York: Simon & Schuster, 1997), 181.

[8] *See* Oct. 22, 2015 congressional hearing, "Words Have Consequences: Palestinian Authority Incitement to Violence," http://foreignaffairs.house.gov/hearing/hearing-words-haveconsequences-Palestinian-authority-incitement-violence, and resulting resolution, https://www.congress.gov/bill/114th-congress/house-resolution/293.

"We believe this political question is extricable. From what we can tell, the Court could rule in the plaintiffs' favor on all counts without addressing who has sovereignty over the disputed territory. *Indeed, the court could rule in the Plaintiffs' favor on at least Counts I, II and III, without touching the sovereignty question*, if it concluded that Israeli settlers are committing genocide. Although the Court might have to make a sovereignty determination in order to resolve some of the property-based allegations in Count IV, that might not be true for every allegation…" *Id.* (emphasis added)

### IV.     The Torture Victim Protection Act claim should not be dismissed at this early procedural stage

Defendants argue that the TVPA cannot be used for claims of aiding and abetting torture and extrajudicial killing.

However, the law is not clear on that proposition. The cases the Defendants cite are from different circuits[9], and buried in their argument is the real substance of their argument: "…this Court should not extend the principle in this case, where Plaintiffs have alleged no facts that even plausibly connect the Abrams' conduct to any alleged injury." Since Defendant is part of the 501)c)(3) charity network funding ethnic cleansing, genocide, wanton destruction of property, Abrams is certainly linked to injuries alleged herein.

Plaintiffs ask this Court to look to the language of TVPA as discussed by the D.C. Circuit Court. The TVPA "explicitly creates a cause of action for claims of **torture** and

---

[9] *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010); the *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*, 889 F. Supp. 2d 912, 924–25 (S.D. Tex. 2012); and the *Mastafa v. Chevron Corp.*, 759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010)

extrajudicial killing. *See* 28 U.S.C. § 1350 note 28 U.S.C. § 2(a). Plaintiffs are entitled to bring separate TVPA claims based on the same underlying events as any claims simultaneously brought under the ATS; the TVPA provides an independent action for claims of extrajudicial killing and **torture**. *See Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008) (permitting plaintiffs to seek relief for claims of extrajudicial killing under both statutes); See also *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 at 1250—51 (finding that the TVPA provides a separate but not exclusive remedy for claims of **torture**). As such, even when claims brought under the ATS are unsuccessful, Plaintiffs' TVPA claims may potentially proceed on their own merit. *Doe v. Drummond Co.*, 782 F.3d 576, 601 (11th Cir. 2015).

Furthermore, the *Doe* Court said: "we hold now that the TVPA applies extraterritorially," *Doe* at 601. "The text of the TVPA itself indicates that actions may arise from conduct occurring outside the United States. The **Act** provides for the liability of any individual who **acts** "under actual or apparent authority, or color of law, *of any foreign nation…*" *Doe*, 782 F.3d at 601

The Plaintiffs herein have suffered tremendous losses as a result of the actions of these Defendants. They have suffered torture and extrajudicial killing (See AC paragraph 32[10], where the "revenge killing" of members of Plaintiff Dawabsheh's family is recounted in detail.

---

[10] …[T]he revenge killing of the Dawabsheh family. The husband, wife, and 18-month infant were incinerated. Young settlers coming from the Beit-El settlement, founded by Ambassador Friedman and others, crept up on the house at 2AM and placed fire accelerants in the cellar to burn down the building. They were able to do so because U.S. donors bought them very expensive night vision goggles. They were taught how to do this by IDF specialists…"

Based upon the circumstances that have been detailed herein, this Court should allow the Plaintiffs in this case to seek appropriate relief under the TVPA until sometime when a complete record is available at the summary judgment stage..

### V.     Plaintiff have properly pled Civil Conspiracy in Count I

Defendant Abrams argues that under D.C. Law, civil conspiracy, Count I, is not an independent cause of action. Plaintiffs never suggested that it was. Rather, Plaintiffs have shown that Defendant Abrams has been engaged in a civil conspiracy to commit several torts—primarily war crimes.

In making his ridiculous assertion, Defendant Abrams cites the holding in *Hall v. Clinton*, (*infra*). Noting, correctly, that under Hall, in the District of Columbia, civil conspiracy does not provide an independent cause of action. "Civil conspiracy, of course, is not actionable in and of itself . . . ." *Hall v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002). "Instead, it serves as a vehicle to provide vicarious liability for another underlying wrong, which itself must be actionable." *Id.* . "It follows that "one cannot be liable for a conspiracy that does not have as its object an actionable wrong." *Id.* . Query: Is conduct like genocide not a crime? How about ethnic leasing or pillage ?

The Court stated*:* *"*Halberstam (*Halberstam v. Welch*, 227 U.S. App. D.C. 167, 705 F.2d 472 (D.C. Cir. 1983)), …holds that the two essential elements of civil conspiracy are (1) "an agreement to take part in an unlawful action or a lawful action in an unlawful manner"; *and* (2) "an overt *tortious* act in furtherance of the agreement that causes injury." Id. at 479, 705 F.2d 472 (emphasis added). The hornbook definition of a "tort" is "[a] civil wrong *for which a remedy may be obtained*." BLACK'S LAW DICTIONARY

1496 (7th ed. 1999) *Hall v. Clinton*, 350 U.S. App. D.C. 422, 285 F.3d 74, 82-83 (D.C. Cir. 2002)"

Applying that holding to the case at bar, the Plaintiffs have certainly pled "unlawful action" (extrajudicial killings) and "an overt tortious act in furtherance of the agreement that causes injury." At least six overt acts have been pled herein, including a $2 billion financing scheme operating onus soil to fud nth settlement enterprise. Those acts are the very gravamen of this case: the establishment of an apartheid regime in the OPT, genocide, pillaging, ethnic cleansing, wanton destruction of the Palestinians in the OPT—all of which are tortious in nature. War crimes are at the top of egregious criminal conduct. That is why U.S. State Department has its own genocide manual.

Thus, Defendant Abrams' argument fails completely.

### VI. Plaintiffs Have Definitely Alleged Numerous Plausible Claims Against Defendant Abrams

Defendant Abrams argues that the AC doesn't meet the test of *Iqbal*[11] which states: "As the Court held in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the pleading standard embodied in FRCP Rule 8 announces **does not require "detailed factual allegations**," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) Emphasis added. As this court can readily appreciate, this is not a simple "he injured me" case.

---

[11] *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)

The AC is replete with allegations, frequently supported by credible news reports like the NY Times, Israeli government investigations, books, U.N. reports and resolutions, all of which detail the extent to which Defendant Abrams was engaged in specific acts in furtherance of the policy to rid the OPT of all non-Jews--genocide and ethnic cleansing.

Plaintiffs would encourage the Court to ask Defendant Abrams whether he disputes the fact that he spoke with, and counseled, a foreign minister's[12] senior executives about the need for settlement expansion, even though at that time the Israeli government had banned settlement expansion. Does Defendant Abrams dispute the fact that at the 30 or 40 AIPAC conventions he has attended he has tried to match up donors with new settlements? (see AC page 20, paragraphs 18, 25, 27.) Does Defendant Abrams deny that he was responsible for making sure that there were ads placed on buses in Washington, DC depicting Palestinians as "savages?" Also, does Defendant Abrams dispute the fact that he has made contributions to different settlements in the OPT, including Ambassador David Friedman settlement Bet El, and to the Friends of the Israeli Army? See *Boim*[13] All of these actions buttress the allegations that Defendant Abrams has been actively engaged in supporting, intimidating, funding, encouraging and enabling the expansion of settlements in the OPT by forcing out all non-Jews. In terms of intimidation, settlers leave livestock carcasses on a Palestinian's front lawn as a their "calling cards" and as specific message to Palestinians to exit the OPT.

## VII.     The First Amendment Does NOT Protect Defendant Abrams's Activities

---

[12] Israeli Prime Minister Benjamin Netanyahu
[13] *Boim v. Holy Land Found. for Relief & Dev., 54*9 F.3d 685 (7th Cir. 2008)

Defendant Abrams argues that all claims against him should be dismissed because his actions are Constitutionally protected free speech. Nothing could be further from the truth.

As this Court knows there are limits on what constitutes protected speech. There are few limits, but the Supreme Court has drawn a clear line between speech that is protected and that speech which is definitely not protected.

One of the elements that delineates the distinction between "protected speech" and unprotected speech is the effect of the speech. If its benign speech, it is protected. But if it is speech that incites violence it is not.

"Exceptions to the **First Amendment's** protection of **expression** exist in the case of a **small number** of "**well-defined** and **narrowly limited classes** of **speech**…" *United States v. Stevens*, 559 U.S. 460, 468-69, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) (quoting *Chaplinsky v. N.H.*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)).

"Two of these **classes** are relevant here -- "**true threats**," *See Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), and "**speech integral** to **criminal conduct**," see *United States v. Alvarez*, 567 U.S. 709, 717, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012) (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S. Ct. 684, 93 L. Ed. 834 (1949).

The Court continued: "**True threats'** **encompass** those statements where the **speaker** means to **communicate** a **serious expression** of an **intent to commit** an act of **unlawful violence** to a **particular individual** or **group** of individuals." *Black*, 538 U.S. at 359. **Speech** "**integral** to **criminal conduct**" is **precisely** what it **sounds like**, and it is not protected on First Amendment grounds "merely because the conduct was **in part initiated**, **evidenced**, or **carried out** by means of language, either **spoken**, written,

or **printed**." *Giboney v. Empire Storage & Ice Co., 33*6 U.S. 490, 502 (1949), *United States v. Ackell*, 907 F.3d 67, 76 (1st Cir. 2018) (emphasis in original)

In this case, Defendant Abrams mimicked the actions—and slogans—of the organizers of the Unite the Right Rally in Charlottesville, Virginia in 2017. There, the Charlottesville organizers, and other financiers of violence, formed a conspiracy to commit violence and promote racial unrest (*see Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018). While the goal of the conspiracy detailed herein is different, i.e. *inter alia*, force 400,000 Palestinian homeowners out of the OPT, the activity engaged in by the instigators of violence was based on racial hatred as well. Different ethnic groups, of course, were targeted, but that is irrelevant. Defendants herein intentionally and repeatedly encouraged, enabled, financed and supported the settlement expansion and funded racial violence and ethnic cleansing.

And, like the Charlottesville promoters of violence, Defendant Abrams knew that his mission-- promotion and encouragement and fulfillment of that mission to rid the OPT of all Palestinians--would necessarily promote violence in the OPT, i.e. only Palestinian private property as available for taking. There was no property owned by Jews in the OPT..

Plaintiffs agree with the legal analysis that holds that you cannot ban speech that is an expression of ideas that *merely offend*s. For example, Defendants hired advertising agencies to buy Washington, DC bus advertisements proclaiming Palestinians to be "savages." They were expressing their feelings and wanted the DC population to understand that. While that conduct, in and of itself, was offensive, it does necessarily incite racial violence.

However, as the record makes clear Defendant Abrams did much more than simply express his feelings about hating Palestinians and forcibly removing them from the OPT.

Page **15** of **19**

For example:

- Defendant Abrams has written numerous articles, which have been published in this judicial district justifying settlement growth and the ongoing seizure of private Palestinian property. He also disseminated the disingenuous message that settlement expansion is a myth created by pro-Palestine UN officials.[14] During the last 20 years Defendant Abrams has made a number of Congressional appearances, and often lies to committee members [perjury] who issue Congressional resolutions: (a) condemning Palestinian violence; and (b) cutting off vital humanitarian aid to the Palestinians. Cutting off that financial aid, especially aid for Palestinian Authority security forces, simply increases the possibility of more wholesale violence. Cutting financial aid also results in the closure of hospitals and emergency clinics telltale signs that genocide campaign is underway. Defendant Abrams knows the tragic consequences of inciting and encouraging violence against members of the Muslim faith, based on the plan devised by White House senior adviser Steven Miller. The Trump administration plan is to deport all non-Americans by accusing them of promoting international terrorism. That is the definition of "international terrorism" (See 18 U.S.C. 2331) and such activity is not only barred by legislative mandate, it is also barred by Executive Orders of Presidents Clinton and Bush. Defendant Abrams views deportation as one more tool in his anti-Muslim toolbox.

---

[14] *See, e.g.*, "The Settlement Obsession: Both Israel and the United States Miss the Obstacles to Peace" Elliott Abrams, August 2011; and "Everything You Know about Israeli Settlements Is Wrong" Elliott Abrams, Uri Sadot, September 5, 2014.

- Defendant Abrams also knows how the Embassy in Jerusalem will treat Palestinian Visa holders. He intends that the immigration records of these Muslim individuals be scrutinized because visa holders can be deported simply because of a missed comma or middle name. That is the Trump/Abrams/Miller game plan to turn the USA into a non-Muslim all White enclave. He knows that his efforts at racial profiling will be brought to the immediate attention of sympathetic officials at Homeland Security, i.e. phony terrorist charges, quick snatch and arrest, and 10 years in jail. Loss of citizenship after waiting 20 years is certainly an injury. Even Defendant Abrams would probably concede that.
- Defendant Abrams has aided and abetted the dehumanization of, and loss of a home in the OPT of the Palestinian population, which is a war crime in itself. The 1946 Nuremburg Principles which have now been codified in the United Nations Charter were adopted to prosecute those individuals like Defendant Abrams who did not themselves pull the proverbial trigger, manufacture the cyanide gas or herd refugees into gas chambers. [See Judge Shira A. Scheindlin's discussion in *Apartheid* case]. However, those individuals encouraged and promoted the Nazi agenda, just as Defendant Abrams has encouraged and promoted the ethnic cleansing and genocide of the Palestinians in the OPT. He has repeatedly violated the US State Department Manual on Genocide, the U.N. Charter, as well as the Law of Nations Clause in the U.S. Constitution, which the court can take judicial notice of under Fed. R. Evid. 201.

Defendant Abrams should not be able to use the First Amendment as a shield to absolve him of liability for his efforts to promote racial violence here in America and foment it abroad. He has engaged in reckless dangerous conduct, money laundering and inflammatory speech designed to promote hatred: (a) among US citizens based upon religion and skin color and (b) between the Palestinian farmers and Jewish-only settlers.

## CONCLUSION

This Court should deny Defendant Abrams' Motion to Dismiss.

Respectfully submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon

Martin F. McMahon & Associates

1717 K Street NW -Suite 900

Washington, DC 20006

202-862-4343

# CERTIFICATE OF SERVICE

This is to certify that I have on October 16, 2020 served all the parties in this case with this **Memorandum in Opposition to Defendant Abrams' Motion to Dismiss** in accordance with the notice of electronic filing ("ECF"), which was generated as a result of electronic filing in this court.

/s/ *Martin F. McMahon*

_____
Martin F. McMahon, Esq.